# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JOHNATHAN L. BURKS,

        Plaintiff,

vs.                      Case No. 2:19-cv-10027

                         Hon. Gershwin A. Drain

BENNY NAPOLEAN, ET AL.,    Magistrate Judge Anthony Patti

        Defendants.

_____/


The Expert Deposition of CHIEF JAMES DAVIS,

Taken at 4747 Woodward Avenue,

Detroit, Michigan,

Commencing at 9:12 a.m.,

Friday, September 24, 2021,

Before Laura T. Ambro, CSR-5882.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JOHNATHAN L. BURKS,

      Plaintiff,

vs.              Case No. 2:19-cv-10027

              Hon. Gershwin A. Drain

BENNY NAPOLEAN, ET AL.,     Magistrate Judge Anthony Patti

      Defendants.

_____/


The Expert Deposition of CHIEF JAMES DAVIS,

Taken at 4747 Woodward Avenue,

Detroit, Michigan,

Commencing at 9:12 a.m.,

Friday, September 24, 2021,

Before Laura T. Ambro, CSR-5882.

Chief James Davis
September 24, 2021

Page 2

1   APPEARANCES:
2
3   SARAH S. PRESCOTT
4   Porter & Porter, PLLC
5   105 East Main Street
6   Northville, Michigan 48167
7   248.679.8711
8   prescott@spplaw.com
9       Appearing on behalf of the Plaintiff.
10
11  PAUL T. O'NEILL
12  Assistant Corporation Counsel
13  500 Griswold
14  30th Floor
15  Detroit, Michigan 48226
16  313.967.6402
17  poneill@waynecounty.com
18      Appearing on behalf of the Defendants.
19
20
21
22
23
24
25

Page 3

1           TABLE OF CONTENTS
2
3   WITNESS                              PAGE
4   CAPTAIN REID CHAKRABARTY
5
6   EXAMINATION
7   BY MS. PRESCOTT: ..................................   4
8
9               EXHIBITS
10
11  EXHIBIT                              PAGE
12  Exhibits attached to transcript.
13
14  DEPOSITION EXHIBIT 1 ............................     8
15  DEPOSITION EXHIBIT 2 ............................    15
16  DEPOSITION EXHIBIT 3 ............................    36
17  DEPOSITION EXHIBIT 4 ............................   114
18  DEPOSITION EXHIBIT 5 ............................   116
19  DEPOSITION EXHIBIT 6 ............................   120
20
21
22
23
24
25

Page 4

1   Detroit, Michigan
2   Friday, September 24, 2021
3   9:12 a.m.
4
5           CHIEF JAMES DAVIS,
6   was thereupon called as a witness herein, and after
7   having first been duly sworn to testify to the truth,
8   the whole truth and nothing but the truth, was examined
9   and testified as follows:
10          EXAMINATION
11  BY MS. PRESCOTT:
12  Q.  Hello, Mr. Davis.  It's nice to meet you in person.
13      And thank you for your time here today.  So, just as
14      before, we are in person.  So, it's maybe a little
15      easier, I hope.  I'm going to ask you questions.
16      You're going to tell me what you know.  Whatever your
17      answers are.  We have to try not to talk over each
18      other because Laura has to do her best to get exactly
19      what the words are.  And when two people are speaking,
20      it makes it harder than the regular job.  It's really
21      important that we also communicate clearly.  So, there
22      might be times where you nod or you shrug your
23      shoulders.  I might know what you mean, but I might ask
24      you to just say a yes or no for the record.  And that's
25      why I do that.  So, again, the record is really clear.

Page 5

1   It's also really important, in that vein of
2   communicating, that you let me know if you don't
3   understand anything.  If you're not sure what I'm
4   asking, please let me know.  Or if you need me to
5   clarify or define a term, okay?
6   A.  Yes.
7   Q.  All right.  So, you are here today in what capacities
8       for the sheriff's office, as you understand it?
9   A.  As I understand it, I believe I'm here in the capacity
10      of PREA director.
11  Q.  And one of the things that we sent to counsel is a
12      request for you to bring along documents that relate to
13      your return to the county.  So, I would ask you just
14      some background questions.  As I understand it, you had
15      a career with the sheriff's office and it ended with a
16      retirement in 2014; is that right?
17  A.  Yes.
18  Q.  Okay.  And then was the next thing that you did for the
19      county a consulting position in the form of James Davis
20      Consulting, LLC?
21  A.  No.
22  Q.  Okay.  So, what was between those two, between your
23      retirement and when you entered a consultancy under the
24      LLC?
25  A.  I came back in a part-time capacity, I believe, some

Chief James Davis
September 24, 2021

Page 6

1   time in 2015.

2   Q.  Okay.  And did you have a title or a particular role

3       that was assigned in that part-time capacity?

4   A.  The reason for my return, as indicated by the sheriff's

5       office, was to assist in police discipline and internal

6       affairs investigations.

7   Q.  And what was your understanding about why there would

8       be somebody that would be doing that part time as

9       opposed to the regular staffing being able to cover

10      those areas fully?

11  A.  My understanding was I was brought in to augment the

12      existing deputy chief over discipline and internal

13      affairs and work in her stead while she attended the

14      FBI academy.

15  Q.  Did you, in fact – was that, in fact, what you

16      did?  In other words, did you, in fact, assist with

17      police discipline and IA during that part-time

18      consultancy?

19  A.  Yes.

20  Q.  Were there other duties or responsibilities during that

21      part-time period before you formed the LLC and entered

22      an agreement with the LLC?

23  A.  Yes.  Because of my experience in the agency, I also

24      assisted with policy.  I assisted in litigation.  I

25      assisted in labor arbitration and general duties.

Page 7

1   Q.  Okay.  And are there any other areas of assistance that

2       you worked in that you can recall right now during this

3       part-time period?

4   A.  No.

5   Q.  And are there particular areas of policy that you

6       worked in during that part-time period?

7   A.  I generally assisted the current, the undersheriff of

8       that time frame and helped him with whatever policies

9       he was working on, which I didn't know would be many

10      different types.

11  Q.  Who was the undersheriff at the time?

12  A.  Daniel Phannas.

13  Q.  P-h-a-n-n-a-s?

14  A.  Yes.

15  Q.  And do you know how long you filled this part-time role

16      in which you were assisting in these ways you've just

17      described?

18  A.  As you may know, the county of Wayne allows retired

19      workers to work in a part-time capacity up to 1,000

20      hours.  I would have reached the hour maximum, I can't

21      recall if it's the end of '15 or the beginning of '16.

22      And then I returned in the full-time capacity.

23  Q.  Okay.  And did you create an LLC in which to do that

24      and enter under a contract?

25  A.  Yes.

Page 8

1   Q.  And did you bring the contract here with you today?

2   A.  What you have today is what could be supplied by the

3       administration director from her records.

4   Q.  Okay.

5   A.  And she sent those I think just yesterday or the day

6       before.

7   Q.  Okay.  So, why don't we mark this first packet.  I

8       don't want to write on it, since it's the only one.

9       But it consists of resolution 2017-590.  Modifications,

10      number 2 between the county of Wayne and James Davis

11      Consulting, LLC, which looks like a two-page document.

12      And appendix B to that document.  Modifications number

13      3 between the county of Wayne and James Davis

14      Consulting, LLC.  And that was executed, it looks like,

15      3/6/18.  There might be two copies of that.  But I'll

16      hand them to the witness.  So, there's apparently two

17      copies of the modifications number 3.  But we'll ask

18      the witness if they're different.

19          So, that's the resolution of one page;

20      modifications 2, two pages; the appendix is one page;

21      modifications number 3 is two pages; and there might be

22      a duplicate of two pages.  So, we're going to mark this

23      as Exhibit 1.

24          MARKED FOR IDENTIFICATION:

25          DEPOSITION EXHIBIT 1

Page 9

1       9:20 a.m.

2   BY MS. PRESCOTT:

3   Q.  My question is is Exhibit 1 the item that you were

4       referring to that had been supplied by administration

5       in the last day or so relative to your agreements with

6       the county?

7   A.  Yes.

8   Q.  And what it looks like is you first entered into an

9       agreement with the county under the format of the LLC

10      in November of 2015.  It says the parties entered into

11      a contract for the term of November 1st, 2015 through

12      September 30th, 2016.  Have I read that correctly on

13      the first page?  So, that's the first page of

14      modifications number 2.  Do you think that November

15      1st, 2015 was the time when you became full time?

16  A.  Yes.

17  Q.  Okay.  And is it the case that you do not have the

18      original copy that we're seeing a modifications number

19      2 of?

20  A.  I believe that the county has it.  And the supervisor

21      is out due to Covid until the beginning of October.

22      And I think at that point we could find the complete

23      contract.

24  Q.  Okay.  You don't have a copy of the original?

25  A.  I may.  I would have to – I would need more time to

Chief James Davis
September 24, 2021

Page 10

1    look for a copy.
2    Q.  Okay.  And so, was the county increasing your pay in
3       these different modifications?
4    A.  My recollection is not an increase.  It's each year
5       we're building on the previous year.  The compensation
6       did not increase.
7    Q.  Are you working under the same original contract, just
8       with labor modifications, all the way up to now?
9    A.  No.
10   Q.  Is there a time that you ended the contracts reflected
11      in Exhibit 1?
12   A.  I believe in '18.
13   Q.  And then what happened with regard to your employment
14      or consultancy or whatever arrangements you had with
15      the county?
16   A.  I continued from then until now as a part-time
17      1,000-hour employee.
18   Q.  Okay.  And because you worked under the thousand hours,
19      you don't need to have a separate consultancy?
20   A.  Correct.
21   Q.  I see.
22   A.  Correct.
23   Q.  I see.  Let me just give this a look.  Do you recall
24      the date – well, let me back up before we move off of
25      this.

Page 11

1            Do you know of any difference between the two
2       versions of modifications number 3 that are the last
3       four pages of the exhibit?
4    A.  It looks like our administrator sent a double.
5    Q.  Okay.  All right.  Fair enough.  I didn't see any
6       differences, but we can look at them minutely later.
7            These contracts don't seem, or at least the
8       Exhibit 1, I don't see a title for you.  Do you know
9       when you obtained the title of the capacity you are
10      talking about being here today, the PREA director?
11   A.  My recollection is 2016.
12   Q.  Okay.  Do you know when in that year?
13   A.  I don't remember exactly, but I think it would
14      correspond with that first full-time contract.  So,
15      perhaps November of '15.
16   Q.  Okay.  The other document that you've supplied here
17      reads Wayne County Sheriff's Office departmental
18      communications.  It's a memo to all concerned from
19      James Davis Consulting, LLC dated September 14th, 2016.
20      And the subject line is 2016 summary of services and
21      activities.  And then that's – let's mark that – is
22      this its own document?  It was clipped with other ones.
23   A.  It goes with the attachments, except for the
24      appointment.  I was trying to find this for today, the
25      appointment.  I thought that would be something that

Page 12

1    you would want as an appointment.
2    Q.  Okay.  And so –
3    A.  The rest of those are together.
4    Q.  So, the memo, 2016 summary of service and activities,
5       goes with the remaining document as like an attachment?
6    A.  Yes.
7    Q.  So, what are you doing in this memo?  What is this memo
8       for?
9    A.  That memo, I recall, was – the purpose of it was to
10      provide the current commissioners a summary of
11      activities.
12   Q.  All right.  And so, was it for the purpose of just
13      letting them know a year end, or a period year ending,
14      or periodic update, or why?
15   A.  It may have been requested by the commissioner's staff
16      that present contracts to the commissioners.
17   Q.  Okay.  And so, in that year that you come on board,
18      around November of '15 and up to September of '16, you
19      say year long advising and assisting with departmental
20      discipline and assistance to the deputy chief.  And
21      that's one of the things you were spending your time
22      doing, right?
23   A.  Correct.
24   Q.  And then you were also, as you said, you were advising
25      and assisting with litigation and assistance to the

Page 13

1    sheriff's legal advisor, right?
2    A.  Yes.
3    Q.  And you were also – you mentioned earlier you were
4       working on some policies here.  You say departmental
5       policy review handcuffing, transportation of prisoners.
6       Did you work on that policy?
7    A.  Yes.
8    Q.  And then you worked with the county department of
9       technology as well to develop and implement a database
10      for background checks of investigators during that same
11      year?
12   A.  Yes.
13   Q.  And then you worked on counseling of female victims of
14      sexual abuse and there is a SAFE contract that you
15      worked on that same year?
16   A.  Yes.
17   Q.  And you did a whole policy review of the whole library
18      service?
19   A.  Yes.
20   Q.  And you worked on knock and announce rules for when
21      people would be coming in, for example, a male into a
22      woman's bathroom or female into men's?
23   A.  Not into the bathroom.  The PREA rules require that
24      cross gender viewing is curtailed as much as possible.
25      And my advisory to the jails was to create a rule that

Chief James Davis
September 24, 2021

Page 14

1    would require opposite gender deputies, when they were
2    assigned to a unit in that capacity, that they announce
3    that the opposite sex is present and will be doing
4    rounds.
5    Q.  Okay.  Do you work with jail command and advise jail
6        command on rules regarding the youthful inmate
7        population as well as inmates in general?
8    A.  Yes.
9    Q.  You worked in collaboration with Wayne State during
10       that same year?
11   A.  Yes.
12   Q.  And I think you previously have mentioned this.  I
13       don't remember in your testimony, but when you work on
14       a policy, that's not you sitting in a room and I'm
15       going to write up a policy.  You have to coordinate
16       with lots of different groups of people and go through
17       iterations, drafts?  There is a whole process that goes
18       with those things, right?
19   A.  Yes.
20   Q.  And it takes quite a lot of time, doesn't it?
21   A.  Yes.
22   Q.  In your memo that you summarize what you've been doing,
23       could you, sitting here today, tell how much time you
24       spent on any one of the bullet points in your memo
25       versus any other time?

Page 15

1    A.  That would be very difficult.
2    Q.  You don't have – so us lawyers, we will write down, at
3        the end of the day, whatever, depose James Davis.  You
4        didn't do that?
5    A.  I did not.
6    Q.  You didn't have to submit billing that accounted for
7        like today I accounted for this policy and today I met
8        with so and so on that program at Wayne State?
9    A.  That was not required.
10   Q.  Did you do it?
11   A.  No.
12   Q.  Are the items that you brought today that were attached
13       to your 2016 summary of services and activities
14       attachments that went with the memo originally?
15   A.  Yes.
16   Q.  And are they the only attachments that went with the
17       memo originally?
18   A.  Yes.
19   Q.  Okay.  One of the items you brought here today you
20       mentioned was something called appointment?
21   A.  Yes.
22       MS. PRESCOTT:  Let's mark that as 2.
23       MARKED FOR IDENTIFICATION:
24       DEPOSITION EXHIBIT 2
25       9:33 a.m.

Page 16

1    BY MS. PRESCOTT:
2    Q.  Can you tell me what that is.  I've just handed it to
3        you.
4    A.  This is the sheriff officially appointing me as a
5        police officer in his department.
6    Q.  Had you been initially appointed police officer in his
7        department prior to this date at any time after your
8        2014 retirement?  In other words, was there a gap in
9        there?
10   A.  There was.  To have my police powers expire, there was
11       a gap, but it was –
12   Q.  From when?
13   A.  From retirement on 1/1/2014 until I returned in '15.
14       Some time in 2015 is my recollection, in a part-time
15       capacity.
16   Q.  Okay.  So then, why did he need to do an appointment in
17       Exhibit 2 if they weren't expired?
18   A.  The Michigan Commission On Law Enforcement Standards
19       says if you're a sworn police officer in the state of
20       Michigan, and employment ends, and you worked a
21       sufficient amount of time, you are eligible to be
22       re-sworn in by any state police agency within two
23       years.  The sheriff would have to officially swear me
24       back in upon return after an official separation.
25   Q.  But only after the two years?

Page 17

1    A.  Any time there was a break in service.  Two standards,
2        state of Michigan standards and police department
3        standards.
4    Q.  Okay.  So, which standard required – or both required
5        Exhibit 2 to happen?
6    A.  To be employed as a police officer, Exhibit 2 has to be
7        signed and executed.
8    Q.  Right.  And is that according to which standard, or
9        both?
10   A.  According to a police agency standard.  To work as a
11       police officer, you have to be sworn in as a police
12       officer for the agency that you work for.  Separate
13       from the MCOLES standard of the ability to be sworn in
14       as a certified police officer in the state of Michigan
15       through training.
16   Q.  So, MCOLES says you can be sworn in.  The police agency
17       standard says you need to be sworn in – not that –
18       it's possible you could go to Grosse Ile or Lansing or
19       wherever and take your history and your experience with
20       you.  But at the sheriff's office, there was an agency
21       standard that said you need to be appointed and sworn,
22       right?
23   A.  All 612 agencies would require a swear-in document for
24       their own documentation that you're qualified through
25       MCOLES training to be a – it's the final act to be an

Chief James Davis
September 24, 2021

Page 18

1    employee for a police department.
2    Q.  Fair.  So, you had your MCOLES.  There is no question
3        about it.  And in '14 you go to retire.  In order to
4        return to the Wayne County Sheriff, because you had a
5        full retirement and you were separated, you then needed
6        to be re-appointed and sworn, correct?
7    A.  If you want to work in the capacity of police officer.
8        The sheriff certainly can hire a civilian who is an
9        unsworn police officer.
10   Q.  Okay.  And that's what he did with you, right?  You
11       weren't technically a sworn officer in 2015 until
12       Exhibit 2 happens in 2016, and then eventually he
13       actually re-swears you as an officer; is that right?
14           MR. O'NEILL:  Excuse me.  Objection as to the
15       date of the document you're showing him, the witness.
16   BY MS. PRESCOTT:
17   Q.  Okay.  Am I right?
18   A.  Yes.
19   Q.  And so, was there any time before Exhibit 2 is issued
20       that you, or somebody with a title or duties of the
21       deputy sheriff – because this document appoints you
22       deputy sheriff.  So, was that applicable before this
23       document, just not officially?  Or how would you
24       describe it?
25   A.  It is and was applicable.  And this is a document I

Page 19

1    could find that represented 2016.
2    Q.  Okay.  So, you're saying before it was technically –
3        that you were deputy sheriff under this document, you
4        were operating as deputy sheriff?
5           MR. O'NEILL:  Objection, vague.  I don't
6        understand the question.
7    BY MS. PRESCOTT:
8    Q.  Is that right?
9    A.  There may be a previous signed appointment from the
10       part-time phase.
11   Q.  Fair.  There might be.  I get you.  But all I'm asking
12       is were you acting in a role called deputy sheriff
13       before Exhibit 2?
14   A.  Yes.
15   Q.  That's all I wanted to understand.
16           You had the pleasure and honor of
17       representing the sheriff's office previously in this
18       case.  You were deposed.  Since that day, right up
19       until we sat down and I started asking you questions,
20       what have you reviewed in terms of documents or
21       materials having anything to do with this case?
22   A.  I reviewed my original deposition testimony.  I
23       reviewed two documents supplied by you as expert
24       testimony.
25   Q.  Anything else?

Page 20

1    A.  The document we turned in today.
2    Q.  Anything else?
3    A.  No.
4    Q.  You were part of a larger deposition in which there was
5        a technical court rule that is called 30(b)(6) where
6        you spoke for the department.  But there were other
7        people in other areas of specialty that also spoke and
8        also testified.  Did you review any of their
9        depositions?
10   A.  No.
11   Q.  So, for example, Mr. Ramel, classifications director,
12       have you seen his deposition?
13   A.  I did not review his deposition.
14   Q.  How about Commander Cane?
15   A.  No.
16   Q.  Am I correct – well, with regard to your own
17       deposition testimony, was there anything in the
18       testimony that you feel needs to be contradicted or
19       corrected here today?
20   A.  No.
21   Q.  Am I correct that you never met Mr. Martin Solomon, the
22       rapist in this case?
23   A.  That is correct.
24   Q.  You've never met my client, Mr. Burks, correct?
25   A.  Correct.

Page 21

1    Q.  Have you ever, all the way up to today, reviewed the
2        internal affairs file relative to the rape?
3    A.  Yes.
4    Q.  When did you do that?
5    A.  I did that prior to the first deposition.  I believe it
6        was part of that.
7    Q.  Okay.  I think you testified that you looked through it
8        and not in detail; is that correct?
9    A.  I don't recall.
10   Q.  Okay.  Whether you said that or not, would it be
11       correct to say that you looked through it but not in
12       great detail?
13   A.  Yes.
14   Q.  Am I correct that you were not in your capacity of a
15       part-time employee or under the James Davis, LLC
16       consultancy?  You did not have any role whatsoever in
17       running the internal affairs investigation as to
18       Solomon and Burks?
19   A.  Other than ensuring that it happened and communicating
20       with them that they were conducting an investigation.
21   Q.  Is that your total role, from beginning to end,
22       anything to do with the IA investigation of Solomon and
23       Burks?
24   A.  Yes.
25   Q.  Internal affairs, when you say communicating with them

Chief James Davis
September 24, 2021

Page 22

1  that they were conducting an investigation, who
2  specifically do you mean?
3  A.  The practice would have been to talk to the captain or
4  e-mail the captain.  We would be notified as an
5  executive group that there was an assault.
6  Q.  Okay.  Do you have a specific memory, sitting here, of
7  talking to or e-mailing a captain about the Solomon and
8  Burks allegations?
9  A.  Not other than it was my practice.
10  Q.  Do you remember who the captain was that was
11  responsible and in charge?
12  A.  I imagine that would be Builivant.
13  Q.  But that you don't know for positive?
14  A.  I'm fairly certain he was in that role in 2016.
15  Q.  And do you recall any communications that you and he
16  had, about the Solomon and Burks allegations, other
17  than that it would have been your practice to say are
18  you sure you are investigating?
19  A.  We would have follow-up communication regarding the
20  unfolding of the case.  That there wasn't going to be a
21  charge.  That they were going to refer to the
22  prosecutor for charges.
23  Q.  Do you remember, sitting here today, having that
24  particular conversation with anyone, Builivant or
25  anyone else?

Page 23

1  A.  I believe it's too long ago to have that clarity of
2  memory other than that was my practice.
3  Q.  You haven't seen any documents that reflect an e-mail
4  exchange of the kind you've just described, have you?
5  A.  No.
6  Q.  Do you think that e-mails might exist?  Or have you
7  looked?
8  A.  I believe we searched for e-mails and we would have
9  turned those over.  So, my guess is we would have
10  talked on that.
11  Q.  Have you talked to – he is now Commander Builivant.
12  Have you talked to Builivant about the Solomon and
13  Burks matter since the lawsuit was filed at any time?
14  A.  I don't think in any detail.  I think I know he was
15  deposed.  I don't know if we were deposed on the same
16  day.  Not regarding the case.
17  Q.  Do you know Mr. Chakrabarty's role in IA at the time of
18  the Solomon and Burks allegations?
19  A.  I imagine he's working in the jail.  But he did have a
20  short stint as IA captain.  And he left, and I'm not
21  sure, sitting here today, what the dates are.  But if
22  he wasn't the IA captain, he was certainly assigned in
23  the jail.
24  Q.  So, do you know whether it was Builivant or Chakrabarty
25  that was responsible at the time of the IA

Page 24

1  investigation?
2  A.  I believe it was Builivant.  I just recall that
3  Chakrabarty did take a turn at that job, but I don't
4  recall when that was.
5  Q.  Did you talk to Chakrabarty about Solomon and Burks at
6  any time?
7  A.  No.
8  Q.  Or e-mail?
9  A.  Not that I can recall.
10  Q.  And you haven't seen any e-mails with him about, you
11  know, following up on the unfolding of the case, that
12  sort of thing?
13  A.  No, not on my computer.
14  Q.  Did you ever listen to the investigatory tapes, the
15  questioning by the investigator that went on in this
16  sexual assault matter?
17  A.  No.
18  Q.  Would it be correct to say that you were not on board
19  6/10 the night of the sexual assault?
20  A.  I would be working days.
21  Q.  And in fact, you didn't go into the wards as part of
22  your regular day-to-day activity, right?
23  A.  No.
24  Q.  Am I correct?
25  A.  Correct.

Page 25

1  Q.  Thank you.  Did you ever talk to Commander Cane about
2  the Burks and Solomon sexual assault?
3  A.  Not that I can recall.
4  Q.  Or e-mail with her about it?
5  A.  Not that I recall.  It's possible, but I don't recall.
6  Q.  Do you know – would either Chakrabarty or Builivant be
7  essentially the head of IA at the time, being a
8  captain?
9  A.  Yes.  They would both be captains in their role.
10  Q.  And is that – is AI headed by a captain?
11  A.  Yes.
12  Q.  You didn't interview any witness, you personally in the
13  Burks and Solomon effort, right?
14  A.  No.
15  Q.  And have you ever read any witness statements in that
16  matter?
17  A.  It's possible if it was part of the IA packet.
18  Q.  But you're not sure?
19  A.  No.
20  Q.  Do you know who did do the witness interviews or the
21  investigation of the Solomon and Burks matter?
22  A.  I don't recall who signed that report.
23  Q.  Okay.  Do you know of any discussion or dialogue
24  between IA and Commander Cane about Burks and Solomon,
25  even if you weren't the one sort of making this happen?

Chief James Davis
September 24, 2021

Page 26

1   Do you know of dialogue they had with regard to Burks
2   and Solomon?
3   A.  I do not.
4   Q.  Did you participate in any sort of review of the file
5   after the IA investigation was – the steps of the
6   investigation were complete with anyone in the chain of
7   command at the sheriff's office?
8   A.  As I previously stated, I would have had a discussion
9   with the captain regarding its status, which would be
10   my practice.
11   Q.  Anything beyond that?
12   A.  We would have had our – we would have met regarding
13   quarterly report or annual report.  We would discuss
14   the cases over the time frame of reporting time to
15   discuss them.
16   Q.  Who are you talking about as we there, we would have
17   met?
18   A.  The internal affairs captain and myself.
19   Q.  Okay.  When you talk about reporting, are you talking
20   about to the bureau of prisons?
21   A.  Both reports – the report to the bureau of prisons and
22   the report for the three-months accounting of assaults
23   in jails.
24   Q.  And who did the three months of accounting of the
25   assaults in jails go to?

Page 27

1   A.  The three month report that we created we send to the
2   commission.
3   Q.  Okay.  So, am I – if I'm understanding, every –
4   periodically, in order to complete reports that had to
5   go out, you would meet with the head of IA to go over
6   what the statistics are of how many allegations and
7   what are the different resolutions?
8   A.  Yes.  As well as the outcomes, the progress.
9   Q.  Am I correct that those aren't dialogues that are
10   specific to the merits or the underlying claims as
11   opposed to accounting for where we are in the process,
12   how many have been resolved, which categories do they
13   fit into?
14   A.  So, if you're talking about the criminal merits of the
15   case, we would mention that, but I would not have an
16   opinion on that.
17   Q.  All the way up to today, have you seen any of the
18   intake or classification documents for Burks or
19   Solomon?
20   A.  Unless they were part of the investigatory packet that
21   I reviewed, I would have seen what was provided by
22   internal affairs.  That could include charging sheets.
23   But not anything specific to classification or any
24   computerized sorts of documents.
25   Q.  Okay.  So, if I've understood correctly, your point is

Page 28

1   whatever would be in the internal affairs file are the
2   things that you might have seen.  If it wasn't in that
3   file, then you wouldn't have seen any intake or
4   classification documents?
5   A.  Generally not.
6   Q.  Have you ever reviewed the Odyssey, the history of
7   charges against Solomon?
8   A.  I've seen the jail charge sheet, but not the Odyssey
9   sheets or any LEIN information.
10   Q.  Have you ever reviewed his medical for any time before
11   the rape?
12   A.  No.
13   Q.  Have you ever spoken with – do you know who the named
14   defendants are in this case, the individual officers?
15   A.  No.
16   Q.  Have you talked to any individual officers who were
17   floor security staff on the night of the assault?
18   A.  No.
19   Q.  About the case?
20   A.  No.
21   Q.  Did you ever speak with any of the prosecutors or
22   police officers who were involved in the prosecution of
23   Solomon as to Burks?
24   A.  Other than the captain, no.
25   Q.  The captain wasn't – do you know who the police

Page 29

1   officers were that were involved in the criminal
2   prosecution?
3   A.  No.
4   Q.  You didn't talk to anybody from Kim Worthy's office,
5   the DPD, did you?
6   A.  No.
7   Q.  You obviously had an array of responsibilities in 2016.
8   But you were not in a supervisorial or command chain of
9   any of the floor security officers for 2016?
10   A.  Correct.
11   Q.  And you also weren't responsible for delivering
12   training to floor security staff, were you?
13   A.  Personally I did not deliver the training.
14   Q.  And there is a whole training unit of people who do the
15   development of the training and then track who is
16   getting it and roll it out, right?
17   A.  In a general sense, yes.  But in 2016, the training
18   that we rolled out was provided by the National
19   Institute of Corrections.  They were computerized
20   modules.
21   Q.  Okay.  In terms of following up who is getting the
22   training on what schedule, is it happening,
23   accountability for is it happening, you weren't
24   operationalizing that for floor security staff in ward
25   610 in 2016 or before, were you?

Chief James Davis
September 24, 2021

Page 30

1  A.  No.  It was happening at a lower command level.
2  Q.  When were you first appointed to do anything relative
3      to training or studying, enforcing the Prison Rape
4      Elimination Act?
5  A.  Is there a window you're asking me to comment on, or
6      forever?
7  Q.  When was it your role to be somebody that was looking
8      at the Prison Rape Elimination Act, how we need to
9      behave under it, how we need to enforce it?
10 A.  In 2003, I was the training director of the agency as a
11     lieutenant and we incorporated PREA into our then
12     correctional academy.
13 Q.  Okay.  When were you responsible for any other aspect
14     of the training or enforcing any Prison Rape
15     Elimination Act requirements?  So, you were in the
16     training unit in 2003.  Was there a time where PREA
17     enforcement was one of your job duties under your
18     title?
19 A.  Other than 2016?
20 Q.  No, 2016.
21 A.  I was the PREA director in 2016.
22 Q.  Okay.  So, 2016 you became the PREA director, right?
23 A.  Yes.
24 Q.  Any other –
25 A.  That's possible that that went into 2017 when I became

Page 31

1      the grants director in '17 and '18.  And then I became
2      the PREA director again when I went back to my
3      part-time role maybe in '19 until today.
4  Q.  The Wayne County sheriff's office runs a correctional
5      academy?
6  A.  Yes.
7  Q.  And you knew and understood that officers – so, is
8      that entity within the sheriff's department, or is it a
9      separate like property or non-property agency?
10 A.  That's the training unit that you referred to earlier.
11     The training unit runs the academy.
12 Q.  So, your point is in 2003, Wayne County knew and
13     understood that it needed to have PREA training for its
14     recruits that were going to the correctional academy,
15     right?
16 A.  We voluntarily added it.
17 Q.  Because you felt that it was necessary?
18 A.  Because we saw it on the horizon as being important.
19 Q.  Okay.  So, you don't have to go to the Wayne County
20     sheriff's office correctional academy to become a
21     correctional officer in the Wayne County jail, right?
22 A.  Correct.  You just have to attend a certified academy
23     in the state of Michigan by the Michigan Sheriff's
24     Coordinating and Training Council.
25 Q.  And did the Coordinating Council all across its

Page 32

1      academies put in some format of training relative to
2      the Prison Rape Elimination Act?  Was it a requirement
3      to do so?
4  A.  I don't think it was a requirement in 2003.  And I
5      can't speak for today, because I no longer have an
6      administrative role with the Michigan Sheriff's
7      Training and Coordinating Council.
8  Q.  So, can you speak to when it became a requirement for
9      all of the correctional academies that are accepted by
10     the Wayne County jail to be sufficient as hired?
11 A.  I can speak to ours.  It's always been included since
12     2003.
13 Q.  Right.  But you can't speak to others?
14 A.  Not sitting here today without looking into it, asking
15     the question.
16 Q.  Okay.  And did you personally create the programming
17     that went into the Wayne County Sheriff's Office
18     correctional academy relative to the Prison Rape
19     Elimination Act?
20 A.  Not the current modules developed.
21 Q.  But back in 2003, you said you were a lieutenant, and
22     you said there was an effort to put some training into
23     the correctional academy?
24 A.  Yes.
25 Q.  Did you lead that?

Page 33

1  A.  Yes.
2  Q.  Okay.  And so, was that same module that you developed,
3      was there like a module or a written policy?  Or what
4      did you develop?
5  A.  I believe we expanded the prison supervision module to
6      contain sexual safety.
7  Q.  Okay.  And so, what does that mean?  You did a
8      PowerPoint, a written policy, or reenactments?  What
9      did you develop?
10 A.  There may have been a PowerPoint that we developed and
11     awareness.  What I'm recalling today sitting here is
12     there was an awareness module regarding the Prison Rape
13     Elimination Act.
14 Q.  Fair.  Can you describe it any –
15 A.  Not any closer than the obvious factors of ensuring
16     that officers are aware of the safety of the prisoners,
17     sexual safety and rape.
18 Q.  I guess what is confusing to me, I assume, since the
19     Wayne county jail has been in operation, officers have
20     been trained that they are supposed to attend to the
21     safety of prisoners?
22 A.  So, if I'm not being clear, of course you're correct.
23     That's all we do.  That's all we do is provide for the
24     custodial care of prisoners in the jail setting.  And
25     officers are expert at that.  And they were expert

Chief James Davis
September 24, 2021

Page 34

1    before 2003.  2003 we made a point to emphasize sexual
2    safety.  It was still a consideration prior.
3  Q.  So, what I'm trying to understand is what changed in
4    2003; if you have any detail that you can give me?
5  A.  What changed is Michigan Sheriff's Coordinating and
6    Training Council became a body in the state of
7    Michigan.  And I was interested in being part of that
8    organization; and I was.  We not only added Prison Rape
9    Elimination Act awareness, but we increased our academy
10    length and we participated in creating the entire
11    correctional module that the state uses.
12  Q.  Okay.  So, my question wasn't super clear.  My question
13    is what specifically in the training modules changed in
14    2003 relative to awareness of prisoner safety,
15    including sexual safety; if you recall?
16  A.  Well, what I recall from Wayne County in 2003 is we
17    were becoming aware of this federal legislation.  We
18    wanted officers to be aware of federal rules.  I'm
19    sorry.  We wanted to be aware, officers to be aware.
20  Q.  Okay.  So, you wanted them to know there was this new
21    act and that it increased or had an emphasis or focused
22    on the risks of sexual violation in conditions of
23    confinement?
24  A.  Yes.
25  Q.  Was there any more content that you can tell us about

Page 35

1    here today?
2  A.  I cannot recall.  I can say from my 1989 jailers
3    training that I attended personally, there was still
4    sexual safety discussed regarding prisoner housing
5    supervision.
6  Q.  When was the first time you took a module that was
7    developed by the people who focused or have expertise
8    in sexual safety in prisons, whether it was PREA or any
9    other, you know, training module from beyond your
10    academy years?
11  A.  When I became the PREA director, I was the first one to
12    take the NIC modules from the PREA center, and I took
13    them all.  And after that, I directed the rest of the
14    jail staff to take modules that I thought were
15    appropriate to their role.
16  Q.  Okay.  So, is this 2016?
17  A.  '16.
18  Q.  And when did you complete the modules?
19  A.  It might be in the exhibit.  I'm not sure.  But it
20    would have been pretty fairly early on.  Perhaps
21    January.
22  Q.  Are there records of that?
23  A.  It might be in what we provided.
24  Q.  Okay.  So, I'll look through these.  Is there any other
25    records?  Then let's mark the rest of it.  Let's mark

Page 36

1    the memo and the stack of papers that you brought as 3.
2       MARKED FOR IDENTIFICATION:
3       DEPOSITION EXHIBIT 3
4       10:11 a.m.
5  BY MS. PRESCOTT:
6  Q.  I marked as Exhibit 3 your memo September 14, 2016.
7    It's two pages.  And then, you know, there's quite a
8    number of attachments.  Oh, I do see -- I'm just
9    looking at this.  But is Exhibit 3 what you were
10    referring to when you said that whatever dates you
11    would have would be in that exhibit?
12  A.  Yes.  And my guess was it was in January, and I took
13    all the modules that were available to take.
14  Q.  Was there a PREA director before you?
15  A.  My understanding is yes.  Chuck Pappas.
16  Q.  Can you spell his name for us.
17  A.  It's Charles P-a-p-p-a-s.
18  Q.  Okay.  And do you know how long he was in that role?
19  A.  I do not.
20  Q.  Do you know why he didn't create PREA coordinators at
21    the different jails during his term?
22  A.  I do not.
23  Q.  Do you know why he didn't order training for all the
24    floor security staff during his term?
25  A.  I do not.

Page 37

1  Q.  Do you know why he didn't create pamphlets and handbook
2    provisions about the Prison Rape Elimination Act during
3    his tenure?
4  A.  I recall us having a discussion that may have been an
5    idea he had.  And I think he was also working on the
6    policy, but it was not completed.  The next generation
7    of sexual safety policy.
8  Q.  The one that was promulgated when you became the PREA
9    director?
10  A.  Correct.
11  Q.  So, he was working on the policy, but do you have any
12    information on why he didn't get a pamphlet put
13    together for prisoners?  Or was that specific to PREA?
14  A.  I do not.
15  Q.  You worked on the policy is it 1417?
16  A.  Yes.
17  Q.  1417.  For months of your time as PREA coordinator
18    before it was revised and promulgated in its more
19    recent form, right, in its updated form?
20  A.  Correct.
21  Q.  In fact, you went through at least five revisions of
22    the policy, back and forth with all the different
23    stakeholders and looking at what was necessary and
24    whatnot; is that correct?
25  A.  That's correct.

Chief James Davis
September 24, 2021

Page 38

1  Q.  How long had Mr. Pappas been working on the policy
2      before you started?
3  A.  I don't know.
4  Q.  Do you know why he wasn't able to promulgate it and get
5      it out during his term as PREA director?
6  A.  No.
7  Q.  Do you know how many drafts were done under his
8      stewardship when he was in that role?
9  A.  I do not.
10 Q.  Do you know whether he had sexual assault response
11     meetings?
12 A.  I do not.
13 Q.  Did you ever attend any sexual assault response
14     meeting?
15 A.  Yes.
16 Q.  Did you ever do so before you were the PREA director?
17 A.  No.
18 Q.  When is the earliest you can recall attending one?
19 A.  The reports from that meeting are in the packet that we
20     supplied today.  I think it was 2016.
21 Q.  Do you know whether there were any meetings being held
22     before that, like a sexual assault response team –
23 A.  I do not know.
24 Q.  – meeting?
25 A.  I do not.

Page 39

1  Q.  Do you know whether Mr. Pappas attended any specialized
2      training for investigating sexual assaults?
3  A.  I don't know.
4  Q.  Did you order internal affairs to attend specialized
5      training for sexual assault investigations?
6  A.  Yes.
7  Q.  Do you know when?
8  A.  The paperwork is in that handout.  It was in that – in
9      2016 I ordered them to – well, I asked supervisors to
10     have them take the specialized investigator training
11     from the PREA website.  And I also recall them saying
12     that they attended some kind of in-person PREA
13     investigator training.  And that may have been before
14     me under Charles Pappas.
15 Q.  Do you know who said that to you?
16 A.  It most likely was Captain Builivant.
17 Q.  What did Captain Builivant say that specifically – do
18     you remember any more than what you just said?
19 A.  Just that there was an in-person training that some of
20     the investigators attended.  And I don't have the
21     specific recollection of the exact wording.
22 Q.  So, you asked a supervisor to have IA take the
23     specialized training in 2016.  Did that then get
24     ordered?
25 A.  Yes.

Page 40

1  Q.  When?
2  A.  In conjunction with the issuance of my memo to internal
3      affairs.
4  Q.  I understand.  I'm asking about a date.
5  A.  I do not know what date the captain gave them to
6      complete it.  But I'm aware they completed it.
7  Q.  Do you know what date?
8  A.  I do not.
9  Q.  And you don't know when the captain gave the order
10     either?
11 A.  I do not.  But my recollection is it was in conjunction
12     with the date of the memo.
13 Q.  Are you saying that it happened the day the memo was
14     issued?  Is that what you mean in conjunction with?
15 A.  Very shortly thereafter.
16 Q.  Have you ever seen that order?
17 A.  Mostly it was verbal and with my memo.
18 Q.  So, that's a no, you haven't seen anything in writing?
19 A.  No.  My memo contains the instructions for accessing
20     the training.  So, that's what they would have gotten.
21 Q.  Do you know if the IA investigation relative to sexual
22     assaults was carried out pursuant to training that was
23     specifically informed by PREA?
24 A.  My thought is that they took that training prior to
25     August.  But we'd have to look at the date on my memo.

Page 41

1      And then they may have kept their certificates that
2      they received from the training.  That would be dated.
3      But I don't know that I have that.
4  Q.  Okay.  So, there's two questions I guess you could – I
5      mean, we could take this as two different thoughts.
6      One is they have the training, yes or no, before
7      August.  And maybe you can find that out.  I have a
8      slightly different follow-up question, which is are you
9      able to assess the quality of the IA investigation in
10     terms of its alignment with PREA based on what you
11     know?
12 A.  Yes.
13 Q.  Okay.  Did I ask you who did it?  You said you don't
14     know who signed the report.  So, did you ever talk to
15     the actual investigator in the sexual assault
16     investigation?
17 A.  I may have.  I don't recall.
18 Q.  So, it's your – in your prior deposition, you
19     testified you don't know whether any staff members were
20     asked any questions in the IA investigation.  Do you
21     now know whether they were asked any questions?
22 A.  I do not.
23 Q.  You didn't listen to the recordings?
24 A.  I did not.
25 Q.  So, you're not aware that not one single solitary

Chief James Davis
September 24, 2021

Page 42

1    question was asked of the victim about where any staff
2    was, what any staff was doing, whether he asked for
3    help, anything to do with what was going on with staff
4    whatsoever, you're not aware of that?
5  A.  I am not.
6  Q.  So, how did you just testify a moment ago that you're
7    able to sit here and assess the quality of the IA
8    investigation into this matter?
9  A.  My understanding of this case is that the inmate told
10    an officer that he had a problem.  The officer acted
11    immediately.  Removed him from the ward with – got
12    assistance, got medical assistance.  Called internal
13    affairs.  There was no indication that there was any
14    fault on the officer's response to a claim of assault.
15  Q.  How would there be any indication of fault on the part
16    of the people who were responsible, and as you just
17    testified 15 or 20 minutes ago, experts in paying
18    attention to people's safety if the victim wasn't even
19    asked a single question about what the experts on
20    safety were doing or where they were or how they
21    responded at the time of the rape?
22  A.  That would be a question for the investigator.
23  Q.  But I'm asking you.  You said you could sit here and
24    testify about the quality of the investigation.  And
25    then you said, you know, there's no indication of any

Page 43

1    problem.
2  A.  I'm confident that if there was an indication of a
3    problem, it would have gone through discipline and I
4    would have seen it from the disciplinary chief and we
5    would have acted on that information.  Because that's
6    what internal affairs does every time, hundreds of
7    times.
8  Q.  So, maybe there would have been all kinds of follow-up,
9    all kinds of discipline, and thinking about it, and
10    paying attention to it.  Except my question to you is
11    how would you ever get them if no one bothered to even
12    ask a single question about what the staff was doing
13    that night?  How would you know if you don't – you say
14    there is no indication.  I agree there is no indication
15    because there is no investigation of it.  So, how can
16    you say what would have happened if there is no
17    investigation?
18  A.  I think there was an investigation and I think they did
19    a good job.  They were able to prosecute the person.
20  Q.  Okay.  But I'm not asking about prosecuting assailants.
21    Your job as the PREA director is to prevent the rape,
22    right?  I mean, it's great that you prosecuted
23    afterwards.  Someone went to jail for that.  But
24    someone was also raped, and your job is to prevent
25    that, right?

Page 44

1  A.  We do everything in our power to –
2  Q.  I'm not asking what you do –
3  A.  – predict and prevent assaults in the jail.
4  Q.  Your job as PREA director is to prevent rape and sexual
5    assault, right?
6  A.  I think there is no question.
7  Q.  Are you comfortable as somebody who has worked in – as
8    somebody who has been a leader in this department, as
9    somebody who has been a retiree after a long period of
10    service, as someone who has been in training, as
11    someone who has been a PREA director, as someone who
12    has been a deputy sheriff, well at your level of
13    command, are you comfortable with the concept that a
14    rape occurs under the watch of officers and they are
15    never questioned about what they saw, what they were
16    doing that night, as part of the workings of the IA?
17  A.  I am never comfortable.  I think our officers do a
18    great job every day.  It's difficult and hard to do.
19  Q.  It's also hard to be a prisoner in the Wayne County
20    jail or in any other jail facility, isn't it?
21  A.  I don't have an answer to that.
22  Q.  Really?  After all your years.  I mean, let's break it
23    down.  You understand that the prisoners have no means
24    to defend themselves when they're locked away in these
25    places, right?

Page 45

1  A.  I think they have the ability to assist in their own
2    welfare.
3  Q.  Okay.  But if they throw a punch, they can be
4    prosecuted for that, right?
5  A.  Correct.
6  Q.  Okay.  And they certainly can't have a weapon, right?
7  A.  We do everything to control contraband and weapons into
8    the jail system.
9  Q.  They could have a weapon, they're not supposed to have
10    weapons, right?
11  A.  Correct.
12  Q.  And they're not supposed to be engaging in any kind of
13    fighting, right?
14  A.  Correct.
15  Q.  Okay.  So, people are locked in with serial rapists in
16    small confined spaces, sometimes for weeks or months at
17    a time, and they are not supposed to fight anyone, and
18    they're not supposed to have a weapon.  Can we agree
19    that that is not a great and comfortable place to live
20    or exist either?  You said the officers had a hard job.
21    Which is getting along in a very dangerous scenario?
22  A.  And we do our best to make them comfortable.
23  Q.  So, to my question, are you – you said you're never
24    comfortable with, I guess, IA investigations.  My
25    question had been are you comfortable, in all your

Chief James Davis
September 24, 2021

Page 46

1  experiences and all your seniority, with an IA
2  investigation that doesn't ask a single question?  Are
3  you aware of other IA investigations that don't ask
4  even a single question about where the officers were at
5  the time?
6  A.  I'm not sure I agree that they didn't ask a single
7  question.
8  Q.  Because you don't know, do you?  You don't really know
9  what they asked, right?
10 A.  I know they asked questions.  You can't conduct an
11 investigation without asking questions.
12 Q.  Okay.  But you, sitting here today, you don't know that
13 they never – well, you testified before you don't know
14 what was asked of the officers or whether they were
15 given written statements to do or questioned in any
16 way.  You already said that.  And you earlier said you
17 didn't listen to the tapes.  You don't know what my
18 client was asked.  Is it going to be your testimony,
19 leaving here today, that you can put your print on, you
20 know, quality job guys, on an investigation that you
21 don't know what the questions were?
22       MR. O'NEILL:  Well, excuse me.  Objection,
23 exceeds the scope of this witness's testimony and
24 expected testimony at trial.  Go ahead and answer, if
25 you can.

Page 47

1  A.  I believe today that they did a good investigation and
2  I think that did they ask a single question needs to be
3  asked to the internal affairs.
4  BY MS. PRESCOTT:
5  Q.  I don't understand the basis for your opinion that it
6  was a good investigation.
7  A.  From the perspective of PREA, prisoners got all the
8  service that they needed that was necessary and
9  required and they did it in an expedient, quick manner.
10 They protected both prisoners by separating them,
11 receiving medical care.
12 Q.  So, you think PREA is solely limited to getting medical
13 care, getting people separated, taking their statements
14 after the fact, and giving no attention whatsoever to
15 what the institutional or personnel failures might have
16 been or even just things that could be improved on?
17 You think that's what PREA is about?
18       MR. O'NEILL:  Excuse me.  Objection,
19 mischaracterizes prior testimony.  You can answer, if
20 you can.
21 A.  I think I need you to ask a question.
22 BY MS. PRESCOTT:
23 Q.  I'll rephrase it.
24       Specific to the Solomon and Burks rape, what
25 analysis was conducted to determine if there was any

Page 48

1  way the matter could have been better handled by the
2  staff or the institution itself?
3  A.  Well, that might go back to my previous answer.  I
4  don't ever – I think we can always do better.  I think
5  we did a good job.  I guess I don't understand your
6  question.
7  Q.  I think you do.  I asked you for your list of specific
8  steps particular to the Solomon and Burks matter that
9  were taken to assess whether the institution or staff
10 could have reacted better prior to the rape or
11 prevented, in any way, the rape?
12 A.  I still don't see how they could have reacted better
13 than they did based on the facts of the case that I
14 know.
15 Q.  Do you know any specific steps?
16 A.  A complaint was made by an inmate.  There was an
17 immediate reaction to the staff to separate, to
18 protect, to get help, to care for.  And there's no
19 indication that anything was done improperly before or
20 after.
21 Q.  A rape happening inside your prison isn't an indication
22 that maybe there could have been something that could
23 have happened better?
24 A.  No.  You're asking me for a specific that someone did.
25 Well, I don't think there is evidence of anyone doing

Page 49

1  anything inappropriate or contributing to the assault.
2  Q.  Okay.  So, have you completed your answer on the
3  specific steps you're aware of?
4  A.  I'm sorry.  I'm not understanding the question.
5  Q.  I asked you a question, whether you could list specific
6  steps that were undertaken.  I repeated it twice.
7  You've answered it as best you can, I imagine.  Do you
8  have more to add?
9  A.  I'm not clear on the question still.
10 Q.  The question had been what particular steps were taken
11 to assess whether the institution as a whole, or the
12 personnel on staff, could have better behaved, acted,
13 fulfilled their duties to prevent the assault?
14 A.  Talk to the internal affairs captain, review his case
15 in the three month time window and annual window, more
16 discussion.  Nothing from internal affairs or
17 discipline or that warranted action.
18 Q.  Anything else?
19 A.  No.
20 Q.  You said in your list more discussion.  Are you talking
21 about talking to the IA captain?  You're not sure who?
22 You're not sure when?
23 A.  Builvant, during the course of the case, which
24 stretched for a very long time.  So, yeah, we would
25 have reviewed it together within our three-month

Chief James Davis
September 24, 2021

Page 50

1    review.
2    Q.  What did Bullivant do specifically to assess whether
3        any staff members might need to be retrained,
4        disciplined, talked to, about their behaviors or
5        failures or acts or omissions?
6    A.  He would act on anything that he found wrong or unusual
7        or failing from the investigation.
8    Q.  Do you know specific steps Bullivant took as to the
9        Burks and Solomon investigation to determine staff
10       appropriateness or inappropriateness of responses?
11   A.  I don't know.
12   Q.  Do you know anything the investigator did in that
13       regard, not Buillvant but the actual – Christopher
14       Lawson, if that helps you?
15   A.  Not outside of the investigation itself.
16   Q.  How about Commander Cane, who is in charge of the floor
17       security?
18   A.  I don't believe we had any interaction.  Maybe we spoke
19       about it, but I do not recall.
20   Q.  Do you know of any steps she took specific to the staff
21       that were on duty on the night of the rape to
22       investigate it for herself or to discipline or coach in
23       any way as to their failures or acts or omissions?
24   A.  I would have to defer to her.  I do not know.
25            MR. O'NEILL:  Can we take a break in the next

Page 51

1    15 minutes or so?
2            MS. PRESCOTT:  Yeah.
3    BY MS. PRESCOTT:
4    Q.  Why isn't there any documentation of you reviewing
5        anything about the Solomon and Burks rape in your role
6        as PREA coordinator?
7    A.  Well, it was my practice to create – review documents
8        if I saw a need to review the case.
9    Q.  So, you didn't review all the cases?
10   A.  I reviewed all the cases, but I only would write a
11       report on hope if I thought something was actionable.
12   Q.  So, the only thing we have that suggests that you, in
13       any way – you don't have an e-mail.  You don't have
14       any writings from Buillvant, Chakrabarty, your boss,
15       Cane, or anybody else, nothing in writing about you
16       ever having anything to do with reviewing the
17       investigation of Solomon and Burks as PREA coordinator,
18       right?
19   A.  Not outside of my three-month review and annual review.
20   Q.  You mean the numbers that reflect that there wasn't
21       even an attack at all in 2016?  Is that what you mean
22       by the three-months review and the annual review?  Is
23       that what you're referring to?
24   A.  I'm referring to the time that we go over the cases for
25       reporting is a chance to see any additional new

Page 52

1    information.  But of course I think I testified earlier
2    that we get an announcement that there's been an issue
3    and we ensure that the investigation is proceeding and
4    that everything is being done that we expect to be
5    done.
6    Q.  What I'm asking about is you did testify about this
7        earlier, but you recall how there is statistics that
8        report out the number of assaults that happen in the
9        jail, and is it substantiated, is it not substantiated.
10       Those are the reviews you're talking about doing in IA,
11       and sitting down and doing regularly, right?
12   A.  Yes.
13   Q.  There are numbers – and I think there's numbers that
14       get put out for every period.  Is it a year?  Or
15       sometimes you do it quarterly?  Do you recall that?  Do
16       you remember that?
17   A.  I lost the question.  Sorry.
18   Q.  That's okay.  You report out to the bureau of prisons
19       the number of different categories of different things,
20       sexual misconduct, sexual assaults, et cetera, by a
21       year, right?
22   A.  Yes.
23   Q.  You recall that we covered, in your last deposition,
24       that this rape happens in 2016.  And in the 2016
25       report, you write zero for number of sexual assaults in

Page 53

1    the prison, right?
2    A.  Well, there's different categories.  So, it's not a yes
3        or a no.  There is on-going investigation.  Mr. Solomon
4        should be reflected in an on-going status, or
5        Mr. Burks.
6    Q.  But nobody in your department, in the sheriff's office,
7        ever took any steps to get to an answer about whether
8        your department substantiated it or didn't?  Didn't
9        they just say we're handing it to the prosecutor and
10       they'll do what they want to do; am I correct?
11   A.  No.  What we would hope is that we would move from
12       on-going to a finality.  But it took two years in his
13       case.  And the finality, in his case, should have been
14       reflected as an assault substantiated.  It would have
15       moved categories.
16   Q.  So, other departments do what they're going to do.
17       That's not up to you.  Like Kim Worthy's office, she
18       can prosecute.  I don't want to use my resources for
19       what – she can do whatever she wants.  And that's not
20       in your jurisdiction, right?  You don't control those
21       decisions?
22   A.  Yes, we don't.
23   Q.  And she could get – one of her prosecutors could make
24       a mistake and not turn over some important evidence and
25       the case could get thrown out, or a person could – a

Chief James Davis
September 24, 2021

Page 54

1    case can be dismissed, even though they committed a
2    rape in the Wayne County jail; do you understand that?
3  A.  I'm sorry.  You would have to repeat that.
4  Q.  Do you understand that the prosecutor could end up with
5    a dismissal of a case where there's absolutely a rape
6    that has occurred in the Wayne County jail even though
7    they can't get a conviction for it; do you understand
8    that?
9  A.  Yes.
10 Q.  And you understand that the jail and the sheriff's
11   office has its own responsibility to determine for
12   itself whether allegations are substantiated or not,
13   right?
14 A.  Yes.
15 Q.  And you can't delegate that to somebody else, correct?
16 A.  Correct.  And we would move it to substantiated,
17   whether it was prosecuted or not.  Whether, based on
18   information from the captain, that he felt it was
19   substantiated.
20 Q.  Why didn't that ever happen in 2016 or 2017 in your
21   reporting out that there is no substantiated cases?
22   Why didn't anybody ever make a finding and say we
23   substantiate that this happened in our facility?
24 A.  Well, I believe, at the time, we were waiting for that
25   to resolve.

Page 55

1  Q.  So, you just decided to delegate it in this case and
2    not make your own determination?
3  A.  No.  I would ask them every three months was there
4    progress on that.  Where would we put that now.
5  Q.  Why didn't you say, for example, Burks passed a
6    polygraph.  A prosecutor finds that there is a basis
7    for a warrant.  A judge binds someone over.  There are
8    findings that there is probable cause.  Why didn't any
9    of those steps say, along with what we see and what we
10   observe, we think that's enough, we think that's
11   substantiated?
12 A.  And we would do that.  And we should have done that.
13   If we didn't, we would have done it.
14 Q.  Wasn't it substantiated to the extent of your people
15   thinking this needs to go, and the prosecutor needs to
16   do this, the very day it went out to Kim Worthy's
17   office for a warrant?  You don't send her office things
18   you don't think happened, do you?
19 A.  Well, we send her things that we're looking for a
20   determination on from a criminal charge, for criminal
21   liability.
22 Q.  There's no piece of paper anywhere that you've ever
23   seen where someone in your department says that the
24   sheriff's office says stamp substantiated, all the way
25   up to today; isn't that correct?

Page 56

1  A.  I think in the previous deposition we discovered that
2    his category wasn't changed.  And I believe that that
3    was an omission because of the length of time it took
4    to prosecute.  I understand that you're saying it could
5    have gone earlier.
6  Q.  So that the data given to the federal government
7    accurately reflected what your own department was
8    concluding.  That's why I was asking those questions.
9  A.  And generally they resolve within that year.  But this
10   one did not.
11 Q.  But it's not – your department has no problem stamping
12   things unsubstantiated and closing files.
13 A.  If that can be determined from the initial response.
14 Q.  And from the initial response, your department
15   determined this should be prosecuted, right?
16 A.  I don't know the answer to that.
17 Q.  Let's ask it this way, and then we can go on break.
18   From the day this got sent to the prosecutor, and for
19   the following year it took the prosecutor to get to the
20   conviction, your office wasn't doing any further steps
21   on this, right?
22 A.  No.  In our opinion, I think I testified, there wasn't
23   any further steps to take.
24      MS. PRESCOTT:  We can take a break.
25      MR. O'NEILL:  Thank you.

Page 57

1      (Recess taken at 10:47 a.m.)
2      (Back on the record at 10:53 a.m.)
3      MS. PRESCOTT:  Back on the record.
4  BY MS. PRESCOTT:
5  Q.  Are you able to testify to any activities Commander
6    Cane took in the year 2016, the months leading up to
7    the rape, relative to improvements for sexual safety or
8    assessments on what might be needed for improvements on
9    sexual safety in her jail division?
10 A.  Well, in general, she would have incorporated all this
11   training, overseen the training, taken the training.
12   Did you mean in general or specifically this case?
13 Q.  So, specifically before the rape, what you actually
14   know happened, instead of what could have happened.
15 A.  Well, I know I ordered training of all the employees in
16   that building.  She got my communications regarding
17   various PREA issues.  And she would have been aware of
18   classifications.  The new educational pamphlet, the
19   inmate rule book, all the things that were implemented
20   in that year.
21 Q.  Okay.  What I'm asking is things that she did.  You're
22   telling me about a pamphlet that existed.  She could
23   have become aware of it.  You know, training that you
24   ordered.  I'm asking about what she ordered.  What she
25   did.

Chief James Davis
September 24, 2021

Page 58

1  A.  Specifically, I guess I can't answer that.

2  Q.  How about any command staff over that jail division,

3       same question.  What specific steps they did, not what

4       you did in, the say eight months before the rape?

5  A.  I can't recall any specifics.

6  Q.  Do you know whether the sheriff's office was compliant

7       with PREA in August of 2016?

8  A.  I would say we were in a position of many jails that

9       were working towards full compliance.  We were

10      complaint in many ways.

11  Q.  What were the ways that you weren't compliant in 2016?

12  A.  That we were not?

13  Q.  Right.  That you were working toward.

14  A.  One of our challenges is the PREA standard of viewing

15      inmates of the opposite gender.  Because we don't have

16      architecture that supports privacy screens for

17      toileting and showering.  And we talked about ways that

18      we could change the building's architecture.  But it

19      seemed impossible that we're abandoning that jail.  And

20      we instead brought in rules like the knock and announce

21      rule for opposite gender viewing.

22  Q.  Anything else in the 2016 area of not quite compliant,

23      not quite there yet?

24  A.  Well, I think we were working on multiple standards at

25      the same time to bring them into fruition, including a

Page 59

1       zero tolerance standard, which I thought was one of the

2       most important PREA standards.  And because that

3       involves a culture change, and that was something I had

4       discussions with command and written communication to

5       help create a – everything I did was focused on zero

6       tolerance, meaning a culture change.  Meaning this is

7       something we think about every day, even in regular

8       transactions, that don't appear to be something that

9       would contribute to a sexually charged environment, but

10      could, and we were working on that.  I think we were

11      working on all the standards.

12  Q.  What standard are you talking about that –

13  A.  To come up to the zero tolerance standard, that we need

14      to create a culture that supports that.  That means

15      roll-call education.  Everything that we're doing to

16      work towards that goal.

17  Q.  Is that still a work in progress?

18  A.  I think we are doing very well in that regard.

19  Q.  Any other areas of not being in compliance in August of

20      2016?

21  A.  I can't recall at this moment.

22  Q.  Okay.  So, the PREA standards, you're familiar with

23      them?

24  A.  Yes.

25  Q.  When was the last time you reviewed them?

Page 60

1  A.  I'm always reviewing them.  I'm reviewing them all the

2       time.

3  Q.  Are you on the – are you an expert on the standards?

4  A.  I know them well.

5  Q.  So, is that a yes or a no?

6  A.  Like I said, it depends on your definition of an

7       expert.  I would never say I know everything about

8       something.

9  Q.  Okay.  And in 2016, you took your first classes on the

10      standards, right?

11  A.  Yes.

12  Q.  Were you an expert when you were taking those classes,

13      or because you had taken the modules?

14  A.  Yeah, I'm not sure – do you want me to define expert?

15      You know, I know more about it all the time.  But what

16      would you say, novice?  Would you say growing?  Would

17      you say improving?

18  Q.  What were your qualifications to be the director of

19      PREA, specific to sexual safety?

20           I understand and I would never – I'm glad we

21      have people who are long termers and have incredible

22      experience.  I see that you've educated yourself.  But

23      I am unsure of what your qualifications were to

24      specialize in anything to do with sexual safety in

25      prisons in the year 2016.  Can you fill me in on that.

Page 61

1  A.  Well, I believe that all of my staff are experts at

2       providing custodial care for detainees.  And they were

3       experts – I mean, they're experts.  It's what they do

4       day in and day out, year after year, shift after shift,

5       over and over.  That's all they do is take care of

6       prisoners and diffuse situations and intervene in

7       dangerous situations and try to house people in the

8       safest place, but least restrictive way possible.  So

9       many considerations.  So, you know, 25, 30 years of

10      doing that, I mean, who would know more than you,

11      right, about that.  And we're one of the state's larger

12      offices, sheriff's offices.  So, if you are going to

13      define expert as you defined it, yes.

14  Q.  So, by that definition, I worked in the conditions.

15      I've diffused situations.  I dealt with many, many,

16      many people.  Then, by that definition, everyone who

17      has been on staff for 25 years is equally qualified or

18      not qualified to be the PREA director?

19  A.  To respond, protect, to assist with inmate needs,

20      absolutely.  So, do I have something more, yes.  I have

21      a Bachelors and a Masters.  I've been to the police

22      executive research forum.  I'm with the state's largest

23      sheriff's office.  I have a great deal of knowledge

24      about how to best care for inmates.  There's no – I

25      don't think that's a question.

Chief James Davis
September 24, 2021

Page 62

1   Q.   My question is what, in the year 2016, set you apart
2        from others like Commander Cane or others like
3        Ms. Bell, one of the defendants in this case, who have
4        many, many, many years of taking care of prisoners in
5        conditions of confinement, specifically to the PREA
6        Act, and what it was bringing as a whole – your words,
7        a whole culture change.  So, what did you have in 2016
8        – what did you have that spoke to the qualifications
9        to bring around a cultural change?
10  A.   Because I had the executive skills to do that.  I was
11       sergeant and commander and deputy chief.  I inserted
12       myself in every aspect of our agency.  And I did it
13       under four political administrations.  There's no doubt
14       I would be qualified to do this.  And you might know,
15       or you might not know, that agencies around the
16       country, there is a – the sergeant is the PREA
17       director or there is the lieutenant.
18  Q.   Yes.
19  A.   So, I'm qualified.
20  Q.   Let's ask it this way:  Did you have any education
21       specific to sexual trauma, sexual victimization, sexual
22       defiance, PREA, any formal education in those subjects?
23  A.   Perhaps in my Bachelors program and psychology courses.
24  Q.   Perhaps or you did?
25  A.   I would think yes that I did.

Page 63

1   Q.   Okay.  When you say it like that, it sounds like you
2        were imagining that's true, but you can't testify to it
3        under oath?
4   A.   Well, it was a long time ago.
5   Q.   Fair enough.  I'm just asking for what you can sit here
6        and testify to under oath as a specific thing you
7        remember.
8   A.   We're aware of the psychology of a lock-up.  We're
9        aware of manipulation.
10  Q.   I'm asking about education, formal education.
11  A.   And I guess you asked that earlier.  So, formally,
12       studying the Act, reading the Act, all my data from the
13       PREA resource training, taking every training that they
14       have to offer.
15  Q.   Because you didn't know anything about what the Act's
16       ins and outs were, what the standards were, prior to
17       2016, correct?
18            MR. O'NEILL:  Objection, contradicts prior
19       testimony.
20  A.   Right.  Because we were aware of it in 2003.  And we
21       did –
22  BY MS. PRESCOTT:
23  Q.   You were aware of it in 2002?
24            MR. O'NEILL:  Excuse me.  You interrupted the
25       witness, Sarah.  Will you please allow the witness to

Page 64

1        finish.
2   BY MS. PRESCOTT:
3   Q.   Did you have more to your last answer?
4   A.   Just the fact that what we do every day is in the
5        interest of sexual safety, of suicide prevention, of
6        assault and batteries.  Those are behaviors that we see
7        every day and react to every day.
8   Q.   You didn't remember what the question had been.  The
9        question had been isn't it true that you had to take
10       all this training in January of 2016 because you did
11       not have prior training on the PREA standards, what
12       each standard was, how it was going to be enforced, how
13       it needed to be operationalized, what other departments
14       in the country were doing, all those kinds of things,
15       you didn't have that prior to 2016; am I correct?
16  A.   What was the first part of that question?
17  Q.   Am I correct that at some point in 2016, you had not
18       had training and education to specialize in whatever
19       the different PREA standards were, how they were
20       operationalized, what other departments were doing
21       elsewhere, what they required, and so on?
22  A.   My experience and my self study of that is what I have,
23       and then training courses.
24  Q.   The 2016 training course, right?
25  A.   Correct.

Page 65

1   Q.   Are you testifying that you took out the PREA Act at
2        some point prior to becoming involved as PREA director
3        and you read the Act?
4   A.   Prior to '16?
5   Q.   Yeah.
6   A.   Sure.
7   Q.   When?
8   A.   As the deputy chief of jails in 2012.  Maybe '11, '12,
9        '13.  We had meetings on PREA even in those years.
10  Q.   So, why weren't staff being trained on PREA in 2012 and
11       '13 if you were reading the Act and seeing that, as you
12       say, your very most important standard said that you
13       were to ensure the sexual safety, prevention,
14       detection, and response?
15  A.   And don't forget every employee had that training in
16       the correctional academy.
17  Q.   Why do you even have PREA training now then if you just
18       go to the academy one day and you get, as you
19       described, introduced to the concept that there was –
20       there is a Prison Rape Elimination Act?  Why do you
21       have the training?  Why don't you just rely on what's
22       at the academy?
23  A.   I think the answer to that is we see that in the
24       standard and we exceed the standards requirement.
25  Q.   So, your testimony is you're exceeding the requirements

Chief James Davis
September 24, 2021

Page 66

1  of PREA in 2012 and '13 when it came to employee
2  training?
3  A.  And in 2016.
4  Q.  I'm back to your point.  You said in 2012 and 2013
5  you're a leader in this department.  And a leader of
6  all of the experts.  You're pulling out the Act and
7  reading it and self studying it.  So, I'm in 2012 and
8  2013 now.  And my question is why the department, if
9  people like you are there self studying it, why doesn't
10  the department roll out training on PREA.  And you
11  answered well, they got it at the academy.  And I said
12  well then why do they have it now?  Why do the PREA
13  training now after the academy, if you can just rely on
14  the first day before you were a sworn officer?  That's
15  the question.
16  A.  It's a long-term process to meet and exceed all the
17  standards.  And that's certainly our goal.  If I'm
18  recalling 2012 and '13, we're talking about standards
19  like the youthful offender standard where we were
20  struggling to create wards to house 17 year olds to
21  comply with the Act.  So, there are many pieces of the
22  Act that we're working on as command in those years.
23  And we were able to correct the staffing plan to allow
24  for the formation of the youthful detainer ward.  So,
25  there was other considerations going on.

Page 67

1  Q.  At what point did anyone say we need to determine which
2  employees have not received training on the PREA
3  standards because they haven't gone to an academy that
4  required it, or because they went to our academy before
5  the year 2003?  When did that discussion happen?
6  A.  There's two parts to that.  There isn't anyone working
7  that hasn't had exposure to the PREA requirement and
8  the jailers training in the state of Michigan.  Because
9  my recollection is it is part of the MSTC official
10  academy.  And I know that we have a module in ours.
11  So, that may be one part.  So, everyone is going to
12  have training on PREA.  As you say initially –
13  Q.  Okay.  But if you follow my point, if I go to the
14  academy in the year 2002, I don't have any exposure to
15  the concept of the Prison Rape Elimination Act; do you
16  agree with that?
17  A.  Well, if the Prison Rape Elimination Act didn't exist
18  in 2003 or didn't exist in 2002 –
19  Q.  Right, it didn't.
20  A.  So, what they have would be sexual safety training,
21  just a viewpoint from a professional correctional
22  officer, that this is something that we pay attention
23  to, that is risk of suicide, risk of assault and
24  batteries, risk of sexual predation is a risk that is
25  always trained.

Page 68

1  Q.  Yes, I understand that.  You're not here today to say
2  that the Prison Rape Elimination Act didn't bring in a
3  water shed change in the way that employees were to be
4  trained and the entire culture shift that you described
5  that it required, are you?
6  A.  No.  I'm trying to follow your question.
7  Q.  I appreciate that.  Because it was a hard one to get
8  right.
9      So, you have testified that PREA issued an
10  awareness that there needed to be, in the entire
11  industry, in the entire profession, a cultural – all
12  the way down to a cultural change, right?
13  A.  Correct.
14  Q.  So, while there may have been all kinds of stuff in
15  1980 or 1970 or 19 whatever, we needed to change things
16  and congress made a bunch of findings about why, right?
17  A.  Yes.
18  Q.  Because prison rape was described to be a serious
19  problem and it was happening a lot, right?
20  A.  Yes.
21  Q.  No matter what the training had been, it wasn't
22  stopping prison rape enough, according to U.S.
23  government?
24  A.  Because one is too many.
25  Q.  There was a huge problem seen by the government and

Page 69

1  they made factual findings about that at the beginning
2  of the Act; you're familiar with that, right?
3  A.  Yes.
4  Q.  So, they said we need to change things, and here comes
5  2003 and they pass the Act.  Everyone who had gone to
6  the academy before 2003 has not been part of what now
7  is going to change.  So, my question for you is because
8  they couldn't be – because it wasn't passed, right,
9  and the cultural shift that we were going to do, and
10  the water shed moment hadn't begun.  So, my question to
11  you is when the Wayne County sheriff's office said we
12  got to go back and we got to pick up everybody who has
13  been here since before 2003, or didn't go to our
14  academy, and they didn't have PREA-specific training,
15  when did they decide we got to do that?
16  A.  You know, that's a question that we could defer to the
17  2012 training center.  I'm not sure, sitting here right
18  now.  Because we always do in-service training.  And I
19  was instrumental in training, our education system that
20  we had at the time.  And the training center was
21  responsible for putting out program matter, in-services
22  every year.  So, sitting here, I'm not sure that there
23  wouldn't have been something that they would have taken
24  in those years.
25  Q.  Was there a zero tolerance policy on sexual assault and

Chief James Davis
September 24, 2021

Page 70

1    sexual harassment promulgated with that kind of work
2    and that kind of cultural construct before 2002 at the
3    Wayne County jail?
4    A.  I don't know if there was 1417 prior to the 2009 that's
5    a revision.  I'm not sure.
6    Q.  You're aware that PREA said that current employees who
7    have not received PREA training had to have it within
8    one year of the effective year of the PREA standards,
9    correct?
10   A.  Correct.
11   Q.  And you're also aware that the agency was required to
12   provide refresher training to all employees, even when
13   they had had something back at the academy, every two
14   years, right?
15   A.  Yes.
16   Q.  So, was there an audit done of who got what, and who
17   needs what, where is everybody in their two years, did
18   they get it at what academy?  Are you aware of any kind
19   of audit of that nature?
20   A.  I was not in the training center in those years.  I'm
21   not aware of any actions that would have been taken
22   regarding that.
23   Q.  And, in fact, when you come in in 2016, and you say
24   everybody please order that there be this PREA
25   training, it's because of this standard saying that

Page 71

1    people needed to get refresher training on a regular,
2    at least two-year basis, right?
3    A.  Correct.
4    Q.  So, why did anybody issue that order in 2012 or 2013
5    when, as you say, people were sitting around in the
6    command offices self studying this thing?
7    A.  I think I said we were acting on other portions of the
8    Act in order to attempt to come into compliance.
9    Q.  Isn't it true – isn't it that even the Act that had
10   been passed, one of the things that happened is that a
11   Wayne County judge said you had to move all the youth
12   and they couldn't be kept with the adults in 2013; do
13   you remember that?
14   A.  I don't remember.  I don't remember the specific order.
15   I know we created a youthful ward.
16   Q.  So, you don't recall that you just didn't create it,
17   that it had to be litigated over and a judge ordered
18   it?
19   MR. O'NEILL:  Objection, foundation.  Go
20   ahead and again answer, if you can.
21   BY MS. PRESCOTT:
22   Q.  I'll ask it again.  You're not aware that a judge had
23   to order that the department take the kids out of the
24   adult areas because of PREA in 2013?
25   A.  I recall that happening regarding state laws, a

Page 72

1    conflict with the federal rule.  And in Michigan, a 17
2    year old cannot be housed in an adult jail.  It
3    violates PREA.
4    Q.  So, a state judge enforced state law and ordered that
5    youth 17 and under be removed, right?
6    A.  I think so.
7    Q.  And so, that happened in 2013.  And clearly by then,
8    the department knew this PREA, these PREA rules, we're
9    supposed to be following and enforcing them, right?
10   A.  Yes.
11   Q.  Was there a memo or any kind of writing by anybody to
12   say you guys, we're supposed to be training, we're
13   supposed to have these refreshers for every single
14   staff member for PREA?  It came in effect in 2012.
15   We're not doing that.  Was there any memo that talks
16   about hey, here's what we're not compliant with, you
17   guys; any time ever that you've seen?
18   A.  I don't recall from 2012.
19   Q.  How about '13, '14, '15, '16?
20   A.  I don't recall prior to mine.
21   Q.  Well, you didn't write a memo saying here's what we're
22   not compliant with?
23   A.  Regarding training?
24   Q.  Or anything.  Any of the standards, did you?
25   A.  Well, there's several memos in there that are dealing

Page 73

1    directly with standards that need improvement.
2    Q.  Okay.  You understood that the policy also needed to be
3    revised and that's why you were working on it, right,
4    because of PREA, right?
5    A.  We chose to update the 2009 version to incorporate more
6    of the PREA rules, yes.
7    Q.  And so, what, whether it's the training, whether it's
8    the policy – let's go to auditing.  PREA requires
9    audits for sexual safety.  That's a standard that is
10   part of the law since 2012 at least; are you familiar
11   with that?
12   A.  Yes.
13   Q.  There's never been an audit, right?
14   A.  We plan on having an audit in the new facility.
15   Q.  But there hasn't been one yet?
16   A.  There hasn't been one at the current jail.
17   Q.  So, in that respect, and maybe others, but at least in
18   that respect, still no compliance with PREA right up to
19   2021, right?
20   A.  With respect to audits, yes.
21   Q.  And I guess I can – can you help me understand the
22   thinking.  This jail is so old and the facility is
23   literally – cannot comply with PREA, like cross-gender
24   viewing.  Therefore, we're not going to audit what
25   might be dangerous in this facility.  I don't

Chief James Davis
September 24, 2021

Page 74

1    understand the thinking of putting off the audit to
2    move away from where, you know, you have PREA problems.
3    A.  Well, we want to comply and want to work towards
4    complying, and our goal is to do that.  And I think we
5    made significant progress.  I don't think we felt like
6    that this would help us, because it would negate – the
7    new facility would need to have a hundred percent
8    compliance audit.  And trying to bring 1926 into a 21st
9    century state-of-the art detention facility, you know,
10   there would never be – I don't know how we could pass
11   that audit.
12   Q.  When you say 1926, you're talking about the date that
13   the Wayne County jail was open?
14   A.  Yeah.  Well, not open, but that particular building.
15   Q.  That particular building.  And so, your point is there
16   wasn't a way to pass the audit in the building that you
17   were in?
18   A.  There may have been a way, but the resources might not
19   have been – it might not have made sense to do that.
20   I mean, it didn't comply in any way.  And interesting,
21   we do comply with the cross-gender viewing in that
22   building, but we don't have privacy screens there.
23   Q.  Okay.  So, any other reason that audits haven't been
24   conducted to this point?
25   A.  Just that we're working towards that.  That's our goal.

Page 75

1    And many other sheriff's offices are also working
2    towards that goal.
3    Q.  Okay.  You've never worked at any other sheriff's
4    office, correct?
5    A.  Correct.
6    Q.  You've never been detailed to another sheriff's office
7    or whatnot, have you?
8    A.  No.
9    Q.  Are you aware of the classification systems that are
10   used and were used in 2016 to screen for risk of
11   potential victimization and potential aggressors
12   pursuant to PREA in other facilities around the region?
13   A.  No.  I'm not in the technology group.  So, the
14   awareness may be with our technology group.  That is
15   their responsibility for a new computer system in the
16   new jail.  I'm sure they're aware of it.
17   Q.  Isn't it true that the department has made calculated
18   decisions over the years to forego investments in
19   safety and security and upgrades at the 1926 jail, as
20   you put it, because the hope and expectation was that
21   prisoners wouldn't be housed there much longer?
22   A.  No, I don't think that's true.  I think we went through
23   extensive renovations and changes and spent millions
24   and millions of dollars adding and making it safer for
25   prison inmates with lighting, with air-conditioning,

Page 76

1    with sprinkler systems.  We have spent a lot of money
2    trying to make that jail safer and more comfortable for
3    the inmates just within the last 20 years.
4    Q.  That's because the inmates took the sheriff and the
5    county to court and said the conditions of confinement
6    here are, I think the word was barbaric, and the court
7    ordered a whole slew of improvements to be made.  When
8    the sheriff was in public saying we can't even invest
9    in this building when we're going to be moving.  Does
10   that history sound familiar?
11   A.  Well, we weren't moving.  The case is from 1971.  And
12   we were building a new facility for 1984.
13   Q.  Right.  And the sheriff publicly said that the office
14   had stopped doing anything improvement wise in the jail
15   because they expected to move.  Do you recall that?
16       MR. O'NEILL:  Objection, foundation.
17   A.  Yeah, I can't recall that.
18   BY MS. PRESCOTT:
19   Q.  You don't recall that?
20   A.  No.
21   Q.  You don't recall that the sheriff had to go down and
22   there was a whole court case in 2013 and '14 and fight
23   over the fact that there wasn't even money and they
24   couldn't keep investing?  You don't remember that?
25   A.  I was not there in '14.  I don't recall that.

Page 77

1    Q.  But just to finish up this section, you never went back
2    to a list of standards and said let's take out the list
3    and let's line up where we're meeting and where we're
4    not meeting and put that in writing, right?  You never
5    did that?
6    A.  That's what we did all in 2016.
7    Q.  Where is it?  I'm asking did you put down on paper
8    here's what we're missing and here's where we're
9    complying?
10   A.  Not like that.
11   Q.  Okay.
12   A.  I think there is a record of the standards that we
13   worked on in 2016.
14   Q.  And so, you can't testify, even sitting here today,
15   that the jail – what items it was in compliance on and
16   what it wasn't in compliance with in 2016, can you?
17   A.  My understanding is we were most in compliance with the
18   Act in 2016, moving towards compliance.
19   Q.  Now, you said that everybody gets training on PREA and
20   everybody has had it.  You don't know the date that
21   everybody got their statutory or their
22   federally-required PREA training completed in the jail
23   that you asked for it to happen, right?
24   A.  Other than it was done in that year.
25   Q.  For example, the lady who put Solomon down in the

Chief James Davis
September 24, 2021

Page 78

1    classification that apparently allowed him to be with
2    my client, she got the training on the day my client
3    was raped, according to a little certificate.  You
4    would agree with me that that doesn't help someone for
5    someone to get PREA training after they've already gone
6    through the steps that lead to these two people being
7    housed together?
8  A.  How would she magically know about that.
9  Q.  Are you aware whether the classification staff had any
10   PREA training, any kind of sexual assault -- some of
11   them aren't officers.  They didn't go to the academy.
12   Are you aware of that?
13 A.  So, if they didn't attend, they were required to take
14   this in-service training regardless.  They might have
15   attended a civilian jailers training.  We used to do
16   that.  I'm not aware what they were doing with civilian
17   training.
18 Q.  They may have.  But the records we got show they
19   didn't, after processing Burks and Solomon through, and
20   they didn't go to the academy.  Were you aware that
21   that was the state of training and education in the
22   office in 2016 like so?  In 2016, were you aware of
23   that?
24 A.  Well, I'm aware that even civilians get training before
25   they start.  And we always had an avenue to train them

Page 79

1    in a civilian-style academy.  So, without guns or --
2  Q.  That's fair.  Rolling back to the tape in your memory
3    to 2016, do you recall being aware that classifications
4    were being handled by people who were not getting any
5    academy training, let alone the two-year refresher
6    training that was supposed to be going on?
7  A.  I would be aware, and was aware, that there would be
8    civilians working in various places in the agency.  But
9    they wouldn't be exempt from this updated training.
10 Q.  And they weren't -- it is just that it came after they
11   dealt with my client.  So, I appreciate that now in the
12   year 2021 they've gotten the training, and maybe even
13   some refreshers that they're supposed to.  Maybe
14   they're getting the refresher trainings they're
15   supposed to get.  My question is whether in 2016 you
16   were aware that the staff, in classification in
17   particular, didn't get any sexual assault training?
18 A.  I would just be aware of the directive that they all
19   received the training, including classification, and
20   not excluding anyone.
21 Q.  Right.  That you gave that didn't go into effect until
22   -- you don't even know when it was completed.  Some
23   time in 2016, right?
24 A.  I gave the division some freedom to make their own end
25   dates based on their individual needs and access to

Page 80

1    computers.
2  Q.  Fair enough.  Listen, I understand you came into this
3    in January.  I understand that.  My point is the PREA
4    standards came in in 2012.  PREA was enacted in 2003.
5    And in none of that time, all of those prisoners that
6    went through, the hundreds of thousands of people that
7    were processed through those years, are going through
8    with classification people who, according to our
9    records, aren't getting any kind of training, some of
10   the civilians especially, and did you know that?
11 A.  No.  Because, like I said, we train civilians.  So, I
12   don't look at them as being different or exempt from
13   training.
14 Q.  What training did the woman who had classified Solomon
15   have on the day that she classified him; do you know
16   that?
17 A.  No.
18 Q.  Do you know that she is basically an admin clerk?
19   I do not know that.
20 Q.  Do you recall that it used to be that sworn officers
21   did interviews with inmates and did like a worksheet
22   with them as part of the old way things used to be done
23   when they were classified?
24 A.  I'm aware that it's changed over time.  That that was a
25   way in the past.

Page 81

1  Q.  But you're not aware of what the policy was that an
2    officer would go through a worksheet with each inmate
3    and like an actual interview?
4  A.  If that's true, it's in the classification policy.
5  Q.  Yeah.  From long ago.  But that's not something that
6    you're familiar with?
7  A.  Well, I'm familiar with that that process happens and
8    that someone interviews them, medically reviews them,
9    and all the general steps.
10 Q.  So, why did it change to the process that's going --
11   whatever the process is today?  Do you know why it
12   changed?  Was it resources?
13 A.  I wouldn't be -- I wouldn't have been part of the
14   discussion.
15 Q.  Nobody ever said hey, you know, you've been retained,
16   you've been deputized, you're on board, why don't you
17   sort of gather a memo of where we're falling down on
18   the PREA standards or where we're doing really great?
19         MR. O'NEILL:  Objection, asked and answered.
20 BY MS. PRESCOTT:
21 Q.  It sounds like no one ever asked you to do that kind of
22   a write-up, right?
23 A.  Well, I guess my answer is I took it upon myself to
24   take it in smaller bites, to send it out with directive
25   changes.

Chief James Davis
September 24, 2021

Page 82

1  Q.  Command staff above you never said please do this,
2      right?
3  A.  No, that I recall.
4  Q.  Some basics on the policy piece.  Is it your
5      understanding that written policies are meant to be
6      picked up by anybody in the department who can read it
7      and understand it and implement it, this is what we do,
8      that's what the written policies are for?
9  A.  Yes.
10 Q.  Do you think that someone who picks up the policies
11     about operations knows how the department really works
12     when they read the policies?  Or do you think that the
13     policies are just sort of guidelines that aren't really
14     reflecting actual practice?
15 A.  I think the policies do reflect practice.  And I don't
16     think it's realistic to assume that we would just sit
17     someone down and say here's 500 pages, now go do those
18     things.  It doesn't happen like that.
19 Q.  I'm saying if someone like me, if I read the policies,
20     am I seeing what is really happening?  Is there like a
21     de facto set of actual practices that aren't what the
22     policies show?
23 A.  I don't think there is a de facto set of policies.  I
24     think the policies work in a totality where, you know,
25     over time and distance all these policies they don't –

Page 83

1      they're not – I don't believe they can work and just
2      read this one.  I mean, they just all work together and
3      they all come from a different intention, let's say,
4      right.  So, there's – but it doesn't mean that other
5      things don't affect what's happening in that policy.
6      So, it's a complex environment.
7  Q.  So – are you finished?  I don't want to cut you off.
8  A.  No, go ahead.
9  Q.  I'm not sure I understand.  You said there is not a de
10     facto set of the way we really do it, policies.  And
11     then you just told me there is a complicated system and
12     everything affects it.  Are you saying there is a de
13     facto set of different practices?
14 A.  No.  I'm saying there are other policies that help you
15     understand the individual policy.  If you have a
16     question, most likely there is another policy that's
17     answering that question.  Because it is – they can be
18     very specific.
19 Q.  And part of the reasoning you have policies is so that
20     the enforcement of expectations can be fair to the
21     staff and to the prisoners, right?
22 A.  Enforcement of rules.
23 Q.  So what you're enforcing, it's actually you already
24     knew this, you have the policies.  So that when you
25     have to enforce your rules, it's fair they knew about

Page 84

1      it, they were expected, told what they were expected to
2      do, right?
3  A.  I don't look at policy as a tools to punish people.
4  Q.  But one nice thing about having policies is it puts
5      people on notice of what their expectations are for
6      their conduct, right?
7  A.  To help them carry out their job.
8  Q.  Yeah.
9  A.  Yes.
10 Q.  And some of the policies are there because they're
11     needed to keep prisoners and staff safe, right?
12 A.  Yes.
13 Q.  And policies are – when they're written, and it sounds
14     like when you went through your whole process, and it
15     took a long time, it takes a long time because once a
16     policy is in place, it's an order, it's a command.  You
17     don't get to pick and choose if you want to follow it,
18     correct?
19 A.  That's correct.
20 Q.  You testified about your level of awareness of Burks
21     and Solomon and who assigned them together, to be
22     together.  Do you recall being asked about that?
23 A.  I don't, but I don't have an awareness of who
24     classified them and housed them.
25 Q.  How about were you honest when I asked you about what

Page 85

1      you knew about whether people were following internal
2      policies about sexual assaults and assault and
3      batteries and how they were managed?
4  A.  Well, I'm not here to lie.
5  Q.  I'm asking about your prior testimony.  You didn't see
6      anything wrong with your prior testimony about who was
7      following policy, what you knew about who was following
8      policy, correct?
9  A.  Well, my assumption is that people follow the policy.
10 Q.  Well, okay.  My question was whether or not you recall
11     seeing anything wrong in your prior testimony about
12     what you knew, what you know when it comes to who
13     followed internal policies or who didn't regarding
14     Solomon's placement?
15 A.  I still don't know that.  I don't recall what's written
16     in my prior testimony, but I don't know that.
17 Q.  You aren't somebody who has a – who has a particular
18     knowledge of the classification process, such as the
19     screening documents and the steps, right?
20 A.  I have not been in command over that.
21 Q.  And you still don't know whether the classification
22     process was handled according to policy or not?  Or you
23     can't comment about the classification process with
24     Solomon and Burks, can you?
25 A.  No.  Because I don't – I really don't understand.  I

Chief James Davis
September 24, 2021

Page 86

1    mean, I wasn't part of that.  So, I don't have any
2    direct knowledge of it.  But I do believe that they
3    correctly classified people.  They're very good at it.
4    I have no reason to believe that they wouldn't properly
5    classify anyone.
6  Q.  But you don't have any specific knowledge particular to
7    Solomon or Burks in that regard, right?
8  A.  No.
9  Q.  Same question with regard to the screening process with
10    regard to either of them.  You don't know anything
11    specific about Solomon and Burks and the screening
12    intakes?
13  A.  No.
14  Q.  We talked about management of offenders or prisoners in
15    the last deposition.  Just to be clear on our
16    terminology, when I say management of a prisoner, I
17    mean like how they're moved.  You know, where they
18    might be housed.  What programming they might receive.
19    Is that your understanding.
20  A.  I understand what you're saying.  I don't recall the
21    testimony.
22  Q.  Does that understanding of management line up with the
23    way you use the word management?  When I say how is
24    that prisoner managed, do you understand that to be in
25    reference to how they were housed, what programming

Page 87

1    they went to, where they were moved in the facility?
2  A.  I think of that term as housing.
3  Q.  Okay.  Do you understand that in August of 2016, the
4    Wayne County sheriff's office knew that my client,
5    Mr. Burks, was at a serious risk of attack from other
6    prisoners within his walls?
7  A.  I don't know.  I don't have knowledge of that.
8  Q.  Do you know whether the Wayne County sheriff's office
9    knew that he was a particularly vulnerable prisoner in
10    August of 2016?
11  A.  I don't have any knowledge of that.
12  Q.  Do you know if anyone knew that he had never been in
13    prison before or jail before?
14  A.  I don't know.
15  Q.  You don't know.  Did the Wayne County sheriff's office
16    take action relative to Burks and his vulnerable status
17    because he presented a harm to himself in particular?
18  A.  Based on him being housed in the protection unit, I
19    think they specifically drew the conclusion that they
20    put him there as a solution to what they viewed as a
21    risk.
22  Q.  Okay.  But do you know whether that's why he was there?
23  A.  No.
24  Q.  Okay.  And so, what is the special unit you're
25    referring to, protective custody?

Page 88

1  A.  Yes.  610 was a protection ward.  And you would be
2    moved there if you had some sort of concern.  Either
3    the inmate or the housing officer would detect that
4    would be a place to eliminate the general population
5    interacting.
6  Q.  Is protective custody supposed to be a place where the
7    custody is more protective than general population?
8  A.  In the sense that you don't want to interact with
9    another specific person or a specific group or you just
10    might feel safer with less people around you.  I mean,
11    I think there's a wide range of reasoning for
12    separating someone from the general population.
13  Q.  Yes, I agree.  But, for example, there could be two
14    different types of people.  There could be Hannibal
15    Lecter, who is going to eat anybody that he is housed
16    with, and very extremely scary and can't be trusted, or
17    an elderly grandfather who is 104 and can barely move.
18    Can both of those people be put into protective custody
19    in the same thing, in the same little interacting unit?
20  A.  I think the answer is it depends.  I mean, I'm trying
21    to think through your scenario.  And it would be
22    unlikely someone who could barely move would be –
23    might be in the medical ward for care and custody.
24    Someone who, you know, eats other people, I think they
25    would be housed in a more restrictive environment like

Page 89

1    maximum.
2  Q.  What if they have just been convicted of mutilating
3    dead bodies and raping young children, they don't go to
4    maximum security, do they?
5  A.  So, then you moved on to how do you determine those
6    conditions.  And that's a different question.
7  Q.  Okay.  But let's go to this one.  People who are
8    charged with mutilating dead bodies and raping children
9    and rape and mayhem.  And then people that have been
10    convicted of, you know, bad check writing.  They've
11    never been convicted of eating people and mutilating
12    dead bodies.  They don't go to maximum security at the
13    Wayne County jail; you're aware of that?
14  A.  I think the answer is it depends on – it depends on
15    what they're presented with.
16  Q.  So, they can, but they don't necessarily go to maximum
17    security is your point?
18  A.  Well, I think that's true for every prisoner that's
19    classified.  I think they make decisions on what they
20    see.
21  Q.  If they see, in the classification ward, that Solomon
22    had been arrested for mutilating a dead body, sexually
23    offending 13 to 15 year olds, why didn't they override
24    anything and put him in maximum security?
25  A.  I don't have any knowledge of what they saw or didn't

Chief James Davis
September 24, 2021

Page 90

1  see or how to classify that.
2  Q.  So, going back to policy then, are you aware that in
3  the year 2016, protective custody was being used as a
4  place to put people who were difficult to manage due to
5  institutional misconduct, difficulty with others,
6  prisoner rock bossing, and so on, at the same time, in
7  the same ward, putting people who were vulnerable to
8  attack?  They're mixing those two groups in the same
9  ward; did you know that in 2016?
10 A.  I would say, again, that it would depend on the facts
11    presented.  There are many reasons you might not want
12    to be in general population.
13 Q.  I'm saying that are you aware that that pattern was
14    occurring in 2016?
15 A.  I'm not aware of that as a pattern, no.
16 Q.  Are you aware of that ever occurring?
17 A.  I'm not aware of them dangerously putting people
18    together, no.
19 Q.  So, you understand that it would be dangerous to put a
20    vulnerable person in with somebody who was difficult to
21    manage, having problems with others, rock bossing,
22    manipulating others, raping people, violating and
23    raping bunkies, and so on; you would not put those two
24    together, would you?
25 A.  I think it's an impossible sort of question if we don't

Page 91

1  have the facts of what they knew.
2  Q.  I didn't ask what anyone knew.  I'm saying you, with
3  your PREA lens over this stuff, you wouldn't think
4  those two should go together, that I just described,
5  would you?
6  A.  Again, I'd have to understand what are you – the
7  variables are so numerous.  You'd have to look at the
8  two cases individually.  Individually, through any
9  lens, including a PREA lens, and make that
10 determination.  Is there a time when it doesn't work
11 out and we have to move them, perhaps.  If that's what
12 you're asking.  But the idea that we would, you know,
13 make mistakes, you know, I think we're very good at not
14 making mistakes, considering the amount of variables
15 and what they're presented with every day.
16 Q.  Okay.  So, let's stipulate that you imagine there could
17 be lots of variabilities.  My question is do you, with
18 your PREA lens, think it's appropriate to put together,
19 into the same ward, a person who is understood to be an
20 especially vulnerable person and a person who is
21 understood to be especially dangerous and difficult to
22 deal with, as demonstrated by interactions with other
23 prisoners, as demonstrated by their record?  Do you
24 think that those two should be placed together?
25 A.  I don't see how it's possible, considering all the

Page 92

1  housing options that we have.  There is single cell.
2  There is isolation.  There's more housing available for
3  someone who is so vulnerable.  I just can't agree that
4  it's A or B.
5  Q.  You can't agree that it's something that should be done
6  or shouldn't be done?
7  A.  Well, no one is going to advocate for harming people
8  through housing.  I mean, no one is going to say that.
9  Q.  I understand.  I'm talking about what is smart to do in
10 order to keep people peaceful, happy, safe prisoners.
11 A.  Yeah, they do that every day.
12 Q.  People that aren't raped.  And I'm asking you, in my
13 scenario, do you think that those two prisoner groups
14 that I just described, or profiles I just described,
15 are people that are properly housed together?  Do you
16 need me to repeat it?
17 A.  Yeah.  If you want me to answer a hypothetical, I need
18 to understand the parameters.
19 Q.  You're here today to be an expert, right; you
20 understand that?
21 A.  Yes.
22 Q.  Okay.  And you're here today citing your expertise and
23 all of the years of experience.  So, that's why I'm
24 asking the hypothetical.  A particular person who the
25 Wayne County jail has identified as being vulnerable to

Page 93

1  be attacked by other prisoners, should that profile of
2  a person be housed with the profile of a person that
3  has been repeatedly charged with rape, mutilating dead
4  bodies, raping children, difficult to manage in the
5  facility, breaking rules, rock bossing people, a
6  pattern of institutional misconduct?
7  A.  I would answer – again, I would answer it depends.  I
8  mean, you could have all these cases but they might
9  have been dismissed, or never charged.  Are they
10 convictions.  Are they – I mean, are they convicted of
11 the crimes.  I mean, I think your second scenario is
12 too broad.
13 Q.  Okay.  Well, let's just take a normal 65-year-old that
14 can get up and down but they're never been in jail
15 before.  They don't have any, you know, history.
16 They're not a hardened criminal.  And somebody who is
17 accused and brought in for mutilating dead people.  He
18 hasn't been convicted though, but he's been arrested
19 for just a pattern of dozens of rapes and mutilating
20 dead bodies.  Should those two people be together?
21        MR. O'NEILL:  Objection, we're getting so far
22 afield on relevance.
23 BY MS. PRESCOTT:
24 Q.  Go ahead.
25        MR. O'NEILL:  You can answer if you can.

Chief James Davis
September 24, 2021

Page 94

1   A.   You know, I think I answered this already.  If you're
2        going to have these extreme scenarios, the answer is
3        going to be no.  But I think it's gray.  It's not black
4        and white.
5   BY MS. PRESCOTT:
6   Q.   Why is the second scenario any different just because
7        – I mean, do you look at charges when putting people
8        together?
9   A.   For them it's real life.  It's in the scenario.
10  Q.   Trust me.  I'm on this side of the table standing next
11       to the person that's been raped.  So, I got that.  My
12       question for you is does the person who is extremely
13       scary because of their charges, does that ever come
14       into it?
15  A.   Yes.
16  Q.   Does this department ever look at that?
17  A.   Of course they do.
18  Q.   Okay.  So, why was Solomon a person who had been
19       charged over and over and over again with raping
20       people, who had been convicted of raping people, who
21       had been found to rape bunkies in the facility, why was
22       he housed with my client?
23            MR. O'NEILL:  Objection, mischaracterizes the
24       record.  You know, Ms. Prescott –
25            MS. PRESCOTT:  You don't need to verbally –

Page 95

1            MR. O'NEILL:  I'm just saying you're
2        misleading the – you're purposely contradicting the
3        record in this case.
4            MS. PRESCOTT:  No, I'm not.
5   BY MS. PRESCOTT:
6   Q.   Why was someone with Solomon's profile housed with
7        someone with my client's profile?
8            MR. O'NEILL:  Objection, outside of the area
9        of this witness's expertise.
10  A.   And my previous answer was I don't know how he was
11       classified.  I don't have those facts.
12  BY MS. PRESCOTT:
13  Q.   How, if you don't know how he was classified, and what
14       the facts were, and how this could possibly be, or
15       whether it makes sense, are you here to say that you
16       think that it was done in accordance with the law?
17  A.   I think I'm going to say that I was not involved in his
18       classification and I don't know how they came to that
19       conclusion.  And I think I already agreed to your crazy
20       example where they're so far apart that it would be
21       obvious.  But I'm not prepared to say that it was
22       obvious with this Solomon.
23  Q.   And you don't know who made any assessment or whether
24       they took the appropriate steps, do you?
25  A.   Well, I know what the practice is.  That those – if

Page 96

1        inmates have problems, they get moved.  And the fact
2        that they had a reason to put them there.  And that the
3        housing officer would say hey, this officer is having,
4        or this inmate is having problems on this floor, or
5        with the general population, what can we do.  And
6        sometimes, somehow – I mean, that's so – I think it's
7        clear that there was some efforts made to protect both
8        of those prisoners.
9   Q.   Isn't it true that the individual floor security staff
10       have no ability whatsoever to remove a prisoner from a
11       dangerous situation that they are witnessing on a
12       floor?  They can't do that?
13  A.   That's wrong.  They can do that.
14  Q.   They don't have the authority or ability to do that, do
15       they?
16  A.   They do.
17  Q.   That's just on paper though.  That's not practically
18       happening.
19  A.   I think you're wrong there.  Because every move that
20       happens starts with the housing officer's observation.
21       Everything, of course, they do, they need guidance so
22       they don't put people in the wrong place.  Yes, they
23       do.  But it all starts with them, if they see people
24       who are sad, and might be at risk of suicide.  What
25       they see in their daily job, that all gets condensed.

Page 97

1        And if they feel that a housing change is necessary,
2        classification gets involved and they make that change.
3   Q.   But they can't remove someone on their own?
4   A.   Absolutely they can, and they're required to.
5   Q.   And they do it?
6   A.   Of course they do.
7            MS. PRESCOTT:  Do you want to take a break?
8            MR. O'NEILL:  I don't need one.
9            MS. PRESCOTT:  I just want maybe five
10       minutes.
11            MR. O'NEILL:  Sure.
12            (Recess taken at 12:02 p.m.)
13            (Back on the record at 12:18 p.m.)
14  BY MS. PRESCOTT:
15  Q.   Do you know Keith Williams at all, one of the
16       defendants in this case?  He's not with the department
17       any longer.
18  A.   I do not know that name.
19  Q.   Do you know, even sitting here today, what rounds he
20       did with the Solomon and Burks ward on the night of the
21       rape?
22  A.   Didn't we look at –
23  Q.   We talked about the policy, yeah.  We had a discussion
24       about rounds.
25  A.   And my impression was they were done.  But perhaps 610

Chief James Davis
September 24, 2021

Page 98

1    was inoperable, the card reader for 610.  That's what I
2    recall.
3    Q.  Okay.  So, do you know – are you going to testify at
4        trial – do you know whether rounds were done that
5        night in ward 610?
6    A.  I would have to review those records to answer that.
7        And I think you showed me some.  But at this point, I
8        can't recall.  So, what I can say is rounds were done.
9        And I think we had a discussion of how it would be
10       difficult to do a round without seeing into 610, is I
11       think what I said.
12   Q.  But you don't have personal knowledge whether you were
13       a part of supervising the rounds?  Or you know what the
14       records are.  We all have the records.  But you don't
15       have any personal knowledge?
16   A.  No, I don't.
17   Q.  And you don't have any knowledge of any discussion with
18       Williams and Mr. Burks on the day of the rape?
19   A.  No.
20   Q.  And do you have any prior knowledge of what Solomon was
21       like at the – you know, like in various periods of
22       being in the jail of his – what his institutional
23       regard was?
24   A.  I do not.  And I don't recall him as a prisoner in any
25       way.

Page 99

1    Q.  Do you know whether Mr. Williams had any experience
2        with sexual assaultive inmates at the time of the rape
3        of Mr. Burks?
4    A.  So, I'm not clear on experience, what you mean.
5    Q.  Like had he been an officer who had managed sexual
6        assaultive inmates?  And to what extent could you
7        testify to any of that?
8    A.  I could not, no.
9    Q.  Do you know what Mr. Williams particular duties were on
10       the night of the rape?
11   A.  I don't.
12   Q.  Do you know whether that night he was operating
13       according to standards and expectations for his
14       supervision of the prisoners?
15   A.  My assumption would be yes.  Do I know, no.
16   Q.  Do you know of any reason why the rounds would not be
17       conducted every 30 minutes in protective custody that
18       night?
19   A.  I do not have knowledge of that.
20   Q.  Or why they weren't conducted every 60 minutes that
21       night?
22   A.  I wouldn't have knowledge of that.
23   Q.  Do you understand that every either 30 or 60 minutes
24       they were supposed to be conducted, right?
25   A.  Well, my understanding of rounds is that the standard

Page 100

1    is 60 minutes.  And that officers are to do them
2    intermittently or so, and unpredictable patterns.  And
3    it takes time to walk from one side of the jail to the
4    other.  And depending on where you start is where you
5    finish.  But the rule is that you do that within the
6    60-minute time frame but still staggering your exit and
7    entering times.
8    Q.  Okay.  Is that written somewhere?
9    A.  Yes.  It's in the rounds policy.
10   Q.  So, you think the rounds policy said you can do more
11       than 60 minutes if you're staggering, what you just
12       described?
13   A.  No.
14   Q.  Do you know how many shifts Mr. Williams had worked?
15       How many doubles or –
16   A.  No, I do not.
17   Q.  Do you know if Burks asked him for help with Solomon?
18       He expressed fear of Solomon?
19   A.  I do not know.
20   Q.  When someone expresses fear of an inmate and says they
21       need help with them, the staff is supposed to
22       investigate that and take steps to deal with it, right?
23   A.  Yes.
24   Q.  Do you know whether Mr. Williams heard or saw anything
25       unusual that night?

Page 101

1    A.  I do not.
2    Q.  Do you know whether he was derelict in any duty that
3        night?
4    A.  I do not.
5    Q.  With regard to Ms. Bell, do you know – again, we have
6        the records on the rounds.  But do you have any
7        information personally about the rounds she did that
8        night?
9    A.  I do not.
10   Q.  Or discussions she had with Mr. Solomon?
11   A.  I do not know.
12   Q.  Do you know if she had any prior knowledge of
13       Mr. Solomon's history of institutional misconduct?
14   A.  No.
15   Q.  Do you know if Williams had that information in August
16       of 2016?
17   A.  I don't know.
18   Q.  Do you know whether Ms. Bell had prior experience
19       managing sexually assaultive inmates?
20   A.  No.
21   Q.  Do you know what her duties were – she was with
22       Williams that night.  Do you have any information what
23       her different roles and duties were that night?
24   A.  I don't know how they were scheduled.
25   Q.  Do you know how many shifts she had worked that week?

Chief James Davis
September 24, 2021

Page 102

1  A.  I do not.

2  Q.  Do you know whether Burks asked her for help with

3      Mr. Solomon, or this person that was coming to be

4      housed with him?

5  A.  I do not know.

6  Q.  Do you know whether she was derelict in any duty that

7      night?

8  A.  No.

9  Q.  Do you know whether the cameras were working on ward

10     610 on the night of the rape?

11 A.  I do not know.

12 Q.  Isn't it true that you and the other policy makers and

13     management at the Wayne County jail didn't consider it

14     something that was your responsibility or your job, to

15     look into whether there were any failures by jail staff

16     that could have contributed to sexual assaults from

17     2003 to 2016?

18 A.  I do consider that within my job description and rely

19     on internal affairs in large part to show me where

20     violations are in investigations.

21 Q.  Is IA supposed to tell anyone else?

22 A.  It's a closed unit.  They keep those investigations

23     confidential.  There is a supervisor, the captain who

24     would communicate with the disciplinary deputy chief,

25     who I communicate with.  And that's the practice.  They

Page 103

1      let us know if there's a violation that comes up with

2      an investigation, like failure to do rounds.

3  Q.  Are there policies that tell IA what they're supposed

4      to investigate?  Specifically that they are supposed to

5      be looking at whether staff may have contributed to an

6      unsafe sexual assault situation, or the institutional

7      failure, like we have a blind spot over here?  Is there

8      some policy that says IA should be specifically looking

9      for those things?

10 A.  I can't think of a policy.  But I know that they

11     believe their duty is to report on what they find.  And

12     in my experience, they're looking for rule violations

13     that I would interpret, under a PREA lens, as something

14     that perhaps could be done differently.  They wouldn't

15     be necessarily looking to the PREA lens, but they would

16     be looking for factual deficiencies.

17 Q.  Was it anybody else's job to look at the IA

18     investigations under that particular lens that okay,

19     whether or not it's a rule violation, it's a risk and

20     we need to be managing this risk because of PREA?

21 A.  No.  I think the commander could be involved.  But

22     internal affairs has their own line of authority.

23 Q.  And you don't see that as problematic, that IA doesn't

24     circle back with the command staff and say look, this

25     is what we found, whether it's exonerating the staff in

Page 104

1      that facility or otherwise?

2  A.  I didn't mean to suggest that that doesn't happen.

3      Line of authority wise, I'm sure there are practices to

4      share the reports because, right, it's the commander's

5      jurisdiction.

6  Q.  But that wasn't happening according to Commander Cane;

7      are you aware of that?

8  A.  She may not have gotten that report.  When I was a

9      commander, I would get those reports.

10 Q.  I'm not talking about in Burks and Solomon.  She said

11     she wasn't getting back, from internal affairs, their

12     findings on the different examinations or

13     investigations internal affairs was doing.

14 A.  She would have to ask for that.  I don't think that

15     they would generally distribute their investigation.

16     It would go to the deputy chief over IA and then

17     whoever else.

18 Q.  So, suffice it to say, you weren't aware of Cane's

19     practice in this regard?

20 A.  I was not.

21 Q.  How is she going to be adequately assessing the

22     security apparatus and the operational apparatus with

23     this lens of oh, sexual assault or sexual harassment is

24     happening here, is what we're finding, if she's not

25     getting the report back?

Page 105

1  A.  And I think that she should.  My only other comment

2      would be that perhaps she was unaware -- I mean, we

3      were all thinking there was no deficiencies.  But you

4      would have to ask her that.  I don't know.

5  Q.  But you can understand -- you seem perfectly capable of

6      understanding that you might have very little record of

7      sexual assaults or substantiated cases for two reasons.

8      It could be because they're not happening.  It could be

9      because they're not being detected or followed up on,

10     right?

11 A.  Yes.  And PREA says expect an increase in reportings as

12     we get close to full compliance.

13 Q.  Right.  But at the policy-maker level, at the level of

14     the management and the people who could make changes at

15     the jail, isn't it correct that there's no

16     consideration of whether there might be failures by

17     jail staff that contributed to or led to sexual assaults

18     that just wasn't happening prior to August of 2016, was

19     it?

20 A.  Well, I think it was happening through the disciplinary

21     system.  That's where all the oversight would start.

22     We would look at what came back from an investigation

23     and say look at this.  I mean, we terminated people for

24     results in our internal affairs investigations.  That's

25     where our information comes from.

Chief James Davis
September 24, 2021

Page 106

```
 1  Q.  So, I know we just did this exercise, logical exercise
 2      a moment ago, but the fact that people are getting
 3      disciplined may be an indication that that's how many
 4      disciplines were necessary, or it may be a reflection
 5      of how many disciplines were caught and followed up
 6      with, right?
 7  A.  Yes.
 8  Q.  Like we can't go back to 2016 and disaggregate that,
 9      can we?
10  A.  No.
11  Q.  And disaggregate this is what our number showed on the
12      number of assaults and harassments and everything, was
13      that really the number is just the number that was
14      memorialized, right?
15  A.  Yes.
16  Q.  And that's why I just go back to I know you haven't
17      heard the tapes, but when you get the tapes years
18      later, and you find out that not one question is asked
19      about well wasn't there anyone doing rounds.  Did you
20      see any officers in the area.  You know, did you call
21      out for the officers.  Have you told the officers you
22      were afraid of him.  I mean, there seems like a really
23      big gap there, doesn't it?
24  A.  Yeah.  I would have preferred these things were done.
25      Normally they're done.
```

Page 107

```
 1  Q.  Can I ask it this way:  I mean, the investigators are
 2      supposed to be very highly trained, right, to do this
 3      work, right?
 4  A.  Yes.
 5  Q.  Right.  You're not expecting and relying on Joe Blow,
 6      who is in the jail from the street, to know what is
 7      relevant and important to run your jail and what
 8      questions should be asked, do you?
 9  A.  No.
10  Q.  Did you have a staff in your PREA role in 2016 at all?
11  A.  No.
12  Q.  Do you recall what's the first thing you ever heard
13      about the Burks and Solomon matter?  Can you roll back
14      in your memory and say like the first thing I remember
15      is this?
16  A.  It's difficult to recall 2016.  You know, I can – you
17      know, I can recall I talked to the captain of internal
18      affairs frequently with different hats, with discipline
19      and with PREA, and I'm sure that came up at some point.
20      I don't know what we said about it.  I'm sure it was in
21      a log that we get every day for report, summaries and
22      that.  I would be alerted.  And then I would sometimes
23      – sometimes I would call the commander and say yes
24      we've already called IA.  That would probably be what I
25      would half recall, I guess.
```

Page 108

```
 1  Q.  And trust me when I say I can barely remember like
 2      before Covid.  It's all very foggy.  So, I guess that
 3      I'm asking you, things that go way back.  Do you recall
 4      any – I imagine, and I don't need to know about staff
 5      that have been engaged with sexual misconduct with
 6      prisoners, so fraternization type disciplines.  Putting
 7      those aside, do you recall any discipline of staff
 8      where there's been a finding of, you know, your lack of
 9      supervision contributed to this sexually unsafe
10      situation for a prisoner?
11  A.  And I think, again, that sort of conclusion would come
12      from reviewing an event.  And it would be noted that
13      something wasn't done, like rounds.  And then we would
14      bring that person in and figure out why that happened,
15      or if it happened.  And certainly discipline could be
16      an offering for that.
17          I'm trying to think back over all discipline.
18      You know, often that's similar to suicide.  That's
19      reviewed.  And we find that there is a deficiency, and
20      we correct that.  And it's similar here.
21          I'm trying to think of a specific case, you
22      know, that we've terminated folks who, you know, maybe
23      had consentual relationships with prisoners.  But I
24      can't recall specific cases.
25  Q.  So my question had been you can't think of a case
```

Page 109

```
 1      relative to punishment, or discipline I should say, of
 2      a staff member relative to an element of, you know, you
 3      weren't supervising adequately?
 4  A.  Other than them participating.
 5  Q.  Do you know of anything in your awareness or that you
 6      plan to testify to that happened with respect to
 7      Mr. Burks or happened with respect to Mr. Solomon
 8      because it was unique to them individually as opposed
 9      to this is the way we do things, this is the policy,
10      this is the practice we do?
11  A.  No.
12  Q.  How about – I mean, in other words, if they had been
13      any other prisoners, is it your understanding and
14      belief that anything that did or didn't happen would
15      have been the same in terms of the way the staff
16      reacted to them, the policies?
17  A.  It sounds like you're asking was there a deviancy based
18      on who they are.  And I don't have any knowledge of
19      that.
20  Q.  Earlier when you testified – I asked you about when
21      the 2016 pamphlet was issued, and you didn't know the
22      date.  Do you know it today?
23  A.  Let's see.
24  Q.  Are you looking at Exhibit 3?
25  A.  Is that what we called this?
```

Chief James Davis
September 24, 2021

Page 110

1         MR. O'NEILL:  Yes.
2   A.  So, Exhibit 3, there is a memorandum from June 7, 2016.
3   BY MS. PRESCOTT:
4   Q.  What does it say?
5   A.  That says that I have made a thousand pamphlets ready
6       for you today.  And of course here's the template from
7       the PREA resource center.
8   Q.  So, if Mr. Burks was already in – so, these were to go
9       in when people were done with intake, right, screening?
10  A.  Yes.
11  Q.  So, if Mr. Burks was already in prison, or jail –
12      excuse me – was there any order that said go give this
13      to everybody that was already here?
14  A.  No, there was not.
15  Q.  Do you think that he wouldn't have gotten the pamphlet?
16  A.  I don't know.  Because if he went back for a re-housing
17      assignment, it could have been given to him.  And I
18      incorporate these rules into the inmate handbook.  And
19      so, he would have had a handbook which would have
20      mimicked sexual safety information.
21  Q.  Do you know when the updated handbook went out?
22  A.  I do not have that.
23  Q.  Do you know when the 2016 new signage went up in the
24      old division?
25  A.  I think there is a – in that May 27 memorandum,

Page 111

1       there's a reference to expected behavior.  The inmate
2       handbook is very clear.  But that's not signage.  I'm
3       saying the handbook is clear on behavior.  I'm assuming
4       it was there in May, but maybe not.  I thought I had a
5       signage one.  Even if we do find it, I don't see a
6       date.
7   Q.  Well, the exhibit is marked and it's part of the
8       record.  So, if it's there, it's there.  Suffice it to
9       say, you don't have any information of your memory?
10  A.  Of the date that they were on?
11  Q.  Right.
12  A.  No, I don't.
13  Q.  You testified at your prior deposition that you did not
14      have superintendent operational authority.  What does
15      that mean?
16  A.  That means I believe in my role as the director that I
17      do not have the ability to order command officers to do
18      that.
19  Q.  Okay.  So, could it be a little bit like sort of like
20      being in the chain of command in terms of operations,
21      what you shall and shall not do?  I'm just trying to
22      understand genuinely.
23  A.  I'm trying to think that through.  As a director, I
24      don't have that line of command authority that I think
25      you just mentioned.  That a sergeant, lieutenant,

Page 112

1       commander, they have over the staff.
2   Q.  And you also – and part and parcel of that is you're
3       not working in the jail's facility, right?
4   A.  I'm not.
5   Q.  You're not seeing the day-to-day?  I mean, you might
6       pass through, there might be a meeting, but you're not
7       there boots on the ground?
8   A.  No.
9   Q.  And that was true in 2016?
10  A.  Yes.
11  Q.  How long had it been since you had been on a routine
12      basis, if not daily, then frequently during the week,
13      in the jail divisions?  How long had it been?
14  A.  Well, the last time I had a post in a jail was 2013.
15      And then I retired.
16  Q.  So, your last post was something that was operationally
17      in the jail?
18  A.  Yes.
19  Q.  Did you ever examine what other jails or prisons,
20      federal, state, local facilities did in 2016 to manage
21      dangerous and difficult inmates where they would be
22      managed and held?
23  A.  Yes.  And I did that with Chuck Pappas.  He had a
24      contact at the Michigan Department of Corrections and
25      he sent us his PREA rule book to help us build the

Page 113

1       policy.
2   Q.  Okay.  So, what's going on with Chuck at this time?  Is
3       he on his way out and he's handing off to you?  Or
4       you're working together?
5   A.  We're in such close quarters.  We see each other, not
6       on a daily basis or anything, but it seems like that
7       too would have been in that handover process.  And he
8       gave me that resource to finish that policy.
9   Q.  Okay.  So, he gave you MDOC's policy?
10  A.  Yes.
11  Q.  And do you remember seeing an MDOC policy, specific
12      provisions that there shall be a determination of a
13      potential victim and who is potentially an aggressor?
14      Do you recall seeing that?
15  A.  I do not.
16  Q.  Do you recall seeing that MDOC rules and regulations,
17      similar to PREA, say that you can't house those two,
18      not only in the same cell, but even in the same pod?
19  A.  Yes.
20  Q.  And you understand that to be what PREA said had
21      happened?
22  A.  Yes.
23  Q.  As of 2012?
24  A.  You know what, I don't have a memory of talking about
25      that in 2012.

Chief James Davis
September 24, 2021

Page 114

1  Q.  Okay.  But do you know, sitting here today, that that
2     is one of the -- that is something that was dictated by
3     the PREA standards that came out in 2012?
4  A.  Yes.
5  Q.  And I'm going to hand you what I'm going to mark as
6     Exhibit 4.  It's the assessment sheet for all its
7     prisoners.
8         MS. PRESCOTT:  You can look at it, Paul.  I
9     only have that one copy.
10        MARKED FOR IDENTIFICATION:
11        DEPOSITION EXHIBIT 4
12        12:55 p.m.
13 BY MS. PRESCOTT:
14 Q.  So, my only question is whether this is something that
15    you know, as you looked at PREA enforcement, like you
16    just testified you got the policy from MDOC, did you
17    get their little handy-dandy here is how to screen for
18    PREA risk in Exhibit 4?
19 A.  No, I don't specifically recall this form.
20 Q.  Have you ever seen any score sheet like that that is
21    specifically designed to get a factor of sexual
22    victimization or sexual aggressor from any facility
23    anywhere?
24 A.  So, I see that this form is more than just a PREA form.
25    It's all different characteristics.  So, it would be --

Page 115

1     it would function in more than one way.  This is
2     certainly augmenting a risk assessment to include
3     sexual aggression.
4  Q.  So, are you aware that MDOC has a whole other screening
5     class level?  You could have one.  You could be a four,
6     and that means you are going to go to maximum security
7     facilities.
8  A.  I don't know that sheet.
9  Q.  So, let's go back to my question about Exhibit 4.  Have
10    you seen a screening tool like what Exhibit 4 has used?
11    Prison Rape Elimination Act risk assessment, have you
12    seen that kind of a format?  The wording might change
13    here or there from either the PREA resource center on
14    line or other facilities in the United States.
15 A.  In 2016?
16 Q.  Have you ever seen one sitting here today, all the way
17    until today?
18 A.  Well, we talked about that with someone from New York
19    this week.
20 Q.  Okay.  How about ever before this week?
21 A.  No.
22 Q.  Do you know whether other counties in the area were
23    using screening tools like as in Exhibit 4?
24 A.  We all have screening tools and we all ask questions
25    that related to victimization and predation.  They're

Page 116

1     not called PREA tools.  But we -- everyone screens for
2     those things.  I haven't seen one that is labeled
3     Prison Rape Elimination Act screening.
4  Q.  When you say we, that makes me think that Wayne County
5     asks those questions.  Do you recall testifying in the
6     last deposition that you do not know what the screening
7     tool is in Wayne County?  You have not seen it?
8  A.  I'm aware that it asks similar questions.
9  Q.  You think Burks and Solomon were asked questions
10    similar to what's on Exhibit 4?
11 A.  Regarding predation and victimization, I would think
12    they were.  Do I know that, no, I don't.
13 Q.  And so, wouldn't that be kind of important to know, you
14    know, given that your PREA lens covers so many
15    different -- I mean, it covers everywhere in the
16    facility and every part of the operation.  But wouldn't
17    it be important to know whether the screening tools
18    were actually using the kinds of questions that would
19    get at like what's seen in Exhibit 4?
20 A.  Yes.
21        MARKED FOR IDENTIFICATION:
22        DEPOSITION EXHIBIT 5
23        12:57 p.m.
24 BY MS. PRESCOTT:
25 Q.  Exhibit 5 is called PREA risk assessment final scoring.

Page 117

1     I only have that one copy.  So, this is an MDOC
2     document too.  I'll just ask a couple questions.  Let
3     me know when you've had a chance to check it out.
4  A.  Okay.
5  Q.  So, this is the MDOC's scoring guide that goes along --
6     so, 5 is the guide that scores when you have answers on
7     4.  And, you know, if you have a yes to certain
8     questions, you get a really high score.  For example,
9     victim of a substantiated prisoner-on-prisoner
10    non-consensual sexual act, you're going to get a really
11    high score of the likely victim.  You get 60 points for
12    that.  If you're an aggressor of a substantiated
13    prisoner-on-prisoner non-consensual sexual act, you get
14    a really high score the other way.  And there's one in
15    between, like any history of perpetrated sexual
16    victimization by threat or force, any history of
17    perpetrated physical abuse, gang affiliation, et
18    cetera, history of consensual sex in a facility.  Have
19    you ever seen Exhibit 5 or, you know, in other words,
20    the score sheet that MDOC was using in 2016?
21 A.  Not that I recall.
22 Q.  Have you ever seen any kind of a score sheet that gives
23    differentiated scores based on the questions that are
24    asked anywhere at any time right up until today?
25 A.  Once again, every assessment tool is going to ask these

Chief James Davis
September 24, 2021

Page 118

1 things in different ways. And we're going to see if
2 there's an aggressor, number one here, based on
3 criminal history and try to gather that same
4 information.
5 Q. So, my question is whether you have seen score sheets
6 that differentiate, based on what you identified
7 someone said, this is how much of a weight should be
8 given based on these scores? Have you ever seen that
9 undertaken, given a score sheet, at any time in any
10 facility?
11 A. Not that I can recall.
12 Q. And are you aware that in the Wayne County jail in
13 2016, you cannot score higher or lower because of
14 anything to do with a sexual crime? You know, so you
15 either have an assaultive felony or you don't. There
16 is nothing that honed in on sexual victimization; are
17 you aware of that?
18 A. I am not specifically aware of the instrument they used
19 in 2016.
20 Q. Fair enough. Don't you think that would be important
21 to differentiate, okay, there is a lot of aggressive
22 people or violent people that are in the jail that have
23 never been sexually aggressive? Wouldn't it be
24 important to have a tool to sort that out?
25 A. It would be important to know that information. You

Page 119

1 know, how you gather it is probably different ways.
2 Q. Wouldn't it be important though to translate it into a
3 score so you could assess specifically the risk of
4 sexually victimizing somebody else as opposed to the
5 risk that you're just scary and violent in general?
6 A. I think that would be helpful, yes.
7 Q. Why wasn't it ever instituted all the way up until
8 today?
9 A. You know, my thought is that we have a system and we
10 use that system and we're aware of sexual predation and
11 victimization. And we do try to protect inmates in
12 that way with the tool that we use. It may not look
13 like that. So, you know, is that something that we'll
14 look at when we move to the new system in a year, yes.
15 Q. But you don't have an answer as to why not, in 2014 or
16 '15 or '13, after PREA came out and said to do this?
17 A. My thought is that we said we do screen and we do
18 screen for those attributes, but it doesn't look like
19 that.
20 Q. And you've told me everything you know about the
21 screening process, right?
22 A. As far as I can determine, yes.
23 Q. When Mr. Pappas and you got the policy, did you ask
24 what they use for screening tools? I know you said you
25 haven't seen them. Did you ask for those?

Page 120

1 A. I think we were concentrating on writing our policy and
2 I think we were comparing policy to policy, not jail
3 operation. So, I don't think we were at that level.
4 Q. So, if you were comparing policy to policy, why not
5 institute, like MDOC, a clear role that says you shall
6 with a potential aggressor, with a potential victim.
7 A. I think that's what we are already trying to do.
8 Q. Well, how is that possible when Mr. Ramel testified
9 there isn't even a categorization of potential
10 aggressors and potential victims?
11 A. More an emphasis on history you're saying that.
12 Q. The history of 2013, '14, '15, '16 is what I'm focused
13 on.
14 A. I'm sorry. I lost the question.
15 Q. Fair enough. So, Mr. Ramel has said we don't identify.
16 We don't have a flag. We don't have a categorization.
17 So, how can you be managing according to category that
18 isn't even traced and tracked?
19 A. Well, 14-17 says you take into account predation. And
20 it said it in 2009 and it said it in 2016. And those
21 were always considerations. Now, it might not look
22 like that, but that has always been in the policy.
23       MARKED FOR IDENTIFICATION:
24       DEPOSITION EXHIBIT 6
25       1:06 p.m.

Page 121

1 BY MS. PRESCOTT:
2 Q. Exhibit 6 goes along with 4 and 5. So, it's Prison
3 Rape Elimination Act (PREA) risk assessments manual
4 from MDOC. And it's got a date, I think, August 12,
5 2015. Take a look at it. I mean, you can take as long
6 as you want. My question is whether you, first, have
7 seen this document before?
8 A. I don't think I've seen this.
9 Q. Do you know of anyone, yourself, or anyone from the
10 Wayne County sheriff's office, asking MDOC will you
11 give us your manual for how you do your sexual assaults
12 or your PREA screening?
13 A. Not to my knowledge. We were asking for the general
14 policy examples that would be put out in '16. And this
15 looks like their prison management system that's unique
16 to them.
17 Q. To this day, is there any manual that tells anyone in
18 classifications here is the PREA requirements for how
19 to do classification screening?
20 A. Other than our policies, I'm not aware of one.
21 Q. Was protective custody a place that had additional
22 layers of oversight or procedures for additional
23 oversight of the inmates?
24 A. Protective custody to me is a broad term. So, there's
25 different types of housing. If you're referring to

Chief James Davis
September 24, 2021

Page 122

1 610's own protection specifically –
2 Q. Let's focus on 610, yes. That ward, did it have
3 special rules for additional oversight or protection?
4 A. As far as I understand, there is a classification
5 option for folks who cannot or they do not want to be
6 in general population. It could be for a high profile.
7 It could be for someone who just doesn't do well with a
8 large group of people. It's not like a mental health
9 ward that requires direct observation or 30-minute
10 rounds, that I'm aware of.
11 Q. So, remember we reviewed the policy and how the policy
12 talked about continuous rounds of individuals two and
13 higher; you're not aware of that?
14 A. Say that again.
15 Q. Do you recall that policy in 2016 actually provided
16 that there would be continuous rounds for individuals
17 not in medical, but continuous rounds relative to
18 individuals that were at a classification of two or
19 higher?
20 A. So, I'm aware that there is a policy for one of the
21 divisions that was written with the words continuous
22 rounds. But I think I said last time in January, and I
23 think I said earlier today, that the idea that it takes
24 an hour to do a round, you're continuously on a round.
25 Continuous rounds, it means different things, I think,

Page 123

1 to different people. And so, if the question is am I
2 aware of it, yes.
3 Q. But you think it means that you can sit at the desk for
4 45 minutes of the hour and not be on your feet moving
5 between people?
6 A. It doesn't mean that. Because you have two people that
7 work there. So, someone is walking and someone is at
8 the desk to provide you security there.
9 Q. Okay. And is that your understanding of how things
10 worked on 610 in the week up to and including the rape?
11 A. I don't know the answer to that because I wasn't, you
12 know, administering that facility.
13 Q. Fair enough. Okay. So, would you agree that there's
14 no more rounds in protective custody than not
15 protective custody, more frequently or –
16 A. I think the answer could be yes, depending on who's in
17 there and what's in there, what the intention was. If
18 it's just because I'm not comfortable around people,
19 then perhaps the standard doesn't change. It goes back
20 to what does unprotected mean. What does special
21 housing mean. You know, what do those mean.
22 Q. Okay. So, it could be, but it's not baked into the
23 cake or inherent that in protective custody we have
24 more rounds or more oversight or more cameras and so
25 on?

Page 124

1 A. Well, cameras aren't – those were a prophylactic sort
2 of thing that we did additionally in that building to
3 try to increase coverage. So, it wasn't tied to a type
4 of inmate. It was a building sort of installation.
5 Q. Is protective custody just another housing unit? Is it
6 treated as just another housing unit?
7 A. And then again it would be – do you mean special
8 custody?
9 Q. I'm talking about ward 610, that level of whatever. I
10 know there's other kinds of special arrangements. But
11 ward 610, regular protective custody, isn't it the case
12 that protective custody is just a different name for
13 the same thing? It's just another housing unit?
14 A. You might think that, but the reason it's not is
15 because it limits the amount of people. It's a small
16 ward. There's only three, four cells. It reduces the
17 amount of people that you're around.
18 Q. It reduces the number of people and increases the
19 exposure to any one of them, right?
20 A. I don't know that I agree with that.
21 Q. Okay. I think we'll just move on from there.
22 Are you aware of anything else that
23 differentiates ward 610, that level of protective
24 custody, from general population, other than there's
25 fewer people?

Page 125

1 A. Well, there are other things that we would do depending
2 on who we house there. So, if it was someone who
3 wanted to shower independently, then they would be
4 pulled one at a time to shower. So, there are other
5 things that could happen in that ward.
6 Q. Can straight people go to alternative lifestyle? Can
7 they go to the alternative lifestyles area because they
8 don't want to be around people who might be sexual
9 offenders?
10 A. My opinion in general, no. But, again, people would
11 call that a special – they might call that a special
12 custody ward. Because as you're screening people and
13 someone says look, I'm a transgender person, and you
14 talk to that person, and you send them to medical and
15 they say I consider myself male or female. How do you
16 identify. Where would you feel comfortable. So, it
17 all happens at the intake.
18 Q. Yeah. I'm saying can someone say yeah I'm straight and
19 I'm not trans, but I don't want to be around people
20 that are potentially sex offenders? Can you opt into
21 the alternative in the hopes that that might be a
22 better place?
23 A. Again, it would be a totality of what's presented to
24 you. I want to go somewhere is never a reason that we
25 send you. You might feel safe there, but we might say

Chief James Davis
September 24, 2021

Page 126

1    you might feel safe there, but we're not confident that
2    the other people are safe with you there.
3  Q.  Right.
4  A.  So, we might not make that decision.
5  Q.  Okay.  And it's certainly not just an option where you
6    can select oh, I'm in jail, I want to get my menu out
7    and I would like to check that I'm in the alternative
8    life?  It's not the prisoner's option?
9  A.  It could start with the prisoner requesting.  But then
10    we have to do some research and discussion and
11    determine what the needs really are based on our
12    expertise as keeping people safe and what they are
13    requesting.  We don't dismiss it.
14  Q.  I got it.  It's just that it's not -- in and of itself,
15    it's not enough?
16  A.  Un-un.
17  Q.  That's a no?
18  A.  No, it's not in and of itself.
19  Q.  I see you wrote a memo about trans inmates and this
20    alternative lifestyle area.  Did you understand that to
21    be something that was just dictated by federal law,
22    that you needed to provide a safe area for people who
23    do qualify?
24  A.  No.  I understand that we have to provide options for
25    people as they present themselves.  A transgender

Page 127

1    person might not be comfortable on a special housing.
2    They say I identify as male, and that's how I would
3    like to be housed.  Well, we'll look for options in
4    that regard.
5  Q.  So, it is required that there be segregation of people
6    who are potentially transgender so that they're not
7    held with the gender they don't identify with?
8  A.  Yes.  We have to look out for everyone's interest as
9    they enter.
10  Q.  Certainly the department understood, in 2016, someone
11    can be at risk of being sexually violated if they are
12    straight and they do not ask for an alternative
13    lifestyle?
14  A.  Correct.
15  Q.  Were you aware, in 2016, that MDOC had been separating
16    potential victims and aggressors for years by then when
17    you sit down with Mr. Pappas and go through the policy?
18  A.  I think our awareness is that we were always looking
19    out for aggressors and victimization in our intake,
20    including sexual aggression victimization.
21  Q.  Okay.  Do you understand that MDOC had instituted
22    policies specifically rating people on the -- you
23    understood PREA brought in specific factors you were
24    required to assess, right?
25  A.  Correct.

Page 128

1  Q.  And that wasn't what everyone had been doing, including
2    Wayne County hadn't been doing, before PREA, right?
3  A.  Well, we would always identify transgender people and
4    determine safe housing for them, or people at risk for
5    sexual aggression, based on the size or any number of
6    factors.  I mean, we always did that.  So, I didn't
7    think we weren't doing that.
8  Q.  Is it your testimony that MDOC was screening for the
9    PREA risk factors before PREA even happened?
10  A.  I don't have an understanding of their screening.
11  Q.  I apologize.  I know you said that.  Okay.  So, what is
12    the function and role of any sort of sexual assault
13    review, whether it's a sexual assault review team or
14    whatever the verbiage might have been at Wayne County?
15    What's its purpose?
16  A.  In my opinion, the purpose is, and always was, to look
17    at anything unusual that could be changed to improve
18    safety in any sort of action, even if it's a suicide,
19    even if it's an assault and battery, those type of
20    reviews.  You know, that's part of command's
21    responsibility, is to make sure we're doing the best we
22    can and look at those incidents to determine is there
23    anything out of the ordinary.  How can we change
24    anything.  And the things I responded to, it's clear
25    why I looked into those.

Page 129

1  Q.  Okay.  And certainly by 2015, or early 2016, I think
2    you've already testified the department understood that
3    that kind of review was necessary to protect against
4    reasonably obvious risks to people that they might be
5    sexually assaulted, right?
6  A.  Right.
7  Q.  And part of what they're reviewing is investigations,
8    right?  You get a complaint, you got to investigate it,
9    and then you got to like sort of post mortem the whole
10    situation, right?
11  A.  Right.
12  Q.  And investigations had to be full and fair and complete
13    and thorough in order for the sexual assault review
14    team to do anything with them, right?  That's what they
15    should be at least?
16  A.  Yes.
17  Q.  Do you think that the investigators were required to
18    look not just at what happened but why it happened?
19  A.  I think that's part of a good investigation.
20  Q.  So, did you write a set of disclosures for this case?
21  A.  I'm not sure.
22  Q.  I'll hand you what was sent to me as defendant's
23    disclosure pursuant to rules of federal procedure.  So,
24    I don't know if we need to mark it, but I guess take a
25    minute to look through it and tell me if you've seen

Chief James Davis
September 24, 2021

Page 130

1    that document before.
2  A.  Is this something new or something old?
3  Q.  Is this something that you prepared, that you've seen
4      before?
5  A.  I guess, I'm not sure what date it's from.
6  Q.  It got to me on September 7th.  And it's signed by
7      Mr. O'Neill.
8  A.  I know I looked at something similar to this before
9      today, just a couple days ago, right.
10  Q.  Okay.  So, you've seen it.  Do you know if you saw it
11     before September 7th?
12  A.  I don't know.
13         MR. O'NEILL:  Can we take a break when we get
14     to a good breaking point.
15         MS. PRESCOTT:  Just let me ask a few more
16     questions.
17  BY MS. PRESCOTT:
18  Q.  This isn't a list that you wrote out?
19  A.  No.
20  Q.  Here in B it says that this is a summary of facts and
21     opinions Director Davis is expected to testify about.
22     And then there's a set of factors.  A, from the prior
23     page, says Director Davis is expected to present
24     evidence under these rules regarding the fact that
25     Wayne County jail took measures to address the risk of

Page 131

1      sexual assault in the jails, and thus, the defendants
2      did not act with deliberate indifference as to whether
3      plaintiff was subject to an assault in the jail on
4      August 24th, 2016.  Do you know how B relates to A?
5      So, this list of B, does it go with the point in A?  Or
6      do you know, one way or another?
7  A.  I guess I don't have an opinion on that.
8  Q.  Okay.  Do you know what – do you have a conception in
9      your mind, or a view in your own words, of what it is,
10     what amounts to deliberate indifference versus what is
11     on the other side of that line?
12  A.  I don't think I could express an opinion on a legal
13     concept like that.
14  Q.  Okay.  Do you have a sense of what steps could be in
15     this document, could not be in this document, that
16     Wayne County took that show it met its duties or its
17     responsibilities to Mr. Burks in the months, years,
18     days, leading up to his rape?
19  A.  I mean, can I think of anything that hasn't been turned
20     in prior to 2016, is that what you're asking?  I don't
21     know what you're asking.
22  Q.  I guess what I'm asking is there's – you know, we have
23     – I'm asking you about any facts that you would bring
24     to the table and say okay, this is what, in my view,
25     shows that we were doing the right thing by Mr. Burks.

Page 132

1      Things that you witnessed, things that you observed, or
2      things that, you know, add up to, you know, we did the
3      right thing with him.
4  A.  My opinion is that we did the right thing and we always
5      do the right thing for the inmates that we house.  I
6      can certainly – I can witness that we have an intake
7      system.  That we have medical.  That we have
8      classification.  That we have housing officers that do
9      rounds.  That we protect our inmates.  We rehouse them
10     when necessary.  That we advise them on the zero
11     tolerance by signage and education, pamphlets.  And
12     that we protect them by responding and investigating
13     and mitigating and providing services for victims.  All
14     the things that we've been talking about.
15  Q.  Anything else?
16  A.  I think intentional creation of our policies that we've
17     already talked about.  Using the PREA resource for
18     training and all the training that we've done for
19     everyone in the facility.
20         MS. PRESCOTT:  All right.  Do you want to
21     take that break?
22         MR. O'NEILL:  Sure.  Thanks.
23         (Recess taken at 1:33 p.m.)
24         (Back on the record at 1:38 p.m.)
25  BY MS. PRESCOTT:

Page 133

1  Q.  Do you know anything about any medical review of
2      anything to do with Solomon or Burks at any time?
3  A.  I think I gathered from the reports they had medical
4      treatment after the attack.
5  Q.  How about anything from before the attack?
6  A.  Other than normal screening, I am not aware.
7  Q.  You're really not aware of the normal screening.  You
8      just have to know that everybody has to go through the
9      quarantine period and go to medical, right?
10  A.  Yes.
11  Q.  So, what might have been done with Solomon, or meds, or
12     what his conditions were, you don't know?
13  A.  I do not.
14  Q.  So, you don't know whether he was a person who was,
15     because of medical conditions, a potentially eminent
16     danger to Mr. Burks?
17  A.  I'm not aware of that.
18  Q.  And have you testified about everything you know about
19     the housing of Mr. Solomon and Mr. Burks, the specifics
20     of who and what put them together, and what was the
21     decision making there?  I think you said you really
22     don't know about that, right?
23  A.  That's correct.
24  Q.  You said that one of the things that's done, in
25     general, is to re-house individuals, when necessary,

Chief James Davis
September 24, 2021

Page 134

1   when there's fear or, you know, known enemies or
2   threats or those kind of things, right?
3   A.  Right.
4   Q.  But you don't know whether those policies were carried
5   out with regard to Burks or Solomon, correct?
6   A.  I do not.
7   Q.  Do you know whether Mr. Williams, Keith Williams, or
8   Ms. Bell had any training specific to PREA standards
9   before August 24th, 2016?
10  A.  The answer is I know it was directed to happen.  I
11  don't know when it happened.  Unless it's in the
12  previous paperwork where we did find some signature
13  sheets, I don't recall at this moment.
14  Q.  You used a word, it was either all or always, in most
15  of your recent – you know, we always protect all of
16  the prisoners.  And those are – you know, I'm trying
17  to recall exactly the wording and I won't be perfect at
18  it.  But is it your testimony here today that Wayne
19  County jail has always protected all the prisoners that
20  have come through its doors?
21  A.  I was trying to – it might be hyperbole, but I'm
22  suggesting that's our business, to keep people
23  safe.  And that's what we do every day.
24  Q.  Okay.  So, I guess what I'm taking, in part, is your
25  point – I guess that – well, strike that.

Page 135

1       So, your point is that the goal is to keep
2   people safe, the effort is to keep people safe, not
3   necessarily that they are always safe?
4   A.  Our goal is to keep everyone safe to the best of our
5   knowledge and experience and do our best to predict
6   dangerousness through the classification process.
7   Q.  Did you read the report -- you said that a couple of
8   the things that you looked at ahead of today were some
9   reports of some experts that we hired.  Did I interpret
10  that correctly?
11  A.  That's correct.
12  Q.  Was there anything in the reports that you thought was
13  incorrect?
14  A.  I think that the PREA representative was incorrect in
15  her general assertion that we don't have any policy and
16  we don't do anything, which was my impression of what
17  she wrote.  And I think the jail expert's opinion
18  saying that yes, I do have policy, but I didn't follow
19  it is incorrect.  From what I know, we followed our
20  policy.
21  Q.  Have we covered everything that you know about the
22  following or not following of policy as to Burks,
23  Solomon, and the rape?
24  A.  Yes.
25  Q.  And have we covered everything that you know about

Page 136

1   whether policy was followed in the, you know, months
2   leading up to the rape, in terms of operational reviews
3   and keeping people trained, keeping people staffed
4   appropriately, and whatnot?
5   A.  Yes.
6   Q.  Okay.  Is there any factor, any item, assertion, in
7   either of the reports that you know of, that wasn't
8   accurate?  So, the characterization of policy and
9   whether it's sufficient or not, it's on the record.
10  A.  My impression was it was very lengthy, and I would have
11  to go over it again.
12  Q.  Who do you think -- there have been times today where
13  you said look, I know what the policy is supposed to
14  be.  I don't know how it was implemented.  Who is
15  ultimately responsible for that question whether, on
16  610, on August 24, 2016, and the weeks and months
17  leading up to it, that would set the conditions that
18  would apply that we were following policy?  What is
19  that person's name?
20  A.  I guess that would be the commander of the facility who
21  would have control over scheduling and duties and
22  assignments.  And they would have ultimate -- they
23  would have the authority that I wouldn't have to look
24  at all of those questions.
25  Q.  Do you know whether the commanders, could they move

Page 137

1   between jails from time to time, or someone could be
2   promoted and moved or whatever it may be, whether they
3   come in and take a look at the recent history of any
4   sexual assault or sexual harassment allegations that
5   have been occurring here?
6   A.  Not that I'm aware of.
7   Q.  Do you see how that could be helpful in understanding
8   operationally what issues may be ongoing?
9   A.  In general that practice would be good.  Not just for
10  this idea, but for operations in general.  Maybe they
11  do.  I don't know.
12  Q.  When they come in, they review other things, right,
13  where are we on staffing, on overtime?
14  A.  Correct.
15  Q.  They come in and they look at where are we on
16  headcount, correct?
17  A.  Right.
18  Q.  So, it's not like the idea of coming in and looking at
19  okay, where have we been, where are we heading.  That's
20  not something out of the ordinary.  It's just that they
21  haven't done it in these particular ways that you
22  described, right?
23  A.  They could.  I tracked results when I was commander.
24  But I don't know what their practice is.
25  Q.  With a PREA lens or the review of what PREA required,

Chief James Davis
September 24, 2021

Page 138

1  would it be appropriate to house someone who was a risk
2  of being a serious harm to a bunkie in a situation
3  where they are together mingling all day, like in ward
4  610?
5  A.  I would only say change that to say known risk.
6  Q.  A known risk?
7  A.  Yeah.
8  Q.  Then the answer would be it would not be appropriate,
9  correct?
10  A.  It is.  I mean, in general, it's appropriate to not
11  house someone who is a known risk with someone that's a
12  potential victim.  So, sometimes those people would be
13  housed alone.  But it's hard to speculate.
14  Q.  Is it an expectation of an officer that if someone is
15  waving them over, calling for them like in the night,
16  that they should assess what is going on?  Is this
17  real.  Is there something they need.  Would that be an
18  expectation?
19  A.  Yes.
20  Q.  Were you aware that Burks was waving a kite and calling
21  for help while he's just been raped overnight and the
22  officer ignores him and doesn't help, doesn't render
23  assistance?
24  A.  I was not aware of that.  But I became aware, somehow
25  in the deposition process, that there was a claim of

Page 139

1  that.  If it's true or not, I do not know.
2  Q.  So, that claim has been made by him under oath in a
3  court of law and in a federal lawsuit.  So, the under
4  oath part was, I don't know, 2017.  All the way up to
5  the lawsuit is filed in 2019.  Do you know of anyone
6  that ever went back, given those pieces of information,
7  and said you're still supervising people, let's ask you
8  about this.  Let's find out what your take is on that.
9  Did anyone do that right up until I called him in and
10  subpoenaed him?
11  A.  I wouldn't have any direct knowledge if that occurred
12  or if someone responded.  But my experience is that's
13  what we do.  Of course we would respond because on
14  midnights you can hear -- it's quiet and you can hear
15  someone asking for assistance.  Of course we would
16  respond.
17  Q.  It would not be appropriate to allow a person to go
18  overnight before they could get help that they were
19  asking for?
20  A.  We would help them immediately once we were informed.
21  Q.  So, did you say no, that we would help them
22  immediately?
23  A.  Once we were informed, yes.
24  MS. PRESCOTT:  I think that I'm done.  If you
25  want to take a break.

Page 140

1  MR. O'NEILL:  I don't need a break.
2  MS. PRESCOTT:  I can pass the witness.
3  MR. O'NEILL:  And no questions.  Thank you.
4  (The expert deposition was concluded at
5  1:52 p.m.  Signature of the witness was not
6  requested by counsel for the respective parties
7  hereto.)

Page 141

1  CERTIFICATE OF REPORTER
2  STATE OF MICHIGAN )
3           ) SS
4  COUNTY OF MACOMB  )
5
6      I, LAURA AMBRO, certify that this deposition
7  was taken before me on the date hereinbefore set forth;
8  that the foregoing questions and answers were recorded
9  by me stenographically and reduced to computer
10  transcription; that this is a true, full and correct
11  transcript of my stenographic notes so taken; and that
12  I am not related to, nor of counsel to, either party
13  nor interested in the event of this cause.
14
15
16
17
18
19
20
21
22      LAURA AMBRO, CSR-5882
23      Notary Public,
24      Macomb County, Michigan.
25  My Commission expires: July 5, 2026