# EXHIBIT B

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5    JOHNATHAN L. BURKS,
 6         Plaintiff,
 7    -vs-                   Case No. 2:19-cv-10027
 8    BENNY NAPOLEON, ET AL.,    Hon. Gershwin A. Drain
 9         Defendants.      Magistrate Anthony P. Patti
10    ~~~~~~~~~~~~~~~~~~~~~/
11    DEPONENT:    DEPOSITION OF COMMANDER ALAN BULIFANT
12              APPEARING REMOTELY FROM WAYNE COUNTY,
13              MICHIGAN
14    DATE:       Tuesday, January 12, 2021
15    TIME:       1:00 p.m.
16
17    REPORTER:    John J. Slatin, RPR, CSR-5180,
18              Certified Shorthand Reporter,
19              Appearing Remotely From
20              Oakland County, Michigan
21
22              (Appearances listed on page 2)
23
24
25
```

Page 2

1   REMOTE APPEARANCES:
2
3   SARAH S. PRESCOTT (P70510)
4   Salvatore, Prescott, Porter & Porter, PLLC
5   105 East Main Street
6   Northville, Michigan  48167
7   (248) 679-8711
8   prescott@sppplaw.com
9       Appearing on behalf of the Plaintiff.
10
11  PAUL T. O'NEILL (P57293)
12  (Present remotely in room with witness.)
13  Assistant Corporation Counsel
14  500 Griswold, 30th Floor
15  Detroit, Michigan  48226
16  (313) 224-5402
17  poneill@waynecounty.com
18      Appearing on behalf of the Defendants.
19
20      ALSO PRESENT REMOTELY:  Mollie Berkowitz
21
22
23
24
25

Page 3

1              TABLE OF CONTENTS
2
3   WITNESS                              PAGE
4
5   COMMANDER ALAN BULIFANT
6
7       Examination by Ms. Prescott         5
8       Examination by Mr. O'Neill         64
9       Re-Examination by Ms. Prescott     66
10
11  EXHIBITS:                          IDENTIFIED
12
13          (None offered)
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1               Tuesday, January 12, 2021
2               Reported Remotely from
3               Oakland County, Michigan
4               1:00 p.m.
5                    *  *  *
6       THE REPORTER:  The attorneys participating in this
7   deposition acknowledge that I am not physically present
8   in the deposition room and that I will be reporting this
9   deposition remotely.  They further acknowledge that, in
10  lieu of an oath administered in person, the witness will
11  verbally declare his testimony in this matter is under
12  penalty of perjury.  The parties and their counsel
13  consent to this arrangement and waive any objections to
14  this manner of reporting.
15      Will legal counsel please indicate your agreement
16  by stating your name, your party represented and your
17  agreement on the record.
18      MS. PRESCOTT:  Sarah Prescott.  Plaintiff agrees.
19      MR. O'NEILL:  Paul O'Neill, for Defendants.  We
20  agree as well.
21      THE REPORTER:  Thank you.
22      Will the witness please present his
23  government-issued identification by holding it up to the
24  camera for verification?
25      THE WITNESS:  (Complying.)

Page 5

1       THE REPORTER:  I understand you're holding up your
2   Office of the Sheriff, Wayne County Sheriff's Sworn
3   Commander I.D.  It's got your name as you've stated it.
4       Thank you for doing that.  I appreciate it,
5   Mr. Bulifant.
6       If you'll raise your right hand, I'll swear you in.
7       THE WITNESS:  (Complying.)
8       THE REPORTER:  I just need a "yes" or a "no."
9       Do you solemnly swear the testimony you're about to
10  give will be the truth, the whole truth and nothing but
11  the truth, so help you God?
12      THE WITNESS:  Yes.
13      THE REPORTER:  Thank you.
14      Ready when you are, Sarah.
15                   *  *  *
16          COMMANDER ALAN BULIFANT,
17  having been first duly sworn, was examined and testified
18  as follows:
19              EXAMINATION
20  BY MS. PRESCOTT:
21  Q.  Hi, Commander.  My name is Sarah Prescott.  I hope I
22      will not forget, but if I do and call you "Sir" or
23      "Mister," I apologize.  I'll try to use your correct
24      title.
25      I'm going to ask you some questions.  This Zoom

Page 6

1    technology is – it can be a little tricky.
2        When I do, if I step on the end of your answer or
3    start to talk over you, I do not mean to do that. It's
4    just maybe that I don't sense that you have more to say.
5        Please just let me know. I'm happy to give you all
6    the time you need to answer the questions.
7        There may be times where you are anticipating the
8    end of my question, and you are ready to answer. Just
9    let me have a little pause so that our court reporter
10   can take down the end of the question and the last words
11   out of my mouth and then you can – you can speak.
12       There could be a time where Mr. O'Neill has an
13   objection. If he does so, he'll let you know whether
14   you don't answer. Otherwise, the practice is that you
15   do answer.
16       So, sometimes he objects but you still answer.
17       It's really important in this context and in every
18   deposition that we understand each other, meaning, when
19   I ask you a question and you answer it, we have to
20   assume you understood and that you are answering it the
21   best you could.
22       So, if there is a time where you don't understand,
23   maybe it's a word or what I'm getting at or what I'm
24   referring to, or it was confusing as a question to you,
25   it's important that I know that.

Page 7

1        So, would – I would just ask you if you would
2    please let me know.
3        Is that agreeable?
4  A. Yes.
5  Q. Okay. Zoom forces us to be verbal and not to nod our
6    heads or shrug when we're not sure. But there may be a
7    time where I say – remind you you're nodding, and I say
8    "Is that a yes?" And that's just to help us keep the
9    record clear.
10       If you need a break – I don't think we'll be here
11   terribly long, but if you need a break, would you let me
12   know that as well?
13 A. Yes.
14 Q. Okay. I have a Deposition Notice that I have
15   circulated, and I'm going to put it on the screen.
16       Can you see that it's titled "United States
17   District Court" at the very top?
18 A. I only have half of it. I've got video screens on the
19   other half.
20 Q. Okay. So, what can happen is, I'm going to give you
21   control over the screen so that you can move the
22   pictures around or you can scroll down, or you can also
23   make it smaller or larger.
24       But my question is whether – and you can look
25   through this document – whether you've seen it before

Page 8

1    today.
2  A. I've seen part of it.
3  Q. Okay. It's two copies of the same thing.
4  A. Okay.
5  Q. One had some typos corrected in the last two or three
6    paragraphs. The first half of it, the first version,
7    the first seven pages was sent on December 18th, 2020,
8    and then we corrected some typos yesterday just in the
9    paragraphs 11 and 12.
10       Can you, for the record, let us know what – if you
11   saw the first document or the second document in this
12   set?
13 A. Can I refer to my notes?
14 Q. Yeah.
15 A. I saw the document that refers to the December 18th
16   date.
17 Q. Okay. And that document lists, with a number 1 through
18   13, some areas of questioning.
19       Is that familiar to you?
20 A. Yes.
21 Q. And are you the County's representative, prepared and
22   designated to speak on 1, 2, 7, 8, and 9 of those
23   itemized areas of questioning?
24 A. Yes.
25 Q. Thank you, Commander.

Page 9

1        Can you tell us what you did to get yourself ready
2    to answer the questions in those areas?
3  A. After reviewing that document, I went back and I
4    reviewed some jail policies regarding procedures and
5    operations for that time period.
6  Q. Okay. Is there anything else you did, anyone you spoke
7    to, anyone you – any documents you looked at, any video
8    you reviewed, any other steps or anything you did?
9        And the only exclusion I'll make is speaking with
10   Mr. O'Neill who is the counsel for the County.
11 A. Yes, I did speak with Mr. O'Neill, and I also reviewed
12   the internal affairs case file.
13 Q. The case file relative to Solomon's sexual assault of
14   Burks?
15 A. Yes.
16 Q. Okay. Are there other materials or documents you
17   reviewed?
18 A. No.
19 Q. For example, have you seen the Complaint?
20 A. No.
21 Q. The lawsuit? Okay.
22 A. No, I have not.
23 Q. Okay. What did you bring with you here today?
24 A. I have the document that identified I saw from the
25   December 18th date.

Page 10

1  I have – let's see. It looks like five jail
2  policies that I had printed out, and then a copy of the
3  criminal internal affairs case against Mr. Solomon.
4  Q. Okay. And when you say "GO policies," can you tell us
5  what G and O mean? General order, or what does that
6  mean?
7  A. I'm sorry. I don't believe I said "GO."
8  Q. I apologize. That's what I heard.
9      You said five policies that you brought and there
10  was some sort of modifier? What was the word?
11 A. Oh. "Jail" policies.
12 Q. "Jail." Thank you.
13 A. Yes.
14 Q. Five jail policies.
15      Okay. Can you tell me what the numbers were for
16  those policies, or are?
17 A. The first one is Document Number 14.14. It's titled
18  "Security Video Monitoring."
19      The second one is Document 14.12. It's titled
20  "Security Division II for Security Rounds."
21      The third one is Document Number 14.3. Its title
22  is "Security Inmate Lockdown Procedure."
23      The fourth one is 14.18, "Security Formal Head Card
24  Count."
25      And the last one is Document 14.1, "Security Census

Page 11

1  Count."
2  Q. Thank you.
3      In that you brought them with you to the
4  deposition, is it correct that you felt that each one of
5  those policies was relevant to one of the areas that you
6  had been designated to testify?
7  A. Not necessarily.
8  Q. Okay. That's helpful.
9      Which ones did you think were not even – you might
10  have pulled them, you might have reviewed them, but
11  looking at them did not think that they were as relevant
12  as you at least may have thought or wanted to check?
13 A. The number for the 14.18, "Security Formal Head Card
14  Count."
15 Q. Okay.
16 A. The Number 14.3, "Security Inmate Lockdown Procedure."
17  And Number 14.1, "Security Census Count."
18 Q. Is – the Number 14.3, the "Security Inmate Lockdown
19  Procedure," what in general is the lockdown procedure
20  referring to?
21 A. The lockdown procedure talks about how the lockdown at
22  the end of the evening at Jail Division II is conducted.
23 Q. Okay. And the head count that the 14.18 refers to, does
24  that happen once a day or once a shift?
25 A. No. The security formal head card count, the formal

Page 12

1  one, actually happens twice a shift.
2  Q. Okay. Is there anything relevant, or is there anything
3  in 14.3 or 14.18 relative to or regarding audio/video
4  equipment?
5  A. I'm just double-checking real quick.
6      No, there is not.
7  Q. Okay. And what does 14.1, when it refers to census
8  count, what is the policy about generally?
9  A. 14.1 was an original policy that 14.18 kind of
10  clarified, kind of made a little more descriptive.
11      But 14.1 talked about the head count and card count
12  and computer match of the inmates at the beginning of
13  your shift and it also said that officers would conduct
14  kind of less formal head counts at other times
15  throughout their shift to make sure that, you know, all
16  the inmates were there.
17 Q. Okay. When you – it sounds like 14.12 and 14.14 were
18  more potentially relevant from your review in your – as
19  you looked at them.
20      What was the issue/revision date on the policy
21  14.12 that you have with you?
22 A. November the 10th, 2015 for 14.12.
23 Q. Okay. And how about 14.14?
24 A. October the 2nd, 2006.
25 Q. I was given a copy of 14.12, and it says "Revision date

Page 13

1  11-12-12."
2      So, would your version be the up-to-date one if we
3  were looking at the year 2016?
4  A. I believe so, yes.
5  Q. Do you know if there was any further revisions to 14.12?
6  A. No. The one that I have is the most current one that
7  I'm aware of.
8      MS. PRESCOTT: Okay. Paul, I don't think I have
9  14.14 at all, but I – in that I have the superseded one
10 of 14.12, and if we were at a dep, we would just pass it
11 across the table and move on, do you think that there's
12 an opportunity for you to fax or scan those so that we
13 can continue on?
14     I can reorganize my questions, but can you get
15 those to me?
16     MR. O'NEILL: Sure. I can e-mail them to you if
17 you like.
18     MS. PRESCOTT: Oh, you can just hit e-mail? Okay.
19 So, let me come back to this issue, but if you
20 could hit e-mail, that would be great.
21     MR. O'NEILL: Yeah. Can you just give me two
22 seconds to make that happen before you start another
23 question?
24     MS. PRESCOTT: Yes.
25     (Discussion held off the record.)

Page 14

1  MS. PRESCOTT: Can we go off the record for a
2  minute?
3  (Short recess at 1:17 p.m.)
4  * * *
5  (Record resumed at 1:20 p.m.)
6  BY MS. PRESCOTT:
7  Q. Commander, one of the things that you were to speak to
8  today in Number 1 is the policies written or nonwritten
9  in effect during August 2016 with regard to the
10 maintenance and use of the audiovisual equipment in
11 6 Old.
12 And a second category was the actual routines and
13 practices of those who staffed the sixth floor during
14 August of 2016.
15 Are you familiar with the actual practices of the
16 individuals who staffed the sixth floor during August of
17 2016 and specifically with regard to their use and
18 reliance on the video equipment?
19 A. Yes.
20 Q. And would administration, policymakers, the people up
21 the chain of command been aware of the practices of the
22 officers staffing that floor through their chain of
23 command in their supervisorial roles in August of 2016?
24 A. Yes.
25 Q. And would you agree that the chain of command, the

Page 15

1  different supervisorial officers had a duty to make sure
2  that the actual practices and the typical, customary,
3  day-to-day doing of the job of the officers on 6 Old was
4  appropriate according to the decision-makers' and
5  policy-makers' directions?
6  A. Yes.
7  We have a duty to make sure that policies are
8  followed and that people are kept safe, yes.
9  Q. And did they – were the chain of command that were over
10 6 Old able to do that effectively in 2016?
11 A. I believe so, yes.
12 Q. With regard to the use of the audiovisual equipment and
13 the reporting of any issues with the audio/video
14 equipment, were those day-to-day activities consistent
15 with approved policy and customary practice of the
16 department?
17 A. I'm sorry. That's kind of a broad question.
18 Would you mind repeating it and maybe being a
19 little bit more specific?
20 Q. Okay. I'm speaking to in August of 2016, the officers
21 who are on the floor of 6 Old, and responsible for that
22 side of the building and those prisoners that were
23 housed there, were their use and reliance on the audio
24 and visual equipment consistent with customary policy
25 and practice of the department?

Page 16

1  A. Yes.
2  Q. Is there anything you know of that the practices of
3  officers on 6 Old in August of 2016 were in any way
4  departing from approved custom policy or practice?
5  A. No.
6  Q. And with regard to the maintenance of the cameras and
7  the role of the folks who had a job of making sure that
8  the cameras were operative, were those folks operating
9  consistent with command policy and practice and what was
10 the established expectation of Wayne County?
11 MR. O'NEILL: Excuse me. Object on the basis of
12 compound question. You're asking about policy, custom
13 and practice. And so that's a compound question.
14 BY MS. PRESCOTT:
15 Q. I'll take an answer.
16 A. I want to kind of like bifurcate my answer because, in
17 my mind, there's a difference between the
18 video-monitoring system working and the video-monitoring
19 system recording.
20 If I'm an off- –
21 Q. Do you – go ahead.
22 A. If I'm an officer and I'm sitting in my duty station and
23 my video monitor is up, and I have images on that video
24 monitor, as far as I know, as that officer is sitting
25 there, the video-monitoring system is working because

Page 17

1  I'm able to see the inmate and live monitor their
2  activity.
3  There's no way for me to know, as an officer, if
4  it's being recorded in a DVR room on another floor, and
5  we're not required to have cameras or even have them
6  record. The video monitoring was a tool to aid us in
7  being able to provide more supervision for the inmates
8  and for our staff, to make sure that our staff was safe.
9  Q. Okay. I want to come back to that because something you
10 said there is – I want to follow up on.
11 But let me clarify my question again because it was
12 a little bit different than what the duty officer
13 necessarily is doing or seeing.
14 So, I was trying to understand if, with regard to
15 the folks who had a job to do in maintaining the
16 equipment, making sure that it was operative, making
17 sure that it was reliable, those wouldn't necessarily be
18 the duty officers; right?
19 A. Correct.
20 Q. So, whoever that class of people is that are more in
21 line with maintenance of the audiovisual system, were
22 they conducting themselves according to approved policy
23 and practice in August of 2016?
24 A. I don't have some of that information because, you know,
25 the camera system was put in and maintained by an

Page 18

1  outside vendor. So, I don't know what the parameters of
2  that contract were or are. And then, you know, again,
3  the command in the building, they know the system is
4  working until it's not working, and then they make
5  notification to try and get the system back up and
6  working again.
7      And there was a period there where it goes in and
8  out. It goes up and down. And there were problems.
9  There were issues. And that's why we would institute
10 the 30-minute round policy whenever we were aware that
11 the camera system was malfunctioning.
12 Q. Okay. So, there's a few things in that answer, too, I
13 want to come back to and break down, but I want to focus
14 on the people that you said would be like the command –
15 either the lieutenants or the commanders, the officers
16 who would hear that there was an issue with the cameras
17 and make note, alert somebody, escalate it and then
18 maybe it might or might not go to the outside vendor.
19     So, that group of command officers who were aware
20 there was a problem, were they doing the job according
21 to approved custom and policy of the department in the
22 year 2016, from January to August?
23     MR. O'NEILL: Excuse me. Objection. Outside the
24 scope of the subject's designated.
25     But the witness can answer.

Page 19

1  A. My answer is yes.
2  BY MS. PRESCOTT:
3  Q. Okay. Who was the outside vendor, or what was it
4  called?
5  A. I don't know.
6  Q. And do you know of any occasion in which the staff of
7  the sixth floor, including Ward 10, from January of '15
8  through August of '16, ever called for that vendor to
9  come in and do any service on those cameras?
10 A. The staff would – the staff from the sixth floor would
11 never call. That would come from either shift command,
12 but more likely an IT person.
13 Q. Okay.
14 A. Or it may be an IT officer.
15 Q. Are you aware of anybody in those categories of whether
16 shift command or IT ever making such a call?
17 A. I don't have personal knowledge of it, but I know
18 Lieutenant Bates was a lieutenant there and Corporal
19 Britt Foreman was an officer there. And they've had –
20 they've been instrumental in the operation of the camera
21 system.
22 Q. Okay. Moments ago, you testified, and I said I wanted
23 to come back to something. You said that you don't have
24 to have cameras and you don't have to have reporting;
25 that they're a tool to enhance security both for inmates

Page 20

1  and staff. And I know that's not your exact words, but
2  did I basically get what your point was?
3  A. Yes.
4  Q. Okay. And would you agree with me that they were a tool
5  that – the cameras, that is, and the DVR were a tool
6  that was not super reliable in August of 2016 on 6 Old?
7  A. Well, I would like to say that I see the camera and the
8  DVR as two separate tools.
9  Q. Okay.
10 A. And I would say, yes, they were not very reliable.
11 Q. Okay. And for how long had that been going on by August
12 of 2016, that the reliability had really broken down?
13 A. I'm not sure of the exact time frame because I wasn't
14 involved with the maintenance at that time.
15     I can tell you, as the commander now at Jail
16 Division II, it is – still we have issues from time to
17 time with it. That's why we're doing 30-minute rounds.
18 Q. And one of the things that you've talked about is the
19 rounds and the areas that you were called on was to talk
20 about routines and practices of those who staff the
21 sixth floor regarding the use and functionality of the
22 video.
23     That's Number 2 on the list.
24     So, you've made the point that when the cameras
25 were down, the – an option would be to enhance security

Page 21

1  a different way, by sending people on more frequent
2  rounds; is that right?
3  A. Yes.
4  Q. And, in fact, it was policy to do that; right?
5  A. Yes.
6  Q. And, in fact, some of the policies call for not just
7  rounds every 30 minutes but continuous rounds; right?
8  A. On specific housing units.
9  Q. And "continuous rounds" means just that? That you're
10 constantly walking between one and the next, or does it
11 mean something different?
12 A. No. You're walking – you're walking, you know,
13 continuously from one to the other.
14 Q. Okay. And so were there times that continuous rounds
15 were instituted in certain wards because of camera
16 inoperability?
17 A. I wasn't there. I don't have personal knowledge, but
18 I'm sure that, yes, there would have been times that
19 continuous rounds were instituted.
20 Q. How about just from January of '15 through August of
21 2016 –
22 A. I wasn't –
23 Q. – time frame?
24 A. I wasn't there at that time.
25 Q. Okay.

Page 22

1  A.  But I would venture to guess that, if the camera
2     systems, the monitoring, the video monitoring itself was
3     down on the fifth and sixth floor, then continuous
4     rounds would have been implemented.
5  Q.  And why do you say that? On what is that based? The
6     fact that it was policy to do that?
7  A.  Yes.
8  Q.  Can you think of any date or time that that was actually
9     instituted in 2015 or 2016?
10 A.  I wasn't there at that time. I don't have the personal
11    knowledge of that.
12 Q.  Do you know whether the officers who staffed 6 Old
13    between January of '15 and August of '16 made
14    documentation or tried to escalate issues of the cameras
15    not working or not -- like freezing or the visibility
16    being poor?
17 A.  I don't have any personal knowledge if they reported
18    that to anyone in that time frame. I was in charge of
19    another area back then.
20 Q.  Do you know what anybody who does -- is there anybody
21    who you do think has that information?
22 A.  Lieutenant Bates. Jason Bates was a command officer
23    there at that time. And Corporal Britton Foreman was
24    involved with the camera systems at that time.
25         So, if there had been a repair request or issue,

Page 23

1     more than likely, they may have been involved.
2  Q.  What was the high-level policy stance on dealing with
3     the cameras?
4         I mean, they were problematic. They had been for a
5     long time. And we did hear from Lieutenant Bates that
6     there were -- that it was sporadic and, you know, there
7     were issues.
8         What was Wayne County's policy for actually
9     correcting this problem in 2016?
10 A.  It's not like anybody ever had a conversation with me
11    and told me, hey, this is how they feel or they view it.
12        I'm willing to speculate to you that, you know, we
13    were supposed to be in a new jail at that time, and the
14    construction of it was halted and stopped, and, you
15    know, the building was a 1920s original building from
16    the old side that did not have this technology. No one
17    had even dreamed of this type of technology. So, all of
18    these things were retrofitted in and we weren't supposed
19    to be in that building any more.
20 Q.  Yeah.
21        I know that it had been -- am I correct that the
22    sheriff had, as a policy, been asking the County to
23    appropriate more money during this time frame, both for
24    rounds and shifts and people to be on the floors but
25    also for maintenance?

Page 24

1         MR. O'NEILL: Objection. That's outside the scope
2     of the Deposition Notice.
3         You can answer if you know.
4  A.  Oh.
5         I know that there has been a battle throughout my
6     career between the sheriff's office and the County with
7     regards to funding.
8         Now, what were the specific asks and needs of that
9     funding that the sheriff himself may have made? I don't
10    have personal knowledge of that, but there's been a
11    financial budgetary struggle my whole career between the
12    County and the sheriff's office.
13 BY MS. PRESCOTT:
14 Q.  Do you have any facts today that tell you that this
15    audiovisual equipment was not part of someone's asks
16    once the old -- once the new prison program had
17    sputtered out?
18        MR. O'NEILL: Same objection.
19 A.  Answer?
20        MR. O'NEILL: Yeah.
21 A.  No, I don't have any knowledge of that.
22 BY MS. PRESCOTT:
23 Q.  Okay. Do you know either way whether -- it sounds like
24    you don't know what the appropriation requests were
25    for --

Page 25

1  A.  No, I don't --
2  Q.  -- that the sheriff might have been making.
3         Do you know whether the sheriff commissioned
4     anybody to assess the state of the camera systems after
5     it became more and more clear that the new jail was not
6     going to happen?
7  A.  I don't -- wouldn't have personal knowledge if the
8     sheriff directed somebody to do that. If he did, I
9     would assume it would be, you know, IT, the people
10    that -- you know, Corporal Foreman, like I've
11    identified.
12 Q.  Okay. But you don't know of any?
13 A.  I don't know.
14 Q.  And are you aware of the basic overall policy, I think
15    starting in around 2011, not to reinvest in maintenance
16    of the old side in favor of building out the new prison?
17 A.  What policy number is that?
18 Q.  Well, it's not a written policy. It was the policy of
19    the County but -- that I think the sheriff either
20    testified to or certainly was made public that they
21    weren't investing in the maintenance of the old
22    building.
23        MR. O'NEILL: Well --
24 BY MS. PRESCOTT:
25 Q.  Are you familiar with that?

### Page 26

1    MR. O'NEILL: Objection. Foundation. And
2    references facts not in the record.
3    A. No, I'm not aware of that.
4    BY MS. PRESCOTT:
5    Q. Okay. What was the policy with regard to maintenance of
6       the audiovisual equipment after 2011 in the old
7       building?
8    A. You would -- if the officer finds a video monitoring
9       failure, like their monitor is not working, they notify
10      shift command. Shift command will tell them to
11      implement 30-minute rounds.
12         Shift command would then notify Corporal Foreman or
13      possibly Lieutenant Bates. I don't know if he had
14      connection with the vendor or not.
15         My understanding is there are some issues that
16      Corporal Foreman is able to fix, but then there are some
17      times that he may have to contact a vendor.
18         But as far as the actual, you know, how it gets
19      fixed, that's their expertise, not mine.
20   Q. Okay. You answered a little bit more on the practical
21      side. I'm talking about the big-picture strategy, the
22      policy of the department on how to deal with the fact
23      that the system as a whole has routine failure.
24         What was the County or the Department's policy with
25      regard to how to deal with that ongoing consistent

### Page 27

1       failure?
2    A. I don't believe there is a policy. I mean, I think
3       you're talking about a discussion between elected
4       officials that goes on, that's not shared with -- you
5       know, the policy directed to me is, if equipment is
6       broken, you notify shift command. You try to get the
7       equipment fixed. You take the, you know, precautionary
8       security measures that you can in the meantime to make
9       it as safe as you possibly can.
10   Q. Fair.
11         And you're a person who is dealing with -- you're
12      dealing with the practical reality that you're handed,
13      too. And so I'm just asking a level maybe above that
14      where the people are -- like, you know, are we just
15      going to put Band-Aids, Band-Aids and Band-Aids, or are
16      we going to actually cure the patient?
17         And so it sounds like you don't have any
18      information about steps or plans or audits or any
19      intention to fix the underlying problem of the systemic
20      failure; is that correct?
21   A. That's correct. I don't have any knowledge of that.
22   Q. Okay. And could you testify to a given month, you know,
23      that each set of rounds necessarily lines up with this
24      camera failing here or that camera failing here so that
25      we could look at rounds as a way of figuring out camera

### Page 28

1       operability and put those together perfectly?
2    A. I'm trying to think.
3         So, you're asking if rounds could be matched up to
4       determine if cameras were operating or not --
5    Q. Yeah. In a particular ward.
6    A. -- I guess that would be possible. I mean, if they were
7       doing 30-minute rounds, you would have to assume that
8       they were doing the 30-minute rounds due to the camera
9       not being operative, although I'm not sure that
10      necessarily means that.
11   Q. Okay. What if they're doing -- what if they're doing
12      60-minute rounds? What then?
13   A. Then the -- I would take that to mean that the video
14      monitoring the duty station can monitor is operating and
15      they're getting an image that's cycling through the
16      various cameras and wards.
17   Q. Okay. And can you testify that that's the case?
18         Like if I showed you the month of April in 2016 and
19      said here is the -- here is the rounds. Some of them
20      are 60 and some of them are 30.
21         Could you say positively that, okay, yes, that's
22      because those cameras were operative?
23   A. Yes.
24   Q. Okay. So, if I find rounds in -- I have documentation
25      of where cameras weren't working, and if I find rounds

### Page 29

1       that are more than 30 minutes, what is happening in
2       those scenarios?
3         So, like, I'll give you an example.
4         In maximum security, on 607 and 608, the cameras
5       frequently weren't operative and sometimes the rounds
6       were more than 30 minutes.
7         So, what's happening there?
8    A. You're asking me to speculate on a great deal -- number
9       of things without knowing all of the facts.
10        There is a lot of things that could be happening
11      there. There could be an emergency somewhere else in
12      the building that officers are responding to. There
13      could be that they didn't know the camera system wasn't
14      operating. It could be that the officer failed, but I
15      don't know the particulars of why that happened without
16      having all the facts.
17   Q. Could it be that the -- could there be times where the
18      camera was fine at the beginning of the shift; shift
19      command gives their daily orders; and like, you know,
20      the thing doesn't work for half an hour, and it comes
21      back on then, and so they just maintain their normal
22      hour shifts?
23   A. What that officer is supposed to do is, if I'm sitting
24      there working, and that video monitor goes out, I pick
25      up the phone. I call shift command and say "Sarg, my

Page 30

1  video monitor just went out."
2  "Okay. Do 30-minute rounds or continuous rounds if
3  you're on 5 or 6."
4  I hang up the phone.
5  Fifteen minutes later, the camera video monitoring
6  system comes back on, for whatever reason. I call shift
7  command and I say, "Hey, Sarg, my camera system is back
8  up. It looks like it's working."
9  "Okay. You can go back to doing hour rounds."
10 Q. Okay. And so did that happen on 6 Old in August of 2016
11    at any point?
12 A. I wouldn't know that without seeing reports or logs or
13    testimony from somebody saying that.
14    I mean, I wasn't there.
15 Q. Okay. So, what about occasions where there was people
16    who refused overtime or there weren't enough -- would
17    there be times where people didn't have enough officers
18    to have rovers and the right number of people to be
19    doing continuous rounds, even if maybe the cameras were
20    off?
21 A. We're under a jail consent decree that requires minimum
22    staffing. And regardless of the staffing or the
23    overtime positions, we have positions that we can cut,
24    but we have to maintain certain minimum security
25    staffing positions and rounds is like the highest

Page 31

1  priority.
2  In fact, this is in 2016. But, I mean, even
3  recently, I've been ordered in at home, off duty on days
4  off, that I'm not eligible to be paid for, to report in
5  to the jail to work those security positions because we
6  cannot staff them.
7  So, when it comes to rounds, the rounds are to be
8  maintained no matter what. There's minimum staffing for
9  the floors. Even if the utility or rover officer is
10 cut, those floor officers are responsible for
11 maintaining those minimum required rounds.
12 And I'm not aware of any time, ever, that we've
13 been below staffing to where we can't maintain the
14 minimum required rounds up until the point I've even
15 come in to work then.
16 Q. Okay. That's helpful.
17 A couple of moments ago, you said on 5 and 6,
18 rounds are either 30 minutes or continuous? Is that
19 with the whole floors?
20 A. Yes. But the reason being is because of maximum
21 security and discipline.
22 Q. Okay. And what about protective custody? Is that in
23 5 or 6 as well?
24 A. They do have protective custody wards on 5 and 6.
25 Q. And is this -- what you're testifying about, the

Page 32

1  continuous and the 30-minute rounds on 5 and 6, was that
2  the practice in 2016?
3  A. Yes.
4  Q. Okay. Are you aware of any deviations from the
5  requirement to do the 30-minute rounds or continuous
6  rounds on Old 6 in 2016?
7  A. No.
8  MS. PRESCOTT: Just give me a minute to look at my
9  notes, please.
10 And, Paul, do you know if that e-mail has gone out?
11 MR. O'NEILL: Yeah. Yeah, I just sent it to you.
12 MS. PRESCOTT: Okay. Thanks.
13 MR. O'NEILL: It's two e-mails separate.
14 BY MS. PRESCOTT:
15 Q. Commander, do you know on how many occasions the folks
16 who staff the sixth floor of Old Wayne in 2016 asked for
17 assistance with cameras that weren't operative?
18 I don't know if I asked that before.
19 A. I believe you did.
20 And, no, I don't know that.
21 Q. Could you testify as to how frequently the cameras were
22 inoperative on 6 Old in the month of August 2016?
23 A. From what I'm told, it was a lot. I mean, I wasn't
24 there, so I don't know, but it was frequent that there
25 were mechanical issues.

Page 33

1  Q. And when the cameras were operative, were there times
2  where they would be on but they wouldn't rotate through
3  as well? Like they wouldn't shift the view so that they
4  were showing all of the areas?
5  A. I don't have specific knowledge of that. That could be
6  an issue, but I don't know that. That would be for
7  Corporal Foreman or Lieutenant Bates.
8  Q. Okay. Fair enough.
9  How about -- do you know whether they -- the
10 cameras were -- when they were on and when they were
11 shifting the view, had good visibility?
12 In other words, the quality of the picture, could
13 you comment on it in August of 2017 on 6 Old?
14 A. I know that I was in charge of a unit that had to do
15 some investigating at that time, and we would routinely
16 receive video, when it was working, of incidents that
17 occurred in the jail, and we were able to use it to
18 prosecute cases, to investigate, you know, issues.
19 So, the video was quality enough that you could use
20 it.
21 Q. You could see what was going on?
22 A. Yes.
23 Q. Okay. Was it better or worse at night when the light
24 might be different?
25 A. Not really -- I don't really remember or recall there

Page 34

1. being a difference between, you know, night or – light
2. or day – light or dark because you would think with
3. dark you wouldn't see as good, but then sometimes you
4. would have glare.
5.     So, I would say it was equal quality either way.
6. Q. Okay. We talked about the video equipment for a bit.
7. And you said that you see the DVR equipment as sort of a
8. different class of issues.
9.     What was going on with the DVR equipment in 2016?
10. A. There were mechanical issues with it, maintenance issues
11. where it would fail. It would come back. It would go
12. down.
13. Q. Do you know of times that it was inoperative just
14. because people would unplug it?
15. A. No, I do not – I'm not aware of that.
16.     I know that there were times I would get cases to
17. investigate and there would be no video available. So,
18. it wasn't working.
19. Q. Okay.
20. A. So, I'm aware of times that it failed.
21. Q. So, how long of a period was that kind of thing going
22. on, or maybe it's still going on?
23. A. Yeah, I mean, there's been camera issues – we still
24. have them. We had a power outage a few days ago and
25. they were down for a while. So, Corporal Foreman was

Page 35

1. able to get them fixed.
2. Q. How far back does this issue go? Through your whole
3. career, or did it really like one day in 2010 everything
4. went haywire, or what was your memory?
5. A. Yeah. I'm not sure. I actually was an officer at that
6. jail, but when I worked there, there weren't cameras
7. installed there yet. And so when I left, I went out to
8. an investigative unit as a detective and so they were
9. installed at that time and I was so out of the jail
10. system that I didn't known what was going.
11.     So, as far as how far back it goes, I don't know.
12. Corporal Foreman or Lieutenant Bates may be able to
13. answer that.
14. Q. After you came back to Wayne County Jail, was – were
15. the cameras a problem when you returned from the
16. investigative unit?
17. A. Yeah.
18.     Like I said, there were times the camera system is
19. inoperable. It's an issue. I mean, where it doesn't
20. work. It's got maintenance issues. It's got
21. compatibility issues. It's – we weren't supposed to be
22. in this jail, and they weren't supposed to be installed
23. in the building that was built in the 1920s.
24. Q. So, when did you come back from that investigative unit?
25. A. It's a little more complicated that that. I went from

Page 36

1. one unit in 2009 to another investigative unit. So,
2. then in 2017, I got sent to Jail Division I, which does
3. not have cameras, for a three-month period.
4.     I went back out to another investigative unit.
5.     And then in 2018, October, I was made commander,
6. and I was placed at Jail I. I just came to Jail II here
7. in June of this year. And as the commander there, like
8. I said, there were times we are still having camera
9. issues.
10. Q. Okay. There are policies in place with regard to
11. retaining video evidence; correct? Like there's a
12. certain number of days that video is kept, according to
13. policy; is that right?
14. A. I'm not aware of a sheriff's office policy about that.
15.     What number are you referring to?
16. Q. Number 7.
17.     Oh, policy.
18.     I was referring to – I was talking about the Dep
19. Notice.
20.     So, in the Dep Notice we said that speaking to the
21. Defendant's policies and practices regarding retention,
22. reuse, destruction or disposition of video.
23.     Do you know of any policies that fit that category?
24. A. The policy for that category is, we're limited by the
25. retention storage capacity.

Page 37

1.     In the original system, the video would only last
2. like five or six days and then it would rewrite over
3. itself.
4.     Now, in some of the newer systems that they've
5. updated since then, it now has about a 30-day capacity.
6.     But, as far as us, I mean, we never went in and
7. deleted or destroyed anything. It was just – they
8. would rewrite over itself.
9.     So, if an incident occurred, as soon as you find
10. out about the incident, you would look for video. You
11. would download it. You would save it to a disc. You
12. would save it on – you know, wherever you could save
13. it. You know, when you forward a copy over to the
14. investigative unit to investigate it, they have a copy
15. of the video. And then that video is kept with that
16. investigative unit file for – and it depends on the
17. case.
18.     I mean, in terms of a CSC, then that video would be
19. kept forever.
20. Q. Sure.
21. A. So, when you talk about retention of evidence, you know,
22. I look at that as downloaded evidence that you've
23. actually recovered or evidence that's on a DVR that you
24. may or may not know about that you need to get off
25. before it's written over.

Page 38

1  Q. Would there be an obligation to record in handwriting
2  things – like, in other words, make a written record of
3  information obtained from a video?
4     In other words, if somebody is at a duty station
5  and they see a prisoner violating a rule or something on
6  the video, do they then have to record all of those
7  observations in writing, or is the video kept, if it's
8  needed, for tickets or discipline? How did that work?
9  A. There's a lot of ways that could go on.
10    I mean, if you're – if I am watching video, and I
11 see somebody commit a crime, commit a rule violation, as
12 a police officer, I can certainly write down in my
13 report, in my log entry that, hey, I witnessed this via
14 video. I observed this. I saw this go on, live or even
15 in recording.
16    As far as the investigator, like, okay, they
17 received the disc. Okay. Now, they watch the disc, and
18 they say, "I've reviewed the disc, and I realized that
19 this occurred. I saw this at this time on this disc."
20 Q. Is there a written policy that speaks to either of those
21 two circumstances, where someone witnesses something on
22 a video or later is the investigator and reviews the
23 video, that says here is where you shall write it down
24 or here is where you must record it?
25 A. I didn't review the report-writing policy, but I know

Page 39

1  just off the top of my head that one of the things
2  required of a police officer is, you write down what you
3  observe, what you see, what you hear, what you witness,
4  what somebody reports to you that they have seen, heard
5  or witnessed.
6  Q. Okay. So, I'm on Number 8 of the list, and it says:
7     "Speaking to the Defendant's policies and
8     practices in place in August of 2016, applicable
9     to the sixth floor, including Ward 10, with
10    regard to the use of logs, records or other
11    documents of any kind to record information
12    obtained from electronic, video, photographic
13    and audio recordings, armband checks or doors."
14    So, is there any policy number that you think
15 applies to or is included in what I just read out, which
16 is paragraph 8 of the Deposition Notice?
17 A. I'm trying to think.
18    I don't think there's necessarily a specific
19 written policy that covers that exact situation. I
20 think it's more of a general thing of, like I said a
21 minute ago, as a police officer, you're supposed to
22 document what occurs. And if you get that knowledge
23 from a video or from live monitoring of a video screen
24 or from an audio recording, then you document that.
25    And you're required to document, you know, things

Page 40

1  that you hear, see, observe, have knowledge of.
2     And so I think it's – it may be covered in a more
3  broader sense where it's not specifically because you've
4  obtained it, you know, via video.
5  Q. Do you know whether in practice the officers on 6 Old in
6  August 2016 were making reports of that sort, of the
7  things that they were observing, either from audio or
8  visual or even from their rounds?
9  A. Well, yeah.
10    I mean, I know, as the commanding officer of the
11 investigative unit at that time, that there were times
12 where we received incident reports from officers that
13 worked on 6 Old where they witnessed things and they
14 documented those things. And they had log entries in
15 the JMS system and JMS reports for like disciplinary
16 rule violations or just informational.
17    So, I know that that was done during that time.
18 Q. Okay. Do you know if any of those – I think it was IMS
19 at the time and now it's JMS.
20    Do you know if any of those logs still exist from
21 2016?
22 A. I don't have specific knowledge of that system. That
23 would be Corporal Foreman.
24 Q. And would you able to speak to any officers specifically
25 making any particular reports on Old 6 in August 2016?

Page 41

1  A. No. Not unless somebody, you know, showed me something.
2  Q. Some of the officers testified, who were working on Old
3  6 on the evening of the assault of my client, that –
4  well, actually, it was, I think, Sergeant Mills.
5     Are you familiar with Edith Mills?
6  A. Yes.
7  Q. So, she was one of the first people to know about the
8  assault, and she went with a partner to the DVR room to
9  go look for footage of what happened to my client.
10    She testified that when they arrived, and her
11 partner testified, that the DVR system was – was
12 unplugged.
13    Do you know whether that's the case or not?
14 A. No, I don't.
15 Q. Do you have any facts suggesting that there's something
16 false about that testimony or anything that you know of
17 that casts doubt on that testimony?
18 A. No. I'm not aware of anything either way.
19 Q. Okay. She and her partner further testified that, when
20 they went back, it looked like it had been eight days
21 that the machine had been unplugged because they went
22 back to when the date was on the last images that were
23 saved on the DVR.
24    Do you know whether that's true or not?
25 A. Going just off of the facts that you just stated to me,

Page 42

1  I don't know how they could know if that's true or not
2  because – just because it's unplugged now but yet they
3  didn't find video for eight days, how do they know
4  somebody didn't know the video wasn't working and went
5  back and tried to work on it or something and
6  inadvertently or accidentally or – maybe they even
7  interpreted the wrong wire.
8      I think that's an assumption that we don't know for
9  sure is correct; that it had been unplugged for eight
10 days.
11 Q.  Okay.  So, it's possible that it was taken out of use,
12 for example, to work on it?
13 A.  I guess.  Again, I'm not a repair person.  I don't know.
14 Q.  Fair enough.
15     I guess what I'm asking is, were there times that
16 the DVRs were taken offline in order to work on them?
17 A.  I wouldn't know that.  That would be a Corporal Foreman
18 issue.
19     I don't operate the DVRs.  I don't have access to
20 them.  I don't have the – you know, the passwords and
21 things.  That's not something that I do.
22 Q.  Okay.  Relative to – I mean, it certainly would have
23 been required policy that – I mean, that the DVR be
24 used while – to the extent it could be; right?  I mean,
25 there is – that's the expectation?

Page 43

1  A.  Well, yeah.
2      I mean, if you have equipment that's operable, of
3  course you want to use it.
4      I want to make sure you understand, too.  You're
5  not – you know, you're not talking about like a DVR at
6  your home.  You're talking about banks and banks and,
7  you know, rows of DVRs all plugged in together in a
8  giant network.
9  Q.  Uh-huh.
10 A.  You know, we're not talking about just one – one item
11 here.  There's a lot there.
12 Q.  It's a fair point.
13     Do you have any idea – and I'm on Number 9 of the
14 Deposition Notice.
15     It asks about preservation and disposition of the
16 evidence of videos of my client in August of 2016.
17     Do you know why it would be that the staff –
18 Sergeant Mills would be saying, "We couldn't find any
19 operative pictures going back eight days before the
20 assault, and in between Lieutenant Bates would be
21 auditing and seeing that the equipment was plugged in"?
22     Do you have any facts about any of that?
23 A.  No.
24 Q.  It would be policy of the department, if a sexual
25 assault was reported, to go immediately to the DVR to

Page 44

1  secure it based on your prior testimony; correct?
2  A.  Yes.
3  Q.  And do you know whether any video was ever able to be
4  found of the incident on October – excuse me – August
5  24th, 2016, and the sexual assault of my client?
6  A.  No.  I'm not aware of any video ever being found with
7  regards to this particular attack.
8      I know that there were videos found of other
9  incidents and other attacks that occurred because we
10 used those to successfully, you know, prosecute those
11 issues.
12 Q.  My client –
13 A.  And it works.  It's a great tool.
14 Q.  Yeah.
15     And my client – I mean, the assailant in this
16 situation tried to turn the rape around and accuse my
17 client of rape.
18     So, another thing that they can be used for is
19 disproving allegations, right, against officers, against
20 other prisoners?
21 A.  It could be part of that, just like, you know, DNA
22 evidence and testimony and, you know, other evidence.
23 Q.  And so it sounds like you found the videos to be a
24 useful tool for prosecution and also security and
25 safety?

Page 45

1  A.  I find all evidence to be a useful tool for all cases.
2      I mean, it would be great if we had a camera
3  covering every inch of the planet at all times, but it
4  would also kind of be scary, too.  I mean, it's all a
5  trade-off.  I mean, the inmates aren't necessarily happy
6  about the cameras when, you know, they want to take a
7  shower, use the toilet or things like that.
8      So, you've constantly got this trade-off of
9  where – you know, just like out in the street, we're
10 worried about protecting individuals and their civil
11 rights, but then we're also worried about providing
12 security.
13 Q.  Why do – given that – the privacy interests at stake
14 for people going to the bathroom or picking their nose
15 or whatever they're doing in their cell, why are there
16 cameras?  Why does the jail come down – it sounds like
17 it's expensive.  They're a headache.  They're half on
18 and they're half off.
19     Why use them?
20 A.  Well, if they save one person – if they prevent one
21 attack, if they prevent one suicide, if they prevent one
22 officer from being hurt, then aren't they worth it?  I
23 mean, we –
24 Q.  Or one person from being raped?
25 A.  We care about the individuals, the inmates and the

Page 46

1  staff, that work in our facility.
2      We do everything that we possibly can to keep them
3  safe.
4      That's why we've got medical care. That's why we
5  send people out to the hospital. We send people to
6  mental health services.
7      You know, we physically intervene when we need to
8  to save other people. I, as an officer, have been
9  injured, helping to prevent inmates from hurting each
10 other.
11     I have personally stopped sexual assaults, when I
12 was an officer, in that same jail.
13     We do everything that we possibly can to keep
14 people safe. And, you know, if the cameras can be part
15 of that, and if they save one person, then they were
16 worth all the aggravation and trouble that they may
17 cause when they don't work.
18 Q. Do you think everything possible was done to keep the
19 cameras in 6 Cell – or – excuse me – 6 Old working in
20 August 2016 to save my client from being raped?
21 A. Under the conditions that we're under with a building
22 that was built in the twenties, with the budget
23 constraints, with the fact that we weren't supposed to
24 be there – we were supposed to be into a new building
25 by that time. I believe that the Wayne County Sheriff's

Page 47

1  Office and its staff members did everything that they
2  could to prevent not only that, but any and all
3  altercations, rapes, suicides, homicides, anything that
4  could possibly occur, because we care about protecting
5  life and safety.
6  Q. Okay. So, it sounds like your point is, given the
7  constraints and that there's budgetary constraints that
8  are practical limits on what can be done? Was that part
9  of your answer?
10 A. Yes.
11 Q. And then you said, "They did everything they could."
12     Do you know of any steps any officers took to
13 protect my client from being raped on August 24th, 2016?
14 A. Apparently, from reviewing the internal affairs record,
15 once the – an officer was notified, which, from my
16 recollection was the following day, I believe, going to
17 law library, they immediately got him help. They got
18 him medical treatment, which – you know, you have to
19 worry about communicable diseases. You have to worry
20 about, you know, sexually transmitted diseases, HIV,
21 just, you know, trauma, all kinds of things.
22     So, by that point, they do what police officers do.
23 If they can't stop and prevent the attack, what do we
24 do? We get the victim care. We try to preserve and
25 secure evidence so that we can bring the guilty to

Page 48

1  justice.
2      So, it gets done. The reports get written. They
3  get generated. They get sent over to the investigative
4  unit, which was my unit that I was in charge of. We
5  vigorously pursued and investigated this crime up and to
6  even giving polygraph examinations to both paries. And
7  we were able to get a successful prosecution on this
8  issue.
9  Q. I don't disagree. I know that there were some steps
10 taken after my client was raped, successful prosecution
11 of another inmate.
12 A. I wish I could prevent every attack before it occurred.
13 They –
14 Q. My question was just on that.
15     Yeah. My question was what you know about any
16 action taken before the rape occurred.
17     You said everything that was done that could be
18 done was done.
19     So, I was wondering what you were referring to, to
20 stop the rape from happening in the first place.
21     MR. O'NEILL: I just want to place an objection.
22 That's outside the scope of subjects of the Deposition
23 Notice.
24     But the witness can answer if he knows.
25 A. I can't prevent something that I don't know was going to

Page 49

1  occur. If I could, I would prevent every crime that's
2  about to happen, and I would also buy a lottery ticket
3  for tonight. And, unfortunately, I can't do either. I
4  mean, I can buy a lottery ticket. I just won't win.
5  BY MS. PRESCOTT:
6  Q. Are there any steps you can identify?
7  A. No. I'm sorry. There are – you can't stop
8  something you don't know. And as long as you follow the
9  policy and procedures and have your due diligence, what
10 more can we ask?
11 Q. Well, you did it, didn't you? You testified that you
12 stopped a sexual assault from happening.
13 A. Because I was alerted that it was happening by the man
14 yelling. I heard it in my duty station. I was able to
15 go down there with my partner, catch him in the act,
16 call for help, get in and physically intervene because
17 he alerted me to the issue.
18 Q. Okay.
19 A. You know, and –
20 Q. Any steps like that that, for example –
21     MR. O'NEILL: Wait. You're interrupting the
22 witness.
23 BY MS. PRESCOTT:
24 Q. Oh, okay. Let's hear –
25 A. And, in particular, the incident that I'm recalling from

Page 50

1  my much younger days, not that far but much younger
2  days, was on a small side unit on one of the old sides
3  like that, but on the opposite end.
4      So, it would have been a 1 Ward instead of a 10
5  Ward. But it is an equal distance amount of space from
6  the duty station to the 1 Ward and the 10 Ward.
7      So, I'm in the duty station and I hear the man
8  screaming on the 1 Ward and I'm able to go down and
9  intervene. You know, you've got the same amount of
10 distance on the tenth floor. So, that –
11 Q.  Okay. So, your point was that if someone is able to
12 scream, you are able to rush to their aid?
13 A.  Yes.
14 Q.  Okay. And that's an example of an officer using his
15 senses, his common sense and his sense of duty –
16 A.  Yeah.
17 Q.  – to take care of somebody.
18     Anything you know about the officers in this
19 scenario that we haven't covered with taking care?
20 A.  No.
21     MS. PRESCOTT: That's all the questions I have
22 except for the policies, Paul.
23     So, could we – and I may not have any about the
24 policies. So, can we take about a ten-minute break?
25     MR. O'NEILL: Sure.

Page 51

1      MS. PRESCOTT: And I'll look at them and I'll –
2  you know, the witness can take a break, and we'll come
3  back at about 12:22 – or 2:22.
4      MR. O'NEILL: Okay.
5      (Short recess at 2:12 p.m.)
6          * * *
7      (Record resumed at 2:19 p.m.)
8  BY MS. PRESCOTT:
9  Q.  Commander, I've got up here a document which was just
10 sent to me by counsel, and it is Policy 14.12.
11     Is that the one you earlier were describing as
12 applicable to Division II?
13 A.  Yes.
14 Q.  All right. It isn't Bates-numbered, but we can – let's
15 see. It looks like it's eight pages long; is that
16 correct?
17 A.  Yes.
18 Q.  And the issue –
19     MR. O'NEILL: Sarah, if it relates to the Bates
20 number, would you give me a day where I can Bates number
21 these two documents and e-mail them to you if you're
22 going to make them a part of the record so that we have
23 Bates-numbered as exhibits to the deposition?
24     MS. PRESCOTT: You mean you're going to send them
25 to John later?

Page 52

1      MR. O'NEILL: I was going to send them to you so
2  you could send all of them together with them
3  Bates-numbered.
4      MS. PRESCOTT: Yeah. I just have a couple of
5  questions. We don't even need the – I mean, the policy
6  will help but the bottom line is we have an eight-page
7  document. Issue date is 11-10-15, and it's Document
8  Number 14.12.
9  BY MS. PRESCOTT:
10 Q.  Is that correct, sir? Commander?
11 A.  Yes.
12 Q.  Okay. Okay. I just have a quick question about this
13 one on page 4.
14     And right where the cursor is, but you may also
15 find it in the middle of the page, it says:
16         "At no time shall more than 60 minutes
17     elapse before rounds."
18     And then it's also in bold a little bit higher.
19     The other – keeping that in mind, the other thing
20 you did send me is 14.14, a six-page document, issue
21 date 10-2-06, and it talks about continuous rounds on
22 Floors 5 and 6. I have pulled it up, and we have it
23 under 1(b) where I've highlighted the cursor on the
24 screen, but you can also look at it, for day shift.
25     There's also a continuous rounds utility officer

Page 53

1  that's mentioned on the second page. It talks about
2  continuous rounds on 4, 5 and 6.
3      So, I just want – my only real question for you
4  is, given that I have these two policies and one says
5  60 minutes, one is a little bit more specific to Floors
6  5 and 6 and talks about continuous rounds, am I correct
7  that the continuous rounds, indeed, are policy for
8  Floors 5 and 6, and the 60-minute rounding is what is
9  applicable elsewhere in the building?
10 A.  Actually, the rounds policy is – if the video equipment
11 is working, the monitoring equipment is working, it's
12 60 minutes.
13     If the video monitoring equipment is not working,
14 it's 30 minutes, no more than 30 minutes, no more than
15 60 minutes.
16     If the video equipment is not working on the fifth
17 and sixth floor, they have the continuous rounds due to
18 disciplinary isolation and maximum security.
19 Q.  Okay. Is that – and that also applies to the
20 protective custody area?
21 A.  They walk the whole floor when they're on continuous
22 rounds, so they also pass those areas, yes.
23 Q.  Okay. So, what is what I've got highlighted on the
24 screen when it speaks to a continuous rounds/utility
25 officer? What is that referring to, given that you said

Page 54

1  that there might be times when the cameras are working?
2      Does this not apply if the cameras are working?
3  A. If you go back to the previous page and look at B,
4     you'll see that these are definitions.
5  Q. Okay.
6  A. That is a definition of what the fifth and sixth floor
7     continuous rounds/utility officer is.
8  Q. Okay. So, then, let's go to "Procedures, C(1), Day
9     Shift and Afternoon Shift."
10     And then it says:
11        "Floors 5 and 6 shall have one
12     rounds/utility officer shared for continuous
13     rounds on those floors only."
14 A. Yes.
15 Q. So, is that what you meant earlier when you said that
16    there would be continuous rounds done on the sixth floor
17    in 2016?
18 A. Yeah. It's – it's if the video equipment is down, and
19    then it's to cover like lunch periods.
20 Q. I'm not sure I understood your answer.
21     Are you saying there weren't continuous rounds on
22    4, 5 and 6, or there were?
23 A. If the video monitoring equipment is working – let me
24    see.
25     THE REPORTER: I'm sorry?

Page 55

1  A. I'm sorry. I'm reading the policy.
2      See, this policy here is from 2006.
3      This other one is from 2015.
4      So, in 2006, according to this policy, if you look
5     at it, there would have been continuous rounds in the
6     fifth and sixth floor.
7  BY MS. PRESCOTT:
8  Q. Okay. But there's no later revision of 14.14 that you
9     know of, is there?
10 A. No.
11 Q. So, as far as you know, the 10-2-06 document is the
12    policy as of 20- – well, as of any time; right?
13    There's no later policy.
14 A. Well, yeah. You've got the rounds policy now.
15     Like today. We're doing 30-minute rounds. We're
16    not doing continuous rounds on 5 and 6.
17     So, you've got the newer – the round – the 14.12.
18     So, like even today, we're doing 30-minute rounds
19    now. We're not doing continuous.
20 Q. Okay. Do you know of any – who decided that 14.14, as
21    it's written here, which talks about the continuous
22    rounding on 4, 5 and 6 – I've just highlighted it –
23    wouldn't be what was done? Instead, it would be
24    30-minute rounds?
25 A. I don't know how that decision – when that was

Page 56

1  implemented or how that was – when I was out in the
2  street units.
3  Q. Okay. Has the 30-minute rounding in 20- – or – excuse
4     me – on Floors 5 and 6, that's with or without the
5     cameras being operable, though?
6  A. We're doing 30-minute rounds in the entire building now.
7  Q. And how long has that been going on?
8  A. I don't know for certain. I know the entire time I've
9     been the commander there – I want to say at least since
10    2018, but it may be longer than that – is when the
11    decision was made that the video system was so up and
12    down frequently that you didn't know when it was up or
13    down due to the DVR recording or due to sometimes the
14    cameras not working or not cycling that they just –
15    they went to 30-minute rounds, and that's where we've
16    been.
17 Q. Okay. So, can you speak at all to – I just want to –
18    I don't want to belabor it, but I want to go back.
19     So, we talked about the actual routines and
20    practices of those who staff the sixth floor in the 2015
21    through 2016 era.
22     So, those two years, '15 and '16. And when the
23    functionality of the video equipment was problematic,
24    was down, what policy were they following? What were
25    they doing?

Page 57

1  Were they doing 30-minute rounds, continuous
2  rounds, hour rounds?
3  A. I don't have the round verification printout in front of
4     me, but I believe it was 30-minute rounds.
5  Q. Okay. Even though – and do you think that that was
6     consistent with the expectation, the policy, the
7     approval of the sheriff and through his chain of
8     command?
9  A. Yeah.
10    Because if you look at 14.12 on page 5, Number 8,
11    at the very bottom of Number 8 there, it says:
12       "The housing units where the malfunctioning
13    occurred shall revert to half-hour rounds until
14    the video monitoring equipment has been repaired
15    and is in full operation."
16 Q. Fair.
17    But your point was they were doing half-hour
18    rounds.
19    You think they were doing half-hour rounds with or
20    without the video monitoring in 2015 and '16?
21 A. No. That's not what I said. I said since 2018.
22 Q. Okay. I keep getting back to my Number 2, which is the
23    Number 2 paragraph of the Dep Notice, and that's why
24    we're crossing – talking.
25       It's speaking about the years 2015 and 2016.

Page 58

1  And –
2  A. And this round verification policy was written in
3     November of '15 and signed by the chief in March of '16.
4  Q. Okay. So, let's talk about March of 2016 through
5     October of 2016.
6        What was going on on the sixth floor if the video
7     equipment was working?
8  A. Hour rounds.
9  Q. I thought you said half-hour rounds?
10 A. In 2016 or 2018?
11 Q. 2016.
12 A. Okay. I told you, at some point, it was determined that
13    the video system they could not know fast enough if it
14    was up or down with the recording, with the monitoring
15    and cycling of the cameras. Some cameras work and some
16    not.
17       So, they decided to go ahead and go to 30-minute
18    rounds for the entire building everywhere. And I don't
19    know the exact date that that was decided because I
20    wasn't there.
21 Q. Okay.
22 A. So, if that occurred after the rape, the sexual assault,
23    that decision to go to 30-minute rounds, then, in 2018
24    or 2016 or whatever, if the video monitoring equipment
25    is down, they do 30-minute rounds.

Page 59

1        If they're sitting in their duty station and the
2     video monitor is working – they can see it cycling
3     through – then they would have been required to do hour
4     rounds.
5  Q. So, what I'm asking is, that – just to – the record is
6     getting very complicated.
7        Is it the case that you don't know what the
8     practice was between March, when the policy was signed,
9     and October 1st, 2016?
10       The practice. I mean, we've got three pieces of
11    paper here, but what they were actually doing on 6. Do
12    you know?
13 A. The policy for 2016 says if the video equipment is
14    malfunctioning, it's 30-minute rounds.
15 Q. Okay.
16 A. So, if the video equipment is not malfunctioning, it's
17    hour rounds.
18 Q. And you're saying that because of –
19 A. The 2015 policy.
20 Q. The 11 – the 14.12?
21 A. Yes.
22    I'm sorry. I –
23 Q. Who decided that they were going to follow 14.12 instead
24    of 14.14, where it says, "Floors 5 and 6 will have
25    continuous rounds"?

Page 60

1  A. I would say this policy, 14.12, is approved by Chief
2     Dunlap in March of 2016. He signs it and he says that
3     is the rounds policy.
4        This is the Security Division II, Floor Security
5     Rounds Policy.
6  Q. Okay. And .14 is the Security Video Monitoring Policy.
7        So, did anyone ever –
8  A. From 2006.
9  Q. – say, "We don't follow 14.14 any more," that you know
10    of?
11 A. I don't know what he said. I wasn't assigned to the
12    jails. I wasn't – when he would give those directions.
13    When he put this policy out, I was in a street unit. I
14    wasn't – like I didn't even receive it.
15 Q. Okay. And speaking for the County in this 30(b)(6)
16    weird deposition situation and scenario you find
17    yourself in, are you aware of anyone ever retracting
18    14.14?
19 A. Other than by putting out 14.12, no.
20 Q. Well, there's a way to retract a policy, isn't there,
21    that says, "14.14 will no longer apply"?
22 A. You could do that. I mean, that is a – something you
23    could do.
24 Q. Okay. Did anyone ever retract 14.12 and say, "We're
25    actually doing 30-minute rounds now"?

Page 61

1  A. It says it right here on page 8, where it says:
2           "The housing units where the malfunction
3        occurred shall revert to half-hour rounds
4        until the video monitoring equipment has been
5        repaired and is in full operation."
6        The video monitoring equipment is malfunctioning.
7  Q. Okay. But it's been malfunctioning for many, many
8     years; right?
9  A. Yes.
10 Q. It's just that some day someone decided, look, this
11    whole system is so unreliable, let's just do the
12    30-minute rounds?
13 A. Yes.
14 Q. And they relied on this from 11-10-15?
15 A. That's the policy now.
16 Q. Right.
17       And so what stopped them on 11-11-15 saying, "You
18    guys. It says here at the bottom of paragraph 8, if
19    there's malfunction going on, we should be doing
20    half-an-hour rounds. And there's just nothing but
21    malfunctions. Some days they're up. Some days they're
22    down. These cameras just aren't reliable"?
23       Did anything stop anyone from using paragraph 8 as
24    of 11-11-15 to start doing half-an-hour rounds?
25 A. We are doing half-an-hour rounds.

Page 62

1   Q. Well, I know, but you weren't – according to you, you
2      weren't in '15 and '16.
3         MR. O'NEILL: Excuse me. Objection.
4      Mischaracterizes his testimony. He said they were doing
5      30-minute rounds in '15 and '16 if the cameras weren't
6      working.
7   BY MS. PRESCOTT:
8   Q. So, did you understand my question, Commander?
9   A. I stated earlier, if the video equipment doesn't work,
10     they do 30-minute rounds. I also stated that, at a
11     certain point, it was decided above me that they were
12     going to just do 30-minute rounds at Jail Division II,
13     and I was not sure what that date was.
14        But I, at least – believe it was at least 2018.
15  Q. Do –
16  A. Now, do you have a round verification printout from
17     6 Old for that day?
18  Q. Do you have anybody that you – that you know made that
19     decision that affected 2018?
20        Do you know the name of a person who would have
21     made the 2018 shift in policy?
22  A. It came above me. It could have been a deputy chief.
23     It could have been the chief, the sheriff, the
24     undersheriff.
25        It would have been above me.

Page 63

1   Q. Okay. And you don't know – but you would point to the
2      second – the third sentence of paragraph 8 as the basis
3      for what's going on now?
4   A. If you're asking me my opinion, yes.
5   Q. Well, I'm asking you as the person that's designated to
6      sit here, unfortunately for you. I hope it's not too
7      unfortunate, but you're the person that the County
8      designated.
9   A. Okay.
10  Q. And so I'm trying to figure out, speaking for the
11     County, you're pointing to the third paragraph of 8 as
12     the reason that we can be doing half-hour rounds right
13     now; right?
14  A. Yes.
15  Q. And as the County – speaking for the County, do you –
16     is there any reason that half-an-hour rounds weren't
17     going on after 11-10-15 based on the very same reasoning
18     in paragraph 8?
19  A. The only reason could be that the video monitoring
20     equipment was working correctly.
21  Q. Do you know?
22  A. No. I don't have personal knowledge of that.
23  Q. And – okay.
24        MS. PRESCOTT: That's all the questions that I
25     have. I appreciate your time.

Page 64

1         MR. O'NEILL: All right. I just have one follow-up
2      question.
3              * * *
4              EXAMINATION
5   BY MR. O'NEILL:
6   Q. Commander, you were asked about policies and practices
7      of the security staff on the day of the attack by
8      Mr. Solomon of Mr. Burks, what, if anything, the floor
9      officers did that could have prevented that.
10        Is rounding – does rounding act as a deterrent to
11     sexual assaults such as Mr. Burks suffered?
12  A. Yes.
13        It's just like on the street. When you've got, you
14     know, officer presence, that deters people from – you
15     know, you've got an officer there in uniform that is
16     deterring people from committing assaultive acts. You
17     know, you've got an officer that's there with their
18     senses, looking. Hey, does this guy look nervous? Does
19     this guy look afraid? Does this man or woman look
20     scared? Are they crying? Do they look depressed? Are
21     they going to harm themselves? Are they going to harm
22     somebody else? Do they need to see the nurse?
23        You're looking for all these signs and symptoms
24     that, hey, is it just too quiet on this ward? Is it too
25     loud on this ward? You know, you're using all of these

Page 65

1      things to try and make sure that nothing is going to go
2      on. And even the cameras, themselves, whether they work
3      or don't work, the cameras simply being there are a
4      deterrent to the inmates' destructive behavior.
5   Q. And how about the officer sitting at the duty station,
6      listening to the activity on the wards? Is that a
7      function of preventing sexual assault?
8   A. It certainly is.
9         I mean, the officer in the duty station, actually
10     he can control a lot of what goes on in those wards
11     because he's got an intercom system where he can not
12     only speak to the inmates but – again, you know, it's a
13     little bit of a distance but you can yell down. The
14     sound echoes. It's concrete. It's steel.
15        And, you know, often a ward will get a little too
16     loud. You'll flash the lights. "Hey, guys, quieten
17     down."
18        You'll hear – maybe they're roughhousing.
19        "Hey, guys, stop it. I don't want to have to come
20     down there and lock you down. I'm going to turn the TV
21     off. You've got to behave."
22        So, just them knowing, yeah, the deputies are here,
23     they are paying attention is a deterrent.
24        MR. O'NEILL: Thank you. Nothing further.
25             * * *

Page 66

1  　　　　　RE-EXAMINATION
2  BY MS. PRESCOTT:
3  Q.  Do you know if anyone flashed any lights or used any
4  　　intercom or used their five senses on August 24th, 2016,
5  　　in any of the ways you just described, sir?
6  A.  I don't have any personal knowledge of that.
7  　　　　MS. PRESCOTT:  I appreciate it.  That's all I need.
8  Thank you.
9  　　　　MR. O'NEILL:  Thank you.  We're done.
10 I'll get Mr. Foreman.
11 　　　　MS. PRESCOTT:  Okay.  Thank you.
12 　　　　(Deposition concluded at 2:40 p.m.)
13 　　　　　　* * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1  STATE OF MICHIGAN )
2  COUNTY OF OAKLAND )
3  　　　　CERTIFICATE OF NOTARY PUBLIC
4  　　I do hereby certify that the witness, whose
5  attached testimony was taken in the above matter, was
6  first duly sworn to tell the truth; the testimony
7  contained herein was reduced to writing via remote
8  attendance of the witness by means of stenography;
9  afterwards transcribed; and is a true and complete
10 transcript of the testimony given.
11 　　I further certify that I am not connected by blood
12 or marriage with any of the parties; their attorneys or
13 agents; and that I am not interested, directly or
14 indirectly, in the matter of controversy.
15 　　In witness whereof, I have hereunto set my hand
16 this day at Highland, Michigan, County of Oakland, State
17 of Michigan on Tuesday, January 19, 2021.
18
19
20 　　_____
21 　　John J. Slatin, RPR, CSR-5180
22 　　Certified Shorthand Reporter
23 　　Notary Public, Oakland County, Michigan
24 　　My commission expires:  July 25, 2023
25