# EXHIBIT C

ALAN   BULIFANT
September 27, 2021

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

JOHNATHAN L. BURKS,

      Plaintiff,

vs.         Case No. 2:19-cv-10027

          Hon. Gershwin A. Drain

BENNY NAPOLEON, et al.,    Magistrate Judge Anthony Patti

      Defendants.

_____/

The Deposition of ALAN BULIFANT,

Taken at 500 Griswold Street, 30th Floor,

Detroit, Michigan,

Commencing at 9:07 a.m.,

Monday, September 27, 2021,

Before Cheri L. Poplin, CSR-5132, RPR, CRR.

ALAN  BULIFANT
September 27, 2021

Page 2

1 APPEARANCES:
2
    FOR PLAINTIFF:
3
      SARAH S. PRESCOTT
4       Salvatore, Prescott, Porter & Porter
        105 East Main Street
5       Northville, Michigan 48167
        248.679.8711
6       prescott@sppplaw.com
7
    FOR DEFENDANTS:
8
      PAUL T. O'NEILL
9       Wayne County Corporation Counsel
        500 Griswold Street
10      Floor 30
        Detroit, Michigan 48226
11      313.967.6402
        poneill@waynecounty.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           TABLE OF CONTENTS
2
3 WITNESS                          PAGE
4 ALAN BULIFANT
5
6 EXAMINATION BY MS. PRESCOTT           4
7
8           EXHIBITS
9
10 EXHIBIT                         PAGE
11 (Exhibit attached to transcript.)
12 EXHIBIT 1                       143
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1 Detroit, Michigan
2 Monday, September 27, 2021
3 9:07 a.m.
4
5           ALAN BULIFANT,
6 was thereupon called as a witness herein, and after
7 having first been duly sworn to testify to the truth,
8 the whole truth and nothing but the truth, was
9 examined and testified as follows:
10          EXAMINATION
11 BY MS. PRESCOTT:
12 Q.  Hi, Commander.  I'm Sarah Prescott.  We theoretically
13     met, it was a Zoom meeting, before, but I'm going –
14     it's going to run very similarly.  I will ask you some
15     questions, and we have these masks, which makes it
16     even harder for the court reporter and sometimes for
17     me to tell if maybe you're hesitating but you have
18     more to say.  Likewise, you may not know if I'm
19     finishing.  But best case scenario we don't talk over
20     each other and we have a little gap in between so that
21     Cheri can take down everything both of us say.  If you
22     need a break, that's always no problem.  I'd just ask
23     that we – answer any question that's pending and then
24     it's fine to take a break any time you need.  And then
25     the last point, and I'm sure I said this to you when

Page 5

1     we met before, but if there's ever a time where you
2     don't know what I'm asking, will you let me know?
3 A.  Yes.
4 Q.  Okay.  What do you understand is your capacity for
5     being here today in terms of your role as a witness?
6 A.  I'm here to answer questions about the Burks lawsuit
7     regarding a sexual assault that occurred in the jail
8     and my knowledge of departmental policies and
9     procedures and to rebut reports from the experts
10    regarding the matter.
11 Q.  Since the last time that you asked questions – or
12    excuse me, answered questions up to today when you
13    started answering questions, what documents have you
14    reviewed of any kind about the case?
15 A.  I was given the expert reports to read that I believe
16    are supplied by your side, and I had to provide my
17    resume or CV here.
18 Q.  Okay.  And besides looking at the reports of the
19    experts, have you looked at any of the documents that
20    were prepared, for example, by the department or
21    anybody to do with the underlying matter or case?
22 A.  No.  I don't have access to the Internal Affairs files
23    or anything anymore.
24 Q.  Last time when we met you were sitting as a
25    representative speaking on behalf of the county, so

ALAN  BULIFANT
September 27, 2021

Page 6

1 then there's a whole bunch of your own personal
2 knowledge that we can't really get into there, and so
3 I just want to understand what you do and don't know
4 and did and didn't do as background.  So let's begin
5 with whether – have you ever in your life met the
6 rapist, Martin Solomon?
7 A.  Yes.
8 Q.  In what capacity did you ever meet him?
9 A.  When I was made the commander at Jail Division 1, he
10 was an inmate there, so I had to have some dealings
11 with him while he was an inmate.
12 Q.  Was that during or after September 2018, then?
13 A.  Yes.
14 Q.  And so would that timeline, sometime after
15 September 2018, be the very first time that you ever
16 met him?
17 A.  That I physically met him, yes.
18 Q.  Okay.  And also the first time that you had ever
19 spoken to him would have been during or after
20 September of '18?
21 A.  Yes.
22 Q.  And had you heard anything about him before September
23 of 2018?
24 A.  Yes.
25 Q.  Okay.  In what capacity?

Page 7

1 A.  When I was the captain of Internal Affairs, you know,
2 there was some investigations regarding his behaviors
3 in the jail, namely, the sexual assault with
4 Mr. Burks.
5 Q.  Okay.  And so am I correct that you become the captain
6 in charge of Internal Affairs, as you just mentioned
7 it, in May of 2017?
8 A.  I was actually made the executive lieutenant of
9 Internal Affairs back in 2009, and I served in that
10 capacity all the way up until January of 2017.  At
11 that point all of the captains were moved.  I was sent
12 to Jail Division 1 as a captain there, and then in May
13 of 2017 they asked me to go back to Internal Affairs
14 and so I returned then, but in 2011 I was appointed to
15 the rank of captain.
16 Q.  I see.  Okay.  So from February 2011 until you leave
17 for Jail Division 1 in 2017 you're running Internal
18 Affairs as its captain?
19 A.  Yeah.  Also in 2009 to 2011 I was the executive
20 lieutenant, which was the highest rank in Internal
21 Affairs at that time.
22 Q.  Okay.  That's helpful.  And so had you heard of any
23 Internal Affairs investigations involving Solomon
24 other than to do with Burks?
25 A.  I don't recall.

Page 8

1 Q.  What was your – you know, a commander of a jail
2 division is pretty high up, so the fact that you're
3 dealing with a particular inmate when you're the
4 commander in 2018, what was that about?
5 A.  Mr. Solomon became – and I don't know if this is
6 HIPAA protected.  I mean, am I allowed to talk about
7 his medical condition?
8 Q.  Yeah.
9      MR. O'NEILL:  Yes.
10 A.  Okay.  So in 2018 when I became the commander,
11 Mr. Solomon, from what the medical teams had told me,
12 was suffering from – there was no physical ailment,
13 but he felt that he could not walk and that he was
14 confined to a wheelchair, so the doctors had assured
15 that there was no physical reason for this, so there
16 would be difficulties and times moving him to
17 different areas of the jail for different activities
18 or whatever, and then, you know, there were times he
19 would make accusations against staff and other inmates
20 and things, so it had become necessary to at times
21 videotape his movements and – and there was one
22 incident in particular where I had to supervise the
23 movement of him from Jail Division 1 to Jail
24 Division 2.
25 BY MS. PRESCOTT:

Page 9

1 Q.  And is the idea of the supervision that you were
2 worried that he'd make an allegation that something
3 happened that the officers never really did do –
4 A.  Yes.
5 Q.  – if it wasn't witnessed by somebody?
6 A.  Yes.
7 Q.  And is that also the idea behind the videotaping?
8 A.  Yes.
9 Q.  Were you also videotaping to prove that when he wanted
10 to he could get up and walk?
11 A.  Well, no.  It wasn't – we weren't videotaping like
12 24/7.  Like what happened is like when we went to move
13 him that day, we videotaped our interaction with him
14 in moving him to prove we didn't hurt him or assault
15 him or do anything like that.
16 Q.  I got it.  And at that time is it your understanding
17 that he was awaiting trial for raping a woman and my
18 client both?
19 A.  I'm not sure if I knew if he was awaiting trial or if
20 he was sentenced or whatever.  I mean, I knew – I
21 remembered him from our Internal Affairs case and that
22 there was a sexual assault case.  I don't know if I
23 knew if he had been convicted at that point or not or
24 what.
25 Q.  Okay.  In other words, though, your understanding was

ALAN  BULIFANT
September 27, 2021

Page 10

1  that he was lying and malingering about his supposed
2  weakness and being in a wheelchair?
3 A.  All I know is that the medical team told me there was
4  nothing physically wrong with him.
5 Q.  Did anyone ever advise you that he had been engaged
6  with an alleged sexual assault of someone in MDOC and
7  then that prisoner had stabbed him repeatedly?
8 A.  I don't recall if I knew that or not.
9 Q.  Okay.  Did you ever speak with Mr. Solomon about the
10  Burks matter?
11 A.  No.
12 Q.  Do you know anybody who did?
13 A.  It was assigned to one of my detectives when I was in
14  charge of Internal Affairs.  I don't remember who it
15  was, but, I mean, I would have assigned the case and
16  it would have gone back through my office, you know,
17  to be approved and everything.
18 Q.  Okay.  So you're not -- you don't know really?
19 A.  Yeah.  I wasn't intimately involved with the
20  investigation.
21 Q.  Okay.  How about Mr. Burks?  Have you ever in your
22  life spoken with my client, Mr. Burks?
23 A.  Not that I'm aware of, no.  I mean, if I had made
24  rounds in the jail or something, maybe I had seen him
25  but I didn't know, you know . . .

Page 11

1 Q.  Okay.  And do you know anyone who did speak with him
2  ever about the Solomon incident?
3 A.  I know one of my detectives that I would have, but who
4  it was I don't know.
5 Q.  All right.  Have you ever -- I know you said that you
6  weren't intimately involved with the investigation.
7  Did you watch any of the witness interviews, like
8  either in the room or because you could, you know,
9  monitor them remotely?
10 A.  I don't believe I had the capacity to monitor them
11  remotely at that time, and I did not sit in on them.
12  We did be -- we did get the ability to monitor
13  remotely, but I believe it was after 2016.
14 Q.  Okay.  Then all the way up till today have you
15  reviewed the tape-recordings of any interviews that
16  occurred around the Solomon and Burks rape?
17 A.  No.
18 Q.  Do you have a memory sitting here today of reading the
19  report of the sergeant that you would have assigned
20  when he or she was done with the review?
21 A.  I don't have a memory of it.  I mean, I'm sure that
22  I -- that I -- if it had been turned in and submitted
23  before I had left to become the commander of
24  Division 1, I would have had to have read it and
25  signed off on it.

Page 12

1 Q.  And when you say signed off, is there an actual
2  literal paper that does that?
3 A.  Yes.  There's a cover sheet.
4 Q.  Okay.  And when do you leave did you say?
5 A.  I became the commander of Division 1 in September of
6  2018.
7 Q.  Okay.  You did say that.  All right.
8      MS. PRESCOTT:  So I have here a page marked
9  3057, Paul.  I don't know that I'm going to mark it,
10  but . . .
11 BY MS. PRESCOTT:
12 Q.  Can you take a look at that, Mr. Bulifant?  My
13  question is just what is that page?
14 A.  This is an IA closure notification which shows that
15  the warrant was approved and that he was arrested on
16  the warrant, went to trial and was found guilty.  It's
17  by Corporal Christopher Lawson, so he was the
18  detective.
19 Q.  Okay.  And it's to you?
20 A.  Um-hmm.
21 Q.  That's a yes just for the record?
22 A.  I'm sorry.  Yes.
23 Q.  Okay.  And then but that's in 2019?
24 A.  Yes.
25 Q.  Is there -- based on your prior answer, it sounded

Page 13

1  like you were out of IA by then.
2 A.  That's correct.
3 Q.  So do you know why this memo was to you?
4 A.  Obviously whoever the captain was that was in charge
5  of IA at that time, which would have been Captain
6  Carmen Ramirez, didn't realize it.
7 Q.  I'm sorry.  Can you say that again?  Someone didn't
8  realize what?
9 A.  The captain that this would have been submitted to,
10  which was Carmen Ramirez, didn't realize that it
11  wasn't her name at the top.
12 Q.  Do you know if you ever got 3057 and any attachments
13  to it?
14 A.  This wouldn't have come to me, no.  Because I was at
15  Division 1.
16 Q.  Okay.  And then once you're at -- out of IA it sounds
17  like from something you said earlier you don't have
18  access to those files?
19 A.  Right.  Unless you were to be tasked with like a
20  disciplinary hearing or something like that.  When
21  you're out, you're out.
22 Q.  Can you tell -- there is a signature and a stamp of
23  approved.  Did you use that stamp when you were in IA?
24 A.  Yes.
25 Q.  What does that mean?

ALAN  BULIFANT
September 27, 2021

Page 14

1  A.   It means that it's been approved and then you would
2       initial it, so this was – it looks like a K to me.
3       It could have been Carmen Ramirez, the captain, or it
4       could have been – I'm not sure if Kevin O'Rourke was
5       still the sergeant at that time or if he had been
6       moved as well, but it looks like a K to me.
7  Q.   Okay.  It's helpful because my next question was
8       there's a little squiggle of some sort of maybe an
9       initialing, and you're not sure who that is?
10 A.   Yeah.  My – yeah.  I'm not sure who it is.  I believe
11      it would be Carmen Ramirez or Kevin O'Rourke.
12 Q.   Okay.  Were you ever on Ward 610 let's say in the
13      three months before and including August 2016?
14 A.   I started in the Wayne County Sheriff's Office in
15      1993, and I was assigned to the old jail, and I worked
16      the sixth floor many, many times as an officer between
17      1993 and 2002, so I had been on Ward 610 many times
18      prior to 2016.
19 Q.   Okay.  So I'm just asking – fair.  I'm just asking in
20      the three months, so June, July, August of 2016, were
21      you ever in Ward 610?
22 A.   Not that I remember.
23 Q.   Okay.  Have you ever spoken with the commander of the
24      jail division who is responsible at the time of the
25      rape?

Page 15

1         MR. O'NEILL:  Spoken about the case?
2         MS. PRESCOTT:  About the case, yeah.
3  A.   No.  I wouldn't have spoken to them about the case.
4  BY MS. PRESCOTT:
5  Q.   Okay.  Do you know who was the commander that was over
6       the jail division where the rape occurred?
7  A.   It changed hands multiple times.  I'm sure I know who
8       the commander is, but I can't say specifically whether
9       it was Lynnette Cain or Donafay Collins or whoever at
10      that time.
11 Q.   Okay.  Did you ever speak with anybody senior to you
12      about the Burks and Solomon rape?
13 A.   Yeah.  When cases come over to Internal Affairs to be
14      investigated, you received a report package and I
15      review it, and then what I would do is I would take
16      them to Deputy Chief Tonya Guy, who was my boss, and
17      then I would sit down and say, hey, look, this is a
18      case that we've received from the jail, they're asking
19      for us to investigate it, it looks like, you know,
20      this is the allegation, do we have your approval to go
21      ahead and initiate, you know, this investigation,
22      which she would have granted and then we would assign
23      it out.
24 Q.   Okay.  And what is the package that comes over that
25      you'd have in hand before you would have that meeting?

Page 16

1  A.   It's a report package from the jail.
2  Q.   Okay.  What should it contain?
3  A.   It would contain a cover sheet and then it would have
4       a PJ83, which is the original police report.  It could
5       possibly have PJ99s, which are supplemental reports
6       from other officers that are involved.  It may have
7       documents from medical.  It may – it will usually
8       have inmate witness forms or possibly other civilian
9       witness forms in it.  It will have prosecution rights
10      forms in it.  It will have a jail management system
11      disciplinary report.  It will have a housing status
12      board printout of the inmates that are in that area,
13      and then, you know, depending upon the case or the
14      allegation, whatever it – there's various other
15      things, I mean, evidence tags.  There's various other
16      things that could be included.
17 Q.   Okay.  And so who would oversee the gathering of that
18      package?
19 A.   The jail.
20 Q.   Say it again.
21 A.   The jail.
22 Q.   The jail.  So there are witnesses.  There are officers
23      who are going to write the PJ83 and that's just going
24      to whoever first came upon the incident; right?
25      Whichever officer –

Page 17

1  A.   That it's reported to.
2  Q.   Is reported to.  So then is the person who oversees
3       the collection that person's sergeant or that person's
4       lieutenant or captain or commander?  Who is
5       responsible for overseeing that?
6  A.   My answer would be in stages of all of them because like
7       let's say it happens on a weekend, so initially what
8       happens is you report the incident, you notify your
9       command, you notify medical, you notify
10      classification.  You do everything you need to do.
11      You write your reports up.  You have to take them to
12      the sergeant to get them approved.  Then the sergeant
13      makes sure that the package is together and has
14      everything it has, and he submits it – or he or she
15      submits it to the lieutenant.  The lieutenant then
16      reviews to make sure that everything is there and
17      nothing is missing.  They submit it to the captain.
18      The captain reviews it.  The captain gives it to the
19      commander.  The commander at that point back then,
20      they were still having to send them to the deputy
21      chief to look at, and then it would have to go to the
22      chief, and then it would be sent over to Internal
23      Affairs.
24 Q.   Okay.  Are the people – if it's an allegation of
25      sexual assault, just to make it easier, are the

ALAN  BULIFANT
September 27, 2021

Page 18

1    accused and the victim, alleged victim, are they
2    already interviewed by the time this comes to IA or
3    does IA have to do that?  What phase would – who
4    would be handling that?
5 A.  So it can happen in a few different ways, but the way
6    that it would normally happen is the allegation would
7    be made.  They're separated.  The officers would give
8    them witness statement forms to fill out.  They would
9    fill them out.  Internal Affairs would be notified,
10   and then a detective would be sent over to make
11   interviews or conduct interviews.
12 Q.  Okay.  And that's before the packet has gone through
13   the eight steps of all the way up and it's been
14   assigned?  IA would already be sending someone over?
15 A.  It can be done that way, yes.  Now, there are times
16   where it won't be because you may get a call from like
17   a prison that says, hey, this inmate claims back in
18   June of two years ago he was sexually assaulted.
19   Well, obviously in that case there's nobody to go
20   interview or whatever, so you'll get the package
21   through first before you may try to settle that stuff
22   up.  So it depends on the case.  But that's a typical
23   serious sexual assault response.
24 Q.  Okay.  And are all IA interviews recorded in 2016?
25 A.  They're supposed to be, yes.

Page 19

1 Q.  Am I correct that you personally, you individually did
2    not interview any witnesses for the Burks and Solomon
3    investigation?  Is that right?
4 A.  Not that I recall, no.
5 Q.  Okay.  And do you have a memory of reading any witness
6    statements from the investigation?
7 A.  I don't specifically recall them, but when the report
8    package would have come through to me, I would have
9    read it so that I could go and talk to the deputy
10   chief guy about it, so I would have read them.
11 Q.  Do you know all the way in your whole life sitting up
12   till today whether you've ever seen the intake and
13   classification documents of either Solomon or Burks?
14 A.  I don't believe I've seen them.
15 Q.  How about Solomon's – how much do you know all the
16   way sitting up to today about Solomon's history of
17   institutional and on the street rapes?  Putting aside
18   the Solomon and Burks piece.  So, you know, sexually
19   assaulting bunkies or sexually assaulting women or
20   children out in the world.
21 A.  Yeah.  I mean, I guess I would feel safe in saying
22   that I know he's accused to have committed a or some
23   sexual assaults.  As far as how many or, you know, who
24   the victims were or how or how it was done, I didn't
25   have that intimate knowledge of it.

Page 20

1 Q.  Okay.  In 2016 you would have known that he was a
2    registered sex offender; right?
3 A.  If he was in the jail on a rape case but not
4    convicted, he may not have necessarily been registered
5    at that point, so I don't know if I would have known
6    if he was registered at that time or not.
7 Q.  So you don't recall at the time you were looking at
8    this knowing that he'd, in fact, been convicted and
9    served a lengthy sentence in which he had maxed out
10   for raping a child?
11 A.  No.  I don't – I don't recall that.
12 Q.  Would you have known in 2016 about how MDOC had tried
13   to send him to sex offender or rehabilitation
14   education and that he had been ejected from the
15   program?
16 A.  No.  I wouldn't have known that.  I want you to
17   understand the role of Internal Affairs, it's not fair
18   to treat someone based upon – you treat each
19   individual act as an investigation and a new
20   investigation.  You know, you can't necessarily say
21   because someone's done something in the past that
22   they're automatically guilty now.  You look at the
23   evidence and you look at, you know, everything that
24   you have, and you present that to the prosecutor's
25   office, and then they take the action that they want

Page 21

1    to take.  So did I know it?  No.  And, quite frankly,
2    you investigate the case for what it is.
3 Q.  Okay.  So when you investigate the case for what it
4    is, that doesn't include trying to identify the
5    person's charge or substantiated history of sexually
6    assaulting others when you have a sexual assault case?
7 A.  If somebody had never raped anybody before but raped
8    somebody now, does that make it any less egregious?
9 Q.  Can you answer my question?  Your investigation
10   doesn't include and embrace trying to figure out if
11   someone alleged to have committed a sexual assault may
12   have a history of committing sexual assaults it sounds
13   like; right?
14 A.  No.  That is something that you may take into
15   consideration when you're preparing to interview
16   someone, but that does not make them automatically
17   guilty.
18 Q.  I didn't say anything – your department and your
19   office never made any determination of substantiation
20   or non-substantiation of the allegations, did it?
21 A.  We submitted a warrant request asking for criminal
22   charges to be brought against him.  That is our
23   statement of we believe that we have probable cause
24   that he has done this, we are asking you to criminally
25   charge him so that he can stand trial for that.  That

ALAN   BULIFANT
September 27, 2021

Page 22

1   is our statement.
2 Q.   That right there?
3 A.   Yeah.
4 Q.   Okay.  When he's – when the warrant is requested?
5 A.   Yes.
6 Q.   Is your department's determination?
7 A.   If we didn't have probable cause in our mind, we
8      wouldn't be able to submit the warrant.
9 Q.   Okay.  And that's a serious thing?  I mean, you're
10     asserting on the reputation and the basis of the
11     investigation in your department probable cause;
12     right?  You understand that that has judicial
13     importance –
14 A.  Yes.
15 Q.  – that your department stands behind that; right?
16 A.  Yes.
17 Q.  And that your department if it – I mean, you have
18     this relationship with the prosecutor's office, hey,
19     we stand behind this determination, this is our word
20     on this; right?
21 A.  Yes.
22 Q.  Well, then why wasn't this case marked substantiated
23     when you did that?
24 A.  Because we don't substantiate a case.  The trier of
25     fact in this case, the criminal justice system are the

Page 23

1    ones that decide is he guilty or is he not.
2 Q.   Okay.
3 A.   We allow the justice to take its course.
4 Q.   So you're not aware of the obligation under federal
5      law to substantiate or rule substantiated or
6      unsubstantiated sexual assaults that happen in the
7      Wayne County Jail?
8 A.   Upon his conviction it's substantiated.
9 Q.   No.  Listen to my question.  You're not aware of your
10     duty within the jail to rule, substantiated or not
11     substantiated?
12 A.  I am aware of that duty because I used to have to
13     report the crime statistics to the feds.
14 Q.  Right.
15 A.  And upon the conviction he is substantiated guilty.
16 Q.  Okay.  See if you can follow my point.
17 A.  I can follow your point.
18 Q.  Outside of your whole role, you have no role
19     whatsoever, jurisdiction, ability to do anything to
20     prosecute someone; right?  That's not your jail's
21     role?
22 A.  Short of requesting a warrant.
23 Q.  Right.  But you agree with me; right?  There's no –
24     your step ends when you request a warrant and then
25     somebody else has to go prosecute?

Page 24

1 A.   Yes.
2 Q.   Okay.  Are you aware of federal law saying in 2016
3      that your department had a duty within its own walls
4      to substantiate or not substantiate sexual assaults?
5 A.   Yes.  And we did when he was convicted.
6 Q.   Okay.  But you just told me moments ago, and we went
7      over it about four times, that your department's
8      determination of substantiation was upon determining
9      probable cause.  Didn't you say that?
10 A.  Yes.  I recall saying that.
11 Q.  And that you guys stand behind that as your reputation
12     and that's, you know, an important judicial step.  Do
13     you remember saying that?
14 A.  Yes.
15 Q.  Okay.  And so my question for you is, why didn't your
16     department report to the federal government that it
17     had done its role, its whole entire role, you were
18     done, anybody else can do whatever they want in Kym
19     Worthy's office, we substantiate this?
20 A.  Because the case is not finished at that point.
21 Q.  Okay.  Well, let me ask you this way.  What if Kym
22     Worthy said I don't have the resources or one of my
23     prosecutors messed up and accidentally didn't turn
24     over Brady evidence or committed – you know, had an
25     affair with the defense lawyer or something and I

Page 25

1    can't prosecute this case?  Don't you have a duty and
2    a responsibility internal to your own walls to make
3    your own decision no matter what she does in her
4    office?
5 A.   You're asking about the report to the Federal Bureau
6      of Prisons Crime Statistics report that we submit
7      every couple of – every year about substantiated,
8      unsubstantiated, confirmed, unconfirmed.  That's –
9      that's the statement that you're requesting, that they
10     send me through the mail that I read and interpret the
11     rules and the following myself and submit, that they
12     sometimes may or may not call back and ask you a
13     question on.  In relation to this hypothetical about a
14     prosecutor sleeping with a defense attorney or
15     something, that situation didn't happen, so I didn't
16     have to face that and I didn't have to make a decision
17     on that.  Just like in 2019 I wasn't there to make the
18     decision on this case.  We requested a warrant
19     request.  The Wayne County Prosecutor's Office issued
20     that.  We went to trial and we got a criminal
21     conviction that makes Martin Solomon guilty of a
22     criminal sexual assault.  We did everything that we
23     could possibly do to provide justice in that matter.
24 Q.  Well, we'll get to more on that, but can I have an
25     answer to my question?  Do you remember what –

ALAN   BULIFANT
September 27, 2021

Page 26

1  A.  You're asking if I was aware of the duty to report it.
2  And yes, it was reported.
3  Q.  No.  I didn't ask that.  I'm not asking about the duty
4  to report.
5  A.  Then repeat the question, please.
6  Q.  Okay.  It's not about reporting.  I didn't ask
7  anything about reporting in my question.  My question
8  was whether you have a duty to make a determination
9  inside your department of substantiated or
10  unsubstantiated for yourselves.
11  A.  Fine.  In my opinion, because we requested a warrant
12  request, in our mind it was substantiated.
13  Q.  Okay.  And then you didn't report that on – do you
14  know that you didn't – that this wasn't reported at
15  that time to the federal government through multiple
16  different formats?
17  A.  They send it to us as a survey.
18  Q.  Just are you aware?
19  A.  Anything that I was given once it was determined
20  completed – because what's the date on the warrant
21  request?  When was it submitted?
22  Q.  It was submitted years earlier.  I mean, it took them
23  forever to prosecute the guy.
24  A.  So, I mean, I don't have those documents in front of
25  me about how many I said were confirmed, how many were

Page 27

1  not.  I don't have that stuff in front of me to look
2  at.  I don't know what was sent in that year by me to
3  the feds.  Do you have the survey?
4  Q.  Yeah.  I have it.  Yeah.  In 2016 it says no, no cases
5  happened.  In 2017 it says no, no substantiated cases
6  happened.  2018 – the 2018 report about 2016 or, you
7  know, no, no substantiated cases happened.  And I'm
8  just wondering why that is.  I guess your answer is we
9  were waiting to see what Kym Worthy was going to do
10  and whether a jury would convict; right?
11  A.  Yeah.
12  Q.  So only if Kym Worthy gets a conviction and nothing
13  goes wrong in the court or she doesn't decide she's
14  going to prosecute it does your department say we have
15  a substantiated case?  Is that the pattern?
16  A.  I don't know.  I guess I would have to wait and see.
17  Q.  Well, I'm just asking if that's the pattern.
18  A.  There is no pattern.
19  Q.  Okay.  It's just that there are very few substantiated
20  cases, and I can see why that is if you're waiting for
21  Kym Worthy to do whatever outside her walls as opposed
22  to making your own determinations.
23  A.  No.  There's a number of reasons why there are very
24  few unsubstantiated cases.
25  Q.  Well, you can't give me a reason why this one was not

Page 28

1  marked substantiated after the warrant request
2  asserting probable cause, can you?
3  A.  I think we're arguing apples and oranges here.  In our
4  mind it was substantiated because we submitted the
5  warrant request.
6  Q.  Okay.
7  A.  Now, did somebody misinterpret the rules when they
8  report it and said we need to wait for a criminal
9  conviction?  That may have happened.  The point of the
10  matter is it doesn't change what happened at the end
11  of the day.  He was accused of sexual assault.  We
12  requested a warrant.  He went to trial and he was
13  convicted.
14  Q.  Okay.  So is that the end of it for you?  You got a
15  conviction of this guy and so that's the end of what
16  your department needed to look at, in particular IA?
17  A.  If there had been some egregious action, some error,
18  something that had occurred that would have caused us
19  to take action, to take notice, to decide that there
20  was some deficiency somewhere, any evidence at all
21  that led to that, we would have taken action, but
22  when – in lacking any evidence that leads you down
23  that substantial trial, all you can do is let the
24  wheels of justice work.
25  Q.  So you needed an egregious error or action but you

Page 29

1  lacked any evidence.  Did your people in IA look for
2  any evidence of anybody doing anything wrong other
3  than Martin Solomon?
4  A.  They would have read the reports, interviewed the
5  parties involved, taken their statements, and they
6  would have followed where the evidence led.  If
7  somebody said something had occurred, then they
8  could have followed up on that, but when that doesn't
9  occur, they can't.
10  Q.  Okay.  So you have people come through the jail,
11  20,000 people a year, and they have a whole wide
12  variety of abilities, right, from probably pretty
13  clever, hardened people, to some pretty vulnerable not
14  the brightest bulbs.  Can we agree on that?
15  A.  Yes.
16  Q.  Okay.  Am I correct that you're not expecting victims
17  of crime to know what they should be asking and
18  answering in an investigation with a trained police
19  officer, are you?
20  A.  Yes.  I do expect a victim of a crime to be able to
21  tell me what has occurred.  We can't go out and
22  speculate every single day – I mean, for instance,
23  did you commit a crime today?  Should I be asking you
24  that question?  Should I be asking the court reporter
25  if she committed a crime today?

ALAN  BULIFANT
September 27, 2021

Page 30

1  Q.  I don't understand your point.
2  A.  Do I go to a bank and ask a bank teller were you
3      robbed today?  Or do I wait for the bank teller to
4      say, hey, we were robbed?
5  Q.  Okay.  So now you have a victim saying I was raped.
6  A.  Okay.
7  Q.  And now you automatically know that if true, and you
8      have to figure that out, but if true, you have someone
9      who's undergone a serious trauma; right?
10 A.  Yes.
11 Q.  And you don't know yet because you barely talk to them
12     if they're the dimmest bulb in all of Wayne County or
13     a criminal mastermind and that's why they're there;
14     right?  You don't know what their capabilities are.
15     You've got to figure that out; right?
16 A.  No.  I'm taking their statement and I'm following the
17     facts where they lead.
18 Q.  Okay.
19 A.  So in the scenario you just gave, it makes it sound
20     like if I think they're a criminal mastermind and
21     they're trying to manipulate it, I don't follow up on
22     it at all.  That's not the case.
23 Q.  No.  That's not what I meant.  That's not what I
24     meant.  I just meant you could be dealing with someone
25     who's able to advocate for themselves and tell a clear

Page 31

1      story.  You could also be dealing with someone with
2      some real – I mean, you know, that doesn't know what
3      to say or how to get help for themselves.  You must
4      have experienced that; right?
5  A.  Yes.
6  Q.  People who genuinely have been victims of crime who
7      are not the best communicators; right?
8  A.  Yes.
9  Q.  And still your job, and the IA department, it's not
10     just your job, but the job of the IA department is to
11     get to the truth; right?
12 A.  Yes.  Follow the evidence where it leads.
13 Q.  And also to root out violations of policies and rules
14     and laws; right?
15 A.  Yes.
16 Q.  You're not depending on Joe Guy, who's a prisoner, to
17     do all the things you need to do to make sure the
18     department is following its rules and regulations, are
19     you?
20 A.  Within reason.  Because I see the rabbit hole you want
21     to go down here.
22 Q.  Okay.
23 A.  That's not the case.  Because you're counting on the
24     jail command to be responsible for running their
25     facility.  And so when we interview somebody and we

Page 32

1      make a determination because, as you stated, okay,
2      this person seems to be together, they seem to be able
3      to communicate their point, they seem to be telling us
4      their version of the facts, they seem to be credible,
5      they seem to be reliable, we're interviewing them, the
6      prosecutor's interviewed them, this and that, when
7      they don't say anything, you know, that anything off
8      the wall happened, that the jail's deficient in some
9      way, shape, or form, you're not going to automatically
10     assume that somebody failed somewhere.
11 Q.  Okay.  How about – okay.  Automatically assume?  I
12     thought your job was to be looking for evidence.
13 A.  And if there's no evidence leading you down the rabbit
14     hole, you don't go.
15 Q.  Okay.  So let's ask it this way.  Do you have a
16     responsibility in IA to enforce a whole series of
17     rules and regulations and standards and expectations
18     that are unique to the jail staff?
19 A.  I would say yes, but I want to clarify that when you
20     say enforce, the role in IA would be to report those
21     and then it would be up to discipline, up to and
22     including the sheriff, to enforce.
23 Q.  Okay.
24 A.  So we're not judge, jury, executioner.  We are –
25 Q.  Investigators.

Page 33

1  A.  Yes.
2  Q.  And in a good investigation, you have to be open to
3      lots of possibilities; right?
4  A.  Yes.
5  Q.  And you have to be willing to entertain all kinds of
6      possibilities at least to see where the evidence might
7      go; right?
8  A.  You follow the evidence where it leads you.
9  Q.  Okay.  And it's not just that.  You don't just come in
10     and say, guy who's sitting in a cell, tell us what you
11     feel like; right?  And then you just take their
12     evidence.  You actually have an interview that's run
13     by a trained investigator; right?
14 A.  Yes.
15 Q.  And that trained investigator goes through specialized
16     training to learn how to explore different
17     possibilities; right?
18 A.  Yes.
19 Q.  And not just to assume one thing happened but to, you
20     know, explore different potential issues; right?
21 A.  Within reasons.  You're not going to – you're not
22     going to make the narrative fit what you want it to
23     fit.  You fit what is provided to you.
24 Q.  What's provided to you.  Well, let's – it seems like
25     you're – let's get to the heart of it.  You're aware

ALAN  BULIFANT
September 27, 2021

Page 34

1  that your investigator asked not one single question
2  about what was going on with the jail staff when the
3  rape occurred of Solomon – of Burks by Solomon;
4  right?
5 A.  I'm aware that Mr. Burks did not say that anything
6  negative about the jail staff.
7 Q.  Did you hear my question?
8 A.  Yes.
9 Q.  My question was, you're aware that your investigator
10  didn't even ask a single question about what the staff
11  was doing or not doing that night, aren't you?
12 A.  Yes.
13 Q.  Okay.  And when did you become aware of that?
14 A.  Through your questioning.  I can tell where you're
15  going.
16 Q.  Okay.  So all the way up until today and sitting here
17  you did not know that your investigator didn't even
18  ask a single question about what the staff was doing?
19 A.  Mr. Burks said he was raped.  He told the officers.
20  The officers wrote the reports.  They got him moved.
21  They got him medical attention.  They got him help.
22  It was reported to IA.  We prosecuted the case.  They
23  did everything they were supposed to do.
24 Q.  I'm going to ask my question again.  All the way up to
25  now where you surmise from questions, I guess, what

Page 35

1  may have happened, you're telling me as the head of IA
2  you didn't know your officers didn't ask a single
3  question about the policies, the procedures, the
4  activities, or the omissions of what the officers were
5  doing on the night of the rape; is that right?
6 A.  I know you're trying to poke holes in their
7  investigation.  If there's not evidence to lead them
8  there, they would not ask these questions.
9 Q.  I'm going to ask it again.
10 A.  Just like if I asked you today did you beat your
11  children?  I don't have any evidence that leads me to
12  believe you've beaten your children, so I'm not going
13  to ask you that question.  It's not appropriate.
14 Q.  But it's appropriate to just use it as a hypothetical?
15 A.  I'm using it as an example.
16 Q.  Let's go back to my question for the third time.
17  Asking to strike that last answer.  My question is, is
18  it your testimony that up until sitting here and
19  whatever you assume or surmise, you did not know, all
20  I'm asking is what you knew, not what other people
21  did, you did not know that your officers in IA did not
22  ask a single question about the activities or
23  omissions of the security staff on the night of the
24  rape?
25 A.  No.  I didn't know that.

Page 36

1 Q.  And you're not troubled by it, are you?
2 A.  Your job is to try to poke holes –
3 Q.  Are you troubled by it?
4 A.  I'm troubled by it and I'll tell you why I'm troubled
5  by it.  Because your job is to poke holes in an
6  investigation that did exactly what it is supposed to
7  do, take a victim who's been wrongfully victimized,
8  report it, get him help, get him medical treatment, do
9  everything he's supposed to do, keep him safe, do what
10  he was supposed to do.
11 Q.  Kept him safe?  You think your investigation kept him
12  safe?
13 A.  If he hadn't been moved that day, how many –
14 Q.  You kept him safe after he was raped.  I got it.
15 A.  You didn't even let me finish my answer.
16 Q.  All right.  Go ahead.
17 A.  We don't have a crystal ball.  We don't know what's
18  going to happen.  Let's say the officers didn't move
19  him that day, didn't do anything.  How many days could
20  he have been victimized?  How – could he have been
21  possibly killed?  We don't have a crystal ball to know
22  what would have happened in the future.  When the
23  officers became aware of it, they reported it.  My
24  detective interviewed, did the warrant request,
25  presented it to the prosecutor's office.  They

Page 37

1  prosecuted the case and got a criminal conviction in
2  this matter.
3 Q.  I heard you.
4 A.  Justice worked that way.  Where it's not working is
5  now you're trying to say that what they did isn't good
6  enough.  That –
7 Q.  So you're troubled by me?
8      MR. O'NEILL:  Excuse me.  Objection.  The
9  witness has not finished answering.
10 BY MS. PRESCOTT:
11 Q.  You're right.  Go ahead.  Go ahead.  I don't think
12  you're answering the question, but . . .
13 A.  It's easy to sit there and try to fit the narrative to
14  what you want it to be –
15 Q.  You think this is easy?
16 A.  – instead of what actually occurred.  It's easy to
17  try to poke holes in what somebody else did when
18  they're not the ones actually doing it.
19 Q.  All right.  Go ahead.
20 A.  They actually got a criminal conviction for a CSC
21  against a man who committed a CSC against him.
22 Q.  You think – who committed a CSC?
23 A.  Solomon.  CSC Burks.
24 Q.  Against a man who committed a CSC against him?
25 A.  We got a criminal conviction against Solomon for

ALAN  BULIFANT
September 27, 2021

Page 38

1  sexually assaulting Burks.
2 Q.  Yeah.  We --
3 A.  Once we became aware of it and did it.
4 Q.  Except you didn't; right?
5 A.  Solomon did it.
6 Q.  Except you didn't get any conviction in your jail;
7    right?  Earlier you wanted to make this
8    differentiation between -- okay.
9 A.  Okay.  You want a conviction in the jail?  Was there a
10    disciplinary report filed on Martin Solomon and did
11    the hearing officer convict him and impose any
12    sanctions?  Do you have that information?
13 Q.  No, they didn't.  He was housed with whoever.
14 A.  It has nothing to do with housing.  I'm asking about
15    were there sanctions?  Did he lose any sanctions or
16    privileges at all?  Was his classification level
17    changed?  Did anything like that occur?
18 Q.  No.  No.
19 A.  I mean, I don't know what criminal --
20 Q.  Does that surprise you?
21 A.  I don't know what conviction the jail got
22    disciplinary-wise, but, I mean, I know we did the
23    criminal aspect of it.
24 Q.  Does it surprise you to know there was no discipline?
25 A.  No.  I'm asking you simply if there is or not.

Page 39

1 Q.  There isn't.  His classification didn't change.  And
2    when they sent him -- when your jail sent him to MDOC
3    after determining probable cause that he raped someone
4    in your facility, they marked him as no red flags, no
5    concerns, nothing to know, MDOC.  Does that surprise
6    you?
7 A.  I don't really know what goes on with classification
8    when somebody rides out and what we supply and what we
9    do not, so I don't really have an answer for that.
10 Q.  Okay.  So my question was, are you troubled by the
11    concept that there would be not a single question
12    asked of my client of did you see staff, were they by,
13    did you ask for help, where were they, did you see
14    rounds?  Anything to do with the floor security staff.
15    I asked if you were troubled.
16 A.  I'm not troubled by that.
17 Q.  I didn't think you would be.  But I didn't understand
18    your last answer.  Instead what your answer was was
19    you're troubled that I'm asking these questions
20    because it's trying to poke holes.  That's troubling
21    to you; right?  Because it's so easy for me?  Is that
22    what your point was?
23 A.  Look, I'm not trying to make this personal.  I
24    understand you have a job to do.  Your job is to try
25    to win money from us.  Our job is to just try to

Page 40

1    protect people and keep people safe and protect them
2    and provide the best security that we possibly can.
3    Unfortunately in this case something happened.  I wish
4    I could go back and change it.
5         In the early '90s when I was a deputy at
6    Jail Division 2, it was either the mid or late '90s, I
7    actually went in and physically intervened and stopped
8    a sexual assault on a known protect ward where I had
9    to physically grab another man and remove him, pull
10    him out from inside of another man.  I've seen it
11    happen.  I have nightmares about it.  I've lived
12    through it.  I have physically placed my body on the
13    line to stop those types of behaviors.  I've spent all
14    of my time in Internal Affairs trying to stop those
15    types of behaviors.  We've prosecuted inmates.  We've
16    prosecuted staff and gotten criminal convictions
17    against staff for engaging in sexual activity with
18    inmates.  We've prosecuted staff and gotten criminal
19    convictions against staff for physically abusing and
20    assaulting physically inmates.  We take these matters
21    very seriously.
22         While I was in charge of Internal Affairs I
23    was responsible for over a hundred resignations or
24    terminations due to staff misconduct in the nine to
25    almost ten years that I was there.  I've lived my

Page 41

1    life -- some of the proudest work that I've ever done
2    is when I was in charge of Internal Affairs.  I've
3    spent a career.  I've taught on this subject.  I still
4    teach on this subject occasionally.  I take it very
5    seriously, and I do everything that I can, as do --
6    does everyone else in the jail.  We place our own
7    lives on the line.  It's that -- Jail Division 2 is
8    the only jail where we've had two officers murdered in
9    it.  We take every action that we can possibly take to
10    make it as safe as we possibly can.  Sometimes things
11    happen.  So what do you do?  You deal with it the best
12    you can upon finding out about it, and we did that in
13    this case.
14 Q.  You think that this investigation was the best you
15    can?  You did the best --
16 A.  Nothing could take sexual assault back.
17 Q.  No.  I'm talking about the investigation after the
18    fact.  You did the best job with the sexual assault?
19 A.  We followed the evidence where it led.
20 Q.  Okay.  But without asking even a single question about
21    what the jail situation could have been, you followed
22    the evidence; is that --
23         MR. O'NEILL:  Objection.  Asked and
24    answered.
25 BY MS. PRESCOTT:

ALAN   BULIFANT
September 27, 2021

Page 42

1 Q.   I guess you don't know that because you weren't aware
2      until now, right?
3          MR. O'NEILL:  Objection.  Asked and
4      answered.  And vague.  Compound.  I don't know what
5      the question is.  There's several questions in there.
6 BY MS. PRESCOTT:
7 Q.   I mean, you can't really say whether this was the best
8      you could have done because you haven't even read or
9      listened to the interviews; right?
10 A.   We have a criminal conviction in this matter.
11 Q.   Okay.  And that really gets to the heart of it.  If
12      you put someone away for the sexual assault, then that
13      must mean you've done your job even if you don't take
14      any time or attention or ask a single question of how,
15      let me finish, how breakdowns in the jail functioning
16      itself could have contributed to the conditions that
17      allowed the rape to happen?
18 A.   We do look for breakdowns in the jail situation, but
19      if nobody tells you that anything occurred, you have
20      no lead to follow.
21 Q.   Okay.  So it was up to Johnathan Burks to know what
22      your policies all say so that he could bring it
23      forward?
24 A.   No.  No.
25 Q.   Okay.  So let's turn away from Johnathan Burks and the

Page 43

1      fact that he wasn't asked any questions.  Are you
2      aware that not a single question was ever asked of any
3      floor security staff who were on duty the night of the
4      rape ever?
5 A.   They filed reports.
6 Q.   No, they didn't, sir.  You're not aware of that?
7 A.   They didn't write police reports?
8 Q.   That's right.
9 A.   Wait a minute.  You're not talking about the officers
10      that reported it.  You're talking about the officers
11      that were working when the alleged incident occurred?
12 Q.   Yeah.
13 A.   Oh, okay.  Then I'll withdraw that.  Yeah.  I --
14 Q.   Are you aware that none of them ever were asked a
15      single question?
16 A.   I may have been at some point.  I don't know as I sit
17      here today if I was aware of that or not.
18 Q.   Are you aware, I guess you are for my question, that
19      none of them was asked to do a 99 or -- I mean, an 83
20      wouldn't be right, but none of them was asked to even
21      write a statement either?
22 A.   I didn't know that, but I also would offer that if
23      nobody said anything that leads to them --
24 Q.   But you just --
25 A.   Again, you're a teller at a bank.  This teller gets

Page 44

1      robbed.  You know nothing about it.  Am I going to
2      say, well, did she know you got robbed?  I mean --
3 Q.   I don't understand your --
4 A.   If the officers had known something would have
5      occurred, had occurred, they would have reported it.
6      They didn't.  I mean, as I sit here I don't know that
7      they were asked.
8 Q.   Your officer knows that a rape is alleged to have
9      occurred in conditions of confinement where the job --
10      the whole job of the floor security people is to keep
11      people safe and prevent injury to themselves and to
12      the staff; right?  That's what's the setup here.
13 A.   Yep.
14 Q.   Someone says a crime occurred and you're like, wow,
15      that's interesting because we had two sworn officers
16      whose whole job it was was to prevent something like
17      that.  That's the setup.  Doesn't it strike you as
18      strange that the people whose job it was -- and I say
19      two because it was two on afternoons and it was two
20      later on midnights, so it's -- you know, overnight
21      there were four.  Doesn't it strike you as strange
22      that no one would go to them and say did you hear
23      something, did you see something, where were you, was
24      there any disturbance, what did you observe about the
25      countenances of the people?  Does that not strike you

Page 45

1      as strange?
2 A.   You don't know what you don't know.  And that's the
3      problem.
4 Q.   I'm asking about an investigation in your department.
5 A.   Um-hmm.
6 Q.   Does it seem unusual that no one would go to the
7      people whose whole job it was to supervise and not ask
8      them while you were supervising what did you see?
9 A.   I'm going to say no.  Now, have the inmates said, hey,
10      I told them and they didn't do anything or
11      something --
12 Q.   Yeah.
13 A.   -- like that that would give you reason to go back?
14      Then yes.  But absent something -- it's like if I
15      don't notice a window's broken, hey, did you know this
16      window was broken?  Well, no.  If I did, I would have
17      told you.  I mean, it's --
18 Q.   Does your investigator when he's talking to my client,
19      does he have a job to do to see whether a crime has
20      occurred by the alleged rape?  That's a pretty obvious
21      answer.  He has that job to do; right?
22 A.   He is following up on the facts and he's going to
23      request a warrant.
24 Q.   Can you answer my question?  One of the things he's
25      supposed to do is figure out is there a basis to think

ALAN  BULIFANT
September 27, 2021

Page 46

1    a crime occurred here, inmate-on-inmate violence?
2 A.  Yeah.  Now, see the way you phrased it there, yeah. I
3    would say yes.  Because I don't want -- like it's not
4    our job to see if a crime occurred or not.  We request
5    a warrant.  The prosecutor decides that a crime
6    occurred or not.
7 Q.  I hear you.
8 A.  And that's a huge distinction for me.  That's why I
9    answered differently this time.
10 Q.  Okay.  And then another thing he's supposed to be
11    doing is he's supposed to be helping protect the
12    environment itself, the system itself, by determining
13    whether a breakdown could have occurred with regard to
14    the rules and regulations of what the staff should
15    follow; right?
16 A.  That can be part of his job, yes.
17 Q.  Was it part of his job with regard to Burks?
18 A.  I think it's part of his job at all times.
19 Q.  Okay.  In what way did the investigator, I think it's
20    Mr. Lawson, assess in any way, shape, or form that
21    part of his job, his responsibility to figure out
22    could there have been a breakdown on our end?
23 A.  I'm saying nothing led him to believe that there was a
24    breakdown because there was nothing reported to him by
25    the inmate that led to this.  Now, you're going to

Page 47

1    say, well, no, that's not good enough, but, I mean,
2    that's my answer.
3 Q.  So my question was, what did Lawson do -- you just
4    said one of his jobs was to figure out if there was a
5    problem with the department itself.
6 A.  So now you're asking me to speculate what Chris Lawson
7    was thinking in his mind while he was interviewing
8    this man.
9 Q.  What you know that he did or didn't do.
10 A.  I know he interviewed him.
11 Q.  Do you know anything he did to try to figure out
12    whether or not the department had violated any rules,
13    any regulations, you know, it or its staff had
14    violated any expectations?
15 A.  I don't know what was in his mind.
16 Q.  Do you know anything he did in that regard?
17 A.  I don't know what he may have followed up on or what
18    was in his mind or whatever.  I mean, I know he did
19    the warrant request.  He got a criminal conviction.
20    He filed a report.  The report was turned in.  It
21    would have been reviewed.
22 Q.  Do you see my concern that -- I mean, can you at least
23    understand the concern that instead of looking for
24    problems that are within the department that could
25    contribute to unsafe conditions, if instead your

Page 48

1    approach is Whac-A-Mole of like let's get this
2    prosecution after this thing happened, you could miss
3    opportunities to actually prevent the next situation?
4    Do you see that concern?
5 A.  I understand that concern, but do you understand my
6    concern?  That someone who's highly trained and
7    skilled and educated to go around and find
8    deficiencies, shortcomings, errors, problems, issues,
9    you can make an argument for anything.  I could sit
10    here and walk through this building and find all kinds
11    of physical hazards that maybe you could trip over,
12    maybe it could be a fire hazard, maybe it could this,
13    maybe it could that.  We followed the evidence that
14    was presented to us.  We could spend all day long
15    running around chasing, playing Whac-A-Mole, just like
16    you said, well, this could lead to this and this could
17    lead to this.  We don't have a crystal ball.  We do
18    the absolute best that we can in an environment that
19    is very difficult and we take every precaution and
20    every safety measure that we can possibly do, an
21    incredibly difficult decision putting our own lives in
22    danger and in jeopardy, and now, again, you want to
23    ask, well, why didn't we do this, why didn't we do
24    that.  You can only do what you can do.  You don't
25    have a crystal ball.  And I don't know what Chris

Page 49

1    Lawson did.  I don't know what he was thinking.  I
2    don't know why he was asking him was he thinking about
3    this over here or looking at this and maybe there was
4    nothing to follow so he didn't.  I'm not him.  I
5    wasn't in his mind.
6 Q.  But you were his boss reviewing this.  That's why I'm
7    asking.  Do you think he did a good investigation
8    here?
9 A.  Yes.  He got a criminal conviction on this matter.
10    I'm not sure that I was the one reviewing it because
11    it looks like it was turned in in 2019 when it was
12    completed, the final package.  I wasn't there.
13 Q.  Well, you were there for years after, including up to
14    and after the probable cause.
15 A.  And I would have read the warrant request that he
16    submitted to the prosecutor's office which I would
17    have had to have approved or signed off on and I felt
18    that that was adequate enough to present.
19 Q.  Okay.  Here's my point, because I'm not sure you --
20    the Whac-A-Mole might have been too --
21 A.  Far?
22 Q.  -- too much of an analogy.  You are very proud that
23    there was a criminal conviction here.  A crime is
24    being punished.  That is one aspect of what
25    Mr. Lawson's job was is to seek out and get the

ALAN  BULIFANT
September 27, 2021

Page 50

1   information about the crime.  And when he needed more
2   information, are you aware that he went back to my
3   client and said I have more questions for you?  Did
4   you know that?
5 A.   I didn't know that as I sit here.
6 Q.   Okay.  And he followed up and he said, oh, well,
7   Solomon says this or, oh, I need to – there's one
8   thing about, you know, why did you da da da, and he
9   would come back and he would ask his questions; right?
10   And then he got that conviction.
11 A.   Um-hmm.
12 Q.   And thankfully a rapist is – you know, the people saw
13   that there was a rape and they held him guilty and he
14   is being sentenced according to law.  I'm focused on a
15   different question, and that is the systemic effort to
16   prevent the next and the next that may or may not have
17   been happening, and my question is, did Corporal
18   Lawson do a good job trying to figure out if there
19   were any problems within the department itself and the
20   floor security staff, their training or their
21   behaviors on the night of the rape?  Did he do a good
22   job at that?
23 A.   It sounds to me like from you just told me he did an
24   excellent job because apparently he followed up and
25   thought about other questions and things that he had

Page 51

1   maybe missed and didn't think of at the time, so he
2   went back to your client and followed up on those
3   things, so it sounded like he was very attentive and
4   tuned in to this case.
5 Q.   They were all questions about what Martin Solomon did.
6 A.   And had there been anything that led him to believe my
7   assumption to staff, he would have followed it up
8   because Chris Lawson – Chris Lawson is a detective
9   that criminally prosecuted five officers for
10   brutalizing multiple inmates in the Wayne County Jail,
11   and some of them even went to prison.  Chris Lawson –
12 Q.   Okay.  Is that supposed to be some – I mean, that's
13   his job.
14 A.   I wasn't done answering.  You never let me finish.
15 Q.   Okay.
16 A.   I mean –
17 Q.   Well, you're not really answering my question, but go
18   ahead.
19 A.   Well, I'm trying to answer your question.  Maybe you
20   just don't understand what I'm saying.
21 Q.   No.  I don't remember asking you did Chris Lawson ever
22   convict –
23 A.   You asked me if he did a great job.  I'm telling you
24   about his job.
25 Q.   Yeah.  I'm talking about this.  I'm talking about

Page 52

1   on this aspect.
2 A.   And I'm saying based upon what you've told me where he
3   went back and asked follow-up questions, he absolutely
4   did.
5 Q.   No.  But you don't know what the follow-up questions
6   were.
7 A.   You just described them to me, that he – the fact
8   that he had thought about it and went back.
9 Q.   Since you don't know, let me fill you in further.  He
10   went back and asked him questions about Mr. Solomon
11   and Mr. Burks and what happened.  And my question for
12   you is, is it your testimony that he did just as good
13   a job trying to figure out whether Judy Bell or Keith
14   Williams might have done something wrong as he did
15   trying to figure out whether Martin Solomon did
16   something wrong?
17      MR. O'NEILL:  All right.  I'm going to
18   place an objection at this point.  This is becoming a
19   debate and an argument, and the questions are
20   argumentative and the tone is argumentative, and I
21   would like the questions – place an objection on that
22   basis and ask that we get back on track to discover
23   facts and opinions that this witness is going to offer
24   at trial.
25 BY MS. PRESCOTT:

Page 53

1 Q.   Go ahead.
2 A.   Yes.
3 Q.   And that's based on your belief in him or what?
4   Because I know you didn't listen to any of his
5   interviews and you didn't know he didn't ask any
6   questions.  So what's that based on?
7 A.   You haven't presented any evidence to where he was
8   deficient in some way.  You haven't been able to point
9   to anything where they said, hey, he was told this and
10   he didn't act on it.  Now, if you had that, I would
11   have assumed you would have already presented it.
12 Q.   How can I present you that he didn't question
13   somebody?  Do you want to see the deposition
14   transcript of Ms. Bell saying no one even asked her a
15   single question about this?
16 A.   No.  I don't want to see her deposition transcript,
17   but –
18 Q.   That's the excellent job you're referring to is not
19   asking a single question?
20      MR. O'NEILL:  Objection.  You're
21   interrupting again.
22 A.   Apparently you want to testify and not me.
23 BY MS. PRESCOTT:
24 Q.   Well, I'd like to get answers to my questions.
25      MR. O'NEILL:  But you're interrupting the

ALAN  BULIFANT
September 27, 2021

Page 54

1  witness before he's done answering.
2 BY MS. PRESCOTT:
3 Q.  Do you have any more to your last answer?
4 A.  I had something in my train of thought, but I lost it,
5    so no.  Not at this point.
6 Q.  It's an excellent job not to ask Judy Bell what
7    happened that night?
8 A.  I don't remember what it was.
9 Q.  Okay.  You said you take these things very seriously.
10   Is it taking it very seriously not to ask the guards
11   whose job it was to supervise the situation, what they
12   saw, what they did?
13 A.  I've answered this multiple times.  If there's no
14   evidence to implicate that they have done something
15   wrong – you don't know what you don't know.
16 Q.  Okay.  So is your point that it's my client's fault
17   that he was more worried about his rapist than he was
18   about whether procedure one, two, three in the policy
19   book was violated?
20 A.  No.  That's not my answer.  It's not your client's
21   fault.  What I am saying is the incident occurred.  We
22   prosecuted it.  We got a criminal conviction.  We
23   followed our guidelines.  We got him medical
24   treatment.  We did everything we were supposed to do.
25   I've said it's unfortunate that this incident occurs.

Page 55

1    But now you're saying, well, you did A, B, C, D, and E
2    but I think you could have done G better so that we
3    should have done that.  I'm not saying it's his fault,
4    but it's definitely not my staff's fault and it's
5    definitely not our officers' fault.  We are – look,
6    this is all about deliberate indifference.  We care.
7    We've always cared.  We do not have a systemic sexual
8    assault problem in this agency.  We have always been
9    at the forefront of trying to prevent and respond to
10   these types of issues and we do.
11 Q.  Okay.  So let's talk about all the investigations
12   before my client.  How come staff are – there are no
13   interviews of the staff on scene when harassment and
14   assault are reported in general?  This isn't just
15   Mr. Burks and Mr. Solomon and what Corporal Lawson
16   did.  How come when I look back at all of the CSC
17   allegations in this jail prior to August of 2016
18   systematically there is no effort to question the
19   security staff who were supposed to be there at the
20   time to determine whether or not they were following
21   expectations and rules and approved practice?
22       MR. O'NEILL:  Objection.  You're asking
23   this – that's vague and it's an improper question in
24   the form.  It's asking questions about multiple
25   apparently CSC investigations and you're not showing

Page 56

1    the witness any of them.  So I object.
2 BY MS. PRESCOTT:
3 Q.  Go ahead.
4 A.  Yeah.  I'm not saying I agree with your assumptions or
5    your statements of fact.  But, I mean, we do rely on
6    the jail to supervise and monitor the officers'
7    activity, and you are relying on evidence or
8    accusations, statements, something to lead you to a
9    potential deficiency, and absent that, again, you
10   could run around digging holes all day long everywhere
11   you go and coming up with nothing.  That's not a good
12   use of resources.  I've got other issues and other
13   things that I need to be dealing with to where I can't
14   just take one case and ignore all the other cases and
15   just follow every possible solution of, you know, did
16   aliens come down and abduct him.  If there's no
17   evidence leading you there, you don't go there.
18 Q.   And there can't be evidence leading you there so that
19   you can go there acting against your own officers if
20   no one asks them if they might have been asleep that
21   night or not paying attention; right?
22 A.  That is your assumption and opinion because you want
23   to paint them in a negative light.  If you painted
24   them in a positive light that had they done something
25   wrong or were derelict in their duty in some way,

Page 57

1    shape, or form that they would respond correctly and
2    appropriately.
3 Q.  Well, people have said – I mean, here's why I ask it.
4    You know, you know and I know the people of the State
5    of Michigan have said that a rape occurred on the
6    watch of these people, so something went wrong,
7    something that according to your testimony, and I take
8    it for completely true and valid, you don't want rapes
9    to be happening in your system.  Of course not.  I
10   don't assume you do.  So something went wrong, and the
11   people have spoken and said it did, and you guys knew
12   it did well before that.  You knew it.  You had the
13   warrant request and you had probable cause.  So when
14   something has gone wrong, I just want to understand is
15   it your testimony that it's not a good use of
16   resources to go back and say, okay, guys, obviously
17   bad things can happen from time to time, but this was
18   a big one, this was a rape, what could we have been
19   doing differently?  Let's look at what the officers
20   there were doing and weren't doing.  That's not a bad
21   use of resources, is it?
22 A.  No.  That's not my testimony that it is a bad use of
23   resources.  What I'm saying is we did what we have
24   always done.  We take these matters seriously.  We
25   handle them.  We get medical attention.  We separate

ALAN   BULIFANT
September 27, 2021

Page 58

1   them. We criminally prosecute. We attempt to
2   convict. We do all of the things that we do. If
3   there is a deficiency that the evidence has led us to,
4   we follow up on that and we review it and we act on
5   it, and we've done that in the past. What you're
6   trying to say is that we are not perfect, and no, we
7   are not perfect, and that's completely different than
8   deliberately indifferent.
9 Q.   That's not what I'm trying to say.
10 A.   I'm sure that in hindsight it would be wonderful if I
11   could go to everybody on every floor where everything
12   happened and say, hey, did you see anything, did you
13   see anything, did you see anything, but we – that's
14   why we rely on officers to report what they see, hear,
15   notice, smell, witness, you know, anything. We can't
16   just assume, oh, well, they should have asked this
17   question and they should have done this. Anybody can
18   poke a hole at anything at any time. Your boss could
19   listen to this deposition and say, oh –
20 Q.   I don't have a boss, sir. Thank you.
21 A.   Well, I'm sure there's some appellate judge somewhere
22   that could listen and say, hey, this lawyer should
23   have asked this question or done this question or this
24   or that, because we all have those deficiencies. We
25   all have those areas where could something have been

Page 59

1   done better. Absolutely it could. I'm not immune to
2   that. Detective Lawson's certainly not immune to
3   that.
4 Q.   Okay. Good. So you guys aren't immune to that. So
5   why are you so resistant to the concept of, hey, Bell,
6   Williams, get over here, there was a rape, you were
7   here that night, let's talk about what could have been
8   done better?
9 A.   I'm not –
10 Q.   Just what could have been done better?
11 A.   I'm not resistant to that.
12 Q.   Okay. So you're open to that?
13 A.   What I'm resistant is you're saying that Corporal
14   Lawson is wrong because he didn't do that or I'm wrong
15   because I didn't tell him to do that.
16 Q.   Did the jail division staff do that ever?
17 A.   I don't know.
18 Q.   Okay.
19       MR. O'NEILL: Let's take a break for a
20   minute.
21       (Recess taken at 10:17 a.m.)
22       (Back on the record at 10:20 a.m.)
23 BY MS. PRESCOTT:
24 Q.   Is there a policy somewhere that says that officers
25   shouldn't be questioned when there's a CSC allegation

Page 60

1   or a sexual harassment allegation when they're the
2   floor security staff that were in the area?
3 A.   No.
4 Q.   Is there a policy that says they should?
5 A.   No.
6 Q.   Was there a practice of the department up to
7   August 2016 of examining the role in any way, shape,
8   or form of floor security staff who are supervising
9   individuals when a CSC is alleged to have occurred?
10 A.   Is there a practice of what? I'm sorry.
11 Q.   It was a long question. Prior to August 2016 was
12   there a practice – first let me just make it –
13   hopefully – it's a long question but it makes it
14   easier. So I asked you if there are policies to do –
15   either to ask or not to ask and you said no. So now I
16   wanted to talk about practice. So practice before
17   August 2016. Was there a practice of questioning
18   floor security staff who would have been assigned in
19   areas where a CSC or a sexual harassment or assault
20   would have been alleged to occur?
21 A.   I can't say that it's a practice. Investigations are
22   like artwork. They're not a science. They're an art.
23   So you – you know, it's like people say the
24   sculpture's in the rock. You follow the evidence, the
25   information where it goes. So if it's necessary, you

Page 61

1   do it. If it's not necessary, you don't. You don't
2   make something – something that's not there.
3 Q.   And are you – I assume you don't have any criticism
4   of Internal Affairs investigators who would not be
5   asking for security staff, you know, hey, there was an
6   alleged, you know, groping or sexual assault and they
7   don't talk to the floor security staff? You haven't
8   ever disciplined or said that's not the way to do it
9   or that's not appropriate or you should have been
10   asking those questions, have you?
11       MR. O'NEILL: Objection. Form. Again,
12   same as before. The question asks about so many
13   investigations.
14 A.   I can't say that's accurate because, I mean, I would
15   call my detectives in all the time and talk to them
16   about things that were done and – or weren't done or
17   should have been done or shouldn't have been done or
18   the way that they had been done, so, I mean, it is –
19   it is. You know, we do – we do monitor and review
20   and we try to make everybody better and each other
21   better constructively. So can I sit here and say that
22   I've never done it? No.
23 BY MS. PRESCOTT:
24 Q.   Do you train IA officers that they should be asking
25   for security staff, what happened, what they saw, what

ALAN  BULIFANT
September 27, 2021

Page 62

1   they didn't see when an alleged sexual assault occurs?
2 A.   It's a case-by-case basis.  If there's something that
3   leads you to go there, then absolutely you should be
4   doing it.
5 Q.   What is – isn't there a value in your line of work to
6   having, even if it's just a zero report, like I got
7   nothing, to record that at the time?  So going back to
8   Bell or Williams.  Did you see anything?  No, I didn't
9   see anything.  Isn't there a value to having a
10   memorialized record of the people who are there?
11 A.   They do their JMS entry logs.
12 Q.   Okay.  But I'm asking about, hey, there's been an
13   alleged rape let's say.  You were on duty.  You were
14   doing rounds.  You were there.  Isn't there a value in
15   memorializing even if they saw nothing so that you
16   have for your records?
17 A.   It depends on the circumstances.  It depends on the
18   evidence.  If the inmate had said, hey, I told them
19   and they did nothing about it, then absolutely.
20 Q.   If the what?
21 A.   If the inmate had said, hey, I told them and they
22   didn't do anything about it, then absolutely.
23 Q.   Is there a reason Mr. Lawson didn't ask my client did
24   you ask for help or did you tell any officers about
25   this?

Page 63

1 A.   When you interview somebody, you get them talking and
2   you get them to give you the information.  Now, you
3   may ask follow-up questions.  You may ask clarifying
4   questions.  You may do a number of things.  But an
5   ethical investigator doesn't want to lead somebody
6   down a path that's going to make them admit to
7   something they maybe haven't done.  So part of it is
8   as much as you don't want to revictimize the victim,
9   I'm not going to sit here and throw up all kinds of
10   things to say, oh, well, so how many times did the
11   officer come in and punch you in the face?  You take
12   the statements that he gives you, that they give you
13   and you follow them where they go.
14 Q.   You keep using this example of did I abuse my kids
15   this morning or did the court reporter rob a bank or,
16   you know, did someone punch someone in the face, but
17   there was an actual rape that occurred here, –
18 A.   Yes.
19 Q.   – so it wasn't just creating facts.  It was trying to
20   understand who was where when.  That's your job;
21   right?
22 A.   And the facts that were reported were –
23 Q.   Can I get an answer to my point?  That's a core job;
24   right?
25 A.   What is a core job?

Page 64

1 Q.   Finding out who was where when.
2 A.   Yes.
3 Q.   Did Bell or Williams or Seals or Lee, the four
4   officers who were on duty the night of the rape, did
5   they all carry out all their duties according to
6   expectation of the department?
7 A.   I have no idea.
8 Q.   Did you ever know?
9 A.   It's not what I was tasked to investigate.  The jail
10   command would be in charge of supervising them.
11 Q.   Is there a reason why your department, the IA folks,
12   did not routinely connect with jail command when there
13   would be an allegation of sexual assault to
14   postmortem, you know, these very issues, okay, you
15   guys are in charge, I think you said you rely on them
16   to supervise, and we're looking at you, you know,
17   enforcement – or not enforcement, but a detection of
18   rule violations, so let's connect and talk about the
19   Burks case or – or the Jones case or whatever the
20   sexual assault claims are?
21 A.   Your statement of fact is inaccurate because we
22   actually would talk.  Me and the commanders would
23   meet, and we would talk about different aspects.  If
24   something occurred that I felt was an issue or
25   whatever, I could call them up and talk to them.  We

Page 65

1   would have lunch.  We would do all kinds of things.
2   In this particular case I imagine that conversation
3   would have gone like, hey, this guy Mr. Burks says
4   that Solomon raped him, so we're prosecuting him.
5   What else do I have to go on?  Because he doesn't
6   allege that anything else occurred.  He didn't even
7   allege anything else occurred in his criminal trial.
8 Q.   So you're not aware – have you read his testimony?
9 A.   At some point I must have because I do –
10 Q.   So you're not aware that he –
11 A.   – because I do recall that he did not make any
12   statement about notifying the deputies in his criminal
13   trial of Mr. Solomon.
14 Q.   You really want to sit here and testify to that?
15   That's what you think happened?
16 A.   Yeah.  That's my recollection of it.
17 Q.   Okay.  So you're not aware that he testified that he
18   specifically called out for help and tried to wave a
19   kite and wave over an officer?
20 A.   That's different than saying I told an officer what
21   had occurred.  Again, that's a misstatement of the
22   facts.
23 Q.   But you do recall that he tried to wave over an
24   officer and get help after he'd been raped and said
25   that the officer ignored his pleas for help?

ALAN  BULIFANT
September 27, 2021

Page 66

1  A.  I don't know about waving out for an officer, but I
2      recall something about him saying that he yelled.
3  Q.  Do you recall him saying he was waving out -- or that
4      he was in any way trying to flag down an officer for
5      assistance after he'd been raped and was ignored?
6  A.  I do not recall that.
7  Q.  That would be troubling if that happened, wouldn't it?
8  A.  It depends.
9  Q.  Okay.
10 A.  Is the officer -- did the officer see it?  Was the
11     officer in location where he could see it or hear it?
12     I mean, all of these things are not in evidence.
13 Q.  Definitely.  Definitely.  So when you read that -- did
14     you read that or did you not?  I don't remember.
15 A.  I recall somewhere --
16 Q.  Okay.  Good.
17 A.  -- about him stating -- him not stating -- there was
18     no statement on the record of him in trial that he had
19     told an officer.  It's not like he said, hey, I told
20     Bell or I told -- you know, I don't even know what the
21     other guy's name is, but there was no record of that.
22 Q.  So you do or you don't recall that he testifies that
23     he -- because you just said he never even testified to
24     it, and I went you don't know?
25 A.  I was --

Page 67

1  Q.  So now my question is, do you recall at some point
2      when you were in IA learning that he had tried to flag
3      down an officer for help and been ignored?
4  A.  I don't recall that.
5  Q.  Okay.  Would that be something that your department
6      would investigate?
7  A.  If it was new evidence that came into being that was
8      substantiated in some way, shape, or form, but here's
9      the problem.  If your back is to me and I wave like
10     this and you don't see it, that's not your fault.
11 Q.  Well, you go ask the officer; right?  Hey, did you see
12     this?  He says he's a rape victim and you're just
13     ignoring him.  Did you see something?  You'd ask the
14     question; right?
15 A.  And maybe Officer Lawson did.  I don't know.
16 Q.  So you're not aware that he didn't?
17 A.  I don't know.
18 Q.  Okay.
19 A.  Again, I'm going from recollection from -- you know.
20 Q.  So Commander Cain testified that you didn't have any
21     sort of -- so you said I was wrong.  Well, it's not
22     just Sarah Prescott sitting here saying that.
23     Commander Cain testified that she did not get feedback
24     back from IA about its findings, about its positions
25     on what was going on in the sexual assault claims.

Page 68

1  A.  On this particular case?
2  Q.  In general.  Is that contrary to what you would say?
3  A.  I'm trying to recall if there was a time I ever spoke
4      to her about any cases.  Yeah.  I don't recall if I
5      ever spoke to her or not.  I mean, there were
6      commanders that I did speak to about different cases.
7      Some are coming to mind, but I believe the one I'm
8      specifically thinking of was at Jail Division 1, so
9      maybe she was at 2.
10 Q.  And am I correct that she wouldn't have gotten any
11     feedback about Solomon and Burks while it was an
12     active IA investigation up to April of 2019?
13 A.  If there was something -- like there are times during
14     an IA case, because you do keep things kind of
15     private, but there are times if something has occurred
16     that they need to know about to take proper
17     precautions like right away to stop something or
18     prohibit, you know, some activity or something from
19     going on, there are times where you would communicate
20     like, hey, as a result of an investigation we found
21     out that this is allegedly happening, you need to make
22     sure that you stop this.
23 Q.  Okay.  And so you don't recall that happening in this
24     case; right?
25 A.  No.

Page 69

1  Q.  And so best you would know is that she would at
2      earliest be informed of something to do with this case
3      when the case would be closed?
4  A.  She probably wasn't even informed then because I
5      believe she would have been at Jail Division 3 at that
6      point.
7  Q.  Okay.  So whoever who was over the jail division, the
8      earliest, then, you would understand, based on
9      processes, that they would get anything back on
10     Solomon and Burks was at the closure of the IA file?
11 A.  In this particular case.
12 Q.  Right.  Am I correct?
13 A.  Yes.
14 Q.  Have you ever spoken with Bell, Williams, Seals, or
15     Lee, the defendants in this case, about Solomon or
16     Burks?
17 A.  No.
18 Q.  Do you know anybody who has?
19 A.  Corporal Lawson.
20 Q.  Why do you say that?
21 A.  Okay.  Now, wait a minute.  So help me with the facts
22     here.  Bell and who are working the day of the alleged
23     incident?
24 Q.  Williams.
25 A.  Williams.  So they're working the shift of the alleged

ALAN   BULIFANT
September 27, 2021

Page 70

1    incident; correct?
2 Q.  And then Lee and Seals are on the next shift.
3 A.  Okay.  Is it reported to Lee and Seals?
4 Q.  Tried to be.
5 A.  Okay.  So who actually writes the reports?  The shift
6    after that?
7 Q.  Two shifts later I guess.
8 A.  Okay.  Then no, I'm not aware of anybody that spoke to
9    them.  I was thinking it was the next shift that
10   reported it, but if it's not, then no, I don't know
11   anybody that spoke to them.
12 Q.  Doesn't it seem like the officers would be really good
13   witnesses to help put a guy behind bars if he raped
14   someone who were there watching everybody the night of
15   the rape?
16 A.  Only if they had direct evidence on the case.
17 Q.  Yeah.  And you can't find that out unless you ask them
18   the question; right?
19 A.  They would have reported it had they observed
20   something.
21 Q.  Okay.  Now, Mr. – unless possibly they weren't paying
22   attention and they were derelict in their duty.  Then
23   they might not report that I was derelict in my duty.
24 A.  Do you have evidence to back that up?
25 Q.  Did you entertain that as a possibility in your IA

Page 71

1    department?
2 A.  I would have to defer you to Corporal Lawson.
3 Q.  So your testimony is that a good investigator would
4    follow up the leads of what my client specifically
5    said happened and who might have seen something
6    happen; right?
7 A.  Now, we gotta be very careful.
8 Q.  Okay.
9 A.  We're speaking specifically about this case.  We're
10   not speaking about all cases.  We're speaking about
11   the facts of this case.
12 Q.  Okay.
13 A.  Because in this case the evidence is based upon the
14   testimony or the witness, the victim.
15 Q.  Okay.
16 A.  If there was physical evidence or something in some
17   other case that leads you to believe that there's
18   something else that's going on, then you can follow
19   that trail.  So what I'm saying is we follow the
20   trail.  I don't want to paint this to where every case
21   is done this way because if there was something else
22   to where, you know – some other kind of forensic
23   information came up that would lead you to think
24   something else happened, then you would follow that.
25 Q.  Okay.  Is it your testimony that a good investigation

Page 72

1    would follow the leads of what my client offered, hey,
2    this person might have seen something, this person
3    might have seen something?  Should Corporal Lawson
4    follow those leads?
5 A.  I would say yes.
6 Q.  Do you know whether my client offered any leads like
7    that?
8 A.  As I sit here, no, I do not.
9 Q.  Okay.  Would it trouble you if Corporal Lawson didn't
10   follow those kinds of leads that my client would have
11   given him?
12 A.  I don't want to use the word "troubled" because I
13   would want to ask Corporal Lawson why didn't he and
14   see what his explanation was.  Maybe there's a reason
15   why.  I don't know.
16 Q.  So my client told Corporal Lawson some other guys told
17   me they saw Solomon coming in and out of my cell at
18   the time of the rape and they they were right across the
19   hall in the other ward and they told me afterwards,
20   hey, yeah, we saw that and also they happened to know
21   that he was a prior rapist of bunkies at MDOC and so
22   they took notice and they saw what was going on and he
23   tells Lawson that.  You're not aware of that?
24 A.  As I sit here, no.
25 Q.  And are you aware of whether Corporal Lawson went to

Page 73

1    talk to those guys?
2 A.  No, I'm not.
3 Q.  Who might have been direct witnesses?
4 A.  No, I'm not aware.
5 Q.  Can you give an opinion on whether that would be a
6    good or bad thing to do to go check with them?
7 A.  No.  I would expect that if he had been told that that
8    he should have went and asked them.
9 Q.  And if he goes and interviews a witness, he should be
10   recording it and making report about it; right?
11 A.  Yes.
12 Q.  Do you know when you first received any training
13   relative to the Prison Rape Elimination Act?
14 A.  I don't remember exactly what year it was.  I know we
15   were kind of in the forefront.  We were writing the
16   policy on it, and then we got that online training
17   through the NCIC for responding to and investigating
18   reports of prison rape.
19 Q.  When I think of forefront, I think what you mean but I
20   want to understand is that you were early adopters?
21 A.  I believe we were, yes.  That's my recollection of it.
22   We were – we were in the beginning.
23 Q.  Okay.  Do you know when the PREA standards came out?
24   Was it 2012?
25 A.  I wouldn't be surprised, because I remember Deputy

ALAN   BULIFANT
September 27, 2021

Page 74

1  Chief Larry Hall, who's not been with us for quite a
2  few years, was the one responsible for initially
3  writing the policy, and I remember reviewing it and
4  talking to him about it a little bit here and there,
5  and he's been gone for quite a while.  So that
6  wouldn't surprise me.
7 Q.  Okay.  PREA requires everybody get PREA training every
8  two years as a refresher.  If they haven't had it
9  before, certainly to have it in the first place if
10  they haven't had it before.  And that wasn't happening
11  until 2016.  Are you aware of that?
12 A.  I don't know what was going on in the jails.  I'm not
13  sure if that's accurate for Internal Affairs.
14 Q.  Okay.  But you don't know when the Internal Affairs
15  trainings were?
16 A.  Well, no.  They were all online.  So, I mean, we may
17  have been doing it in the jails maybe – I don't know
18  if the jail were doing it or not doing it.  I wasn't
19  in charge of the jails at that point.  But what I'm
20  saying is is that you're saying they weren't doing it
21  until 2016.  I'm not arguing that.  I'm just saying
22  – it may have been.  I don't know if you have our
23  training records from IA.  I wouldn't be shocked if we
24  were doing it.
25 Q.  Would you be able to identify the IA file, the full IA

Page 75

1  file on Solomon and Burks or would you not have seen
2  it because it wouldn't have been completed until after
3  the prosecution?
4 A.  I mean, when you say identify it, like – well, see,
5  do you mean like if anything is missing?
6 Q.  Yes.  Yeah.
7 A.  I mean, I wouldn't know without the original file if
8  something was missing.  I mean, I can tell you what's
9  there and what it looks like it is and what – what I
10  would think should be there, but without the actual
11  file, I wouldn't know if – I mean, what – if they
12  left something out, I don't know if I would know.
13 Q.  Okay.  Do you ever remember specifically talking to
14  Lawson about the Burks and Solomon investigation?
15 A.  I don't specifically remember talking to him about it,
16  but I know that we would have because you're required
17  to do case extensions – oh, wait a minute.  This is a
18  criminal case not involving an officer, so there would
19  be no case extensions.  Periodically I would look at
20  the case logs to see how many cases were assigned to
21  each officer where they were and so I would go to them
22  and I would say give me an update, where are you on
23  this case and it would be like, well, hey, we're
24  waiting for this person to come back from sick leave
25  or this one's at the prosecutor's office waiting for a

Page 76

1  decision or we go to trial on this date.  So I would
2  get updates about – so we probably talked about it at
3  some point.
4 Q.  Okay.  It sounds like there's nothing where you
5  specifically remember a more substantive discussion
6  about it that you can testify about?
7 A.  No.
8 Q.  Do you know whether the policies on rounds were being
9  followed the night of the rape?
10 A.  I thought that was part of what we talked about the
11  last time.
12 Q.  Well, we talked about cameras and some on rounds, but
13  I'm just wondering if you know whether like Williams,
14  Bell, Seals, Lee, those rounds they did were in
15  accordance with written policy at the time.
16 A.  I thought that that was part of the review or whatever
17  for the last deposition and that it looked like they
18  were.  That's my recollection.
19 Q.  Okay.  And so we talked about whether the policy
20  saying that there needed to be continuous rounds of
21  prisoners of this kind and we talked about continuous
22  means continuous.
23 A.  Um-hmm.
24 Q.  Your point is but we could do our rounds?
25 A.  Um-hmm.

Page 77

1 Q.  And the records do show that they were doing rounds
2  about hourly; right?
3 A.  Um-hmm.
4 Q.  Do you recall that?
5 A.  Um-hmm.
6 Q.  That's yes?
7 A.  Yes.  I'm sorry.
8 Q.  Okay.  So did anyone at any point ever put in writing
9  that you know of we're not going to be doing
10  continuous rounds, we're going to be doing these
11  hourly rounds, this policy that says continuous, we're
12  not applying that, that you know of?
13 A.  Yeah.  I don't know.  I mean, when I left the jail in
14  2002, we were doing continuous rounds, but then I made
15  detective and went out to a street unit, and then they
16  brought in the cameras, and so it all changed at that
17  time period, and I'm not – I don't know what was
18  written or not written or anything about it.
19 Q.  Do you think that they've changed doing the continuous
20  rounds because of the cameras?
21 A.  Yeah.  Yeah.  Because of the camera system, that's –
22  doing continuous rounds were stopped.
23 Q.  I see.  Okay.  And then you're not sure – okay.  So
24  that's an example.  So you're in IA and there's this
25  policy and it's on the books that says do continuous

Page 78

1   rounds with these kinds of prisoners.  And nobody has
2   said to stop that; right?  You just said I'm not aware
3   of there being anything in writing that says that's
4   not what we're doing anymore.  So doesn't that put
5   your department in a weird position because there's a
6   written policy that says to do it and there's nothing
7   saying to stop?
8 A.   No.  No, no, no.
9 Q.   Okay.
10 A.   I think I misconstrued your question.  I mean, I got
11   the new policy that says do them hourly or half hourly
12   if the camera system's down.  You asked me there a
13   policy saying to stop the old policy.  I don't
14   remember seeing a policy that says stop the old
15   policy.  I have the new policy where we were operating
16   under, but it doesn't -- I don't know if it
17   specifically says this supersedes or replaces the
18   other one or whatever.
19 Q.   So you're not aware that the current up-to-date today
20   policy still says to do continuous rounds with
21   prisoners that are close security or higher?
22 A.   No.  There's -- there's been several ideations of that
23   policy even since the other deposition that we did and
24   so -- because it just changed at my jail again.
25 Q.   Okay.

Page 79

1 A.   That closed continuous observation rounds I think
2   you're talking about?
3 Q.   It says continuous rounds -- okay.  So let's take -- I
4   confused things by saying up till today because we're
5   not worried about 2021 or 2022.  So in 2016 we're
6   allowed to ask for what was the policies, and then
7   Mr. O'Neill goes and he gets the policies that were in
8   place in 2016 and he hands me the policy on rounds,
9   and the policy -- and this is what we talked about at
10   your last deposition, and the policy says you do
11   continuous rounds.  Do you remember talking about that
12   and we went over that policy?
13 A.   I remember the hourly and half hourly according to the
14   camera system.
15 Q.   Okay.  You don't remember us talking about the
16   continuous rounds?
17 A.   Maybe if you can show it to me.
18 Q.   Okay.
19 A.   I know with mental health close observation there may
20   be still times that continuous rounds are necessary.
21 Q.   And I can pull out the policy too.  Just give me a
22   second.
23 A.   But that's mental health.
24      MS. PRESCOTT:  This is Page 21, Paul, if
25   you want to pull it up.

Page 80

1 BY MS. PRESCOTT:
2 Q.   "In fact, some of the policies call for not just
3   rounds every 30 minutes but continuous rounds; right?
4      Answer:  On specific housing units.
5      Question:  And continuous rounds means just
6   that, you're constantly walking between one and the
7   next, or does it mean something different?
8      Answer:  No.  You're walking -- you're
9   walking, you know, continuously from one and the
10   other.
11      Question:  And so were there times that
12   continuous rounds were instituted in certain wards
13   because of camera inoperability?"
14      So then we get into the cameras.  You say,
15   "I wasn't there.  I don't have personal knowledge of
16   that."
17      And I asked you if there were continuous
18   rounds during the time frame of this rape, and you
19   say -- let's see.  "Were there times continuous rounds
20   were instituted?"
21      "I don't -- I wasn't there.  I don't have
22   personal knowledge.  Yes, there would have been times
23   continuous rounds were instituted."
24      "How about from January 15 through August
25   of '16" --

Page 81

1      "Answer:  I wasn't -- "
2   I finished the question.  "-- time frame?"
3      "I wasn't there at that time.  But I would
4   venture to guess if the camera systems monitoring, the
5   video monitoring itself was down on the fifth and
6   sixth floor, then continuous rounds would have been
7   implemented."
8      Is that your belief that continuous rounds
9   were implemented?
10 A.   I -- I only believe continuous rounds would be
11   implemented if it's a mental health issue, like for
12   suicide watch or something.  They call it close
13   observation, but usually that's on the fourth floor,
14   Division 1.  Or possibly the fifth floor if it was a
15   female inmate.
16 Q.   Okay.  Then we talk about 2.3.  So policy 2.3 is the
17   policy on classification.  Okay?  Classification
18   plans.  And it says that "Security Level 2.  Close
19   security inmates shall have in cell supervision from a
20   continuously staffed security post in the immediate
21   area and within sound of the housing unit.  In
22   addition, rovers shall continuously monitor close
23   custody housing areas and make continuous rounds.
24   Continuous rounds and sound supervision shall be
25   provided close security inmates who are assigned to

ALAN   BULIFANT
September 27, 2021

Page 82

1  occupancy cells and for out of cell activities as
2  well." And then also "Supplemental security measures
3  also shall be taken if warranted."
4      So that's in 2.3. It's Paragraph 5-A. And
5  I can hand it to you if you want.
6 Q.  You say that's a classification policy?
7 Q.  That's right.
8 A.  Yeah. Can I see it, please?
9 Q.  Yeah. So it's 5. It's got the orange.
10 A.  Like Page 1 or 2 does it say the classification at
11   top or –
12 Q.  Page 1 and 2.  I've handed the witness Page 1 and 2.
13 A.  So this was written in January of '06.
14 Q.  Okay.
15 A.  I don't know if it was subsequently replaced because I
16   wasn't – I've never been assigned to classification.
17   It may have been replaced. It may have been that the
18   jail updated the round policy and didn't know this one
19   existed, because classification is kind of separate
20   from the jail because you've got – you've got like,
21   you know, commander of the jail, but classification,
22   you have a director of classification and they're kind
23   of equal and separate, so . . . I mean, I'm
24   speculating. It could be this had been updated or
25   rescinded.

Page 83

1 Q.  The information I have is that it's the policy as of
2  2016 even yes, though, it was a decade old by then.
3  This is what the county provided. Excuse me. The
4  sheriff's office provided.
5 A.  Yeah. I don't know why this is – my guess is they
6  didn't know it existed.
7 Q.  So do you know whether classifications understood when
8  they say this person is this level of dangerous, there
9  are two, they need – and there shall be continuous
10  close security rounds from continuously staffed local
11  places and then also rovers continuously monitoring
12  them, do you know whether they were aware that that's
13  not what was happening?
14 A.  I mean, it's speculation. My point – but logically
15  all I can say is that the classification staff often
16  works overtime in the jail, so – in like security
17  positions, so, I mean, you would think that they knew
18  that wasn't being done by working in those positions,
19  but, again, that's speculation. I don't have direct
20  knowledge.
21 Q.  I mean, the thing in this case is the person who
22  classified Solomon is a civilian, so that wouldn't be
23  applying to her, but I take your point.
24      Okay. Suffice it to say, you're not aware
25  of anyone ever in writing saying, hey, we don't – we

Page 84

1  aren't going to do this or we shouldn't do this, what
2  policy 2.3 is saying, we're going to be doing a
3  different kind of rounds?
4 A.  The classification – no. No.
5 Q.  Okay. You mentioned that you had looked at the expert
6  reports and that you're here to rebut them. What did
7  you mean? How so?
8 A.  Well, I don't agree with the opinions and conclusions
9  that were reached on. One of the things that I
10  noticed was that the experts didn't seem to have any
11  investigative experience. They had experiences like
12  jail administrators and teachers and things like that.
13  And one of the guidelines especially through PREA is
14  that an independent third party review takes place,
15  which in our instance is the Wayne County Prosecutor's
16  Office reviewing this case and doing their criminal
17  prosecution. See, it's easy as a jail administrator
18  to point out a flaw because you're the trier of fact.
19  You get to say, okay, you're wrong in this avenue, but
20  you don't have to run that by anybody. It's not
21  peer-reviewed. Whereas like a true investigator,
22  they're not the trier of fact. They present the fact
23  and then a discipline panel makes the decision or the
24  jail administration makes the decision or the
25  prosecutor's office or whatever. So, I mean, to me it

Page 85

1  was very obvious that they were paid – they presented
2  their facts in a certain light and they also presented
3  them somewhat skewed in my opinion because they wanted
4  to like believe facts one way but then would kind of
5  ignore exculpatory information. So, I mean, again,
6  it's – you get what you pay for.
7 Q.  Well, you're being paid to give your expert opinion,
8  aren't you?
9 A.  I get paid the same whether I'm here or not. I get
10  paid the same whether I'm sitting at Jail Division 2
11  or if I'm sitting here providing testimony about this.
12  There's no increase. There's no decrease. It's –
13 Q.  You're paid to sit here today, unlike me, –
14 A.  And if I wasn't –
15 Q.  – the person you accuse of being here for money.
16 A.  And if I wasn't sitting here, I'd be sitting at the
17  jail doing my job there –
18 Q.  Right.
19 A.  – to the best of my ability trying to make sure it's
20  safe.
21 Q.  Okay. So you get paid by the county and you're
22  definitely a supporter of the sheriff's office; right?
23 A.  I'm a supporter of – of the criminal justice system.
24 Q.  So you're not a supporter of the sheriff's office?
25 A.  But I don't want this to –

ALAN BULIFANT
September 27, 2021

Page 86

1 Q. Have I misstated that?

2 A. No. I don't want this to sound political because I

3 was a supporter of the prior administration, I was a

4 supporter of the administration before that, I was a

5 supporter of the administration before that. I joined

6 this organization to be a Wayne County Sheriff, and I

7 support whichever sheriff is in power. So I'm not –

8 I mean, I am in an appointed position as a commander,

9 but I – it was not a political appointment. I mean,

10 it was – I came up through the ranks and I've been a

11 police officer and I'm going to end as a police

12 officer.

13 Q. Have you made donations to the sheriffs in their

14 campaigns?

15 A. I have attended – I have attended fundraisers, yes.

16 And various sheriffs and prosecutors as well.

17 Q. And have you – so when you attend, like you pay, you

18 know, 20 bucks to get in the door or 20 bucks for the

19 spaghetti dinner or whatever is for the fundraiser?

20 A. Buy a ticket. Buy a ticket.

21 Q. And then you've also – like have you helped put those

22 kinds of events together, a car wash or a spaghetti

23 dinner or whatever?

24 A. Never.

25 Q. No? And have you, you know, asked friends to vote for

Page 87

1 the sheriff, like not campaign, but like, you know,

2 spread the word for the candidate?

3 A. I can't say I've ever asked anybody to vote. I've had

4 people ask me like, hey, what kind of guy is – you

5 know, like I remember somebody specifically saying

6 what kind of guy is Benny Napoleon. And, you know,

7 he's a good guy. He treats us well. You know, he

8 cares about people. That type of thing. I don't

9 recall ever saying, hey, you should vote for him.

10 Q. Okay. And so let me go back because you mentioned

11 some things in your last answer. So you said one of

12 the things that you noticed about the experts are that

13 they didn't have investigative experience. And PREA

14 talks about an independent reviewer. Do you think IA

15 is independent of the sheriff's office?

16 A. No. The Wayne County Prosecutors is.

17 Q. Okay. But you understand – so to go back, and this

18 isn't just about Wayne County Jail, you understand

19 that all systems, whether it's MDOC or a jail system,

20 through a sheriff's office, they're all supposed to

21 under PREA make not an independent review, with an

22 inside their own system review; right?

23 A. Right.

24 Q. Your mask made it hard. Did you say yes?

25 A. Yes.

Page 88

1 Q. Okay. Sorry. Okay. So the independent reviewer, are

2 you talking about like auditors? I didn't understand

3 your point about those.

4 A. Yeah. And I realize it could be done in different

5 capacities. Like some agencies have a PREA response

6 team. Some agencies – like we have a PREA

7 coordinator that also reviews cases. It's James Davis

8 and before that it was Chuck Pappas, but . . . You

9 can be audited, but like for us, the independent –

10 like a lot – the independent agency that reviews like

11 for all criminal sexual assaults, unless somebody says

12 they do not want to prosecute, we submit a warrant

13 request, you know, and let the Wayne County

14 Prosecutor's Office decide do they want to prosecute

15 or not. So they are like an additional checks and

16 balance. Because they also have the ability and the

17 authority to go back and say, hey, I want you to do

18 further follow-up investigations in this matter in

19 this area.

20 Q. Okay. Does the Prosecutor's Office review files that

21 are not submitted for prosecution?

22 A. No.

23 Q. Okay. So, for example, you might find that someone

24 hasn't committed a crime but they violated –

25 seriously violated internal policy in their behavior,

Page 89

1 so it's not going to go to Kym Worthy's office, but

2 your office can certainly say you violated an – like,

3 you know, maybe it's sexual harassment. You violated

4 an expectation with regard to this prisoner's rights

5 and we're firing you. That's a thing that can happen;

6 right?

7 A. Yeah. Now, are we speaking about staff or inmates or

8 both?

9 Q. It could be either; right?

10 A. Okay.

11 Q. You sexually harassed a colleague or you sexually

12 harassed a prisoner; right?

13 A. Okay.

14 Q. Either one of those can happen; right?

15 A. Yes.

16 Q. And it may not be all the way to a crime, but it's

17 still something that you are going to take seriously

18 and do something about; right?

19 A. Yes.

20 Q. Okay. So Kym Worthy's office isn't like auditing

21 those files or overseeing or reviewing those files in

22 any way, is she?

23 A. No. It would only be something that's of a criminal

24 nature.

25 Q. And likewise her office isn't responsible for and it

Page 90

1  doesn't participate in are jail operations running
2  according to constitutional standards, does it?
3 A.  Well, Kym Worthy wouldn't be part of that, but the
4  federal government would be.  You're talking about the
5  United States Constitution.
6 Q.  Yeah.
7 A.  Yeah.  I mean, like – like obviously the feds will
8  come in if you're in violation of civil rights and
9  things like that.
10 Q.  Okay.  But you've not had the federal government even
11  investigating anything to do with civil rights
12  violations in the Wayne County Jail, have you?
13 A.  I – there were times that the FBI reached out to me
14  and asked for case information so they could review
15  it.
16 Q.  Okay.  But those were for criminal matters; right?  Or
17  potentially?
18 A.  Potentially criminal matters, yes.
19 Q.  Right.  I'm talking about the civil side of the
20  justice department that's coming in and saying – to
21  your point about an independent reviewer, has the
22  civil side of the justice department come in let's say
23  in 2015 or '16, just to make it more discrete, and
24  said we're looking at adherence to civil rights laws?
25 A.  Okay.

Page 91

1 Q.  Has that happened?
2 A.  No.
3 Q.  Okay.  And your career in criminal justice has been at
4  the Wayne County Sheriff's Office, right, completely?
5  Although I know you were a detective on a street unit
6  at different times.  Like is it all under –
7 A.  Well, I just want to be clear.  At one point the
8  prosecutor's office was paying my salary, so I was
9  technically a Wayne County Prosecutor's employee, but
10  I was still sworn in by the sheriff, so . . .
11 Q.  And is that when you were a street officer?
12 A.  Yeah.  That was from 2002 to 2009.
13 Q.  Okay.  So fair enough.  That's a fair clarification.
14  So there was a time where the check would have come
15  through a different payroll, but you've always been
16  sworn within the sheriff's office; right?
17 A.  Yes.
18 Q.  And so there isn't – sometimes we ask really obvious
19  questions, but I just want to make sure I'm
20  understanding.  You have never played that independent
21  role of checking over some other agency's PREA
22  compliance or its handling or management of how are
23  you guys doing with regard to sexual safety of
24  prisoners?
25 A.  Not PREA, but I have had to investigate other criminal

Page 92

1  matters at other agencies where they've requested us
2  to come in but they were not proven related.
3 Q.  Okay.  And so I guess I'm just going to your point
4  about the PREA standard and how there's this idea of
5  independent reviewers.  You have not been that person;
6  right?
7 A.  Correct.
8 Q.  Okay.  And you understand Kym Worthy's office doesn't
9  enforce PREA or like implement PREA standards as to
10  the jail; right?
11 A.  Correct.
12 Q.  So I guess I want to understand your point about –
13  because I had asked you what did you see in the
14  reports that raised issues for you, and fairly enough
15  you said, okay, these people didn't have investigative
16  experience as independent reviewers.  But you haven't
17  either, so I'm trying to understand why that raises an
18  issue for you.
19 A.  I was speaking of investigations in totality, not just
20  sexual assault investigations –
21 Q.  I see.
22 A.  – when I made that statement.  I'm talking about all
23  investigations.  I don't get to decide if I'm right or
24  wrong.  I have to let somebody else look at it and
25  they say, hey, you were right or you were wrong.

Page 93

1 Q.  Okay.  And what about auditing?  Is that – you
2  consider that different or the same as investigating?
3  Like when you're auditing PREA or you, know.
4 A.  No.  Auditing – auditing could be a review.
5 Q.  Could be?  I'm sorry.
6 A.  Could be a review.
7 Q.  Akin to an independent review?
8 A.  Yes.
9 Q.  Okay.  So you're not aware that one of our experts,
10  Ms. Bonner, has been doing PREA audits all over the
11  country for different facilities throughout her
12  career?
13 A.  I mean, I didn't know that, no.
14 Q.  Okay.  So this is one of the points you saw in one of
15  these things is whether they had investigative
16  experience.  You said that you thought that their view
17  of things were skewed, they seemed to believe one way
18  and ignore exculpatory evidence.  Do you have any
19  particular area that you thought that they ignored
20  something exculpatory?
21 A.  There was one section in there where they state that
22  the inmate made a statement that he had told the
23  officer or whatever and if you are to believe the
24  inmate at face value or whatever, then, you know,
25  basically the sheriff's office is wrong, but the

ALAN   BULIFANT
September 27, 2021

Page 94

1   problem is is he didn't have – they, he, she, they, I
2   don't know who –
3  Q.   The expert.
4  A.   The expert.  Thank you.  Did not have any evidence to
5   say that the investigator or that the officers had
6   been told.  I mean, you could very – you could just
7   as likely have changed that statement if they take the
8   officer's testimony at face value, then the officer's
9   right.  It could have just as easily been stated than
10   way.  But instead of stating it both ways or that way,
11   they chose to state it in the side that was most
12   beneficial in that light.
13  Q.   Okay.  I get you.  Did you see other things like that
14   that stood out to you as –
15  A.   That's the thing that really hit me over the head.  I
16   mean, like instead of listing it – you know, it's
17   kind of like when you put it down, you put it all
18   down.  You don't just put it one way, one-sided.
19  Q.   And that's something that Corporal Lawson should do,
20   too, as an investigator, right?
21  A.   Yes.  If the evidence leads you there.
22  Q.   Do you know why he didn't record in any of his reports
23   that my client had told him that there were other
24   inmates who had claimed to have seen the activity
25   going in and out of the cell?

Page 95

1        MR. O'NEILL:  Asked and answered.
2  A.   I don't know that he was told that.  And I don't know,
3   if that is the truth, why.
4  BY MS. PRESCOTT:
5  Q.   What could be some of the punishments that could
6   happen to somebody if they ignored a prisoner's
7   request for assistance after the prisoner had been
8   sexually assaulted?  Do you know?
9  A.   Well, you could be criminally prosecuted, for one.
10   You could be federally prosecuted.  You could be
11   civilly liable.  You could certainly be terminated.
12  Q.   Do you think that the officers believe that threat of
13   termination is not a really serious threat?  Like, in
14   other words, that that's not the kind of thing that
15   would really happen, though, if you ignored a request
16   for help?
17  A.   I guess that would depend on the officer, because my
18   experience at IA, you know, like I said, I had over a
19   hundred people that were either terminated or resigned
20   as a result of investigations that we did, and I would
21   kind of be shocked like, hey, this person just saw
22   somebody two or three months ago get caught for the
23   same thing, how is it that they're doing it?  I mean,
24   did they think they were going to get away – so that
25   would kind of shock me from time to time.  So, I mean,

Page 96

1   the most honest answer I can give you is I guess that
2   it's an individual.
3  Q.   I see.  I take your point.  So sometimes you would see
4   officer B and they know darn well officer A just got
5   fired for doing something –
6  A.   And they do the same thing.
7  Q.   – and they do the same thing and you're like
8   scratching your head like what the heck?
9  A.   Why?
10  Q.   Okay.  Is there anything else that stopped you about
11   the reports that you thought, you know, these are
12   the –
13  A.   Nothing off the top of my head.
14  Q.   Okay.  So I know it sounds like you – you know, we
15   covered what you didn't – you know, did you see this
16   or talk to these people.  Is there anything that we
17   haven't covered that you did relative to the IA
18   investigation with Burks and Solomon that we haven't
19   talked about?
20  A.   I can't think of anything, no.
21  Q.   Okay.  And am I correct that you were not involved
22   with training the floor security staff on Ward 610 in
23   the – let's at least just say in the calendar year or
24   two before August of 2016?  Is that true?
25  A.   I just want to clarify.  I don't know – I know

Page 97

1   Corporal Judy Bell I would not have been.  The other
2   officer, I don't know him what his seniority date is
3   because I don't know him.  He – if he had – was a
4   newer officer, I may have taught at his jailer's
5   training class or something, because there was an IA
6   class that I taught, so just for total clarity, maybe
7   that.
8  Q.   Okay.  So I just want to clarify my question too.  So
9   like I'm just – so in 2014, '15, '16 you would not
10   have been doing training for the floor security staff
11   of 610; is that right?
12  A.   Unless they were new hired into the department and
13   jailer's training.
14  Q.   I see.  So if they were brand-new kind of – if they
15   were –
16  A.   Coming in.
17  Q.   If they came in during '14, '15, '16 you were doing
18   some of the jailer training.  All right.  Thank you.
19   That's helpful.  But other than that, no?
20  A.   No.
21  Q.   Okay.  And then also with regard to supervising on
22   Ward 610 let's say in '14 – 2014 to 2016, would you
23   have been in a supervisory role?
24  A.   No.
25  Q.   And then in terms of, you know, PREA enforcement or

ALAN  BULIFANT
September 27, 2021

Page 98

1  enforcement, again, using your word of enforcement,
2  like these are the rules and you've violated them, I
3  have to enforce it, you didn't do any of that for the
4  floor security staff of 6 Old in the two years before
5  the rape, did you?
6 A.  No.
7 Q.  And you weren't in the chain of command on the night
8  of the rape of floor security staff?
9 A.  No.
10 Q.  And we already covered you didn't do -- have you ever
11  in your career worked on the corrections -- or
12  classification side?
13 A.  Never.
14 Q.  Okay.  So like do you know what the -- how they sort
15  out who might be dangerous from who?
16 A.  I have a basic understanding of the criteria in the
17  operation.
18 Q.  Do you in IA -- does IA have jurisdiction over the
19  civilians who work like in classification?
20 A.  Yes.  We -- we -- I mean, we have jurisdiction over
21  everybody kind of, but, I mean, again, you're
22  reporting it.  Somebody above you decides the
23  discipline or security revocation.
24 Q.  Fair enough.  Is it right to say you guys are
25  essentially the investigatory arm of the whole

Page 99

1  department, then?
2 A.  Yeah.  We police the police.
3 Q.  So it would go up to whoever their bosses may be, but
4  you guys are the investigators across; is that fair?
5 A.  Yeah.
6 Q.  Okay.  I can't remember if I asked if you know if the
7  floor security staff on duty the night of the rape
8  violated any rules or violated any practices of the
9  command staff that were instituted down.
10 A.  You did ask that and no, I do not.
11 Q.  I'm sorry.
12 A.  That's okay.
13 Q.  I truly didn't remember if I did.  Do you know when --
14  you mentioned that people were working on a policy
15  around sexual safety and you may have used the name, I
16  don't think I remembered, it was a Hall or somebody
17  who was working on policy.  Do you know when the
18  updated policy was rolled out?
19 A.  No, I don't.
20 Q.  Okay.  And do you know when the floor security staff
21  in 6 Old was trained on the policy whenever it got
22  rolled out?
23 A.  No, I do not.
24 Q.  And at one point there was a time when people went
25  around posting up signs for, you know, how to report

Page 100

1  sexual violation or to stay safe, like maybe more like
2  tips to stay safe or hotlines to report.  Do you
3  remember when that signage went up?
4 A.  I don't remember the specific year.  I know that Chuck
5  Pappas is the one that had it done.  He was the first
6  PREA coordinator.  So it was after he came on.  You
7  know, we also have the PREA hotlines in our phones
8  too.
9 Q.  Okay.  Do you know when that stuff got rolled out?
10 A.  No.  It just -- it kind of all runs together after so
11  many years.
12 Q.  It's been a while too.  I understand that.
13 A.  Yeah.
14 Q.  There was also an update to the inmate handbook and it
15  had to do with sexual safety.  Do you have any idea
16  when that happened?
17 A.  No.  But I do remember seeing that that happened.  I
18  do recall it, yeah.
19 Q.  Could you say whether that happened before or after
20  July of '16?
21 A.  I'm sorry.  I don't know.
22 Q.  Okay.  And there was also at some point someone
23  decided to put together a pamphlet that everybody
24  would get as they came in through intake or
25  classification on sexual safety.  Do you know whether

Page 101

1  that would have happened before July '16?
2 A.  I don't know.  I think that was a Chuck Pappas thing
3  also, but I don't know.
4 Q.  And do you know whether the classification system with
5  regard to Solomon and how he was classified and Burks
6  and how he was classified, do you know whether that
7  system worked according to whatever the policies and
8  procedures are supposed to be?
9 A.  I believe, and, in my opinion, even with this
10  unfortunate incident it did, because Solomon is
11  somebody that was in on a kidnapping charge I believe
12  and then Mr. Burks was on a child case of some sort,
13  and so they're both individuals that could be at risk
14  inside the general population, and we don't have a
15  crystal ball.  I mean, even as unfortunate as the
16  sexual assault is, say Mr. Burks had not been placed
17  in protection.  Say he had been placed in general
18  population.  He may have been murdered.  So, I mean,
19  maybe as unfortunate as the CSC is, he could have been
20  killed had he been placed somewhere else, and we'll
21  never get to know that because that didn't happen.
22  So, I mean, I believe that unfortunately sometimes you
23  do everything you can but bad things still happen and
24  you do the best you can.
25 Q.  Do you know if Solomon was placed in protective

ALAN  BULIFANT
September 27, 2021

Page 102

1   custody because he was at risk from others or whether
2   he was – had, for example, dozens of misconducts and
3   disciplinary charges and had been rock bossing people?
4 A.   I don't know how that decision was made.  I know he
5   had a kidnapping charge at that time.
6 Q.   Do you think classifications is basing its decisions
7   on charges as opposed to convictions?
8           MR. O'NEILL:  Objection to foundation.
9           You can answer if you know.
10 A.   My basic understanding of the classification system is
11   they take current charges, past charges, history, all
12   of those things into consideration, size, weight,
13   gender, religion, you know, height, weight, race.  All
14   of those issues are involved.
15 BY MS. PRESCOTT:
16 Q.   Okay.  So I guess you don't know what the thought
17   process was on how Solomon was placed in Ward 610; is
18   that right?
19 A.   No, I do not.
20 Q.   And do you know whether anybody looked at the
21   compatibility of Solomon and Burks when housing them
22   in the same ward?
23 A.   No.  I wouldn't know that.
24 Q.   Okay.  Do you know whether the classification system
25   has a way to assess whether someone is likely to be a

Page 103

1   sexual aggressor and by contrast whether another
2   person is likely to be a sexual victim?
3 A.   I have basic knowledge of a screening process that
4   takes place upon entry where they will ask questions
5   about like sexual orientation, things of that matter.
6   We do offer some alternative lifestyle housing
7   assignments.  So I do think that an effort is made in
8   those categories.
9 Q.   Okay.  So for sure there's an effort to say do people
10   have a certain lifestyle if they're transgender or
11   they may feel at risk because they're homosexual and
12   then they're going to be going into general population
13   with a bunch of men.  Putting those pieces aside, do
14   you know of a system to assess whether someone might
15   be particularly sexually violent with regard to the
16   people they're housed with?
17 A.   No, I don't.
18 Q.   Okay.  Do you know what, for example, MDOC does to try
19   to figure that out or the feds when someone comes into
20   their –
21 A.   No.
22 Q.   – care and custody?  So you're not aware that by 2016
23   because of rules that had issued in 2012 the federal
24   government, the state, and other, you know, other
25   jurisdictions were screening people specifically to

Page 104

1   determine whether they might be sexually aggressive
2   and sexually violent under PREA?
3 A.   I don't know how they do it.  I mean, I may have been
4   aware at some point that they're doing something, but,
5   I mean, I would say we're doing something, too, so, I
6   mean, I don't know what that they do.
7 Q.   But to get to like the something that you think that
8   you were doing, you've told us everything you know
9   about that; right?
10 A.   I have the basic knowledge and understanding.  I'm
11   sure there's more to it that I don't know of.
12 Q.   Fair.  But have you told me what you do know?
13 A.   Yes.
14 Q.   Okay.  Do you know who did the housing assignment of
15   Burks and Solomon as of the time of the rape?
16 A.   No.
17 Q.   Do you know whether Solomon or Burks got the handbook
18   or the pamphlet or saw the signs that we talked about
19   in the last few questions?
20 A.   Do I know for sure?  No.  They would have had to have
21   seen the signs at some point moving throughout the
22   jail.  But, I mean, there's – the handbooks are
23   issued by classification and registry.  They should
24   have gotten it, but can I guarantee you that they did?
25   I mean, I don't have that knowledge.

Page 105

1 Q.   Well, and just also like when those things were
2   instituted.  Like were they before or after them?
3 A.   Yeah.  I was at IA, so I'm not sure.
4 Q.   Okay.  Do you know if Mr. Burks was ever in an
5   assignment other than protective custody, like in
6   general population?
7 A.   I don't know that.
8 Q.   Do you know whether suicide risk played a factor in
9   where Solomon was placed into 610 as opposed to other
10   assignments?
11 A.   I don't know if it was necessarily involving him, but
12   I do know that suicide is something that is taken into
13   consideration.  You know, you try not to house inmates
14   alone because if there's nobody there to see them in
15   between rounds, it would be, you know, possible to
16   hurt yourself, so that is something that is taken into
17   consideration.  Do I know that that directly applied
18   to Solomon or Mr. Burks?  I do not.  But it is
19   something that is considered.
20 Q.   Okay.  Is your point about that someone might see it
21   that another inmate might scream, like, hey, man –
22 A.   Oh, he's hanging himself.  And I've had that happen.
23   I've had many times where other inmates have alerted
24   me to that.
25 Q.   And tell me about – like had there been a push in

ALAN   BULIFANT
September 27, 2021

Page 106

1   this era at least, you know, 2014, '15, '16, to
2   address suicide risk and that there had been some
3   unfortunate incidents of suicide in the jail?
4 A.   Yeah.  Like the years kind of run together.  I'm not
5   sure exactly what years they were.  But there were
6   some years like you'd get -- you wouldn't have any and
7   then you'd have some where maybe you had a few.  So
8   you would always try to redouble your efforts to
9   just -- you know, you wanted zero every year.  You'd
10   try everything to keep everyone safe, and so you
11   always look at it after an unfortunate incident and
12   try to take action.
13 Q.   Yeah.  But wasn't there something where there was an
14   investigation or a news report, either an outside
15   agency or some sort of report that Wayne County had an
16   alarmingly high number?
17 A.   Yeah.  I know at some point there was a news report.
18   I remember.  I don't know what year.  Some of that
19   stuff is sensationalized.  I mean, if you look at the
20   national average, the rate of suicide is far lower in
21   the Wayne County Jail than it is per capita
22   population.
23 Q.   Okay.  Yeah.  That's -- the reports don't -- I don't
24   know if they say that, but that's your understanding?
25 A.   Yeah.

Page 107

1 Q.   Okay.  So what is the -- what are the criteria for
2   assignment to the alternate lifestyle area?  Would you
3   be able to opine on that or comment on that?
4 A.   No.  I mean, I really don't know what goes into that
5   determination between classification and possibly
6   medical.
7 Q.   When you would be on IA, and I think you might have
8   testified to this, but is it -- even when you were in
9   IA, would there be times where you were ordered in for
10   overtime or coming into the floor security to cover?
11   I think you were talking about in the case of rounds
12   where we have to maintain a certain level of rounds,
13   and then you said sometimes you'd get ordered in?
14 A.   Yeah.  Now, IA was and is exempt from being ordered
15   into the jail on overtime.
16 Q.   Okay.
17 A.   You were allowed to volunteer, but there was only very
18   specific locations you were allowed to work.  You
19   weren't supposed to have any contact with other
20   inmates or other staff members.  So, for instance, you
21   would be like in a key control booth or a center
22   station booth, because the problem is, is you know, if
23   you did have some kind of interaction with an inmate
24   or a staff member or something, who's going to
25   investigate it?  Who's going to -- you know.

Page 108

1 Q.   I see.  So IA doesn't get ordered -- so what was your
2   point about -- were you saying you could get ordered
3   in to do overtime when you were like division
4   commanders over the jail divisions?
5 A.   Yes.
6 Q.   Is that what it would be?
7 A.   Yes.
8 Q.   Okay.  But during IA -- I think you answered my point
9   is that the IA people are not sort of like covering
10   those shifts --
11 A.   No.
12 Q.   -- with other floor security?
13 A.   If they do, it's voluntary and it's specific
14   locations.
15 Q.   Okay.  It's those more like isolated?
16 A.   Yes.
17 Q.   Okay.
18 A.   Now, as a jail commander I've been ordered in.
19 Q.   Makes IA have its positives.  There are certain
20   divisions, right, where you get a car and certain --
21 A.   Right.
22 Q.   -- where you don't have to do overtime.
23       Okay.  So when there is an allegation of
24   something less than an assault but that's still
25   sexual, like, you know, he keeps pressing me, like he

Page 109

1   keeps making comments, does that -- who investigates
2   that?  Is that IA or is that outside of IA?
3 A.   It depends on what it is.  Like, for instance, if an
4   inmate just said, hey, this guy keeps flashing me,
5   then that's when, you know, you'd write a JMS report
6   for jail discipline, have classification move that
7   inmate, see if, you know, different housing needs to
8   be made available or whatever.  If it's -- like let's
9   say somebody says, hey, I want you to have sex with
10   me, if you don't, I'm going to beat you up.  Now
11   you're bordering on potentially, you know, criminal
12   activity.  So generally in those cases, you know, a
13   prosecution rights form would be filled out.  If the
14   person wanted to prosecute, then that's IA.  If they
15   say no, I don't want to prosecute, I just want the guy
16   moved or get the guy to leave me alone, then that's,
17   you know, a jail discipline and moving issue
18   reassignment.  And, you know, one of the other things
19   we do, too, is we link them in JMS as enemies in the
20   facility.  That way they don't get housed together.
21 Q.   Okay.  So it sounds like that the prosecution rights
22   form and that prosecution rights decision sometimes
23   controls the channel or the flow of things because if
24   the inmate doesn't want to pursue it, then you're just
25   doing a management issue now of keeping people apart?

Page 110

1  A. That's possible, yes.
2  Q. Okay.  And then also the flashing.  Can I just make
3     sure I understand because these terms and these words
4     might mean –
5  A. Sure.
6  Q. So like I think of flashing as people exposing their
7     genitals; right?
8  A. Yes.
9  Q. Okay.  So have you encountered in your IA career or
10    maybe even just your floor security career that the
11    fear inmates will have over what could happen to them
12    in retaliation if they're considered a snitch?
13 A. Yeah.  That's why you take precautions to make sure
14    that that doesn't occur, and that's one of the things
15    that the PREA phone system and the tablet system has
16    helped alleviate.
17 Q. Have you over your career had inmates that were
18    attacked, rightly or wrongly, because they were
19    suspected of being a snitch?
20 A. When you say have I had them attack –
21 Q. Like have you seen the situation where the victim
22    alleges he's kicking my rear-end because he thinks I'm
23    a snitch?
24 A. Yeah.  Usually it's more from the outside world, like
25    this guy thinks I testified on this case in Detroit

Page 111

1     back on him ten years ago so he beat me up now.
2  Q. Okay.  Yeah.  I mean, people pass through your
3     facility pretty quickly in order –
4  A. Before Covid, yes.
5  Q. So within IA, when you have to have an inmate in to
6     talk about another inmate because of the fear of
7     retaliation or the risk of retaliation, that's why
8     you're trying to keep some like anonymity or keep them
9     separated, that sort of thing?
10 A. Yeah.  There was different things you can do.  I mean,
11    you'll have the floor officer pull them out for a
12    visit and you talk to them there.  You may have them
13    move him down to like a conference room or something
14    like in shift command so that nobody knows they were
15    there or even possibly taken upstairs to like a
16    recreation room that's not being used or something,
17    line-up room, you know, just something that makes it
18    sounds like they're going to something innocuous when
19    really they're going to talk to you.
20 Q. Okay.  And if someone gives evidence to IA about
21    another inmate, so inmate about inmate, do they then
22    get classified as enemies to keep them apart from that
23    point forward?
24 A. Yes.  And we have had instances where, like I said,
25    we – we've had inmates testify against officers as

Page 112

1     witnesses for us in Internal Affairs where we had to
2     have them placed in CAPIAS and protective housing or
3     we've even had people moved outside of our system to
4     other counties and things.
5  Q. What was the acronym?  CAPIAS?
6  A. CAPIAS.
7  Q. Is it – that's the C-A-P-I-A-S?
8  A. Yes.
9  Q. Can you tell me what that is?
10 A. It's a couple of holding cells that's behind our jail
11    medical on the second floor Division 1, and they're –
12    they're isolated cells where you can place a very high
13    risk or high visibility, you know, inmate.  Like when
14    Kwame Kilpatrick was in, that's where he was.
15 Q. I was going to say like if you're arresting a judge or
16    something, –
17 A. Yes.
18 Q. – they're going to be in that or if you're arresting
19    a, I don't know, hundred-year-old like Alzheimer's
20    patient that's super vulnerable or something, they can
21    be there?
22 A. Yeah.  We'd probably place them in the infirmary
23    instead if it's a medical issue, but…
24 Q. Okay.  So what's the point of the cell, then?  It's
25    for a non-medical reason that they need to be –

Page 113

1  A. Yes.  Yes.
2  Q. Okay.  And are those cells, like are those places
3     where they're kind of like medical can also see them
4     coming and going so that they – in case of suicide
5     or …?
6  A. They're very isolated, and we don't like using them
7     because of suicide, so like – like they don't get
8     used unless it's, like I said, a Kwame Kilpatrick or a
9     Matty Moroun or somebody that – it's got to be
10    somebody really high risk that we have to keep safe
11    from everybody else because that – the suicide risk
12    is a real concern.
13 Q. Okay.  So they're not in the medical area is what
14    you're saying?
15 A. The medical area is on the second floor, but they're
16    tucked off way in the back around a corner.
17 Q. Okay.
18        MR. O'NEILL:  Sarah, can we take a break
19    when you're ready?
20        MS. PRESCOTT:  Yeah.  We can take a break
21    any time.
22        (Recess taken at 11:32 a.m.)
23        (Back on the record at 11:37 a.m.)
24 BY MS. PRESCOTT:
25 Q. Is there only a certain group of people in IA that can

ALAN   BULIFANT
September 27, 2021

Page 114

1  pull in staff and question them or is like a Corporal
2  Lawson or anybody else when they get a file they can
3  go ask anyone they want anything they want?
4 A.  Yeah.  I mean, they have to have the union involved,
5  so the only other criteria is if it's a command
6  officer, I would like for there to be -- like if it's
7  a sergeant, I would like an IA sergeant to sit in.  If
8  it's above a sergeant, I would -- you know, usually I
9  try to sit in unless it was something very like not
10  directly involving them, just like they're adding a
11  little informational piece to it, and then if it's
12  above the rank of commander or deputy chief, there
13  would be times like I would have to have someone
14  higher rank sit in.
15 Q.  Okay.  So do you have to have the union involved any
16  time an officer is questioned by IA?
17 A.  It depends.  It depends on which union they're in and
18  what the Collective Bargaining Agreement says at a
19  specific time.  Like some unions do not allow you
20  to -- even if the officer instead of -- the command
21  officer's union was like that.  Even if you said I do
22  not want the union in, the union had a right to be in.
23 Q.  I see.  Okay.  So let's put it this way.  Unless the
24  officer specifically says I do not want someone from
25  my union and it's a floor security officer, does the

Page 115

1  union need to be involved?
2 A.  Yes.
3 Q.  Okay.  And unless -- whenever IA questions folks with
4  the union, does it always do a Garrity or is it just
5  sometimes?
6 A.  No.  And -- no.  It's not always Garrity.  It's
7  just -- usually it's when the union insists on it or
8  the officer because they won't answer your questions
9  normally.  And a lot of times they hurt themselves
10  with Garrity.  They don't -- they don't really
11  understand what it means.
12 Q.  Because then they still refuse?
13 A.  Well, Garrity only protects you if you've done
14  something illegal.  If you haven't, why would you need
15  Garrity?  Because the problem with Garrity is like --
16  like let's say an inmate says an officer assaulted
17  them, and so I would bring the person in and say did
18  you assault this person?  Well, I want Garrity.  Okay.
19  So I read you Garrity.  Did you assault this person?
20  No.  Why wouldn't you want me to know that without
21  Garrity?  Because now I can't tell the prosecutor that
22  I've interviewed you and you told me you didn't do it.
23  What happens is the prosecutor sees this inmate says
24  he assaulted him.  When I attempted to ask him about
25  it, he took Garrity.

Page 116

1 Q.  Invoked Garrity and now I can't tell you.  Yeah.
2  Okay.
3 A.  So yeah.  They don't understand it.
4 Q.  Okay.  Which is weird because they have a union.  But
5  okay.  So if there is an interview with an officer
6  with or without their union by IA, would there be an
7  expectation that a record would be made of it?
8 A.  Yes.
9 Q.  Even if it was two lines of I asked him if he was
10  there on that night, he said he had, you know, a sick
11  kid and he never was even there?
12 A.  Yes.
13 Q.  And then certainly if there was a Garrity, you would
14  also record and we also gave the Garrity warnings
15  and --
16 A.  Yes.  And there's a form.
17 Q.  And there's a form.  Okay.  And then are there rules
18  about how you get an officer?  That's just a floor
19  security officer, right?  Just like a corporal or
20  floor security officer that's not a sergeant or above.
21  Are there rules about what you have to do to get
22  through the union to get to have a sit-down with them?
23 A.  Oh, no.  I mean, basically like let's say I want to
24  talk to a day shift GL2 officer.  I call their shift
25  command and say can you send me officer so-and-so and

Page 117

1  a union rep, and so the officer will pick does he want
2  his local chief steward, does he want -- he's got the
3  right to excuse the chief steward and have the
4  president or vice president of the union instead, so
5  it's kind of like --
6 Q.  You're doing it right then, whoever's coming up right
7  then.  Okay.
8      Okay.  Do you know of any involvement of
9  Corporal Rogers with the events of the Solomon and
10  Burks rape?
11 A.  No.
12 Q.  There's a Corporal D-Z-I-A-D-O-W-I-C-Z.  Do you know
13  of any information or observations they had about the
14  events leading -- like the night or two before the
15  rape or the night of the rape?
16 A.  No.
17 Q.  How about a Corporal O'Connor?
18 A.  No.
19 Q.  With an O.  Three O's actually.  How about Officer
20  Piazza, P-I-A-Z-Z-A?
21 A.  No.
22 Q.  How about Officer Clark?
23 A.  No.
24 Q.  How about a Corporal Scott?
25 A.  No.

ALAN   BULIFANT
September 27, 2021

Page 118

1 Q.  How about a Corporal Spencer with a C?
2 A.  No.
3 Q.  How about a Corporal Thorpe with an E?
4 A.  No.
5 Q.  There's something that the county provided – or
6     excuse me, sorry, the Sheriff's Department provided
7     that these deputies are believed to have information
8     regarding the observations they made during their
9     shifts in the day or two before the rape.  You don't
10    know anything about that?
11 A.  No.
12 Q.  Okay.  Your department is able to pull I think you
13    said like housing information about who – what
14    prisoners are in a particular area –
15 A.  Yes.
16 Q.  – when like a sexual assault is alleged to occur;
17    right?
18 A.  Yes.
19 Q.  And then it's not unheard of or – because I've seen
20    it in a number of interviews where, you know, maybe
21    they just pass out the blank form and it's like what
22    did you see and different inmates will say, you know,
23    he did this to this guy or I didn't see anything.
24    That's pretty common to hand out witness statements to
25    the inmates; right?

Page 119

1 A.  Yes.
2 Q.  And sometimes it's done when the inmates don't know
3     anything and they write I didn't see anything; right?
4 A.  Yes.
5 Q.  The county provided – the office – the sheriff's
6     office provided a list of inmates who were on the same
7     floor or cellblock or nearby adjacent cellblock as the
8     Solomon and Burks rape happened.  I can – I'm going
9     to show you – I'm not going to mark it because I
10    printed it funny, but I'm going to show you 34 names.
11    I'm not going to read them all into the record, but 34
12    names.  They start Sims and end with Powell.  Can you
13    just tell for the record whether you've got that list
14    of names now in front of you?
15 A.  Yes, I do.
16 Q.  Okay.  So these were names that the county provided
17    that may have information about this matter.  Just
18    take a second and look at if and let me know if you
19    know of any information about any of them being
20    questioned about the rape.
21 A.  No, I do not.
22 Q.  Even if you know whether they were questioned or not,
23    you don't have anything that tells you they do or
24    don't have information one way or the other, do you?
25 A.  No.  Not in front of me.

Page 120

1 Q.  Well, in your memory or –
2 A.  No.
3 Q.  Okay.  That's fair.  Are you able to testify about
4     whether there was knowledge on the part of the
5     department in August of 2006 whether my client,
6     Mr. Burks, was at serious risk of attack from other
7     inmates?
8 A.  In 2006?
9 Q.  Did I say that?  2016.  Thank you.
10 A.  No.
11 Q.  Are you able to testify whether there was knowledge on
12    the part of the department that Mr. Solomon was an
13    imminent risk to the people that he was bunking with
14    or assigned in the same area with?
15 A.  No.
16 Q.  Do you know whether there is any different level of
17    supervision in Ward 610 as it being a protective
18    custody unit than there is in like a general
19    population setting?
20 A.  It's – it's the same level of supervision.  You're
21    just isolated.  There's less people you have contact
22    with.  There's three cells instead of, you know, ten.
23 Q.  Fair enough.  So do you know whether there's any
24    effort to – do you know whether sometimes people are
25    put into Ward 610 or other protective custody areas

Page 121

1     because they've become dangerous and difficult to
2     manage in general population?  In other words, they're
3     problematic to others in general population?
4 A.  I don't have specific knowledge of that.  That's more
5     of a classification issue because, I mean, I know that
6     we have disciplinary wards and we also have maximum
7     security wards.  So, I mean, there are ways to manage
8     somebody who's difficult.  But then if it's a mental
9     health issue, I mean, you can do that through mental
10    health on the fourth floor, so . . . I don't know if
11    they would use it for that reason.  That's not
12    something I would do.
13 Q.  You gave me an example of where there might be a
14    flasher, and I know you're not saying that happened or
15    that was just an example, and you said that in that
16    case it might be that the floor security staff could,
17    you know, kind of pull out the guy who was complaining
18    from the guy who was alleged to do it.  Is the floor
19    security staff authorized to act that quickly, though?
20    Like do they have to involve other people or are they
21    able to do that?
22 A.  Yeah.  I mean, let's walk all the way through it.
23    So say, hey, hey, help on Ward 505, this guy just exposed
24    his penis to me.  I'm not going to wait and make a
25    bunch of phone calls.  I'm going to pull the guy out

ALAN   BULIFANT
September 27, 2021

Page 122

1   that exposed his penis and remove him from the housing
2   unit and secure him in a holding cell, so now I've
3   removed the threat, I've done this or that.  Now, as
4   far as in terms of writing a report, I've got to
5   notify the sergeant because he's got to approve the
6   report.  I've got to notify classification for a new
7   housing assignment.  I've got to refer it to the jail
8   compliance department so that a disciplinary hearing
9   can be done.  So, I mean, yes, you take action
10  immediately, but after everybody's safe and secure,
11  then you have to notify a bunch.
12 Q.  Are there places on every ward or cell – that was
13  nonsense.  Strike that.
14        Are there places on every floor or
15  accessible to floor officers where they can, you know,
16  pull someone out for a temporary spot?  I think I've
17  seen that marked like with a star on the housing
18  placements or something.
19 A.  I don't know about a star in the housing placements,
20  but like you have several different options, so like
21  – a like a – primarily you can always say lock down
22  and lock everybody in their individual cells because
23  they're all single bunked in Division 2.  Another
24  option is you could get somebody locked in – like so
25  say I have two inmates fighting.  I can't get them all

Page 123

1   to lock down because they won't, but I can get one of
2   the combatants to step into a sally port and close
3   that side and I can lock them doors.  I don't want to
4   pull him out and have the guy start fighting me, but
5   I've got him isolated from everybody else, so I can
6   leave him there.  The other issue is you could pull
7   them out and put them into the hallway holding cell
8   areas where you can isolate them there if they're
9   compliant or if you're able to get handcuffs on them
10  or whatever.  So the officers actually do have – they
11  do have options available to them.
12 Q.  Do you know whether Burks asked for help at any point
13  from Williams or Bell or Seals or Lee?
14 A.  No.
15 Q.  You know you're going to be asked to testify and give
16  your opinion about why specific to Burks and Solomon
17  the county fulfilled its constitutional duties.  What
18  will be your answer on why the jury should say it did?
19 A.  Because upon being notified about it they took action
20  to get him removed from the housing assignment, get
21  medical attention, get investigations launched into it
22  and a criminal prosecution and conviction.
23 Q.  Okay.  Do you know of any facts that suggest that the
24  scenario with Burks and Solomon, the rape that
25  occurred and then the following steps, that those

Page 124

1   steps happened because of anything unique to them or
2   that their situation is in some way about it being
3   Mr. Solomon and Mr. Burks as opposed to just any two
4   people?
5 A.  No.
6 Q.  Do you know of any prosecution of any officers that
7   had anything – were present, aware, near anything to
8   do with the rape of Solomon – of Burks by Solomon?
9 A.  Do I know the prosecution of any officers like –
10 Q.  So any officer that had anything to do with whether it
11  was an investigation, whether they were floor
12  security, whether they were follow-up, whether they
13  were there, you know, before and set up the scenario,
14  anything to do with Burks's rape by Solomon.  Have any
15  of those officers ever been prosecuted for anything?
16 A.  No.
17 Q.  Has any prosecution of any officer that you do know of
18  have anything to do with the rape of Solomon – of
19  Burks by Solomon?
20 A.  No.
21 Q.  Other than – we know Solomon was prosecuted.  Do we
22  know of any other inmate whose prosecution has
23  anything to do with Burks's rape by Solomon?
24 A.  No.
25 Q.  Was there any pattern of behavior that was played out

Page 125

1   and prosecuted that related to the Burks
2   Solomon – that, you know, your department brought to
3   bear on investigating Burks's rape by Solomon?
4 A.  Not that I'm aware of, no.
5 Q.  Do you know what observations Williams, Bell, Seals,
6   or Lee made on the night of the rape?
7 A.  No.
8 Q.  Do you know how long they spent on their rounds
9   or …?  I mean, I know it's knowable and we have
10  those records, but do you have any information about
11  that?
12 A.  No.
13 Q.  Do you have any opinions about how long they spent on
14  their rounds or whether they were good or bad rounds?
15 A.  My opinion is they met the minimum requirement for
16  what they're supposed to do at the very least.
17 Q.  Based on knowing what the times of their rounds were?
18  Is that what you're basing that on?  Or is there some
19  other information you have?
20 A.  I'm basing it on the totality of all of this that I've
21  been through.  I mean, at some point if there had been
22  discipline or anything, this would have come up
23  through all these depositions and question and
24  paperwork and everything, and I have – I've never –
25  nobody's ever hinted at that or anything, and I'm not

ALAN  BULIFANT
September 27, 2021

Page 126

1 aware of any discipline or anything, so …
2 Q.  So it's the absence of a disciplinary step or –
3 A.  Information of anything negative.
4 Q.  Okay.  Do you know if anyone's ever assessed whether
5    the two of them are doing rounds that really give them
6    an opportunity to observe signs of risk or stress
7    of – you know, the signs that someone can be
8    imperiled and threatened and they're afraid?  Do you
9    know whether they've been trained on those techniques?
10 A.  We have training that's covered in our suicide
11    prevention training.  It's covered in the PREA
12    training.  It's covered I'm sure in multiple other –
13    probably first aid, CPR.  It's covered in multiple –
14    there's mental health training that everyone takes.  I
15    don't know if you've ever met Corporal Judy Bell, but
16    she's a very experienced officer, like 35 plus years
17    probably in the agency.
18 Q.  Do you have any information or facts about what
19    training any of the four of them got prior to
20    August 2016?
21 A.  I don't have that information.
22 Q.  Have you ever walked rounds with any of the four of
23    them in a supervisorial, like evaluating their
24    demeanor with prisoners or whatever?
25 A.  No.

Page 127

1 Q.  Do you know if anyone has above them, command staff?
2 A.  I'm sure there's been a sergeant or lieutenant or
3    somebody at some point who has.
4 Q.  Okay.  Not something that you know of sitting here?
5 A.  Right.
6 Q.  Is there any way to know how many times sexual
7    assaults are going unreported in the jail maybe from
8    fear of being considered a snitch or someone's being
9    threatened?  Is there any way to tell?
10 A.  No.  But I would be confident that at Jail Division 2
11    with single cell bunking is extremely difficult
12    because I can see a scenario if you're double bunked
13    or during the middle of the night with nobody around
14    you can do it, but at Division 2, I mean, the housing
15    units are so small.  It's so cramped.  You're single
16    celled.  So the doors are open if you're out together.
17    There's no two people in the cell together on lockdown
18    or anything.  So, I mean, anything that goes on in
19    that cell, other people are going to know about it.
20    And I know that it would be easy to say, well, they
21    wouldn't tell, but you have to realize if you're the
22    guy that sees this other guy get sexually assaulted,
23    you may have the thought in your mind of next week
24    it'll be me.
25 Q.  Right.

Page 128

1 A.  So I don't want to let this go on.  I don't want to
2    let this happen.  I've got to – and with the tablets,
3    now you can send, you know, grievances that nobody
4    else can get access to, kites, the PREA hotline, their
5    visits.  You know, you get pulled for recreation or a
6    medical appointment or whatever.  I mean, there are
7    ample opportunities to report activity.  You could
8    pass a note when you ask for your razor or the mop
9    bucket or something.  I mean – it's –
10 Q.  You have not been PREA coordinator; right?
11 A.  No.
12 Q.  And in terms of – are you able to testify – I mean,
13    we have talked to Mr. Davis.  But are you planning to
14    testify about the activities of his work and how he's
15    implemented PREA or …?
16 A.  Director Davis's?
17 Q.  Yeah.
18 A.  No.
19 Q.  Do you have any insight on how he has run things with
20    setting up training or coordinating training for
21    staff?  Is that something you plan to testify about?
22 A.  If asked, I would be offered – I would be willing to
23    provide that Director Davis is a retired deputy chief
24    in the Wayne County Sheriff's Office, and when he was
25    a sergeant, I worked as an officer under – underneath

Page 129

1    him, and in his time with the sheriff's office, I
2    mean, he was lieutenant over the training unit.  He
3    was a commander at the jails and at the courts, deputy
4    chief.  He's been – he's been involved in training
5    throughout most of his career.  He's been involved
6    with, you know, implementing systems and monitoring
7    and supervisory and all of those types of activities.
8    He's very qualified in that area.
9 Q.  Okay.  Do you have a set of facts that you're basing
10    any particular opinion on based on what he has done on
11    PREA or sexual assault training?
12 A.  I mean, I had to work with him when I was the captain
13    of Internal Affairs.  We would work together on the
14    PREA statistics and things like that.  So, I mean, you
15    know, he was reporting the statistics at certain
16    times.  He took over that role and that duty, and we
17    would look at different cases and things like that.
18    So I had had some interactive experience with him.
19 Q.  Okay.  Do you know when he ordered training or what
20    the training was for floor security?  Do you have any
21    facts on what he directed and when?
22 A.  Yes.  Now, I can't provide the specific dates, but
23    even to this day he will send out mass emails that
24    says, hey, jail PREA captains, which are captains that
25    are designated to be PREA, it is time for the annual

ALAN BULIFANT
September 27, 2021

Page 130

1    training, here is the website, I need everybody to
2    pick a class from these three categories or however
3    many categories, print out their certificates, they
4    all need to be collected and sent back to me on a
5    specific date. And so like to this day he still
6    coordinates and collects all of that, and I get the
7    emails from him, but I don't know when. I mean, I
8    know we've already done it for this year.
9  Q.   And that effort – are you planning to testify that
10   that effort of getting everybody trained and tracking
11   and paying attention to their certificates and the
12   classes they're taking that's showing appropriate
13   necessary care for avoiding sexual harm to prisoners?
14 A.   I didn't believe that I was going to be testifying
15   about that. I said if I was asked my opinion, these
16   are the things that I would say and I would say that.
17 Q.   Okay.
18 A.   I mean, his credentials will speak for themselves.
19 Q.   Okay. But you don't know when he – like, for
20   example, when the floor security staff got ordered,
21   you must have training by X the first time that he was
22   running this?
23 A.   No. I mean, like if we searched the emails, I may
24   find the emails, but … From when I was told to do
25   it.

Page 131

1  Q.   Do you know whether there were PREA managers prior to
2    August of 2016?
3  A.   I don't know when they were implemented.
4  Q.   Okay. And do you know when they did get implemented
5    whether their duties and jobs were the same as they
6    are today? Whenever that – you know, I know you
7    don't know the date, but …
8  A.   To answer that, I want to say that their duties
9    and jobs have always been the same because we've
10   always treated sexual assaults in a very serious
11   manner. By designating them PREA managers, the
12   captains, I believe it was kind of one of those
13   things, hey, let's redouble our efforts, let's remind
14   ourselves, let's remind the staff, let's make sure –
15   you know, it's kind of like when you have an uptick in
16   the suicides that we spoke about earlier, we decide,
17   hey, we're going to really reevaluate and really
18   buckle down on this, and I think that's what the PREA
19   manager designation did. So I would like to say that
20   their duties are the same. It's just been a
21   redoubling of the efforts.
22 Q.   Okay. And their duties are the – these are people
23   who are captains; is that right?
24 A.   Yes. Um-hmm.
25 Q.   And so how about are you able to testify as to

Page 132

1    whether – how the captains that are designated as
2    PREA managers as to the steps they've taken, when,
3    what, where, your opinions of the steps they've taken
4    on PREA training or any kind of training on sexual
5    assault?
6  A.   If asked, I would offer that they help coordinate when
7    the notices are sent out that training be conducted.
8    They help coordinate that everybody's notified of it,
9    everybody completes it, prints out the certificates,
10   they're all collected, they're all forwarded on for
11   record-keeping, and that when he or she is reviewing
12   reports investigatively that she's keeping PREA – or
13   he or she is keeping PREA in mind and making sure that
14   the steps and processes are being followed, in
15   addition to the other maintenance issues all done.
16   Like, for instance, if you have a phone that's down on
17   a housing unit on a ward, well, guess what? Your
18   phone's not just down. Your PREA hotline is down. So
19   you need to make sure that you get that up and running
20   because that is a PREA hotline possible notification.
21   You know, same thing with the tablets, you know, so –
22   so, again, it's – these are things we've all done
23   before. We're just going to make sure that we're even
24   focused on them even more.
25 Q.   Okay. And so let's see if I under – so you know

Page 133

1    there's a policy of turning off the phones at night;
2    right?
3  A.   After lockdown. Yep.
4  Q.   Well, is it after lockdown?
5  A.   Yes. Well, it's 9:00; right? Lockdown's at ten. So
6    no. It's one hour before lockdown.
7  Q.   Okay. So does that still happen?
8  A.   Yes. It should.
9  Q.   And in terms of when someone got – anything else that
10   you are prepared to offer an opinion relative to
11   the PREA managers working on training or anything to
12   do with sexual assault?
13 A.   No. I think we've covered it.
14 Q.   All right. Do you know whether the policy on sexual
15   assault misconduct, prevention, and intervention, it's
16   14.17, do you know whether that policy contains or
17   reflects each of the requirements of federal law on,
18   you know, for example, PREA?
19 A.   When Deputy Chief Larry Hall wrote the policy
20   originally, he is a lawyer, so that was one of the
21   criterias that he was making sure that it followed
22   through, and when him and I would have discussions and
23   conversations about that, those were issues that he
24   was in line with. Now, the subsequent – you know, if
25   there had been changes to that policy or order for

ALAN   BULIFANT
September 27, 2021

Page 134

1  anything, you know, I don't know what may have been
2  omitted.
3 Q.  Okay.
4 A.  But I know that was in consideration at the time.
5 Q.  Okay.  And so if I've understood, and I just want to
6  make sure I understand, so Deputy Chief Hall, who's a
7  lawyer, he would have been a person who paid attention
8  to the law, and so that's – and that's the best you
9  can kind of tell me about whatever the policy would be
10  lined up next to whatever federal or state laws?
11 A.  Yeah.  Unless you give me the federal, state law
12  and/or policy and let me go through it line by line
13  over several hours.  That would be the only way to –
14  and even then, I mean, I can only give you my
15  layman's – I'm sure that if I got seven lawyers in a
16  room, all seven would have a different opinion on what
17  it means.
18 Q.  Well, let's put it this way.  That's not been
19  something – alignment of the policy to state and
20  federal law is not something that has ever been part
21  of your lookout or your duties that have been assigned
22  to you; right?
23 A.  Correct.
24 Q.  And so, for example, if PREA says that it's important
25  to identify specifically people who are sexually

Page 135

1  aggressive and separate them from people who are
2  sexually vulnerable in housing, Mr. Rommel says we
3  don't have flags for that, could you testify about
4  whether the policy lines up with federal law on that
5  point?
6 A.  I believe the PREA coordinator would be better.
7 Q.  Have you ever had anything to do with the PREA
8  Resource Center?
9 A.  I think we've done some training through them, some
10  online training.
11 Q.  Okay.  So you think you might have done – so when you
12  say we might have done training, you mean like you
13  might have taken modules yourself?
14 A.  Yes.
15 Q.  Okay.
16 A.  I've definitely taken modules.
17 Q.  Fair enough.  Through the PREA Resource Center?
18 A.  Yeah.  I thought I called it NCIC or something
19  earlier, but – the NICIC Center or something, but
20  yeah, I recognize the PREA Resource Center title.
21 Q.  Let me just understand it this way.  Have you had any
22  role as a liaison for the department to the PREA
23  Resource Center to obtain resources, evaluate
24  resources, implement resources?
25 A.  No.

Page 136

1 Q.  And do you know who has been doing that, if anyone?
2 A.  I believe the PREA coordinator.
3 Q.  Okay.  Do you have dates or exactly what steps that
4  that would have happened?
5 A.  Not with me, no.
6 Q.  Okay.
7 A.  Because we have our own virtual online learning, and
8  the PREA is outside of our own virtual.  So, yeah,
9  it's through an independent party.
10 Q.  Okay.  It sounds like you – did you ever fill out any
11  of the quarterly reports that would go, for example,
12  to the Bureau of Prisons?
13 A.  There was a time that I was doing it, and then when
14  Director Davis took over, he took it over at a certain
15  point where I would just pull the files and give them
16  to him.
17 Q.  Okay.  Do you know when that transition happened?
18 A.  It was in my later time in IA, and was the PREA
19  coordinator after Chuck Pappas, so it would have been
20  my later – my later stages in IA.  I don't know exact
21  dates or years.
22 Q.  Okay.  And so were you able – do you have the
23  decision-making that you would do on, okay, this
24  matter here, the Smith file, qualifies in this
25  category versus that category or would that be

Page 137

1  something Davis would be deciding?
2 A.  If he was sending the report, he would be deciding
3  that.
4 Q.  What about the time before he took over and that you
5  were doing it?  Were you with someone else telling you
6  how to categorize or were you deciding that?
7 A.  Yeah.  There were times that I would fill it out and
8  discuss it with DC Guy and then it would be sent up.
9 Q.  Okay.  And the things that you were reporting to the
10  Bureau of Prisons, would those all be things that IA
11  had investigated?
12 A.  This is a more complicated issue because IA is the
13  de facto keeper of the records for the agency, so even
14  if a case file is left's say a record only, a
15  non-prosecutorial incident, it is still sent to IA and
16  filed and copied there.  So we have it.  It was not
17  investigated.  It was immediately closed upon
18  receiving it.  But we actually have the information to
19  report it because the jail has no system for that type
20  of activity.
21 Q.  Okay.  So let's say I'm a guy and I'm like that guy is
22  flashing me and I'm going to – I'm sure they get
23  angry about that.  You need to get him apart from me.
24  Does that become a record that goes to IA?
25 A.  Yeah.  It could be.  Now, and keep in mind flashing

ALAN   BULIFANT
September 27, 2021

Page 138

1    could be a crime, but usually, I mean, it's a
2    misdemeanor.  These guys are facing hard time.  So
3    they usually would sign like a prosecution rights
4    form, hey, I don't want to prosecute, just move the
5    guy.  So then that comes over as a record only and
6    it's just filed, but technically there is something
7    that could still fall beneath the PREA guidelines.
8  Q.  Okay.  What if it's just like, you know, he's pushing
9    me, he's pressing me for sex, get him away from me –
10   I guess you testified earlier some people aren't –
11   they aren't given that assignment or the prosecution
12   rights form.  Does that then have a record in the
13   record only category?
14 A.  It depends on the incident and the situation, because
15   without a prosecution rights form, then I want a
16   detective to go and ask this person what happened, or
17   you send it back to the jail and say, hey, you need to
18   go back and do a prosecution rights form on this.  You
19   know, I mean, it depends on the case.
20 Q.  What if it's not a crime?  There's no doubt there's no
21   crime.  It's just sexually inappropriate.
22 A.  Yeah.  Record only.  We file it.
23 Q.  So what gets generated?  So the guy's like this guy is
24   just asking me for sex.  There's no crime.  I mean,
25   maybe that's solicitation.  And the guy is like

Page 139

1    talking about sex and talking about how he likes to
2    have – I don't want it, you know, he's weirding me
3    out.  What happens – what's documented –
4  A.  What happens with like PREA is you would write a
5    report, a JMS report, because it's referred for
6    discipline or even if it's referred for information
7    only, and then like typically we get those through the
8    PREA hotline, which go to Internal Affairs or through
9    the grievance system, which goes to compliance, so
10   what happens is is we get notified by the compliance
11   person or the IA person.  Hey, so-and-so just called
12   the PREA hotline or so-and-so just sent this
13   grievance.  Somebody's got to go up and interview him.
14   Usually we send a sergeant out.  So the sergeant goes
15   out, hey, what happened?  Oh, nothing.  I just want
16   this guy to leave me alone.  So you write that quick
17   two-liner out.  Hey, we interviewed this guy because
18   he picked up the PREA hotline.  He says that this guy
19   exposed his genitals to him.  He just wants to be left
20   alone.  He was never physically touched, assaulted,
21   doesn't need medical, doesn't need mental health or
22   nothing.  We just gotta move this guy.  Contact
23   classification.  New housing assignment.  So PJ83, JMS
24   report.  Classification.  You move the guy.  Record
25   only.  No investigation necessary.

Page 140

1  Q.  Do you know whether a form was made on Solomon to say,
2    you know, classification, you need to reclassify this
3    guy because he's probable cause sexually assaulted
4    somebody?
5  A.  It wouldn't be a form.  It would be the report, the
6    JMS report.
7  Q.  Okay.  Do you know of any way that classification has
8    to like up someone's classification or change their
9    management because of a sexual assault even happening
10   within your own facility?
11 A.  I mean, they can review people's classification
12   levels.
13 Q.  Sure.  And, in fact, they have to; right?  Like every
14   so often?
15 A.  Every so often or as a command officer or even as an
16   officer or whatever I would feel comfortable with,
17   hey, can you look at so-and-so and see, you know.
18 Q.  But do you know whether there's like a weighted
19   formula or a formula or a check box or a flag that
20   says, hey, this guy has committed a sexual, you know,
21   violent or even just a flashing situation in our
22   cells, we've got to manage him differently?
23 A.  Yeah.  I don't know how any of that's done.  They have
24   a system, but I don't know what it is.  Because I know
25   they used a Northpointe computer system at one point.

Page 141

1    They've had a confinement file system.  So I don't
2    know what it is.
3  Q.  Do you know anything about the training that's
4    mandated at the academy specific to sexual safety,
5    whether it's PREA or just more generally sexual
6    safety?
7  A.  So when you say the academy, do you mean the police
8    academy we send to a new jailer's training person
9    who's going to operate in the jail or do you mean
10   somebody we send to Schoolcraft College to become a
11   certified state licensed police officer on the street?
12 Q.  Let's start with the new jailer training.
13 A.  New jailer's training, yes.  They teach PREA in
14   jailer's training because those are officers that are
15   going to work in our jail specifically.
16 Q.  Okay.  And do you know when they started teaching PREA
17   concepts specific to –
18 A.  No.
19 Q.  – your academy?  Okay.  And then do you know whether
20   when they did do that there was some other module that
21   rolled out with – parallel to the training of the
22   people who had already been to the academy?
23 A.  I don't know.
24 Q.  Okay.  And then the second group you said is that
25   there's also someone could go to Schoolcraft for the

ALAN  BULIFANT
September 27, 2021

Page 142

1   state – you know, state licensed position?
2 A.   Yeah.  Now, they're training people to be police
3   officers on the street.  I doubt they cover PREA.
4 Q.   Okay.
5 A.   Because they're doing traffic stops and stuff.  That
6   type of stuff.
7 Q.   Fair.  Although there was a case I think it was in
8   2017 where a guy was asking women for sexual favors
9   when he would pull them over and stop them and they
10   caught him.
11 A.   Yeah.  I mean, that's a crime, but, I mean, the Prison
12   Rape Elimination Act is designed for prisons.
13 Q.   Prison.  Right.  Yeah.  All right.  And have you ever
14   had any role in like developing the modules at the new
15   jailer training or on sexual safety specifically?
16 A.   No.
17 Q.   And have you ever like sat through the modules
18   specific to sexual safety at the new jailer training?
19 A.   No.
20 Q.   Okay.  And you don't know when Williams, Bell, Seals,
21   or Lee took any training at all let along PREA
22   specific training; right?
23 A.   I don't have that information.
24         MS. PRESCOTT:  Do you mind if we take five?
25   I'm going to look at my notes.  I think I'm done, but

Page 143

1   I just want to check my notes.
2         MR. O'NEILL:  Yeah.
3         (Recess taken at 12:22 p.m.)
4         (Back on the record at 12:30 p.m.)
5         MS. PRESCOTT:  Okay.  We can go back on.
6         (Marked EXHIBIT 1 at 12:30 p.m.)
7 BY MS. PRESCOTT:
8 Q.   I'm going to hand it to your lawyer first.  It's not
9   because I'm being rude but so he can look at it.  This
10   is what I'm going to mark as Exhibit 1.  Take a look
11   at it.  Tell me when you've had a chance to do so.
12 A.   Do I need to read the parts about Director Davis or
13   just my own?
14 Q.   Anything you're comfortable with.  I wasn't going to
15   ask you specific questions about that area, but . . .
16 A.   Okay.
17 Q.   So that document is signed by – it's not signed by
18   you.  It's signed by Mr. O'Neill.  I'm just wondering
19   if you've seen this document before.
20 A.   Yes, I have.
21 Q.   Okay.  And when did you first see it?
22 A.   It was the Friday – not last Friday.  The Friday
23   before.
24 Q.   Okay.  And let's see.  We're on a Monday, so it would
25   have been – let me look at the calendar.

Page 144

1 A.   The 17th maybe.
2 Q.   Okay.  The 17th was the last Friday.
3 A.   I think -- I think it was Friday the 17th.
4 Q.   Okay.  And then did you write the words on the paper?
5   Like did you type -- even if you didn't put them into
6   this format, did you write any of this content?
7 A.   We had had a conversation and then he wrote it or I'm
8   assuming he wrote it.
9 Q.   Okay.  So the answer is you didn't write this?
10 A.   Correct.
11 Q.   Okay.  And have you ever seen it in this -- I mean,
12   have you seen it in this format?  So this -- with this
13   like header and signature line and all that?
14 A.   Yeah.  I believe this is the same.
15 Q.   Okay.  Do you know of any Internal Affairs
16   investigation that would have reviewed a
17   classification decision at any time or said anyone
18   sort of fell down on the job relative to how they
19   would classify somebody?
20 A.   No.  As I sit here I do not.
21 Q.   I should have asked you one more thing about
22   Exhibit 1.  I'm sorry.  Is there anything in it that
23   you see that you would change or be incorrect about
24   your -- the portion that comes under your name?
25 A.   The one -- the only thing is you had asked me earlier

Page 145

1   if Mr. Burks was ever in general population.  I told
2   you I didn't know.  And it says that Mr. Burks was
3   never in general population at the Wayne County Jail.
4   That would be the only thing that . . .
5 Q.   Okay.  How about anything that you would add to this
6   exhibit?
7 A.   No.
8 Q.   Okay.  Do you think that the Wayne County Jail has
9   needed a culture change to align itself to what PREA
10   requires in terms of protecting people from prison
11   rape?
12 A.   No.  No.  We have some of the most violent criminals
13   in the country, if not the world, and, you know, other
14   agencies when we talk to them and discuss to them and,
15   you know, they hear how many homicide suspects we have
16   and other things of that nature, they can't even
17   fathom how we're able to maintain the control that we
18   do, especially in light of we were supposed to be in a
19   new jail back in 2012 that was never completed, and
20   with the national staffing issues and everything else
21   that's going on, we actually do an incredible job with
22   what we have.  I mean, that jail was built in the
23   1920s.
24 Q.   Do you think it gets in the way of your ability to
25   keep prisoners safe?

ALAN  BULIFANT
September 27, 2021

Page 146

1 A.   Oh, a newer facility would absolutely make it easier
2      and aid us and help us with being able to do that.
3 Q.   How about the fact that the county controls what you
4      can offer to people to pay them?  Do you think that
5      that gets in the way of your ability to recruit and
6      get the right numbers that keep people safe?
7 A.   I can't necessarily say that that's the case because
8      when I wanted to be a cop it wasn't because I ever
9      thought I was going to get rich.  I think that there's
10     a cultural shift in the country.  Some of it is
11     deserved, some of it is media manipulated, and some of
12     it is perceived.  We have some work to do, and I don't
13     mean Wayne County.  I mean law enforcement in general.
14     But society has some work to do too.
15 Q.  Were you ever present when Mr. Napoleon would say that
16     the way that the county executives would control the
17     pay scale would interfere with his ability to bring
18     people on and the numbers that are needed?
19 A.  I've heard the sheriff say that, yes.
20 Q.  Do you agree with that?
21 A.  To an extent.  I mean, like I said, when I wanted to
22     be a cop, it wasn't because I thought I would get
23     rich.  I think the benefits has more to do with it
24     than the pay scale, the cost of the medical insurance
25     and the pension situation.

Page 147

1 Q.   But weren't the benefits and the pay better for people
2      like you when you came in versus people today?
3 A.   Yeah.  Yeah.  They sure were.
4 Q.   Do you think that the county has devoted the resources
5      to the sheriff's office and specifically to the jail
6      that it really needs to maintain its operations?
7           MR. O'NEILL:  Objection.  Foundation and
8      outside the scope of this expert's planned testimony
9      at trial.
10          You can answer if you can.
11 A.  I was on the bargaining team for the command officers
12     union when I was a captain, so I had a chance to sit
13     down with the county and negotiate some of these very
14     issues right before we were imposed upon from the
15     consent decree.  And has the county been able to fund
16     us the way that I would like to see us funded?  No.
17     But the county had to fund us in the way that they
18     were able to fund us, and the simple fact of the
19     matter is is the money didn't exist.  They didn't have
20     it, so they couldn't give it to us.  And because of
21     some bad decisions that were made previously in the
22     past regarding the pension system and things of that
23     nature, it wasn't sustainable, and I would rather see
24     them make the cuts that they did and you, know, go
25     through a bankruptcy or something and possibly lose

Page 148

1      them altogether.  So I don't believe that they had the
2      money and just kept it from us.  I believe that it
3      wasn't possible to do business as usual.
4 BY MS. PRESCOTT:
5 Q.   Do you remember -- were you ever part of the sheriff
6      having to in a court of law go back and forth with the
7      county about mandates that he was up against the
8      constitution and the consent decree?
9 A.   No.  I was never part of that.
10 Q.  You weren't part of that.
11          MS. PRESCOTT:  Okay.  Those are my
12     questions.  Appreciate it.
13          MR. O'NEILL:  I have nothing.  Thank you.
14          MS. PRESCOTT:  Thank you for your time.
15          THE WITNESS:  Thank you.
16          MR. O'NEILL:  I'll take an electronic copy,
17     please.
18          (The deposition was concluded at 12:39 p.m.
19          Signature of the witness was not requested by
20          counsel for the respective parties hereto.)
21
22
23
24
25

Page 149

1           CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN )
3              ) SS
4 COUNTY OF WAYNE   )
5
6           I, Cheri L. Poplin, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10     reduced to computer transcription; that this is a
11     true, full and correct transcript of my stenographic
12     notes so taken; and that I am not related to, nor of
13     counsel to either party nor interested in the event of
14     this cause.
15
16
17
18
19
20
21
22          Cheri L. Poplin, CSR 5132, RPR, CRR
23          Notary Public,
24          Wayne County, Michigan
25 My Commission expires:  August 21, 2025