# EXHIBIT D

2014 WL 6911574

KeyCite Yellow Flag - Negative Treatment

Distinguished by Horter Investment Management, LLC v. Cutter, S.D.Ohio, June 16, 2017

593 Fed.Appx. 506

This case was not selected for

publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.

United States Court of Appeals, Sixth Circuit.

ASK CHEMICALS, LP, Plaintiff–Appellant,

v.

COMPUTER PACKAGES,

INC., Defendant–Appellee.

No. 14–3041

|

Dec. 10, 2014.

**Synopsis**

**Background:** Assignee of subsequently-expired Japanese patent protecting method of producing riser sleeves filed breach of contract suit claiming damages resulting from patent management service provider's failure to pay annual fees on behalf of assignee that resulted in irretrievable lapse of patent. The United States District Court for the Southern District of Ohio granted provider summary judgment. Assignee appealed.

**Holdings:** The Court of Appeals, Boggs, Circuit Judge, held that:

[1] report of assignee's sole expert witness was not admissible, and

[2] assignee's lost profits were not established with reasonable certainty.

Affirmed.

Clay, Circuit Judge, filed concurring opinion.

West Headnotes (2)

[1] **Evidence** 🔑 Breach of contract

Proffered expert's methods for calculating amount of patent assignee's lost profits from breach of contract by patent management service provider's failure to pay annual fees on behalf of assignee that resulted in lapse of Japanese patent were not scientifically reliable, thus precluding admission of expert's testimony regarding assignee's lost profit damages. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

19 Cases that cite this headnote

[2] **Patents** 🔑 Rights and liabilities of assignees and grantees

Assignee's amount of lost profits from patent management service provider's failure to pay annual patent fees on behalf of assignee that resulted in lapse of Japanese patent protecting method of producing riser sleeves was not established with reasonable certainty, as required for assignee's recovery of consequential damages from provider for breach of contract, under Ohio law, where assignee had no track record of sales of riser sleeves in Japan aside from decade-old effort abandoned after factory fire, assignee's profits in Japanese market could not be established by comparisons to assignee's sales in Europe and North America, and assignee failed to provide basic data about Japanese market necessary to project potential future profits.

57 Cases that cite this headnote

***507** On Appeal from the United States District Court for the Southern District Of Ohio.

BEFORE: BOGGS, CLAY, and GILMAN, Circuit Judges.

OPINION

2014 WL 6911574

BOGGS, Circuit Judge:

**\*\*1** Plaintiff–Appellant ASK Chemicals (ASK), the assignee of a now-expired Japanese patent, appeals the district court's award of summary judgment to the defendant, Computer Packaging, Inc. (CPI), in a breach-of-contract suit claiming damages resulting from CPI's failure to maintain the patent on ASK's behalf. The district court granted CPI's motions to exclude the report of ASK's sole expert witness and for summary judgment. ASK appeals both the exclusion of the expert report and the grant of summary judgment. For the reasons set forth below, we affirm.

I

This case concerns the possible damages owed by defendant CPI to ASK for CPI's breach of contract when CPI failed to pay the amounts required under Japanese law to maintain ASK's Japanese Patent No. 3,278,168 (the ′168 patent).

In 1997, Ashland, a chemical company, applied for a Japanese patent to protect the method by which it produced a particular type of riser sleeve that was unique in its employment of a "cold-box" manufacturing process. Riser sleeves are used throughout the foundry industry to improve the quality of metal castings. As the liquid metal cools in the hollow of a casting, it solidifies and shrinks. The last part of the casting to cool within the hollow will often form a void where remaining shrinkage occurs. The result is a defective metal casting. Riser sleeves, essentially metal reservoirs external to the casting, prevent this potential defect by providing additional liquid metal during cooling so that voids form in the riser, not in the casting itself.

The ′168 patent issued on April 30, 2002 and was assigned by Ashland to ASK on November 30, 2010.

A version of the riser sleeve, ASK's "Exactcast" riser sleeve, is covered by a number of European and American patents. Although Exactcast riser sleeves have sold successfully in both the Americas and Europe, ASK's (and its predecessor's) efforts in Japan were less fruitful: a factory fire in 2003 put an end to its initial penetration of the Japanese market and **\*508** ASK did not again focus on Japan until 2008, when it began developing Japanese clients, a long and arduous process requiring the commitment of significant time, effort, and money. At the time the ′168 patent lapsed, ASK had no sales of related technology in Japan.

The parties do not dispute the basic facts regarding the assignment of the patent, the lapse of the patent, or the cause of its lapse. The sole issue before the district court was the question of what damages CPI might owe to ASK for the breach.

Ashland, while still the holder of the ′168 patent, had hired CPI to pay the annual fees due on its patents in Japan. After the assignment of the ′168 patent to ASK, CPI continued in its role maintaining the patent. Had the patent been properly maintained under Japanese law, it would have expired on March 21, 2017. But the patent was not maintained. CPI failed to make the ninth necessary payment, due in January 2010. Six months later, at the end of Japan's statutory grace period, the patent lapsed irretrievably.

**\*\*2** On July 20, 2012, ASK filed a complaint against CPI in the United States District Court for the Southern District of Ohio, requesting compensatory, direct, expectancy, and prospective damages under two counts: breach of contract and breach of implied-in-fact contract. CPI filed an answer on April 5, 2012, in which it admitted that it had failed to pay the required fees and that, as a result of its failure, the patent lapsed. Following the completion of discovery, CPI submitted two contemporaneous motions: (1) to exclude the report of ASK's expert witness, Brian Russell, and (2) for summary judgment.

Following briefing and oral argument, the district court granted CPI's motion to exclude the report proffered by ASK's sole expert witness. The district court subsequently granted CPI's motion for summary judgment. It held that, in the absence of the report, there were no further issues of material fact for a jury, and ASK had failed to demonstrate with reasonable certainty the amount of lost profits resulting from the breach of contract. ASK timely appealed.

II

This court reviews the district court's exclusion of the testimony of an expert witness, as it reviews all evidentiary rulings, for abuse of discretion. *See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); Pride v. BIC Corp., 218 F.3d 566, 575 (6th Cir.2000).* The district court abuses its discretion when it "relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard." *Barner v. Pilkington N.*

2014 WL 6911574

*Am., Inc.,* 399 F.3d 745, 748 (6th Cir.2005) (internal quotation marks and alterations omitted).

We review the district court's grant of summary judgment de novo. *See Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 933 (6th Cir.2000). District courts may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In assessing a movant's claim to summary judgment, the court draws all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Though the moving party bears the initial burden of showing that there is no genuine dispute of material fact, after the movant makes such a showing, the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a **\*509** genuine dispute of material fact for trial. *Id.* at 256, 106 S.Ct. 2505.

III

On appeal, ASK advances two issues. First, it argues that the district court erred in granting CPI's motion to exclude the expert testimony of Brian Russell because his methods were unreliable. Second, ASK argues that the district court erred in granting summary judgment to CPI because, even if Russell's report was properly excluded, ASK still presented sufficient evidence to withstand summary judgment.

A

The district court granted CPI's motion to exclude the expert report of Mr. Russell because, although the court decided that he was qualified as an expert, it also found his report to be insufficiently reliable.

 **\*\*3** Testimony of expert witnesses is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 allows an expert witness to provide testimony in opinion form if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702. Rule 702, in concert with other Rules of Evidence, empowers the district court to ensure

that the expert's testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The court plays this same gatekeeping function even if the expert's opinion is "technical," rather than scientific, in nature. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). This line of cases governing the district court's screening of experts seeks to "strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 176–77 (6th Cir.2009).

Though the court found that Mr. Russell had sufficient specialized knowledge to offer evidence as an expert, it found that the other requirements of Rule 702 were not satisfied. Rule 702(b) requires that an expert's opinion be "based on sufficient facts or data." Fed.R.Evid. 702(b). Rule 702(c) requires that the expert's testimony is the product of both "reliable principles and methods." Fed.R.Evid. 702(c). As the *Daubert* Court articulated, the district court must concentrate "solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. However, "[a] district court is not required to admit expert testimony 'that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.' " *Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 254 (6th Cir.2001) (citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)).

In *Nelson,* this court found such an analytical gap. The plaintiff proffered the testimony of a board-certified neurologist and psychologist regarding the neurological effects that result from exposure to a particular chemical. Although the magistrate judge found that the neurologist was properly credentialed to serve as an expert witness, the magistrate judge correctly refused to admit the expert's opinion because "the methodology by which [the expert] reached his opinion concerning causation **\*510** [was not] found reliable." *Nelson,* 243 F.3d at 254. The court determined that, although the tests used to assess exposure to the chemicals were generally accepted, the expert "admitted no knowledge concerning the actual exposure of the ... plaintiffs ... or the temporal relationship between their exposure and symptoms." *Ibid.* Because the leap between the limited data and the expansive conclusion in the doctor's testimony was too great for the evidence to be reliable, we

determined that the judge did not abuse his discretion in excluding the doctor's testimony.

**\*\*4** **[1]** The situation in this case is similar to that in *Nelson.* The district court found that the experience, education, and professional qualifications of ASK's witness, Russell, properly qualified him as an expert. Like the magistrate judge in *Nelson,* the district court here did not balk at the witness's expert credentials, but only at his methods. The district court in this case found that Russell based his calculations on fundamentally flawed data and impermissible methods. Russell determined the amount of lost profits, in part, from a marketing plan that ASK produced a decade-and-a-half ago, which only covered the years 1998 to 2003, and from which he extrapolated future lost profits during the years 2013 to 2022–all without explaining his method or assumptions. Russell also relied on ASK's 2011 global-market analysis, which estimated the riser-sleeve markets of various regions of the world, including Asia, but that did not provide data about Japan specifically. Thus, according to the district court, it could not serve as a reasonable basis to estimate profits in Japan. For Russell to have demonstrated lost profits to a reasonable certainty he would have required, at a minimum, the following data: "(1) the size of the Japanese riser sleeve market; (2) ASK's market penetration; (3) ASK's sales; and (4) ASK's direct costs." In the absence of these basic, objective figures, any projection or calculation made by Russell of future lost profits would, like the calculations of the neurologist with no direct knowledge of patient exposure in *Nelson,* involve "too great an analytical leap." *See Nelson,* 243 F.3d at 254.

Of course, "an expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field." *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.,* 125 F.3d 1176, 1182 (8th Cir.1997). But Russell's wholesale adoption of Plaintiff's estimates, without revealing or apparently even evaluating the bases for those estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis. "As 'gatekeeper,' the trial judge is imbued with discretion in determining whether or not a proposed expert's testimony is admissible, based on whether it is both relevant and reliable." *Johnson v. Manitowoc Boom Trucks, Inc.,* 484 F.3d 426, 429 (6th Cir.2007) (quoting *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). On the facts of this case, and particularly in light of the unreliability of the evidence underlying Plaintiff's estimates,

the district court was within its discretion to determine that the lack of independent verification or analysis of the revenue projections rendered Russell's opinion unreliable. Where an expert merely offers his client's opinion as his own, that opinion may be excluded. *See, e.g., CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.,* 815 F.Supp.2d 673, 677 (S.D.N.Y.2011) (rejecting expert testimony based on "the conclusory statements of [the party's management] and not on his independent evaluation of the facts"); **\*511** *King–Indiana Forge, Inc. v. Millennium Forge, Inc.,* No. 1:07–cv–00341–SEB–SML, 2009 WL 3187685, at \*2 (S.D.Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded.").

**\*\*5** Given the unreasonableness of Russell's methods, the faulty and incomplete data upon which they were based, and the general unreliability of the evidence, the district court did not abuse its discretion in excluding Russell's testimony.

B

The district court granted summary judgment to CPI, holding that, in the absence of Russell's expert report, there was insufficient evidence on the record to create a genuine dispute of material fact.

Under Ohio law, consequential damages, including damages for lost profits, are available in suits for breach of contract. A plaintiff can recover lost profits if it can show that "(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of the profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty." *City of Gahanna v. Eastgate Props., Inc.,* 36 Ohio St.3d 65, 521 N.E.2d 814, 817 (1988). However, in order for a plaintiff to recover lost profits, "the *amount* of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Id.* at 818 (emphasis added). In other words, damages are not awarded merely on a plaintiff's assertion "that it would have made a particular amount of profits, but [the plaintiff] must prove lost profits with calculations based on facts." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.,* 147 Ohio App.3d 382, 770 N.E.2d 1068, 1083 (2001).

We do not address the question of whether lost-profits damages *never* may be proven by comparison to a plaintiff's

performance in an existing market. But in the case of ASK's complaint, neither of the first two elements is in doubt. Profits were certainly in the contemplation of the parties at the time the contract was made-CPI was, after all, in the business of administering the patent-management programs of intellectual-property owners. Similarly, there is no dispute over the second element, causation. If ASK had suffered lost profits as the result of the lapse of the '168 patent, it would have been because of CPI's (admitted) failure to pay the required annual payment.

The parties dispute only the final requirement, that the lost profits be shown to a "reasonable certainty." In demonstrating lost profits, Ohio law does not require plaintiffs to prove the amounts lost with absolute precision. The evidence "need only be reasonable, not specific." *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.,* 12 Ohio St.3d 241, 466 N.E.2d 883, 887 (1984). But demonstrating lost profits to a reasonable certainty requires the use of detailed evidence, for example, "expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 640 (1990) (citing Restatement (Second) of Contracts § 352, cmt. b). The evidence submitted must be sufficient to support calculations establishing the amount of lost profits: "Unless the figure is supported by calculations based on facts available or in evidence, the courts will properly reject it as speculative or uncertain." *Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991).

**\*512 \*\*6** A review of four Ohio cases—one of which established lost profits and three of which did not—demonstrates what constitutes non-speculative, reasonably certain lost profits. First, lost profits were awarded under Ohio law in *Michigan Millers Mut. Ins. Co. v. Christian,* 153 Ohio App.3d 299, 794 N.E.2d 68 (2003), a case in which the evidence demonstrated the amount of lost profits to a reasonable certainty. Among the types of evidence were testimony regarding market conditions, records of company earnings during the time period in question, records of company earnings during identical periods in the preceding years, and compilations of customer receipts and business transaction records. *Id.* at 77. From this evidence, a simple computation comparing the profits of one period with the profits of another period at the same time of year in the same location in the same enterprise allowed the establishment of lost profits to a reasonable certainty.

Second, and in contrast, in *Homes by Calkins,* the plaintiff failed to demonstrate lost profits to a reasonable certainty because the claim was necessarily unprovable and speculative. In a suit for damages based on a vendor's failure to have a deed restriction removed, the plaintiff, a real-estate developer, was delayed in building a development by the 11 months necessary to clear the property's title following sale. Reviewing his evidence, the trial court found, and the Court of Appeals of Ohio affirmed, that since neither the plaintiff nor the court "could reasonably estimate how many units [the plaintiff] could have sold, if it could have sold any," the plaintiff failed to demonstrate lost profits to a reasonable certainty. *Homes by Calkins, Inc. v. Fisher,* 92 Ohio App.3d 262, 634 N.E.2d 1039, 1045 (1993). Since the demonstration of lost profits in a new business is necessarily more speculative, such demonstrations "*receive greater scrutiny* because there is no track record upon which to base an estimate." *Andrew v. Power Mktg. Direct, Inc.,* ––– Ohio App. ––––, 978 N.E.2d 974, 992 (2012).

Third, in *Ace Vending Co. v. Davidson,* 8 Ohio App.3d 328, 457 N.E.2d 341 (1982), the plaintiff failed to demonstrate its lost profits to a reasonable certainty because the evidence it submitted was based on an inapposite comparison. Ace Vending had several vending machines that were unlawfully detained after the closing of the pizzeria in which they were installed. The evidence submitted consisted of little more than the testimony of Ace Vending's office manager as to the average amount of money per week made by the machines during the last two months the pizzeria was open. Since the pizzeria had gone out of business, however, the court rejected this evidence because, following the pizzeria's closing, the lost profits would necessarily have been limited to the amount of money that the machines would have made *at another location* had they been timely returned. *Ace Vending,* 457 N.E.2d at 343.

Finally, in *Kosier v. DeRosa,* 169 Ohio App.3d 150, 862 N.E.2d 159 (2006), the court found that the plaintiff failed to demonstrate lost profits where his calculations lacked necessary data. In a suit for breach of contract to install new flooring into a house, the plaintiff submitted evidence as to his labor costs, but provided no information as to how many hours of work would have been required to complete the contract. The Ohio Court of Appeals held that, in the absence of such evidence, it was not possible to establish the amount of profits lost to a reasonable certainty. *See Kosier,* 862 N.E.2d at 166.

**\*\*7** **[2]** In this case, ASK's evidentiary submissions suffer from each of the defects outlined in the three Ohio cases above. Like the plaintiff in *Homes by Calkins,* **\*513** ASK had no track record of riser-sleeve sales in Japan aside from the decade-old effort that had been abandoned following the factory fire. The lack of any reliable track record subjects ASK's lost-profits calculations to stricter inquiry and increases the difficulty of determining a reasonably accurate figure for lost profits. Though ASK had again taken the initial steps necessary to reintroduce their riser sleeves into Japan (they sought certification from several potential clients and sold test products), they still had almost no sales history and thus any attempt to demonstrate lost profits using riser-sleeve sale projections alone would suffer from a lack of hard data.

ASK's evidence was also like that in *Ace Vending* because it sought to establish profits in the Japanese market based on an inapposite comparison with sales in Europe and North America. Having provided sales figures only for North America and Europe and providing virtually no relevant market research on Japan, ASK sought to establish potential future sales and profits by analogizing sales in one region of the world with potential sales in another. Such extrapolation, without more, is insufficient to establish lost profits to a reasonable certainty.

Lastly, ASK's evidentiary submissions appear to suffer from the same basic fault as in *Kosier* because the submissions lacked necessary data. As the plaintiff in *Kosier* failed to provide one of the basic elements necessary to its calculations (the number of hours of labor performed), ASK has failed to give basic data about the Japanese market that would be necessary to make reasonably certain projections of potential future profits. As the district court pointed out, without data on the size of the Japanese market or ASK's sales and direct costs, it would be virtually impossible to settle on a figure for ASK's lost profits.

Were the demonstration of the *existence* of lost profits all that was necessary to overcome a motion for summary judgment, ASK may have had success. Based on the evidence submitted, a jury could very well find that ASK had lost profits because of CPI's breach. On appeal, ASK provides a painstaking roster of all the evidence placed in the record, including marketing surveys, its 1998 marketing plan, its regional market-share calculations, European and American licenses, and projections of capital costs for the building of a new factory. However, since there is no way that the evidence submitted could lead a court to determine the *amount* of lost

profits to a reasonable certainty, there is no genuine dispute of material fact for a jury. ASK's evidentiary submissions, even though voluminous, do little to establish a specific sum necessary to meet the standard of a "reasonable certainty." *See City of Gahanna,* 521 N.E.2d at 817.

IV

**\*\*8** For the reasons above, we AFFIRM the judgment of the district court.

CLAY, Circuit Judge, concurring.

I agree with the majority that Plaintiff did not put forward sufficient evidence to permit a reasonably certain determination of its damages. I write separately because I believe Ohio law requires a more precise consideration of the proofs than the analysis offered by the majority.

In particular, I take exception to the suggestion in the majority opinion that a company in Plaintiff's position, or any company prevented from entering a new market, would face a "stricter inquiry" in proving its damages. Ohio law allows even entirely new businesses to proceed under the "general test ... for the recovery of **\*514** lost profits" and expressly recognizes that such businesses may prove their damages through circumstantial evidence. *AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 638 (1990).

I also write separately in order to clarify the circumstances in which I believe a plaintiff may prove lost profits damages by comparison to its performance in another market. Proof of lost profits poses an inescapably hypothetical question, as the Ohio Supreme Court recognized in *AGF,* and thus inevitably requires a degree of estimation. *See id.* A plaintiff's track record of successful performance in other markets is a source of reliable and pertinent data that I believe in many cases will strengthen the certainty of damages calculations. *Cf. MindGames, Inc. v. W. Pub. Co.,* 218 F.3d 652, 654–55 (7th Cir.2000) (a track record of successful sales of past games could allow the creator of a board game to establish lost profits with sufficient certainty). Indeed, in a similar case, the United States Supreme Court approved evidence of lost profits based on a market comparison similar to the approach urged by Plaintiff here. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 116 and n. 11, 123–25, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (accepting estimates

2014 WL 6911574

that the plaintiff would have achieved a 16% market share in Canada absent the breach where the estimates were based on a comparison of the plaintiff's sales in the US).

Nonetheless, I believe that Plaintiff in this case has not introduced sufficient evidence to allow a factfinder to determine damages with a reasonable degree of certainty and therefore concur in the judgment. I would affirm the exclusion of Russell's expert report solely because, as the majority explains, it unquestioningly accepts Plaintiff's projections about the sales and market share the company would have achieved in Japan and dresses up those unsupported estimates in the authority of an expert analysis. I find the remaining evidence put forward by Plaintiff inadequate to allow a factfinder to calculate damages with any reasonable degree of certainty for a single, narrow reason: Plaintiff has inexplicably failed to support its estimates about the Japanese riser sleeve market with any data, analysis, or expert opinion. Instead, it relies on a single-page, undated spreadsheet with "guesses" as to the market share and sales volume of its three competitors in Japan. Without more, a factfinder would be unable to translate Plaintiff's successful track record in North America and Europe into any reasonable projection of sales and profits that Plaintiff could have achieved in Japan.

**1. Exclusion of the Expert Report**

 **\*\*9**  Although I agree with the majority that Russell's report should be excluded because it uncritically accepts and relies on Plaintiff's own revenue projections, I part ways with the majority when it suggests that Russell was remiss for failing to include and rely on "basic, objective figures" like Plaintiff's "market penetration," "sales," and "direct costs" in Japan. Maj. Op. at 510. The majority argues that without these figures "*any* projection or calculation" of lost profits would be too speculative to meet the standards of expert testimony. *Id.* (emphasis added). This reasoning sets up an impossible hurdle in a case like the present one, where by definition the measure of damages is a counterfactual: what profits would Plaintiff have earned had Defendant not breached the contract? I perceive nothing in Federal Rule of Evidence 702 that prevents an expert from offering such an estimate or projection, so long as it is supported by sufficient, albeit circumstantial, facts and data. *See, e.g.,* **\*515** *Andler v. Clear Channel Broadcasting, Inc.,* 670 F.3d 717, 727–29 (6th Cir.2012) (holding that the district court erred in excluding expert testimony that would have provided projections of the plaintiff's lost earning capacity based on a statistical average salary); *Multimatic, Inc. v. Faurecia Interior Systems USA,*

*Inc.,* 358 Fed.Appx. 643, 650–51 (6th Cir.2009) (relying on expert's testimony rejected projected lost profits and indicating that the expert "had a reasoned, non-speculative basis" for his projections where his data "came from a reliable industry forecaster").

For the same reason, I cannot agree with the majority's suggestion that it would be improper for Russell to rely on the 2011 global market survey setting out sales and market share for Plaintiff and its competitors in various regional markets. The data in that document, while not sufficient standing alone to support a computation of lost profits, is circumstantial evidence relevant to estimating the sales and market share Plaintiff may have achieved in Japan absent Defendant's breach, and could justly be relied on by the expert.

The principal shortcoming in Russell's report, in fact, is that he did *not* rely on the 2011 global market survey or similar sources to generate a projection of Plaintiff's probable sales, market share, and royalties, but instead unquestioningly adopted Plaintiff's own revenue estimates and used those estimates as the basis for his calculations.

**2. Summary Judgment**

Under *AGF, supra,* Plaintiff is entitled to rely on circumstantial data to support its lost profits damages. *See* 555 N.E.2d at 638 (holding that a new business venture may establish lost profits damages "with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like."). The majority opinion, however, asserts that because "ASK had no track record of riser-sleeve sales in Japan aside from the decade-old effort that had been abandoned following the factory fire," it lacks a "reliable track record" and therefore will face a "stricter inquiry" into its lost profits calculations. Maj. Op. at 513. The majority also writes that because Plaintiff "had almost no sales history" in Japan, "any attempt to demonstrate lost profits ... would necessarily suffer from a lack of hard data." *Id.* This analysis proves little, however, because any new business would lack a sales history, and yet under Ohio law, that business may recover lost profits. *See* 555 N.E.2d at 638–39. Moreover, it strikes me as odd to suggest that Plaintiff lacks a "reliable track record" or any relevant "sales history" when it successfully competes in at least two other regional markets selling the same product it would have sold in Japan.

**\*\*10** I believe the majority too casually rejects the most reliable source of circumstantial data Plaintiff could rely on —the company's performance in the riser sleeve markets of other parts of the world. *See* Maj. Op. at 513 (suggesting that "analogizing sales in one region of the world with potential sales in another.... without more, is insufficient to establish lost profits to a reasonable certainty."). I believe such cursory treatment of the comparative evidence to be unwarranted. Because I am concerned that the majority opinion treats this issue without adequate precision, I will briefly set out my own analysis here.

Courts have rightly recognized that "some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." **\*516** *MindGames, Inc. v. W. Publ'g Co. Inc.,* 218 F.3d 652, 658 (7th Cir.2000) (internal citation and quotation omitted) *quoted in Telxon Corp. v. Smart Media of Del., Inc.,* 2005–Ohio–4931, 2005 WL 2292800 at \*44 (Ohio Ct.App.2005). *See also* Restatement (Second) of Contracts § 352, cmt. a ("Doubts are generally resolved against the party in breach."). Nonetheless, Ohio law prudently limits speculation by requiring that "[a] plaintiff may not merely assert that it would have made a particular amount of profits, but must prove lost profits with calculations based on facts." *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.,* 147 Ohio App.3d 382, 770 N.E.2d 1068, 1083 (2001). *See also Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (1991) ("Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative and uncertain.").

For this reason, to the extent that the majority opinion suggests that proof of lost profits by reference to Plaintiff's successful record in other markets, as a method, is unlikely to meet the standards of "reasonable certainty," I respectfully disagree. To the contrary, comparative evidence—whether drawn from the plaintiff's performance in another market, the experience of another company in the same market, or from a past business venture of the plaintiff—can improve the certainty of a computation of lost profits by anchoring the projected profits to a body of empirical fact. *See Zenith Corp.,* 395 U.S. at 116, 124–25, 89 S.Ct. 1562 (accepting evidence from plaintiff's performance in other markets); *AGF,* 555 N.E.2d at 638 n. 1 (suggesting that records from similar businesses in the same locality can be used to prove a company's lost profits); *MindGames,* 218 F.3d at 658 (stating that a successful track record in prior endeavors may furnish a

basis for estimates of probable sales lost due to a defendant's breach).

*Zenith Corp., supra,* is illustrative. In that case, the Supreme Court considered a damages award based on a patent pool's anti-competitive conduct in denying Zenith licensing agreements that would have facilitated its sales of radios and television sets in Canada. 395 U.S. at 114–18, 89 S.Ct. 1562. The evidence included a computation of damages, prepared by Zenith's experts, that "reflect[ed] a comparison between Zenith's percentage share of the United States television market ... and Zenith's actual share of the Canadian market during the same period." *Id.* at 116 n. 11, 89 S.Ct. 1562. The Supreme Court soundly advised that

**\*\*11** [t]rial and appellate courts alike must ... observe the practical limits of the burden of proof which [may] be demanded of a ... plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

*Id.* at 123, 89 S.Ct. 1562. The Court held Zenith's evidence —including testimony that the breach "prevented its securing a share of the market comparable to that which it enjoyed in the United States, and which its business proficiency, demonstrated in the United States, dictated it should have obtained in Canada"—supported an award of damages. *Id.* at 124–25, 89 S.Ct. 1562.

Of course, "[a] comparison of two different markets will always be open to the argument that the markets are fundamentally incomparable, like apples and oranges." *Rose Confections, Inc. v. Ambrosia Chocolate Co.,* 816 F.2d 381, 394 n. 7 (8th Cir.1987). However, where there is a reasonable basis for comparing the markets, in the interest of allowing the factfinder **\*517** to consider relevant evidence that might limit undue speculation in the calculation of lost profits, I believe that the differences should be reserved "for the jury to weigh." *See id.*

I believe Plaintiff's track record of successful sales, market share, and royalties in North America and Europe may be validly used to estimate the revenues it could have achieved in Japan. The fact that the respective markets are for the same product, riser sleeves, used for the same industrial purposes, is a sufficient basis for comparing them. The comparable nature of the three markets is further demonstrated by the presence of one of Plaintiff's principal competitors in each. In order to translate Plaintiff's success in other regions into projections

of lost profits in Japan, however, a factfinder would need a minimum quantum of basic information about the Japanese riser sleeve market, such as its size. Plaintiff's evidence about the Japanese market is inadequate to allow such a projection to be calculated with reasonable certainty.

Plaintiff heavily relies on a document that it describes as a "market survey" of the Japanese riser sleeve market. Plaintiff relies on the numbers in that document to describe the total size of the Japanese riser sleeve market, to estimate the share of that market it could achieve, and ultimately to calculate the revenues it would have received. This purported "survey," however, is nothing more than a single page document setting out supposed sales and market share for Plaintiff's three competitors in Japan from 2008 to 2010. The document is undated, leaving it unclear if the numbers are intended as forecasts or estimates of past sales. The sales numbers are prominently described by the column heading, "Guess." (R. 46–12, "Japanese Survey," filed under seal.) The market share numbers also appear to be rough estimates. According to Plaintiff's 30(b)(6) deposition testimony, because there are no industry groups that collect and provide data on the riser sleeve market in Japan, the numbers in this purported survey are "educated guesses" based on "market intelligence." (R. 35–4, ASK Deposition, p. 187, under seal). Finally, nothing in the document speaks to the market for a license to produce the Exactcast technology by any of Plaintiff's competitors.

**\*\*12** Although I am sympathetic to the challenges Plaintiff faces in marshalling evidence about the riser sleeve market in Japan, an undated document revealing acknowledged guesses with no justification for those guesses is simply not enough to support a "reasonably certain" computation of the profits Plaintiff could have achieved in Japan. Instead of confronting the challenge head-on and putting before the court the bases for its estimates of the Japanese market, including any testimony or data relevant to or corroborative of its calculations, Plaintiff instead asks us to rely, essentially, on its say-so. These proofs fail to meet the requirement that a plaintiff "prove lost profits with calculations based on facts." *See UZ Engineered Prods.,* 770 N.E.2d at 1083.

### Conclusion

In sum, while I disagree with the reasoning in the majority opinion, I believe that it reaches the correct result. Therefore, I concur in the judgment.

### All Citations

593 Fed.Appx. 506, 2014 WL 6911574

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1344763

KeyCite Yellow Flag - Negative Treatment

Distinguished by Deere & Company v. FIMCO Inc., W.D.Ky., March 8, 2017

2013 WL 1344763
Only the Westlaw citation is currently available.
United States District Court,
W.D. Louisiana,
Lake Charles Division.

Monique L. BEANE, Individually and as
Natural Tutrix of the Minor Child, J.B.

v.

UTILITY TRAILER MANUFACTURING
COMPANY and Truck Trailer
Manufacturers Association.

No. 2:10 CV 781.
|
Feb. 25, 2013.

Named Expert: LaVann Watts, Rob Maharrey, Tom Rosby, Mark Roush, George Schmidt, Leonard William Baker, Rodney P. Ehrlich, Richard J. Gironomi, Francis S. Smidler.

**Attorneys and Law Firms**

Chad E. Mudd, David P. Bruchhaus, Michael Keith Prudhomme, Mudd & Bruchhaus, Lake Charles, LA, John M. Lane, Paul F. Ferguson, Jr., Ryan M. Schaper, Provost Umphrey, Beaumont, TX, for Plaintiff.

Edward E. Rundell, Lottie L. Bash, Raymond L. Brown, Jr., Gold Weems et al, Alexandria, LA, Glen M. Darbyshire, Inglesby Falligant Law Firm, Savannah, GA, for Defendant.

*MEMORANDUM ORDER*

PATRICIA MINALDI, District Judge.

**\*1** Before the court is a Motion in Limine to Exclude Expert Testimony [Doc. 209] filed by the defendant, Utility Manufacturing Company ("UTM"). The plaintiff, Monique L. Beane, filed a response [Doc. 213] and the defendant filed a reply [Doc. 225]. The plaintiff's response included a request for a hearing, but as the undersigned can decide this issue on the briefs, her request is DENIED. For the foregoing reasons, the defendant's motion is GRANTED.

## BACKGROUND

This case arises out of a "side underride"[1] collision between Mr. Robbie Beane's vehicle and a UTM 18–wheeler tractor-trailer, causing Beane's death.[2] The plaintiff alleges that Beane's injuries could have been limited if the trailer, designed by UTM, had had sufficient side underride protection.[3] The nine experts at issue in this motion, who are all professionals in the trailer manufacturing industry, would allegedly testify about side underride accidents, design and engineering issues related to side underrides, technological and economic feasibility of including side underride protections on a trailer, causation and effect of side underride accidents, and their work in the trailer manufacturing industry.[4]

## LAW & ANALYSIS

In UTM's motion, they move to exclude the testimony of nine witnesses[5] disclosed by the plaintiff as "individuals who may give testimony as expert witnesses [but] are not retained by Plaintiff regarding this matter and, in some instances, are actually hostile/adverse to Plaintiff."[6] UTM argues that these experts should be excluded because the plaintiff has failed to provide a written expert report for each of these nine witnesses, as per the requirements of Fed.R.Civ.P. 26(a)(2)(B).[7] They further argue that Rule 26(a)(2)(C), which carves out a subset of experts which are exempt from Rule 26(a)(2)(B)'s expert report requirement, does not apply because the nine listed experts do not have "firsthand knowledge" of the events concerning Beane's accident, and because the plaintiff has not proven that the nine experts have such knowledge.[8] UTM further avers that even if Rule 26(a)(2)(C) applies, the plaintiff has not provided a sufficient description of the experts and what they will testify about, as per the requirements of that section.[9] Finally, they submit that the proposed expert testimony should be excluded, because: (1) the plaintiff has not provided a proper explanation for why she did not include expert reports; (2) the experts' inclusion would unduly prejudice UTM; (3) the prejudice would not be cured by granting a continuance; (4) the experts' testimony is duplicative of other expert testimony and therefore not important enough to justify inclusion.[10]

Beane v. Utility Trailer Mfg. Co., Not Reported in F.Supp.2d (2013)

2013 WL 1344763

The plaintiff counters that she does not need to file written expert reports for these experts, pursuant to Rule 26(a)(2)(B), because: (1) she has not specifically retained or specially employed them to testify at trial; (2) some of the witnesses may be "hostile" to her position (because they work in the same industry as UTM); and, (3) she has "no control over any of these witnesses other than the power of subpoena."[11] As such, 26(a)(2)(B)'s requirements, which apply to witnesses who are "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," allegedly do not apply to these nine witnesses.[12] She argues that, under Rule 26(a)(2)(C)'s disclosure requirements, she has "more than adequately" disclosed these witnesses.[13] Additionally, she alleges that the nine experts' testimony is relevant because, even though they do not work for UTM, they can provide knowledge on general trailer design practices in the industry.[14] Finally, she notes that information from these experts would not be duplicative and that the witnesses were properly disclosed such that UTM could depose them to glean information, two factors which cut in favor of not excluding them.[15]

**\*2** In UTM's reply, it argues that the plaintiff fundamentally misconstrues Rule 26(a)(2)(B)'s terms to come to the conclusion that any and all experts not specifically retained by her are exempt from the expert report requirement, and that instead an expert will only be exempt if the proponent of the expert can demonstrate that the expert has "firsthand knowledge" of the incidents involving the litigation.[16] UTM further avers that the plaintiff's argument that the nine experts' testimony is relevant does nothing to address the actual argument made in its motion: that these experts must submit expert reports.[17] Further, they note that the plaintiff's argument that her disclosures fulfill Rule 26(a)(2)(C)'s more lax disclosure requirement also fail, as they have not submitted sufficient information.[18]

Subsection (a)(2) of Rule 26 dictates that a party must disclose to other parties "the identity of all expert witnesses who may be used at trial to present evidence under Federal Rules of Evidence 702, 703, or 705. Subsection 26(a)(2)(B) says:

> Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, [the witness] disclosure must be accompanied by a written report-prepared and signed by the witness-if the witness is one retained or specially employed to provide expert testimony

in the case or one whose duties as the party's employee regularly involve giving expert testimony.

Fed.R.Civ.P. 26(a)(2)(B). The report must include (1) a statement of all opinions the witness will express; (2) facts and data considered by them; (3) exhibits; (4) the witness's qualifications; (5) a list of cases in which the witness testified as an expert in the past four years; (6) a statement of the compensation to be paid. Id.

Rule 26(a)(2) was amended in 2010 to include subsection 26(a)(2)(C), which requires "summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions." Fed.R.Civ.P. 26(A)(2)(C). The advisory notes on subsection (a)(2)(C) note that if an expert is not required to provide a written report, they must still disclose the subject matter on which they are expected to present evidence under Federal Rule of Evidence 702, 703, or 705, and a summary of facts and opinions to which they will testify.

As a preliminary matter, the undersigned notes that the plaintiff's descriptions of the nine witnesses UTM seeks to exclude clearly do not satisfy the written report requirements under 26(a)(2)(B): the descriptions in the plaintiff's disclosure are very short and do not include exhibits, facts and data to be considered by them, any opinions they will express, etc. See Fed.R.Civ.P. 26(a)(2)(B). Thus, the main contention between the parties centers around whether Rule 26(a)(2)(B) even applies in this case, or the more lax 26(a)(2)(C) applies instead.

As Rule 26's amendment occurred only two years ago, there is little case law discussing how a court distinguishes an expert who falls under 26(a)(2)(B) from an expert who falls under 26(a)(2)(C). One of the few circuit court cases on point, cited by UTM, is the First Circuit's Downey v. Bob's Discount Furniture Holdings, Inc., 633 F.3d 1 (1st Cir.2011). In Downey, after the plaintiffs discovered an infestation of bedbugs at their home, they called an exterminator, who treated the bedbug problem and composed an incident report. Id. at 3. In litigation resulting from the bedbug infestation, the exterminator was listed as an expert, but the plaintiffs did not provide an expert report for him. Id. at 4.

**\*3** The First Circuit went-through an analysis of 26(a)(2)(B) and 26(a)(2)(C) to determine under which group the exterminator would fall. The court held that 26(a)(2)(B)'s designation of an expert who was "retained or specially

employed" turned on "the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony." *Id.* at 6. Continuing, the court noted that in instances where "the expert is part of an ongoing sequence of events and arrives at his causation opinion during treatment, his opinion testimony is not that of a retained or specially employed expert," and thus 26(a)(2)(C), and not 26(a)(2)(B), would apply. *Id.* at 7. Several district courts have followed the lead of *Downey* and held that the distinction between a 26(a)(2)(B) expert and a 26(a)(2)(C) expert is that 26(a)(2)(C) experts' conclusions and opinions arise from firsthand knowledge of activities they were personally involved in before the commencement of the lawsuit, and not conclusions they formed because they were recruited to testify as an expert after-the-fact. *See, e.g., American Property Constr. Co. v. Sprenger Lang Found.,* 274 F.R.D. 1, 4–5 (D.D.C.2011); *Chesney v. Tennessee Valley Auth.,* Nos. 09–09, 09–48, 09–54, 09–64, 2011 WL 2550721, at *2 (E.D. Tenn. June 21, 2011); *Saline River Properties, LLC v. Johnson Controls, Inc.,* no. 10–10507, 2011 WL 6031943, at *9 (E.D.Mich., Dec. 5, 2011). While not explicitly adopting the *Downey* standard, at least one district court in the Fifth Circuit has likewise noted that the delineation between a 26(a)(2)(B) and a 26(a)(2)(C) expert is whether the expert has "first-hand factual knowledge of [the] case so as to escape the requirement that he submit a full expert report." *Skyward Bound Ranch v. City of San Antonio,* no. SA–10–CV–0316–XR, 2011 WL 2162719 at *2 (W.D. Tex., June 1, 2011).

Here, the nine witnesses which UTM seeks to exclude are clearly not "percipient witness[es] who happen[ ] to be experts," but rather are "expert[s] without prior knowledge of the facts giving rise to the litigation [who are] recruited to provide expert testimony." *Downey,* 633 F.3d at 6. Looking to the plaintiff's descriptions of these individuals, they are all professionals from trailer manufacturing companies other than UTM. The plaintiff is bringing them in specifically to testify about such things as economic and technological feasibility, the dangers of side underride accidents, alternative designs for trailers, defects, and causation.[19] There is no evidence that these experts have any firsthand knowledge on UTM's trailer design or Beane's specific side underride accident, and thus any comparisons the experts might make between their companies' trailer and UTM's trailer must arise by examining the relevant information from this case, indicating that they were specifically recruited after-the-fact just to provide expert testimony.

*4 The plaintiff's argument that expert reports are not required because she has not actually hired or retained these experts therefore misreads the intent of the 2010 addition of subsection (a)(2)(C). Allowing the plaintiff to subpoena these experts, who necessarily must study the facts and issues in this litigation in order to testify with any context, would grant the plaintiff the double benefit of retaining expert witnesses without having to pay them for their preparation, and without having to expend the extra effort in presenting expert reports or proving their expertise on the issue of trailer design. Further, while this issue was not briefed by the parties, the undersigned expresses serious doubts as to whether the plaintiff even has the jurisdictional authority to compel "hostile" non-party experts to testify in a court which is, for some experts, hundreds of miles away, simply via the power of a subpoena. *See* Fed.R.Civ.P. 45(c)(3) (a court may, on motion, quash a subpoena if it requires a non-party to travel more than 100 miles from where that person resides, is employed, or transacts business).

As the undersigned has found that these nine experts more appropriately fall under subsection 26(a)(2)(B), the next inquiry is whether these experts should be excluded, or whether the plaintiff should be granted leave to supplement with the expert reports of these nine witnesses. For this inquiry, the undersigned must turn to Rule 37(c)(1), under which a trial court may punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or substantially justified. Fed.R.Civ.P. 37(c)(1). To determine whether exclusion of these experts is proper, the Fifth Circuit assesses four factors: "(1) the explanation, if any, for the party's failure to comply with the discovery order; (2) the prejudice to the opposing party of allowing the witnesses to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of the witnesses' testimony." *Barrett v. Atlantic Richfield Co.,* 95 F .3d 375, 380 (5th Cir.1996).

On the first prong, it appears that the plaintiff's explanation for not providing expert reports revolves around her central argument in this motion: that these experts do not require expert reports because they are not retained by her.[20] In most cases where the Fifth Circuit upheld a district court's exclusion of experts, the courts found that failure to produce information on the experts "was designed to prejudice the opposing party and violate the scheduling order." *Tolliver v. U–Haul Co. of Texas,* no. 2:09–CV–313, 2011 WL 3626328 at *4 (W.D.La., Aug. 17, 2011) (referencing *Barrett,* 95 F.3d at

380–81). Here, there is no evidence that the plaintiff intended to stymie UTM's trial preparation by presenting insufficient expert reports: instead, the plaintiff is simply arguing that a new (and arguably not entirely clear) amendment to Rule 26 applies to these experts. As the undersigned does not find clear intent to violate the scheduling order and prejudice UTM, this factor does not weigh in favor of exclusion.

**\*5** On the second prong, the undersigned agrees with UTM that not providing expert reports for these nine experts may lead to undue prejudice. According to the Fifth Circuit, an expert report must be "detailed and complete" in order to "avoid the disclosure of 'sketchy and vague' expert information." *Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 572 (5th Cir.1996). Here, absent an expert report, UTM is essentially in the dark on what these "experts" might rely on in their testimony. While UTM could depose these nine experts in order to assess their credibility/expertise, the scant information provided by the plaintiff about these nine individuals does not give UTM much of a lead on what to examine the experts on during depositions. Further, without additional information, UTM cannot determine whether it needs to edit its own expert reports in order to rebut any information provided by these nine experts. The plaintiff counters that UTM has not even attempted to depose these nine experts, and that she "properly disclosed" their identities.[21] Because, based on a review of the plaintiffs descriptions of these nine experts, UTM would almost certainly require depositions order to flesh out their qualifications, and these depositions would have to happen almost instantly (an unlikely possibility, since these are "hostile" witnesses not retained by either party and scattered throughout the United States) in order for UTM to file sufficient Daubert motions (which were due January 11, 2013), this factor weighs in favor of exclusion.

On the third prong, the possibility of curing the prejudice by granting a continuance, the undersigned notes that this case's deadlines have been set and reset numerous times in response to the parties' various discovery disputes.[22] Indeed, this case, originally filed in 2010, has been subject to several scheduling conferences. Discovery deadlines, dispositive motion deadlines, and the trial date have been pushed back on several occasions. While the parties have expressed a desire to proceed to trial on March 18, 2013, and the Magistrate Judge has diligently ruled on a flurry of pending discovery motions in order to maintain this trial date, the undersigned expresses serious doubts that this deadline could be maintained in light of the fact that, if the experts are included, the plaintiff

may move for extra time to obtain expert reports, which necessarily may trigger a request for extra time from UTM in order to conduct depositions. Because both parties wish to adhere to the March 18th trial date, the undersigned finds that a continuance would necessarily disrupt this plan, and thus this factor weighs in favor of exclusion.

On the fourth prong, the undersigned finds that the nine experts' testimony may not be sufficiently important, and thus this factor weighs in favor of exclusion. As noted by UTM, in deciding this prong, courts may consider whether the plaintiff's "case will ... fail solely as a result of the exclusion of [the] expert testimony" because the testimony may be elicited by other properly designated experts. *Smith v. Johnson & Johnson,* no. 3:08CV245, 2011 WL 3876997 (S.D.Miss., Aug. 31, 2011) (referencing *CQ Inc. v. TXU Mining Co. LP,* 565 F.3d 268, 280 n. 7 (5th Cir.2009). UTM argues that because the nine experts' testimony is duplicative of other testimony from other properly designated experts, their testimony will not ultimately affect the outcome of the plaintiff's case.[23] The plaintiff acknowledges this, agreeing that the nine experts will "address the same issues" but that their testimony will be fundamentally different because it will come from "inside the walls of the trailer industry."[24]

**\*6** Reviewing the list of experts the plaintiff has disclosed which includes expert reports, the undersigned is uncertain whether testimony from "inside the walls of the trailer industry" is absolutely necessary, in light of the fact that two experts with expert reports (Perry Ponder and Bruce Enz) have already been offered to testify about industry knowledge, testing, engineering options for underride safety, reasonable alternative designs, and the history and available knowledge on underride protection.[25] There is no reason cited by the plaintiff why these two experts could not conduct their own inquiry and discover information from "inside the walls of the trailer industry" in order to come to their conclusions, and in fact it seems apparent that they would need to conduct such an inquiry, based on the broad spectrum of topics they will allegedly cover. Thus, this factor weighs in favor of exclusion.

Assessing all of the factors in total, the undersigned finds that these nine experts should be excluded from testifying, primarily because their testimony would be unnecessarily duplicative. Accordingly, it is

**ORDERED** that the motion is **GRANTED** and the nine experts, LaVann Watts, Rob Maharrey, Tom Rosby, Mark

Beane v. Utility Trailer Mfg. Co., Not Reported in F.Supp.2d (2013)

2013 WL 1344763

Roush, George Schmidt, Lenoard William Baker, Rodney P. Ehrlich, Richard J. Gironomi, and Francis S. Smidler are excluded from testifying at trial.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1344763

Footnotes

1   A side underride collision occurs when a vehicle rams into the side of a tractor-trailer. These collisions can allegedly be particularly dangerous because many of a vehicle's safety features will not protect the driver and passengers from such a collision.

2   Pl.'s Resp. in Opp. to Def.'s Mot. to Dismiss, [Doc. 213], at pg. 2.

3   *Id.*

4   Pl.'s Seventh Supplement to Disclosure & Designation of Experts, Ex. A to Def.'s Mot. in Limine, [Doc. 209–2], at pgs. 8–11.

5   In its original motion, UTM does not move to exclude the former testimony of the deceased Mr. John Tomassoni or the live testimony of Mr. Allan Kam, who are also listed as experts without expert reports. Confusingly, its reply, however, UTM notes that the plaintiff has failed to prove that "any and all non-retained experts are excluded from the report requirement of Rule 26(a)(2)(B) ." Def.'s Reply, [Doc. 225], at pg. 4. As UTM does not explicitly move to exclude these two witnesses, however, the court will not decide on whether their exclusion is proper in this order.

The nine witnesses designated in UTM's motion and their descriptions from the plaintiff's disclosure and designation of experts submission are as follows:

1. LaVann Watts: a current or former Lufkin Trailer employee who is designated as both a fact and expert witness. He is, as to plaintiffs, an adverse witness. Plaintiffs may elicit testimony from Mr. Watts regarding his work at Lufkin and through TTMA, NTHSA, knowledge of risks and dangers pertaining to underride accidents, design and engineering issues, alternative designs, technological and economic feasibility, defect and causation. Plaintiffs have attached a copy of a CV of Mr. Watts; however, Plaintiff cannot verify whether it is current or accurate. Plaintiff does not have a complete list of prior testimony from this witness; however, he has testified in at least two cases of which Plaintiff is aware: (1) *Maravilla v. Lufkin (Webb County, Texas)* and (2) *Baker v. Lufkin (Panola County, Texas).*

2. Rob Maharrey: a current or former Lufkin Trailer employee who is designated as both a fact and expert witness. He is, as to plaintiffs, an adverse witness. Plaintiffs may elicit testimony from Mr. Maharrey regarding his work at Lufkin and through TTMA, NHTSA, knowledge of risks and dangers pertaining to underride accidents, design and engineering issues, alternative designs, technological and economic feasibility, defect and causation. Plaintiffs do not have a CV available regarding Mr. Maharrey, nor a list of cases in which he testified; however, Mr. Maharrey has testified in *Baker v. Lufkin (Panola County, Texas).*

3. Tom Rosby: the former CEO/President of Monon Trailer Company who is designated as both a fact and expert witness. He is, as to plaintiffs, an adverse witness. Plaintiffs may elicit testimony from Mr. Rosby regarding his work at Monon and through TTMA, NHTSA, knowledge of risks and dangers pertaining to underride accidents, design and engineering issues, alternative designs, technological and economic feasibility, defect and causation. Mr. Rosby is also the former President of TTMA and is expected to be question regarding TTMA, its interworkings, and its role and influence in regulatory activities affecting the trailer industry. In 2007, Mr. Rosby was sentenced to 7 years imprisonment for fraud. To best of Plaintiffs' knowledge, Mr. Rosby is still serving his sentence.

4. Mark Rousch: a current or former employee/officer of Vanguard Trailers (formerly Monon Trailers) and a subsidiary of China International (CIMC). Plaintiffs may elicit testimony from Mr. Roush regarding his work in the trailer industry and through TTMA, NHTSA, knowledge of risks and dangers pertaining to underride accidents, design and engineering issues, alternative designs, technological and economic feasibility, defect and causation.

2013 WL 1344763

5. George Schmidt: a current or former employee/officer of Strick Trailers who is designated as both a fact and expert witness. He is, as to plaintiffs, an adverse witness. Plaintiffs may elicit testimony from Mr. Schmidt regarding his work at Strick and through TTMA, NHTSA, knowledge of risks and dangers pertaining to underride accidents, design and engineering issues, alternative designs, technological and economic feasibility, defect and causation.

6–9. Leonard William Baker, Rodney P. Ehrlich, Richard J. Gironomi: are current/former employees/officers of Wabash National. Plaintiffs may elicit testimony from these gentlemen regarding their work in the trailer industry and through TTMA, NHTSA, knowledge of risks and dangers pertaining to underride accidents, design and engineering issues, alternative designs, technological and economic feasibility, defect and causation.

[Doc. 209–2] at pgs. 8–11.

6    *Id.* at pg. 8

7    Def.'s Mot. in Limine, [Doc. 209–1], at pg. 6.

8    *Id.* at pg. 9.

9    *Id.* at pg. 6.

10    *Id* at pgs. 11–13.

11    [Doc. 213] at pg. 3.

12    *Id.*

13    *Id* at fn.5, pg. 5.

14    *Id.* at pgs. 5–8.

15    *Id.* at pg. 8.

16    Def.'s Reply to Pl.'s Resp., [Doc. 225], at pgs. 4–9.

17    *Id.* at pg. 7.

18    *Id.*

19    [Doc. 209–2] at pgs. 8–11.

20    [Doc. 213] at pg. 3.

21    *Id* at pg. 8.

22    *See generally* Docket Sheet.

23    [Doc. 209–1] at pgs. 12–13.

24    [Doc. 213] at pg.8.

25    [Doc. 209–2] at pgs. 6–7.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3186 Filed 07/10/23 Page 17 of 66
Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)
2017 WL 4042342

2017 WL 4042342
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

ESTATE OF Eva C. PUPPOLO,

Celeste Puppolo, Executor, Plaintiff,

v.

John J. WELCH, Jr., J.

Welch, Jr., Ltd., Defendants.

Case No. 5:14–cv–95
|
Signed 09/12/2017

**Attorneys and Law Firms**

R. Peter Decato, Esq., Decato Law Office, Lebanon, NH, for
Plaintiff.

David L. Cleary, Cleary Shahi & Aicher, P.C., Rutland, VT,
for Defendants.

**OPINION AND ORDER DENYING PLAINTIFF'S
MOTION TO ADMIT AUDIO RECORDINGS,
DENYING DEFENDANT'S MOTION TO DISMISS,
GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION FOR EXPENSES,
GRANTING DEFENDANT'S MOTION TO EXCLUDE
THE OPINIONS OF THOMAS O'TOOLE,
AND GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT REGARDING PLAINTIFF'S
LEGAL MALPRACTICE CLAIM**

(Docs. 42 & 76)

Christina Reiss, Chief Judge United States District Court

**\*1** The Estate of Eva C. Puppolo, Celeste Puppolo, Executor
("Plaintiff") brings this action against Defendants John J.
Welch, Jr. and J. Welch, Jr., Ltd. (collectively, "Defendant"),
alleging four state-law causes of action: legal malpractice
(Count I), negligent misrepresentation (Count II), and two
counts of breach of contract (Counts III and IV). Pending
before the court is Defendant's "Motion to Dismiss, or
in the Alternative, Motion for Summary Judgment, or in
the Alternative, Motion to Preclude Further Opinions, and

Motion for Expenses." (Doc. 42.) Defendant seeks dismissal
of the action pursuant to Fed. R. Civ. P. 37 and the exclusion
of the opinions of Plaintiff's legal malpractice expert, Thomas
O'Toole, Esq. pursuant to Fed. R. Evid. 702. Defendant
further contends that judgment as a matter of law is warranted
because Plaintiff will be unable to establish the essential
elements of her legal malpractice claim. Plaintiff opposes
Defendant's motions.

On April 4, 2017, Attorney O'Toole testified at an
evidentiary hearing held pursuant to *Daubert v. Merrell
Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its
progeny (the "*Daubert* hearing"), whereupon the court took
the pending motions under advisement. Thereafter, Plaintiff
moved to admit certain audio recordings of telephone
communications, which she contends are relevant to the issue
raised by Defendant's motions (Doc. 76) (the "motion to admit
audio recordings"). Defendant opposes admission, arguing
that the recordings are irrelevant, are not authenticated, and
may have been produced in violation of applicable law.
The court took the motion to admit audio recordings under
advisement on May 15, 2017.

Plaintiff is represented by R. Peter Decato, Esq. Defendant is
represented by David L. Cleary, Esq.

**I. The Undisputed Facts.**
In this case, isolating the undisputed facts is no easy task.
Defendant's Statement of Undisputed Facts is confined to
Attorney O'Toole's opinions and does not address the factual
allegations underlying Plaintiff's legal malpractice claim.
Plaintiff's Statement of Disputed Facts, in turn, fails to
respond directly to Defendant's Statement of Undisputed
Facts. Both statements contain impermissible legal argument.
As a result, the court has confined its recitation of the facts
to only those which are supported by admissible evidence as
required by Fed. R. Civ. P. 56(c).

Plaintiff is the niece of Eva Puppolo, who passed away
in 2003 while residing at Crescent Manor Care Centers
("Crescent Manor"), a nursing facility and healthcare
provider located in Bennington, Vermont. Plaintiff alleges
that the administration of a lethal amount of fentanyl caused
her aunt's death and maintains that this and other treatment
were, "at a minimum, grossly negligent and reckless, and
consequently brought about what prudent health practitioners
would have known to be certain death." (Doc. 1 at 8, ¶
55.)[1] At the time of her death, Eva Puppolo was eighty-

2017 WL 4042342

two years old (Doc. 56–1) and weighed sixty-eight pounds (Doc. 75 at 58:14–15). Plaintiff retained Christopher S. Dodig, Esq. to prosecute survival and wrongful death claims against Crescent Manor. Attorney Dodig allegedly failed to commence a timely action and his noncompliance with the applicable statute of limitations is the fulcrum of Plaintiff's claims against him.

**\*2** Plaintiff thereafter retained Defendant to bring a legal malpractice action against Attorney Dodig and his law firm in the Vermont Superior Court (the "Dodig malpractice action"). The Dodig malpractice action resulted in a defense verdict in January 2010. The Vermont Supreme Court upheld the verdict the following year. *See Puppolo v. Donovan & O'Connor, LLC*, 2011 VT 119, 191 Vt. 535, 35 A.3d 166. On May 7, 2014, Plaintiff filed the instant action, alleging that Defendant's legal representation breached the applicable standard of care and that he breached several promises to her regarding how the Dodig malpractice action would be prosecuted.

At the court's *Daubert* hearing, nineteen exhibits were introduced into evidence, including Attorney O'Toole's expert witness opinions, his deposition transcript, and Defendant's deposition transcript. Attorney O'Toole's opinions are reflected in three documents: an undated opinion served on June 10, 2015 (the "Undated Opinion"), a second opinion dated and served September 10, 2015 (the "September 10, 2015 Opinion"), and a third opinion dated and served August 15, 2016 (the "August 15, 2016 Opinion").

Attorney O'Toole is currently a named partner in the firm Baroody & O'Toole located in Baltimore, Maryland, and is admitted to practice law in New York, Maryland, and the District of Columbia. Prior to his engagement in this case, Attorney O'Toole has not served as an expert witness. He has practiced law since 1986 and began handling litigation matters in approximately 1995 or 1996, concentrating mainly on personal injury cases and other civil disputes. In approximately the last ten years, Attorney O'Toole has litigated several medical malpractice cases, trying three cases unsuccessfully to verdict. He has handled between five and ten legal malpractice cases over the past five years, although none to verdict. Attorney O'Toole acknowledged that in 2003 the Bar of Maryland suspended him for thirty days for failing to file state and federal income tax returns over a three-year period.

Attorney O'Toole has known Plaintiff for approximately the past five years. Over four years ago, they discussed the possibility of his representation of Plaintiff in this action. In early 2014, Plaintiff engaged Attorney O'Toole to represent her in multiple medical malpractice actions brought in Maryland and Washington, D.C. arising out of the deaths of her parents. In May of 2014, Plaintiff discharged Attorney O'Toole in three of those actions, accusing him of "running the legal clock in these cases without representing the Plaintiff's best interests[,]" withholding critical procedural information from her, and failing to communicate with her regularly. (Doc. 74 at 2, Ex. M.) Attorney O'Toole still represents Plaintiff in two of those actions. In his testimony, Attorney O'Toole conceded that this arrangement creates the appearance of a conflict of interest that might impact his credibility, presumably because he has an incentive to offer favorable opinions in exchange for Plaintiff foregoing a legal malpractice action against him.

In January 2015, Plaintiff disclosed Attorney O'Toole as her legal malpractice expert in this case. Attorney O'Toole and Plaintiff have not entered into a written agreement governing his expert witness services. He is not being compensated on a contingency basis, but rather plans to charge Plaintiff a fee of $300 per hour. Prior to his deposition in this action, Attorney O'Toole maintained no records regarding the hours he spent on this case. Since his deposition, he has recorded his time but has not billed for it. Although Plaintiff gave him several checks for small amounts in partial payment for his services, Attorney O'Toole destroyed them because he believed Plaintiff could not afford to pay him.

**\*3** Defendant has not directly challenged Attorney O'Toole's qualifications as an expert witness or asked the court to strike his opinions on that basis. For the purposes of the pending motions, the court assumes without deciding that Attorney O'Toole is qualified to serve as an expert witness on legal and medical malpractice under Vermont law. *See In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1024 (S.D.N.Y. 1997) (observing that an expert witness must "at least have a reliable basis in the knowledge and experience of the particular discipline involved") (internal quotation marks omitted).

### A. The Undated Opinion.

On June 10, 2015, Plaintiff served Attorney O'Toole's Undated Opinion which states as follows:

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3188 Filed 07/10/23 Page 19 of 66

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

I have been asked to review certain documents relating to the legal representation rendered by John J. Welch, Jr. ("Mr. Welch") to the Estate of Eva C. Puppolo in its action against Christopher S. Dodig and Donovan & O'Connor, LLC. I have reviewed certain trial transcripts, pleadings, motions, discovery materials, and medical records. Based upon my review and based upon my education, training, experience, and knowledge of the facts of this case, it is my opinion to a reasonable degree of legal probability, that Mr. Welch breached the standard of care in his representation of the Estate in the following ways: failed to call as an expert witness Philip Totonelli, M.D., especially as it pertains to the standard of care relating to the dosing of fentanyl in treating Ms. Puppolo; failed to call witnesses with material information, such as Brianne Dimaggio; failed to present evidence demonstrating that the increase in the size of the wound was due to a tear; failed to challenge the medical testimony of defendants' expert with available scientific information, e.g., *Disposition of Toxic Drugs and Chemicals in Man*, which was known by and discussed with Mr. Welch; failed to present evidence of the alteration by the medical providers of certain medical records; and elicited testimony from defendant Christopher Dodig regarding defendant Christopher Dodig's opinions about the merits of the underlying medical mal practice case. It is also my opinion to a reasonable degree of legal probability that but for such breaches in the standard of care, the outcome achieved by the Estate would have been different. I reserve the right to amend and/or supplement this report should additional information become available, including, e.g., reviewing the discovery deposition of defendant Welch after it is taken.

(*Id.*, Ex. 13) (spelling in original). A footnote recites Attorney O'Toole's educational background and employment history as follows:

I graduated from law school in 1986 from the Columbus School of Law in Washington, DC. I worked for Mudge Rose Guthrie Alexander & Ferdon in New York for approximately three years[.] ... Since that time, I have been in private practice, principally with Neal C. Baroody. A portion of my practice involves medical mal practice claims and legal mal practice claims. I have no prior testimony in the last four years. I am to be compensated at $300.00 per hour plus expenses.

*Id.* at 1 n.1 (spelling in original). After the Undated Opinion was served, the parties amended the discovery schedule to provide Plaintiff the opportunity to serve another expert opinion on or before September 10, 2015.

**B. The September 10, 2015 Opinion.**

The September 10, 2015 Opinion includes the information set forth in the Undated Opinion, except that Attorney O'Toole opines that "to a reasonable degree of legal probability ... but for such breaches in the standard of care, the Estate would have prevailed at trial on its claims." (*Id.*, Ex. 12 at 2.) The September 10, 2015 Opinion adds four footnotes which address Defendant's alleged breaches of the standard of care.

**\*4** First, Attorney O'Toole opines that Defendant should not have called Benjamin Glick, M.D. to testify as to Eva Puppolo's cause of death, and should instead have called Plaintiff's preferred expert witness, Philip Totonelly, M.D., who is acting as an expert witness in at least one other case brought by Plaintiff.[2] Attorney O'Toole opines this was a breach of the standard of care for the following reasons:

Mr. Welsh represented to the Court during a pretrial hearing that he could not get in touch with Dr. Totonelli. As a result, he used Dr. Glick. However, Dr. Totonelli has informed the undersigned that Mr. Welsh never attempted to contact him in connection with this matter. Dr. Totonelli is a clinician, with years of experience treating patients, including those suffering from pain. Dr. Glick, on the other hand, is a medical examiner with no experience treating patients. Choosing a medical examiner with no personal experience treating patients is not reasonable under the circumstances, especially when an experience clinician was available. Dr. Totonelli is also a cardiology specialist who would have explained how the manner in which Ms. Puppolo passed was consistent with a fentanyl overdose. The decision to use Dr. Glick instead was not in good faith.

*Id.* at 1 n.1 (spelling in original).

Second, Attorney O'Toole opines that Defendant should have cross-examined Attorney Dodig's medical witnesses with the textbook *Disposition of Toxic Drugs and Chemicals in Man. See id.* at 1–2 n.2 (stating "Plaintiff has evidence where Mr. Welch promised to use the text in the case. In furtherance of the promise, [Plaintiff] acquired at great expense a copy of the book for trial.").

Third, Attorney O'Toole opines that Defendant failed to present evidence that Crescent Manor employees had altered Eva Puppolo's medical records. *See id.* at 2 n.3 (stating Defendant "encouraged [Plaintiff] to pursue evidence of alteration and agreed to use such evidence if discovered. [Plaintiff] retained a company to examine the records. It was

2017 WL 4042342

determined that certain records had been altered. He breached that promise when he failed to present such evidence during trial.").

Fourth, Attorney O'Toole criticizes Defendant's decision to elicit Attorney Dodig's opinions regarding the merits of Plaintiff's medical malpractice claim against Crescent Manor:

Mr. Dodig's reasons for not pursuing the claims were not relevant to the case—only his failure to properly advise the client as to the appropriate statute of limitations. Allowing Mr. Dodig to testify to the reasons, primarily medical, as to why he did not pursue the claims was extremely prejudicial and only served to bolster the defendants' case. Allowing such testimony was not reasonable and a breach of the standard of care.

**\*5** *Id.* at 2 n.4.

**C. Attorney O'Toole's December 9, 2015 Deposition.**
Defendant noticed Attorney O'Toole's deposition, which was scheduled to take place on December 9, 2015 in Baltimore, Maryland. The Notice of Deposition (the "Notice") directed Attorney O'Toole to bring to the deposition "[h]is complete file" and any correspondence in connection with this action relating to his compensation, the "identification of facts or data that the plaintiff's attorney provided and that the expert considered in forming the opinions to be expressed[,]" and the "identification of assumptions that the plaintiff's attorney provided and that the expert relied on in forming the opinions to be expressed." (Ex. C at 1.) The Notice further instructed Attorney O'Toole to bring "[a]ll invoices, bills, or other statements for services in connection with his work" in this action. *Id.* at 2.

The day before Attorney O'Toole's scheduled deposition, Defendant's counsel informed the court that Plaintiff sought to reschedule Attorney O'Toole's deposition so that he could review Defendant's file, which purportedly had not yet been produced in full. At a telephone conference held on December 8, 2015, the court ordered the deposition to proceed and made the following inquiry:

THE COURT: So how is he going about and writing reports and rendering legal opinions without seeing [Defendant's file]? So he filed these reports. It's time for the deposition. It is going to go forward. If you want to take a second deposition and he changes his opinion based on the review of the files, you may ask to do so, but this is no surprise to him that he is going to be deposed, and if this possession

of this file was a condition precedent to him issuing an opinion, why did he issue opinions?

MR. DECATO: I understand, your Honor.
(Doc. 39 at 8:11–21.)

Attorney O'Toole's deposition took place as scheduled. At his deposition, Attorney O'Toole identified six acts or omissions by Defendant that allegedly breached the applicable standard of care in his handling of the Dodig malpractice action: (1) failing to call Dr. Totonelly as an expert witness; (2) failing to call Brianne Dimaggio as a fact witness; (3) failing to present evidence that Eva Puppolo's ulcer had been caused by a tear; (4) failing to introduce evidence from the textbook and other articles Plaintiff had obtained; (5) failing to present evidence that Crescent Manor employees had altered Eva Puppolo's medical records; and (6) eliciting damaging testimony from Attorney Dodig regarding the merits of the underlying medical malpractice case. Attorney O'Toole acknowledged that he did not fully read the Notice and, as a result, he did not bring to the deposition the documents required to be produced.

**D. Attorney O'Toole's August 15, 2016 Opinion.**
On February 29, 2016, at the parties' joint request, the court ordered Plaintiff to file any amended expert report "within forty-five (45) days of the receipt of the transcript of the completed deposition of Defendant, which is to occur by May 15, 2016[.]" (Doc. 41.) On July 14, 2016, Defendant moved for summary judgment, noting that Plaintiff had failed to serve an amended expert report within the time period ordered by the court and arguing that Attorney O'Toole's two prior opinions failed to comply with Fed. R. Civ. P. 26. Defendant sought dismissal of the action and the preclusion of further opinions by Attorney O'Toole.

**\*6** One month later, Plaintiff opposed the motion to dismiss and served the August 15, 2016 Opinion. In that four-page opinion, Attorney O'Toole opines as follows:

Having read Mr. Welch's deposition transcript and having read the transcript of telephonic conversations pertaining to this matter, I provide the following supplementation of my previous reports on the captioned matter.

In a legal malpractice action, a plaintiff must prove that the attorney was in fact negligent and that this negligence was the proximate cause of the plaintiff's injury. (See, Fleming v. Nicholson, 168 Vt. 495, 497, 724 A.2d 1026,

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3190 Filed 07/10/23 Page 21 of 66

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

1028 (1998)). In a legal malpractice action, the required standard of conduct is the exercise of professional care and skill. Hamilton v. Sommers, 2014 S.D. 76, ¶ 1, 855 N.W.2d 855, 858. Vermont appears to recognize the doctrine of judgmental immunity. Roberts v. Chimileski, 2003 VT 10, 175 Vt. 480, 820 A.2d 995. Under the doctrine of judgmental immunity, an attorney is not liable for acts and omissions in the conduct of litigation which are based on an honest exercise of professional judgment.

It is my opinion, held to a reasonable degree of legal probability, that Mr. Welch departed from the standard of skill and care held out for the legal profession in the State of Vermont. In my opinion Mr. Welch has not exercised the professional care and skill expected of a Vermont attorney litigating a case where the main goal is to obtain punitive damages. It is further my opinion that Mr. Welch isn't or shouldn't be protected by the judgmental immunity doctrine as the evidence supports that Mr. Welch didn't act in good faith and upon an informed judgment after undertaking reasonable research of the relevant legal princip[le]s and facts of the given case. See, e.g., Smith v. Lewis, 13 Cal. 3d 349, 530 P.2d 589, 595, 118 Cal. Rptr. 621 (Cal. 1975).

Even though Mr. Welch intended to seek punitive damages, he testified that he wasn't familiar with Pion v. Bean, 2003 VT 79, 176 Vt. 1, 833 A.2d 1248. However, he conceded that Pion accurately described the law in the State of Vermont as it existed in 2010. Pion says that punitive damages are appropriate where there has been a showing of actual malice or a showing of conduct manifesting personal ill will or conduct carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights will suffice.

In his deposition, Mr. Welch indicated that the basis of the wrongful death action would have been related to administering too much fentanyl and that he intended to get punitive damages by showing reckless and wanton behavior. If getting punitive damages was Mr. Welch's goal, he failed to pursue and utilize the available evidence to establish malice or reckless and wanton behavior.

I mentioned the evidence Mr. Welch ignored in my earlier opinion(s): Mr. Welch failed to call as an expert Philip Totonelly, M.D., especially as it pertains to the standard of care relating to the dosing of fentanyl in treating Ms. Puppolo; failed to call witnesses with material information,

such as Brianne DiMaggio; failed to present evidence demonstrating that the increase in the size of the ulcer was due to a tear; failed to challenge the medical testimony of defendants' expert with available scientific information, e.g., *Disposition of Toxic Drugs and Chemicals in Man*, which was known by and discussed with Mr. Welch; failed to present evidence of the alteration by the medical providers of certain medical records; and elicited testimony from defendant Christopher Dodig regarding the merits of the underlying medical malpractice case.

**\*7** I am concerned by the fact that Mr. Welch represented to the trial court that he chose not to use Dr. Totonelly because he attempted to contact him on a plurality of occasions and was unable to reach him. I called Dr. Totonelly and had no trouble reaching him. When I did reach Dr. Totonelly, he indicated that Mr. Welch had never tried to contact him. Mr. Welch testified that he could understand why Celeste Puppolo believed he was going to call Dr. Totonelly as a witness and that he recalls promising to call Dr. Totonelly as a rebuttal witness.

In his deposition, Mr. Welch admitted to knowing of Dr. Totonelly and he knew that Dr. Totonelly had strong opinions. Mr. Welch knew that Dr. Totonelly had the opinion that the Crescent Manor health care providers had negligently or intentionally overdosed Eva Puppolo with fentanyl in extreme quantities which caused her death. This is very strong evidence establishing negligence, especially considering that there was a claim for punitive damages.

Mr. Welch admitted in his deposition that he had initially planned on using Dr. Totonelly as a witness. Dr. Totonelly was listed as an expert witness in the 26(b)(4) disclosures. I have reviewed Dr. Totonelly's written opinion, and there is nothing in Dr. Totonelly's written opinion that should give pause to any reasonable attorney trying to establish negligence and get punitive damages. During his deposition, Mr. Welch suggested that Dr. Totonelly would have been impeached by his prior opinion(s) as to [Crescent Manor's] role in causing Eva Puppolo's death. However, this was not the reason he represented to the trial court as to why he was not using Dr. Totonelly. He represented to the trial court that he tried to contact Dr. Totonelly, but was unsuccessful and left to rely on Dr. Glick.

Mr. Welch admitted in his deposition having a discussion with Celeste Puppolo about using Dr. Totonelly as a rebuttal witness. This representation to Celeste Puppolo is concerning because he represented to the trial court that

2017 WL 4042342

he was unable to contact Dr. Totonelly. In addition, Dr. Totonelly advised me that Mr. Welch had not contacted him in connection with this case. However, even if Mr. Welch really intended to call Dr. Totonelly on rebuttal, during his deposition, he questioned the wisdom of using Dr. Totonelly in this manner. In my opinion, Dr. Totonelly's vastly superior clinical background mandated that he be utilized in the Estate's case in chief to establish negligence and get beyond a motion for a directed verdict on the issue of punitive damages. Ultimately, Judge Suntag set aside the request for punitive damages. In my opinion, if Mr. Welch had called Dr. Totonelly to testify in the Estate's case in chief, Judge Suntag would have decided otherwise.

In my opinion, Brianne DiMaggio and some of her fellow nurses should have been called to testify. Mr. Welch was aware that Brianne told the Bennington Police she thought someone at Crescent Manor had intentionally given an overdose of fentanyl to bring about Eva Puppolo's death. Ms. DiMaggio indicated she had provided care for Eva Puppolo and she was of the following belief: (1) Crescent Manor had killed Eva Puppolo; (2) Crescent Manor tore Eva's coccyx with a bedpan and failed to take care of the tear on Eva's backside; and (3) Crescent Manor had "redone" Eva's medical records immediately after Eva's death. This evidence goes directly to punitive damages, and it was ignored. Ignoring this evidence shows, in my opinion, a lack of professional care and skill.

There was evidence that the nurses were holding a lottery of sorts in to guess when Eva would die from the fentanyl. This evidence would go directly to the issue of malice and to the issue of punitive damages. Excluding this evidence shows a lack of professional care and skill. If this evidence was presented, along with the evidence of the altered medical records and the evidence from Dr. Totonelly, Brianne DiMaggio and some of the other nurses, then the Estate's claims of negligence and for punitive damages would likely have succeeded.

  **8**  The evidence I've seen suggests that Mr. Welch made promises to try the claim against Attorney Dodig a certain way and then Mr. Welch reneged on the promises. He agreed at one time to call Dr. Totonelly, Brianne DiMaggio and some of the other nurses, but didn't. He agreed at one time to use the report from Joan McCann about the altered medical records and didn't. In my opinion, the refusal to use this and the other evidence shows poor judgment and lack of good faith.

An attorney is not infallible when he makes choices about what experts to call and what exhibits to put in. However, he still has to use professional care and skill and Mr. Welch failed to do so. Mr. Welch's judgments were not the honest exercise of professional judgment.

In my opinion, Mr. Welch's failure to use available evidence and his broken promises to his client constitutes a breach of Mr. Welch's duties to use professional skill and care. It is also my opinion, based upon a reasonable degree of legal probability, that but for Mr. Welch's failures, a jury would more likely than not have returned a verdict for the Estate and have awarded general <u>and</u> punitive damages. I believe Mr. Welch's breach of the standard of care was the proximate cause of the Estate's failure to succeed with ... Judge Sontag and the jury.

A solemn relationship of trust and confidence exists between an attorney and his client. It was violated in this case. The failure of Mr. Welch to call Dr. Totonelly; to deal credibly with Dr. Glick; to call Brianne DiMaggio and many of the other nurses; and to use evidence of altered medical records all caused the Estate to lose its case and lose its claims of negligence and for punitive damages. Mr. Welch failed to use the competent evidence, all of which tended to support the Estates' claims for compensatory and punitive damages. According to Mr. Welch, "It is well established that 'an attorney's decision to pursue one of several reasonable courses of action does not constitute malpractice.' " In light of his obligations and representations to the client and the trial court, Mr. Welch failed to act reasonably. Therefore, it is my opinion, held to a reasonable legal probability, that Mr. Welch committed legal malpractice and caused the Estate harm.

(Doc. 74, Ex. 7 at 1–4) (spelling in original).

Attorney O'Toole testified that Plaintiff's counsel provided him with a draft of the August 15, 2016 expert witness opinion to which he made certain minor edits. He then converted the document into letter format, and Plaintiff served it on Defendant. Attorney O'Toole acknowledged that he did not perform the legal research that is reflected in his August 15, 2016 Opinion. A comparison of the opinion drafted by Plaintiff's counsel and Attorney O'Toole's August 15, 2016 Opinion reveals that they are substantially identical with minor revisions.

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

**E. Attorney O'Toole's Testimony Regarding the Extent of His Reliance on Plaintiff's Audio Recordings and the Transcriptions Thereof.**

On April 2, 2017, Plaintiff moved *in limine* to admit uncertified transcripts of seven audio recordings she surreptitiously made of telephone conversations with Defendant in 2008–10 and with certain fact witnesses. Plaintiff contends that these materials "may have some bearing on the parties' *Daubert* hearing to be held on Tuesday, April 4, 2017[.]" (Doc. 72 at 3, ¶ 14.) Plaintiff also filed seven supporting affidavits, in which she described the circumstances, timing, and manner in which she created the audio recordings, which include material unrelated to this action. *See, e.g.,* Doc. 72–1 at 3, ¶ 8 (Plaintiff's affidavit noting that "[v]oices unrelated to this litigation, and in the order in which they occur, are Dr. Bier, Dr. Mamo, Patrick, Marcia, and John"). Plaintiff's own affidavit states that she read the uncertified transcripts of the audio recordings and opines that they had been accurately transcribed.

**\*9** At the *Daubert* hearing, the court denied Plaintiff's motion to admit the uncertified transcripts of the audio recordings without prejudice, and stated as follows:

THE COURT: ... What [Plaintiff] has asked me to do is to rely on a transcript in lieu of the audiotapes. That's the problem, because I would typically have an unbiased third party certify that this is a true and accurate copy of the audiotape.... I am going to deny the motion without prejudice. If you give me the audiotapes, that's the best evidence. The Court can listen to them ... and determine whether or not they should be admissible.

MR. DECATO: We will do that if you give us leave to go get them and give them to the Court.

THE COURT: Sure. You don't have to do it right now. I am just saying that I can't accept the evidence in the form that you proffered[.]
(Doc. 75 at 7:19–8:7.)

Attorney O'Toole was thereafter examined regarding the facts and data he considered in forming his expert opinions. His August 15, 2016 Opinion is the only opinion that arguably references the audio recordings, stating only that he "read the transcript of telephonic conversations pertaining to this matter[.]" (*Id.*, Ex. 7 at 1.) In his testimony both at deposition and at the court's *Daubert* hearing, Attorney O'Toole drew no connection between the audio recordings and his opinions. At

his December 9, 2015 deposition, Attorney O'Toole testified: "Well, I don't know whether I read a transcript, listened to a tape. I'm not sure." (Doc. 81–1 at 151:13–14.)

At the *Daubert* hearing, Attorney O'Toole testified that he read the transcripts of Plaintiff's audio recordings, but had not listened to the recordings themselves:

Q. I'm talking about transcriptions of telephone calls.

A. Oh. I read some of the transcriptions, yes....

Q. All right. Did you ever listen to the tapes?

A. No, I don't think I listened to those tapes, but I don't know.

Q. Did you ever inquire as to whether or not the recordings were made legally?

A. I was told that they were made legally.
(Doc. 75 at 187:4–15.)

At the conclusion of the *Daubert* hearing, the court expressed doubt regarding the relevance of the underlying recordings:

THE COURT: ... I have already said this, but I am not going to accept transcripts prepared by a party. And I want the best evidence, the audiotapes. You can renew the request to admit them. I am not so sure that they have much to do with the *Daubert* hearing because the witness was so imprecise about what he had reviewed and what he hadn't reviewed. So I have no way of telling whether they are relevant or not. *Id.* at 211:4–14.

On April 25, 2017, Plaintiff filed the motion to admit audio recordings, contending that "[l]istening to the audiotape evidence has a bearing on the parties' *Daubert* hearing held on Tuesday, April 4, 2017[,] as F.R.E. Rule 703 states that an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. Attorney O'Toole is aware of the audiotape evidence and the evidence that bears on the issue of [Defendant's] deceit." (Doc. 76 at 2, 3.) Plaintiff did not address Attorney O'Toole's equivocal testimony regarding whether he actually listened to the audio recordings or reviewed the transcripts of them. In a May 23, 2017 filing, Plaintiff represented that "Mr. O'Toole has not listened to the recordings since 2012" but that "[t]he recordings had made a permanent impression on him when he first did his research on this case, and he remembers the intensity of the dialog[ue]." (Doc. 79 at 2–3, ¶ 4.) Plaintiff

2017 WL 4042342

attached an affidavit signed by Attorney O'Toole dated May 23, 2017, wherein he averred that "[l]istening to the tapes and reading the trial transcript provided me with the background information and facts I needed to form my opinions regarding legal malpractice." (Doc. 79–1 at 1, ¶ 3.)

## II. Conclusions of Law and Analysis.

### A. Whether to Grant Plaintiff's Motion to Admit Audio Recordings.

**\*10** The audio recordings Plaintiff seeks to admit are relevant only to the extent that Attorney O'Toole relied upon them in forming his opinions. *See* Fed. R. Evid. 702(b). In both his December 9, 2015 deposition and at the *Daubert* hearing, Attorney O'Toole testified that he either did not listen to the audio recordings or, at best, that he did not know whether he had listened to them. None of his expert opinions indicate that he relied on the audio recordings, despite his obligation to disclose "the facts or data [he] considered ... in forming" his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii); *see also id.*, advisory committee's note to 2010 amendment (noting "the intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients"). The strongest evidence of his reliance on the recordings is his August 15, 2016 Opinion which reflects that he reviewed an unspecified "transcript of telephonic conversations pertaining to this matter." (Doc. 74, Ex. 7.)

Attorney O'Toole's post-hearing affidavit seeks to alter the record by stating that he relied on both the audio recordings and the transcripts in forming his opinions. His affidavit does not identity when he undertook those tasks. The court declines to allow him to "correct" his testimony in this *post hoc* manner.[3] As Plaintiff has failed to satisfy her obligation to show that the audio recordings are relevant, Plaintiff's motion to admit audio recordings (Doc. 76) is DENIED. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (stating that "in analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case").

### B. Whether Defendant Is Entitled to Rule 37 Sanctions.

### 1. Whether Plaintiff's Untimely Service of the August 15, 2016 Opinion Warrants Dismissal of the Action.

Defendant argues that Plaintiff's failure to timely serve the August 15, 2016 Opinion is inexcusable and justifies dismissal of the action. "If a party ... fails to obey an order to provide or permit discovery,... the court where the action is pending may ... dismiss[ ] the action or proceeding in whole or in part[.]" Fed. R. Civ. P. 37(b)(2)(A)(v). The sanction of dismissal is appropriate only in "extreme situations," such as "when a court finds willfulness, bad faith, or any fault on the part of the" non-compliant party. *Guggenheim Cap., LLC v. Birnbaum*, 722 F.3d 444, 451 (2d Cir. 2013) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990)) (internal quotation marks omitted). The court is guided by the following factors in evaluating whether this sanction is warranted: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of... noncompliance." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (internal quotation marks omitted).

Here, although Plaintiff's noncompliance was willful and the period of noncompliance was inexcusable, the extreme sanction of dismissal of the case is not warranted. "Parties must be given notice and an opportunity to respond before a cause of action, or potential remedy, is dismissed as a sanction for failure to comply with court orders." *Id.* at 160. No notice was provided in this case. In addition, while the degree of prejudice to Defendant is substantial, the consequences to Plaintiff are far greater and border on draconian. Lesser sanctions will appropriately address the untimely disclosure of Attorney O'Toole's opinions, remedy the prejudice to Defendant, and still allow Plaintiff to have her claims considered on their merits. *See Dodson v. Runyon*, 86 F.3d 37, 39 (2d Cir. 1996) (stating that "[t]he remedy [of dismissal] is pungent, rarely used, and conclusive. A district judge should employ it only when he is sure of the impotence of lesser sanctions.") (internal quotation marks omitted) (alteration in original).

**\*11** For the foregoing reasons, Defendant's motion to dismiss the action as a Rule 37 sanction is DENIED.

### 2. Whether Plaintiff's Untimely Service of the August 15, 2016 Opinion Precludes Its Admissibility.

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3194 Filed 07/10/23 Page 25 of 66
Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)
2017 WL 4042342

In the alternative, Defendant argues that Attorney O'Toole's August 15, 2016 Opinion should be precluded as a sanction for its untimely disclosure without justification. This would leave the Undated Opinion and the September 10, 2015 Opinion as Plaintiff's only expert witness disclosures. In determining an appropriate response, the court is guided by Fed. R. Civ. P. 37, which provides, in pertinent part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

In determining whether a party's violation is "substantially justified or harmless," courts in the Second Circuit consider: "(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590–91 (2d Cir. 1988)).

It is undisputed that Plaintiff served Attorney O'Toole's August 15, 2016 Opinion over one month after the court-ordered deadline to do so. Plaintiff neither sought leave of court to extend that deadline, nor requested an extension from Defendant. *See Beyer v. Anchor Insulation Co.*, 2016 WL 3676091, at *4 (D. Conn. July 6, 2016) (finding no adequate explanation for the party's failure to comply with a discovery order and noting that "plaintiffs continued to conduct expert discovery after their deadline without notice to the defendants or leave from the court"). Plaintiff proffers no explanation for failing to comply with the court's discovery deadline. Because she has initiated and pursued at least three lawsuits, each alleging some form of professional malpractice, she is not a neophyte in the requirements of litigation. Throughout this proceeding she has been represented by counsel. There is thus no reasonable justification for her noncompliance with the court's discovery deadlines.

Regarding the opinion's importance, prior to the late service of the August 15, 2016 Opinion, Plaintiff had disclosed two opinions by Attorney O'Toole, which were required to set forth "a complete statement of all" of his opinions. Fed. R. Civ. P. 26(a)(2)(B)(i). Attorney O'Toole's August 15, 2016 Opinion purports to materially alter those opinions. Accordingly, permitting Plaintiff to rely on

Attorney O'Toole's August 15, 2016 Opinion would prejudice Defendant because it would require Defendant to confront a new opinion after a summary judgment motion has been filed. A continuance may remedy some of the prejudice to Defendant, but would not avoid a waste of party and judicial resources. *See Advanced Analytics, Inc. v. Citigroup Glob. Mkts., Inc.*, 301 F.R.D. 31, 41 (S.D.N.Y. 2014) (holding that "a continuance is not appropriate, given the age of this case and the fact that discovery has long been closed"); *see also Softel*, 118 F.3d at 963 (stating that "the enormous length of every step of the proceedings in this case militate[s] against any more continuances"). As one court has observed:

> *12 Defendants are entitled to make summary judgment motions on the basis of the discovery record compiled in accordance with the federal rules and the court's orders. [A party's] new expert theory cannot be presented without giving [the opposing party] an opportunity to depose his experts, thus reopening discovery and rendering [that party's] motion, addressed in good faith to the theories and evidence that had been disclosed, an expensive waste of effort.

*Every v. Makita U.S.A., Inc.*, 2005 WL 2757952, at *6 (S.D.N.Y. Oct. 24, 2005).

Viewing the relevant factors collectively, the court concludes that Plaintiff's untimely service of Attorney O'Toole's August 15, 2016 Opinion is neither harmless, nor excusable. *See In re Omeprazole Patent Litig.*, 2002 WL 287785, at *5 (S.D.N.Y. Feb. 27, 2002) (precluding improperly disclosed expert testimony where "not one of [the] factors weighs in favor of permitting the new opinions in this case"). On this basis alone, the opinion is subject to exclusion. The court nonetheless proceeds to evaluate the merits of the August 15, 2016 Opinion to determine whether it is otherwise admissible. If it is, the sanction of exclusion may be too harsh. If it is inadmissible, Plaintiff will suffer no prejudice as a result of its exclusion. The court thus DEFERS ruling on Defendant's motion to exclude until the admissibility of the August 15, 2016 Opinion is determined.

**3. Whether Defendant Is Entitled to Costs Occasioned by the Untimely Disclosure of the August 15, 2016 Opinion.**

Pursuant to Rule 37, "[i]n addition to or instead of [the sanction of preclusion], the court, on motion and after giving an opportunity to be heard ... may order payment of the reasonable expenses, including attorney's fees, caused by"

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3195 Filed 07/10/23 Page 26 of 66

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

a party's untimely disclosure. Fed. R. Civ. P. 37(c)(1)(A). This court "has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37, and its ruling will be reversed only if it constitutes an abuse of discretion." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). In exercising its discretion, "the court may draw upon its first hand familiarity with all the pertinent circumstances of the particular case." *Mayo–Coleman v. Am. Sugar Holding, Inc.*, 2016 WL 7378767, at *1 (S.D.N.Y. Nov. 16, 2016) (internal quotation marks omitted).

In seeking exclusion of the August 15, 2016 Opinion, Defendant requests "all costs associated with bringing this motion, and the activities leading up to the motion, including all attorneys' fees[.]" (Doc. 42 at 25.) In his July 14, 2016 affidavit, Defendant's counsel identifies four categories covered by this request: (1) the expense associated with preparing for and attending Defendant's deposition ($10,019.50); (2) the expense associated with the production of files in response to Attorney O'Toole's deposition ($1,267.00); (3) unspecified additional costs associated with the prior two categories ($1,713.75); and (4) fees and costs associated with preparing and filing the instant motions ($3,872.00).

Because Defendant's motion was precipitated, at least in part, by the late disclosure of the August 15, 2016 Opinion which the court has found both unjustified and prejudicial, an award of costs is appropriate. However, because Defendant's motion seeks relief on several other grounds that do not stem from Plaintiff's late expert witness disclosure, those costs must be excluded. For example, Defendant has not shown why he should recover costs and fees for preparing for and attending his own deposition. While he asserts that Plaintiff requested to depose him so that Attorney O'Toole could amend his opinions, the parties jointly moved to amend the discovery schedule to allow Defendant's deposition without any provision that Plaintiff bear the costs thereof.

*13 In addition to attorney's fees and expenses associated with the motion to exclude, Defendant seeks an award of costs in the amount of $1,267.00 for the production of his files to Attorney O'Toole after his December 9, 2015 deposition. Because Plaintiff was entitled to production of Defendant's file, Defendant may recover only photocopying costs.

On balance, the court attributes $500 of Defendant's expenses of $3,872.00 incurred in filing the pending motions to Plaintiff's untimely expert disclosure, and attributes the remaining amounts to unrelated issues. In the absence of a more particularized statement, the court has no other means of segregating the expenses incurred by the untimely disclosure. Even without this information, however, the court has little difficulty in concluding that at least $500 in attorney's fees are attributable to Defendant's motion to exclude. In the event Defendant contends that additional fees and expenses were incurred in responding to Plaintiff's untimely disclosure, he may renew his application supported by a particularized statement as to the tasks involved, the fees and costs incurred, and his counsel's hours expended and hourly rate.

For the reasons stated above, the court GRANTS IN PART AND DENIES IN PART Defendant's request for expenses and ORDERS Plaintiff to pay Defendant the sum of $500.00, together with Defendant's costs, if any, incurred in photocopying his file for production to Plaintiff.

## C. Whether to Exclude Attorney O'Toole's Opinions Pursuant to Rule 702.

The admissibility of Attorney O'Toole's opinions is governed by Fed. R. Evid. 702, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:"

  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

  (b) the testimony is based on sufficient facts or data;

  (c) the testimony is the product of reliable principles and methods; and

  (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The court therefore assumes a "gatekeeping" role "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). This gatekeeping obligation "applies to all expert testimony" and not simply to "scientific" testimony.

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3196 Filed 07/10/23 Page 27 of 66
Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)
2017 WL 4042342

*Id.* at 147. The party proffering expert testimony bears the burden of establishing its admissibility "by a preponderance of proof." *Daubert*, 509 U.S. at 592 n.10.

In *Daubert*, the Court identified several factors to be considered in determining whether an expert's opinion is admissible: whether the expert's theory or technique "can be (and has been) tested," whether it has been subjected to peer review or publication, its known or potential rate of error, and its " 'general acceptance' " within the particular discipline. *Id.* at 593–94. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596.

**\*14** The trial court's inquiry is "a flexible one" whose "overarching subject" is the "evidentiary relevance and reliability ... of the principles that underlie a proposed submission." *Id.* at 594–95. The court therefore has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152; *see also Amorgianos*, 303 F.3d at 266 (observing that "the *Daubert* inquiry is fluid and will necessarily vary from case to case"). "The flexible *Daubert* inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos*, 303 F.3d at 267. The court's "focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Defendant contends Attorney O'Toole's opinions are inadmissible because they are unreliable. Expert testimony in a legal malpractice action "does not lend itself to the scientific and technical concerns expressed by *Daubert*." *Tokio Marine & Nichido Fire Ins. Co. v. Calabrese*, 2011 WL 5976076, at \*12 (E.D.N.Y. Nov. 28, 2011) (quoting *LNC Invs. Inc. v. First Fidelity Bank*, 2000 WL 1024717, at \*4 (S.D.N.Y. July 25, 2000)). Nonetheless, a legal malpractice expert "must do more than aver conclusorily that his experience led to his opinion[.]" *523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 643 (S.D.N.Y. 2014). In addition to Rule 702 and *Daubert* and its progeny, the court must consider whether an opinion's tendency to assist "the trier of fact to understand the evidence or to determine a fact in issue[,]" Fed. R. Evid. 702(a), is outweighed by other considerations such as unfair prejudice and the possibility of misleading and confusing the jury. Fed. R. Evid. 403.

### 1. The Undated and September 10, 2015 Opinions.

With regard to the Undated and September 10, 2015 Opinions, Attorney O'Toole states that he "reviewed certain trial transcripts, pleadings, motions, discovery materials, and medical records" in forming his opinions. (Doc. 74, Ex. 14 at 1.) These "cursory reference[s] to the sources of his opinion[s] do not enable the [c]ourt to determine that" his opinions are "based on sufficient facts or data." *Kellogg v. Wyeth*, 2012 WL 2970621, at \*5 (D. Vt. July 20, 2012); *see also* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring that an expert report disclose "the facts or data considered by the witness in forming" his or her opinions). From the proceedings in this case, the court is aware that Attorney O'Toole did not review Defendant's complete file or have the benefit of Defendant's deposition before he rendered the Undated Opinion and the September 10, 2015 Opinion. Attorney O'Toole could therefore only speculate regarding the factual and legal underpinning of Defendant's strategic decisions. *See Ryan v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2010 WL 2232670, at \*8 (D. Conn. June 2, 2010) (excluding testimony of expert who was unaware of alternative explanations for the outcome of an arbitration proceeding and holding that the expert's "failure to consider these other factors renders her opinion unreliable").

Moreover, both the Undated Opinion and the September 10, 2015 Opinion consist of a litany of strategic decisions made by Defendant without tying those decisions to the applicable law. The court thus has no means of determining whether Attorney O'Toole applied the correct standard of care under Vermont law in reaching his opinions. Because Attorney O'Toole has never practiced in Vermont and is not licensed in this jurisdiction, and because neither the Undated Opinion nor the September 10, 2015 Opinion disclose any legal research, the court cannot assume he consulted Vermont law prior to rendering his opinions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (observing that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

**\*15** The Supreme Court has "clarified that, whether a witness's area of expertise was technical, scientific, or more generally 'experience-based,' Rule 702 requires the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom

2017 WL 4042342

the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005) (citations and footnote omitted). In the case of the Undated Opinion and the September 10, 2015 Opinion, that intellectual rigor is lacking. *See Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (concluding that *Daubert* "requires the district judge to satisfy [herself] that the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting").

The Undated Opinion and the September 10, 2015 Opinion suffer from the additional deficiency that they assert that Plaintiff would have prevailed in the Dodig malpractice action if some or all of Defendant's strategic decisions had not been made. These statements are conclusory in nature and do not account for countervailing facts. *See Vale v. United States*, 673 Fed.Appx. 114, 116 (2d Cir. 2016) (holding that expert testimony is "inadmissible as unreliable where it consists of conclusory and speculative opinions" and that the expert's medical malpractice opinions "provided conclusory and speculative statements" regarding the defendant's negligence); *S.E.C. v. Badian*, 822 F. Supp. 2d 352, 357 (S.D.N.Y. 2011) (excluding expert testimony that is "replete with inadmissible generalized statements of law, legal conclusions and conclusory statements"). For example, neither opinion addresses Dr. Totonelly's provision of a prior inconsistent written opinion regarding the cause of Eva Puppolo's death,[4] or the fact that Eva Puppolo was elderly and severely underweight at the time of her death. Choosing an unequivocal cause of death opinion from a medical examiner such as Dr. Glick over the inconsistent opinions of Dr. Totonelly, a clinician who presumably neither treated nor examined Eva Puppolo, is not an error so patently obvious that analysis is unnecessary.

Similarly, neither opinion addresses the fact that lay witness Brianne Dimaggio was investigated by the police for her alleged role in Eva Puppolo's death. On that basis, the credibility of her allegations that the nurses conducted a lottery regarding the timing of Eva Puppolo's death, that Crescent Manor "killed" her, and that Crescent Manor hired an outside firm to alter its own medical records are subject to impeachment. Defendant was entitled to consider those countervailing facts in deciding whether to call her as a witness.

As for Defendant's eliciting Attorney Dodig's opinions regarding the merits of the medical malpractice action, neither

the Undated Opinion nor the September 10, 2015 Opinion indicate whether this was the sole evidence on that point or whether it was merely cumulative. Taking into consideration the defense verdict in the Dodig malpractice action, evidence that the Estate's medical malpractice claim lacked merit was likely presented to the jury by the defense.

**\*16** Finally, both the Undated Opinion and the September 10, 2015 Opinion assert a number of legal conclusions. "Although testimony that embraces an ultimate issue to be decided by the jury is not inadmissible *per se*, Fed. R. Evid. 704, it should not be received if it is based on 'inadequately explored legal criteria.' " *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 709 (2d Cir. 1989) (citation omitted). Here, both opinions assert opinions regarding causation without explaining the law and the facts that support those conclusions.

In light of the significant analytical gap between Attorney O'Toole's opinions and the facts and law upon which they are premised, the failure to sufficiently identify the facts and data upon which they are based, and the fact that Attorney O'Toole rendered his opinions without the benefit of Defendant's complete file or deposition, the Undated Opinion and the September 10, 2015 opinion would not assist the jury in determining whether Defendant committed legal malpractice. *See Joiner*, 522 U.S. at 146 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Amorgianos*, 303 F.3d at 270 ("In light of the defects in the methodologies employed by plaintiffs' experts and the district court's reasonable determination that there was a significant 'analytical gap' between the experts' opinions and the studies on which they relied in reaching their conclusions, the district court's exclusion of plaintiffs' experts' testimony because it was not grounded in science was well within its discretion."). When coupled with the Plaintiff's noncompliance with Fed. R. Civ. P. 26(a)(2) and Fed. R. Evid. 702(b) in disclosing the opinions despite ample time and opportunity to do so, there are no grounds on which they should be admitted. For the foregoing reasons, the Undated Opinion and the September 10, 2015 Opinion are hereby EXCLUDED.

### 2. The August 15, 2016 Opinion.

The August 15, 2016 Opinion consists of a narrative prefaced by a statement that "[h]aving read Mr. Welch's deposition transcript and having read the transcript of

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3198 Filed 07/10/23 Page 29 of 66

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

telephonic conversations pertaining to this matter, I provide the following supplementation of my previous reports on the captioned matter." (Doc. 74, Ex. 7 at 1.) This vague statement fails to cure the deficits in the Undated Opinion and the September 10, 2015 Opinion in identifying the facts and data upon which Attorney O'Toole's opinions are based. *See* Fed. R. Civ. P. 26(a)(2); Fed. R. Evid. 702(b). On that basis alone, the August 15, 2016 Opinion is subject to exclusion. *See Amorgianos*, 303 F.3d at 267 ("To warrant admissibility ... it is critical that an expert's analysis be reliable at every step.").

Although the August 15, 2016 Opinion sets forth substantially more facts and legal analysis than the Undated Opinion and the September 10, 2015 Opinion, it is merely a conduit for the opinions of Plaintiff and her counsel. *See Gary Price Studios, Inc. v. Randolph Rose Collection, Inc.*, 2006 WL 1319543, at *8 (S.D.N.Y. May 11, 2006) (precluding expert testimony that "would in large measure simply parrot the testimony that [plaintiff] may be expected to give at the trial"); *King–Ind. Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009) ("When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded."). Attorney O'Toole acknowledged at the court's *Daubert* hearing that he performed none of the legal research presented in the August 15, 2016 Opinion and merely made minor revisions to the expert witness opinion prepared for him by Plaintiff's counsel. Because the August 15, 2016 Opinion is not "the product of [Attorney O'Toole's] independent analysis[,]" it is inadmissible. *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009); *see also Toole v. Toshin Co.*, 2004 WL 2202580, at *3 (W.D.N.Y. Sept. 29, 2004) ("In assessing the reliability of an expert's methodology, the court should also consider whether the expert's opinion emanates from his own independent research[.]").

**\*17** Attorney O'Toole's August 15, 2016 Opinion is inadmissible for the further reason that it is based on an erroneous assumption that dishonesty to a court or to a client, a lack of good faith, or a breach of promise to call a witness or present evidence, are sufficient to sustain a claim of legal malpractice under Vermont law. The Vermont Supreme Court has expressly held that the failure to call Dr. Totonelly was a "strategy disagreement" for which Plaintiff's wishes must give way to her attorney's exercise of professional judgment:

> She also complained of her attorney's choice of expert witness. While plaintiff conceded that both her preferred expert and the expert her attorney eventually hired came to the same conclusion-that her aunt had died of a Fentanyl

overdose-she felt her expert was "more definitive," "not wimpy," and "very staunch in his opinion." Her attorney explained that he had made a "plurality of attempts" to contact plaintiff's preferred expert, but having received no response, retained another whom he considered "just as competent" and capable of providing "everything" he needed for expert testimony.

. . .

> As the trial court correctly stated, "[t]he decision regarding which expert, or how many experts, to retain is a classic strategy decision within the discretion of the attorney." ... A disagreement on strategy does not rise to the level of "good cause" sufficient to support a motion to withdraw. ... The trial court thoroughly examined these strategy disagreements, and its determination that counsel made reasonable decisions within the purview of his professional discretion is firmly rooted in the record. The primary conflict was over the way in which the case would be tried, and plaintiff points to little more than her disagreement with these decisions to support her motion. ... The choices at issue were well within the discretion of plaintiff's counsel, and the trial court did not abuse its discretion in denying the motion.

*Puppolo*, 2011 VT 119, ¶¶ 9, 17 (internal citations omitted). Rather than squarely address the Vermont Supreme Court's *Puppolo* decision, the August 15, 2016 Opinion does not even mention it.

It is well-established that violations of professional responsibility do not *per se* constitute legal malpractice. *See, e.g., Davis v. Findley*, 422 S.E.2d 859, 860 (Ga. 1992) (collecting cases and holding that an alleged violation of the Code of Professional Responsibility, "*standing alone,* cannot serve as a legal basis" for a legal malpractice action) (internal quotation marks omitted) (emphasis in original). Moreover, even if Defendant had been truthful with Plaintiff and the trial court, the August 15, 2016 Opinion fails to adequately explain why this would have produced a favorable outcome for the Estate. In other words, had Defendant been honest in explaining to both Plaintiff and the trial court why he chose not to call certain witnesses, use certain textbooks and treatises, or ask certain questions, it is not clear how this would have produced a different result. The jurors in the Dodig malpractice action were not privy to the reasons for his strategic decisions, nor should they have been.

Finally, the August 15, 2016 Opinion is inadmissible because it purports to instruct the jury as to the relevant law and

Case 2:19-cv-10027-GAD-APP  ECF No. 169-5, PageID.3199  Filed 07/10/23  Page 30 of 66

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

the conclusions it must reach regarding the credibility of witnesses and the persuasiveness of their testimony. " 'The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury.' " *Andrews*, 882 F.2d at 709 (quoting *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)). As the Second Circuit has explained:

**\*18** Generally, the use of expert testimony is not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination. In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony which states a legal conclusion.

*United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (citations omitted); *see also Nimely*, 414 F.3d at 398 ("Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.").

While vigorous cross-examination, introduction of opposing views, and cautionary instructions from the judge may address some of the risks posed by the August 15, 2016 Opinion, the Second Circuit has recognized that even if a court reminds a jury that a lawyer's views of the law are " 'not binding[,]' " "such a charge cannot always cure the trial court's error in allowing inadmissible evidence." *Fiataruolo v. United States*, 8 F.3d 930, 942 (2d Cir. 1993). In such circumstances, "allowing attorneys to testify to matters of law would be harmful to the jury." *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). "First, the jury would be very susceptible to adopting the expert's conclusion rather [than] making its own decision. There is a certain mystique about the word 'expert' and once the jury hears of the attorney's experience and expertise, it might think the witness even more reliable than the judge." *Id.* "Second, if an expert witness were allowed to testify to legal questions, each party would find an expert who would state the law in the light most favorable to its position. Such differing opinions as to what the law is would only confuse the jury." *Id.* As the *Daubert* Court observed: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.

Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks omitted).

In this case, when the inadmissible parts of the August 15, 2016 Opinion are excluded, there is little left. In tacit recognition of this fact, Plaintiff's counsel asked Attorney O'Toole in an email whether they should "bit[e] the bullet" because they could not show legal malpractice. (Doc. 74, Ex. L.) When coupled with evidence that Attorney O'Toole performed no independent legal research in rendering the August 15, 2016 Opinion, to nonetheless allow him to testify as an expert witness before a jury would be a derogation of the court's gatekeeping function.

Because the August 15, 2016 Opinion is untimely and inadmissible under Fed. R. Evid. 702, *Daubert* and its progeny, and Fed. R. Evid. 403, Defendant's motion to exclude Attorney O'Toole opinions is GRANTED.

## D. Whether Defendant Is Entitled to Summary Judgment as to Plaintiff's Legal Malpractice Claim (Count I).

Defendant contends that, in the absence of admissible expert testimony, Plaintiff's legal malpractice claim cannot survive summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**\*19** In federal court, where jurisdiction is premised upon diversity of citizenship, the court applies the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Vermont applies "the Restatement (Second) of Conflicts for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (Vt. 2000). This approach chooses the substantive law of the state that "has the most significant relationship to the occurrence and the parties." *Amiot v. Ames*, 693 A.2d 675, 677 (Vt. 1997). Because Plaintiff's claims arise out of Defendant's representation of Plaintiff in Vermont, it is the state with the most significant relationship to the occurrence and the parties and thus Vermont law governs Plaintiff's legal malpractice claim.

Under Vermont law:

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

[a] lawsuit against an attorney for negligence generally requires: (1) the existence of an attorney-client relationship which establishes a duty of care; (2) the negligence of the attorney measured by his or her failure to perform in accordance with established standards of skill and care; and (3) that the negligence was the proximate cause of harm to plaintiff.

*Hedges v. Durrance*, 2003 VT 63, ¶ 6, 175 Vt. 588, 589, 834 A.2d 1, 3. "If the alleged negligent conduct is a matter of judgment unique to that profession, the above elements must be established by expert testimony to assist the trier of fact in determining negligence." *Estate of Fleming v. Nicholson*, 724 A.2d 1026, 1028 (Vt. 1998). "The only exception to this requirement is where the Tack of care is so apparent that only common knowledge and experience are needed to comprehend it.' " *Clayton v. Unsworth*, 2010 VT 84, ¶ 17, 188 Vt. 432, 439, 8 A.3d 1066, 1072 (quoting *Estate of Fleming*, 724 A.2d at 1028). An attorney's strategic decisions, including whether to call particular witnesses and introduce certain documentary evidence, are "matter[s] of judgment unique to" the legal profession. *Estate of Fleming*, 724 A.2d at 1028. As the Supreme Court of Texas has explained: "[d]ecisions of which witnesses to call, what testimony to obtain or when to cross-examine almost invariably are matters of judgment. As such, the wisdom and consequences of these kinds of tactical choices made during litigation are generally matters beyond the ken of most jurors." *Alexander v. Turtur & Assocs., Inc.*, 146 S.W.3d 113, 119 (Tex. 2004) (citation and internal quotation marks omitted).

In light of the Vermont Supreme Court's conclusion that Defendant's selection of the witnesses and evidence to present at trial in the Dodig malpractice action constituted "reasonable decisions within the purview of his professional discretion[,]" *Puppolo*, 2011 VT 119, ¶ 17, Plaintiff carries a heavy burden to establish that they nonetheless constitute a deviation from the applicable standard of care which caused her damages. It is not enough for Plaintiff to claim that Defendant promised to pursue certain strategies in the Dodig malpractice action and failed to do so because Plaintiff cites no Vermont authority for the proposition that a legal malpractice claim can be brought on that basis.

Correspondingly, Plaintiff proffers no facts that Eva Puppolo's death was so clearly caused by medical malpractice

that even a lay person could conclude that Attorney Dodig failed to timely file a meritorious lawsuit. *See Corey v. Norman, Hanson & DeTroy*, 742 A.2d 933, 940 (Me. 1999) (stating that in the absence of expert testimony, "the factfinder would be compelled to speculate as to proximate causation"). In turn, "from the perspective of a lay juror, the causal link between the [P]laintiff's allegations of negligence" by Defendant and the adverse outcome in the Dodig malpractice action "is far from obvious." *Bozelko v. Papastavros*, 147 A.3d 1023, 1030 (Conn. 2016). Expert witness testimony is thus essential to Plaintiff's legal malpractice claim against Defendant. *See Estate of Fleming*, 724 A.2d at 1025. She has not, and cannot, establish a breach of the duty of care and causation without it.

**\*20** Because Plaintiff has failed to establish the essential elements of legal malpractice under Vermont law, Defendant's motion for partial summary judgment as to that claim is GRANTED and Plaintiff's legal malpractice claim (Count I) is hereby DISMISSED. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating that the entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to admit audio recordings is hereby DENIED. (Doc. 76.) Defendant's motion to dismiss the action is DENIED. The court EXCLUDES the opinions of Attorney O'Toole in their entirety and GRANTS IN PART AND DENIES IN PART Defendant's motion for expenses. Plaintiff is ORDERED to pay Defendant the sum of $500.00, together with any photocopying costs incurred by Defendant in producing his file. The court GRANTS Defendant's motion for partial summary judgment as to Plaintiff's legal malpractice claim (Count I) and that count is DISMISSED. (Doc. 42.)

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 4042342

Footnotes

Estate of Puppolo v. Welch, Not Reported in Fed. Supp. (2017)

2017 WL 4042342

1  Plaintiff alleges that Eva Puppolo executed a Living Will providing that she not be administered opiate analgesics or other "drugs that alter mind." (Doc. 1 at 3, ¶ 19.) Plaintiff contends that her aunt's medication regimen violated those express wishes.

2  The testimony Plaintiff expected Dr. Totonelly to provide at trial is reflected in an August 12, 2005 email in which Dr. Totonelly opined that "the actual cause of death at the time of arrest is without question the administration of the lethal fentanyl dosage administered by nursing staff of" Crescent Manor. (Doc. 74, Ex. 4 at 5.) Defendant points out that Plaintiff has produced another version of this email bearing an identical date and time but which contains typographical discrepancies that allegedly call into question the document's authenticity. Plaintiff filed an affidavit signed by Dr. Totonelly on January 3, 2017 wherein Dr. Totonelly explains how he sent two different emails seconds apart.

3  *See In re Fosamax Prods. Liab. Litig.,* 707 F.3d 189, 193–94 (2d Cir. 2013) (holding that the district court was "entitled to disregard [expert's] new testimony ... where the relevant contradictions between the first and second depositions are unequivocal and inescapable, unexplained, arose after the motion for summary judgment was filed, and are central to the claim at issue"); *Carbotrade, S.p.A. v. Bureau Veritas,* 1999 WL 714126, at *15 (S.D.N.Y. Sept. 14, 1999) (concluding an expert's "prior inconsistent statements undercut the credibility of his recently formulated opinion at trial").

4  Contrary to his August 12, 2005 opinion that Eva Puppolo's death was caused by a lethal dose of fentanyl, according to a June 1, 2005 disclosure, Dr. Totonelly opined as follows:

[B]y providing Ms. Puppolo with Glyburide instead of Enalapril Ms. Puppolo was caused to go into a hypoglycemic shock. He will testify that attempts to treat this resulted in a fluid overload causing congestive heart failure and considerable shock and damage to her kidneys. This precipitated a downward course for Ms. Puppolo and hastened the progression of her underlying cardiac conditions.

(Doc. 74, Ex. G at 1.)

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-10027-GAD-APP   ECF No. 169-5, PageID.3202   Filed 07/10/23   Page 33 of 66
Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., Not Reported in F.Supp.2d...

2006 WL 1319543

2006 WL 1319543
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

GARY PRICE STUDIOS,
INC., and Gary Price, Plaintiffs,
v.
RANDOLPH ROSE COLLECTION,
INC., Randolph Rose, Ellen Rose, Jordan
Rose, Far Eastern Antiques & Arts, Inc.,
Stephen Gano, and John and Jane Does,
Doe Entities 1 Through 5, Defendants.

No. 03 Civ. 969(CSH).
|
May 11, 2006.

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior J.

 **\*1**  Defendants move *in limine* to exclude the proffered
expert witness opinion testimony of Michael Zumwalt
relating to the quantum of Plaintiffs' damages. Plaintiffs
contend that the Court should allow Zumwalt to testify,
leaving Defendants to pursue by cross-examination any
perceived shortcomings in his testimony.

I. BACKGROUND

A. Procedural History
This is an action for copyright infringement. The background
facts are fully set forth in the Court's prior opinion reported at
2005 WL 1924733 (S.D.N.Y. Aug.9, 2005), familiarity with
which is assumed. For present purposes, it is sufficient to say
that in that opinion, the Court granted Defendants' motion for
partial summary judgment dismissing Plaintiffs' Fifth Claim
under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for
unfair competition. Plaintiffs' first four claims remain for trial
before a jury, which will begin on May 22, 2006. Those claims
are for copyright infringement under the Copyright Act of
1976, 17 U.S.C. §§ 101 *et seq.*

Specifically, Plaintiffs allege that Defendants created and
marketed four sculptures (one for each claim) that infringe
on four copyrighted bronze sculptures depicting children
at play created by Plaintiff Gary Price ("Price"). *See*
2005 WL 1924733, at \*1. Price had granted to Plaintiff
Gary Price Studios, Inc. ("GPS") the exclusive license to
sell limited edition reproductions of each of these four
sculptures. Plaintiffs filed their complaint alleging copyright
infringement on February 11, 2003. On or about February
30, 2003, Defendants consented to a preliminary injunction
and ceased and desisted their creation and marketing of the
four sculptures in question. The trial will determine whether
Defendants infringed Plaintiff Price's copyrighted works, and,
if so, the amount of monetary damages to which Plaintiffs are
entitled.

B. The Proffered Expert Opinion Testimony
Plaintiffs' expert witness on damages is Michael Zumwalt.
Currently he owns and operates an entity called "Michael
Zumwalt Econometrics." Zumwalt calculated the amount of
Plaintiffs' damages in a 19-page report with exhibits dated
July 29, 2004. Counsel for Defendants deposed him on
October 22, 2004.

At his deposition Zumwalt defined "econometrics" as "the
use of mathematics to compute an economic result."[1]
Expanding on that concept, Zumwalt testified:

> Q. Could you explain that a little bit further?
>
> A. It's basically applying mathematical principles
> to economic results. The formulas that are used and
> applications of mathematical principles to say how
> did this event affect this business or what are the
> economic impacts of this event.
>
> Q. How long has the discipline of econometrics
> been around?
>
> A. The discipline of econometrics, in essence,
> has always been around in that it's merely the
> application of someone trying to compute the
> economic events of a certain-or economic impacts
> of certain events. So as far back as there's been
> commerce there's been someone practicing it.
>
>  **\*2**  Q. I'm not talking about the fact when it could
> be applied, but when has it been in action as an
> application?

Case 2:19-cv-10027-GAD-APP  ECF No. 169-5, PageID.3203  Filed 07/10/23  Page 34 of 66
Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., Not Reported in F.Supp.2d...
2006 WL 1319543

A. In the terms of a practice the discipline has existed since commerce has existed.

Q. Was there a person who first introduced econometrics as an approach to economics?

A. Well, in that the primary definition of econometrics is the application of math, mathematical principles to business results, it would be hard to go back to find that person.

Q. So there's no one that the academic communities attribute econometrics as having been the first person who is the forefather or forewoman-

A. No.

Q. -to use this econometric theory?

A. Again, I'm not an academician. So, in essence, I have not studied how they would attribute or to whom they would attribute the discipline.[2]

Zumwalt describes his background and experience as follows:

During the past 26 years, I have served as a practicing Certified Public Accountant, a Chief Financial Officer for business entities, and a Chief Executive Officer or Managing Director directly responsible for the operations and financial matters for business entities or units. In these roles, it has been my responsibility to use established business practices and methodology in developing, analyzing, and critically evaluating revenue forecasts, related costs, financial projections, budgets, new product line development, and the present value of future cash flows or investments.[3]

The "business entities or units" which employed Zumwalt since he graduated from college in 1978 consisted of an accounting firm, an oil drilling company, two real estate management companies, a company providing services to remove contaminants from waste waters, another company providing services relating to radioactive contamination at federal sites, and presently (together with his personal consulting firm) a company that developed a software product whose function is environmental compliance and safety.[4] Prior to the case at bar, Zumwalt had never authored an opinion involving an assessment of damages that includes copyright infringement issues, or testified in a case involving copyright issues, or been deposed in a copyright case.[5]

Nor has Zumwalt had any personal experience in business practices or methodology relating to the creation, marketing, or licensing of sculptures or any other work of creative art.

Zumwalt introduces his written report by saying:

The purpose of this Report is to provide a computation for each category of damages arising from the infringement of certain sculptures by the Defendants and to make available the documents or other evidentiary material on which such computation is based, including materials bearing on the nature and extent of injuries suffered.[6]

As will be developed in greater detail *infra,* Zumwalt's principal opinion on damages is that Gary Price's awareness of the Defendants' infringing conduct caused Price to create fewer new sculptures of his own, with consequent lost sales. Zumwalt offers a partial description of the methodology he used in providing his damages computations:

*3 In preparing this Report, I have used practices and methods that are generally accepted within the business community for evaluating similar events. Namely and principally, I have used past financial performances and actual results in key business components as the basis for evaluating the financial impact of the infringement. The process of evaluating economic events based upon past economic reality rests in the very roots of business evaluations whether it relates to simple or very sophisticated financial analyses and whether the analyses occur in academia or in actual business practice.[7]

I have said that in the language just quoted Zumwalt gives only a "partial description" of his methodology because the crucial elements in that methodology are not revealed until the next page of the report, under the caption "Assumptions." Zumwalt there says:

In the preparation of this Report, I have relied upon the accuracy of the documents provided and testimony given. Further, I have relied upon the assumption that the decline in Gary Price's creative production of new works *resulted from the time and energy that the infringement diverted from the creative focus of the artist and his studio* and that the infringement *diminished the Plaintiffs' view of the profitability of new works, thereby reducing the incentive to create new works.*[8]

Case 2:19-cv-10027-GAD-APP  ECF No. 169-5, PageID.3204  Filed 07/10/23  Page 35 of 66
Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., Not Reported in F.Supp.2d...
2006 WL 1319543

Zumwalt's testimony during his deposition indicates that these assumptions of diminished creative production-the depressing effect, one might say, that Defendants' infringements had upon Gary Price's artistic Muse-were to a material degree elicited from Price and Ken Donnelly, his key employee, by questions put to them by Zumwalt himself. Thus, during his deposition counsel for Defendants asked Zumwalt about a written schedule tending to show that Price created on average a larger number of sculptures during years before he became aware of Defendants' infringements than he did in subsequent years. This testimony then ensued:

Q. On the documents identified as scheduled work created and planned by Gary Price, what was the purpose of this report or rather what was the purpose of this schedule?

A. The schedule was prepared *responding to a question that I posed to the plaintiffs based upon the diminished creation of works.* If you look at the works that you did create, what seems to be missing or what would you-do you now think you would have created *if your energy and creative abilities had not been disrupted by this infringement....*

Q. So how do you isolate the infringement in the context of all the potential things that could divert somebody's creative focus; how do you isolate the infringement and then isolate that?

A. Because you're talking about one human being. What I did is I inquired whether, based on his representation that this was what interrupted his creative focus, *I inquired whether there were other things that also significantly affected his creative focus.*

**\*4** *Q.* So you relied on his representation? You did no independent investigation to determine whether there were other factors that did affect his creative focus?

A. I relied upon his representation which was supported by Ken Donnelly.

Q. And Ken Donnelly is an employee of Gary Price?

A. He is an employee of Gary Price....

Q. When you're talking about the diminished value from the plaintiff's perspective of his works, how can that be attributed to some act that the defendant has done?

A. What he is saying in my conversations with Gary Price, it's not that there is a cohesive separation between the infringement and it affected the value or the division in a divided sense. Indeed it is, gosh, this impacted me and in impacting me I thought of all these factors. And so I was not meaning to isolate it into two separate events, but really the impact that it had on him. I viewed that in terms of how could I see that that impact did occur.

Q. And how do you see that that impact occurred; how does it manifest itself?

A. By the reduction in his creative output.

Q. And how do you know there's been a reduction, in fact?

A. What I chose to measure was works that he had copyrighted in the ten years prior to the infringement and after the infringement, after he became aware of the infringement.[9]

Using this methodology based upon these assumptions, Zumwalt's report sets forth two "Approaches" (Zumwalt's term) to a calculation of Plaintiffs' monetary damages caused by Defendants' infringement of the four sculptures created by Gary Price. "Approach One" is captioned "Damaged Creative Production."[10] Zumwalt calculates "Total Damages Under Approach One" to be $1,565,351.[11] Consistent with Zumwalt's deposition testimony quoted *supra,* the proposition upon which this entire "approach" depends is stated in the report: "This calculation reflects that the Plaintiffs' creative production has fallen by an average of 6.2 new works per year for the three years following the infringement, or by 18.6 works in total. See Exhibit B to this Report for the detailed calculations."[12]

Exhibit B to Zumwalt's report is worth describing in some detail. Under the title "Before Infringement," a column captioned "Number of Created Works" gives the number of works Gary Price created during each of ten years, as follows: 1992, 10; 1993, 23; 1994, 24; 1995, 21; 1996, 40; 1997, 9; 1998, 12; 1999, 8; 2000, 4; and 2001, 21. The "Average Works Created" during this ten-year period is computed to be "17.2 per year." Exhibit B then lists the "Number of Created Works" during each of three years "After Infringement," as follows: 2002, 16; 2003, 9; and 2004, 8. The "Average Works Created" during this three-year period is computed to be "11.00 per year." Comparing the two averages, in Exhibit B Zumwalt

Case 2:19-cv-10027-GAD-APP   ECF No. 169-5, PageID.3205   Filed 07/10/23   Page 36 of 66
Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., Not Reported in F.Supp.2d...
2006 WL 1319543

arrives at a computation of "Average Works Lost" of 6.20 per year for three years, resulting in a computation of "Works Lost 2002-2004" of "18.6 for 3 years."[13]

**\*5** Zumwalt's calculation of $1,565,351 in damages for Approach One-Damaged Creative Production has two components: $1,288,143 as "Damages Caused to Creative Production" and $277,208 as "Damages from Lost Sales from Infringement." As an "Alternative to Approach One Damages," Zumwalt then arrives at a two-component total of $1,439,743.[14] The first component is the same. The second component is reduced to $151,600. Zumwalt describes that component as "Infringers' Disgorged Profit," an alternative "whereby the Infringers are required to merely disgorge themselves of profits realized from their sale of the infringed works," which Zumwalt calculated "by multiplying the works that the Infringers sold by their catalog prices."[15]

The particular dollar figures that appear in Zumwalt's "Damaged Creative Production" approach to Plaintiffs' infringement-caused losses are all based upon the asserted loss of 18.6 works which Gary Price did not create during the post-infringement three years, as previously discussed. Zumwalt turned these lost works into lost dollars by examining income statements and cost figures, derived principally from the 2003 financial statements of Plaintiff Gary Price Studios, Inc. and that company's corporate income tax returns for the preceding three years.

While the calculations appearing in Zumwalt's "Damaged Creative Production" approach to the damages suffered by Plaintiffs as the result of Defendants' infringements give rise to a number of questions, in the view I take of the case I need not consider them all.

Zumwalt's "Approach Two" to Plaintiffs' damages is characterized as "Lost Licensing Fee."[16] In this approach, Zumwalt undertakes to calculate "the license fee that the Infringer did not pay for the use of the infringed works as well as the disgorgement of the Infringers' profits from the infringement."[17] As noted *supra*, Zumwalt's business experience did not include any familiarity with the creation, marketing or licensing of sculptures such as those created by Gary Price. Not surprisingly, therefore, in order to prepare his report Zumwalt asked Price "to provide an estimate for license fees that he believes to be reasonable based upon his experience in marketing his own works and his review of their licensing values."[18] Zumwalt accepted Price's figures. For the

four infringed sculptures in suit, they yield a total "Value of Unpaid License Fee" of $490,00. To that figure Zumwalt adds the same "Infringers' Disgorged Profit" amount of $151,600 that he calculated in Approach One, so that the damages calculated under Approach Two total $641,500.[19]

In Zumwalt's view, Approach One, based upon the "Damaged Creative Production" concept, "is a more complete assessment of the true impact actually caused by the infringement ..."[20] Defendants' *in limine* motion poses the question of whether any of Zumwalt's opinions are admissible in evidence.

## II. DISCUSSION

### A. Applicable Law

**\*6** The trial court has wide discretion in evidentiary rulings on expert testimony. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997). The standard for reversing a decision to admit or exclude expert testimony is abuse of discretion. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59-60 (2d Cir.2002).

A trial judge's discretion in admitting or excluding proffered expert testimony is informed by the Federal Rules of Evidence and appellate case law. The Second Circuit emphasizes the importance of the first of these two sources. "The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence." *Nimely v. City of New York,* 414 F.3d 81, 395 (2d Cir.2005). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the evidence is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The leading Supreme Court decisions on the question are *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The progeny of *Daubert* and *Kumho* in the lower federal courts are legion. The two most recent

2006 WL 1319543

reported Second Circuit cases are *Nimely* and *Ruggiero v. Warner-Lambert Company,* 424 F.3d 249 (2d Cir.2005).

In *Nimely* the Second Circuit acknowledged the "well-accepted principle that Rule 702 embodies a liberal standard of admissibility," noting *Daubert'* s holding that the more restrictive commercial business-factor analysis, of the sort falling within Zumwalt's experience, is problematic. While the transcript of Price's deposition is not a part of the record on this motion, I gather from Zumwalt's report and deposition that Price claims his awareness of Defendants' alleged infringements so distracted and diverted him that Price's creative focus and energies were diminished and the number of his created sculptures were consequently reduced.

Such a damages theory leads inevitably to the highly subjective and personal subtleties and mysteries of artistic creation. In *Nimely* the Second Circuit, paraphrasing *Daubert,* said that a trial judge evaluating the admissibility of expert opinions should consider whether the proffered "theory or technique had been and could be tested." 414 F.3d at 396. In the case at bar, there is no indication that the theory that a creative artist's *angst* over perceived infringement of his works may lead to a reliably measurable suppression of his Muse has ever been tested; and there is ample reason to believe that such a test could ever be made. William Wordsworth, the 19th-century English Romantic poet, described the creative process (appropriately enough in a sonnet):

> **\*7** High is our calling, friend! Creative Art (Whether the instrument of words she use, Or pencil pregnant with ethereal hues,) Demands the service of a mind and heart, Though sensitive, yet, in their weakest part, Heroically fashioned.[21]

The services of the sensitive mind and heart demanded by Creative Art are subject to inexplicable obstacles. For example, why the American novelist J.D. Salinger's "instrument of words" has been silent for decades following his publication of *Catcher in the Rye* and several shorter works is one of the literary mysteries of the age. In my view, the average-per-year productivity loss theory advanced by Zumwalt cannot be tested within the context of the mysterious ebb and flow of an artist's creative powers.

But even if I accept that a commercial business loss analysis has some sort of utility in the world of creative art (*pace* Wordsworth), it is immediately apparent that the methodology employed by Zumwalt in this case is unreliable.

Of course, Price can testify at trial that he was distressed and distracted by Defendants' conduct and that this mental anguish caused a decrease in his creative production of sculptures. The jury will make of that testimony what it will. But Price's availability to testify in aid of his damages claim is not determinative of the admissibility of Zumwalt's opinions to support the claim. We have seen that Zumwalt's methodology purports to calculate the number of Price's post-infringement "lost works" and the consequent lost income by comparing the average number of Price's artistic creations during the ten pre-infringement years with the lower average production rate during the three post-infringement years, which yields total "lost works" of 18.6 during those later three years, a figure upon which Zumwalt bases his calculation of Plaintiffs' economic loss. I cannot accept this yearly averaging method of calculating the number of "lost works" ascribable to Defendants' conduct (*i.e.,* works that Price would have created but for that conduct). One need go no further than to observe that during the first five years of the ten-year pre-infringement period, Gary Price created 118 sculptures or an average of 23.6 works per year, while during the last five years of those pre-infringement years Price created 54 works for an annual average of 10.8 works. Comparing these two averages leads to a computation of "Average Fewer Works" of 12.8 per year during the last five years of the ten-year pre-infringement: a differential percentage twice the 6.2 average of "Works Lost" Zumwalt calculated when he compared Price's ten-year pre-infringement creation average with the three-year post infringement period, and upon which he bases all his damages calculations. The difficulty on admissibility, of course, is that Defendants had not infringed anything during those first ten years and Zumwalt's methodology does not account for the greater number of fewer works (stay with me, reader) during those pre-infringement years. The record on this motion does not reveal the cause for this dramatic falling off of Price's average annual creation rate before any infringement occurred.[22] Nothing in Zumwalt's methodology or report explains it. Therefore I conclude that "there is simply too great an analytical gap between the data and the opinion proffered," which is to say, Zumwalt's methodology is "simply inadequate to support the conclusions reached." *Nimely,* 414 F.3d at 396. In that circumstance, "*Daubert* and Rule 702 mandate the exclusion of the unreliable testimony." *Id.* at 396-97.

Gary Price Studios, Inc. v. Randolph Rose Collection, Inc., Not Reported in F.Supp.2d...
2006 WL 1319543

**\*8** I reject Plaintiffs' argument, frequently made by proponents of expert testimony, that any imperfections go to weight, not admissibility, and are for the jury to evaluate following cross-examination. If I were to accept that argument in this case, I would be required to beat my gatekeeper's sword into a ploughshare. *See Ruggiero,* 424 F.3d at 255 (in a case where trial judge properly rules that an expert's opinion is admissible, "any remaining objection to the expert's credentials or methodology was for the consideration of the jury," but *Daubert* and Rule 702 mandate exclusion if expert's methodology or studies are inadequate to support the conclusions reached, which the Second Circuit held in *Ruggiero* ).

Other problems abound with respect to Zumwalt's qualifications to express these opinions and the opinions' reliability. Zumwalt is qualified to express an opinion on commercial business loss calculations and accounting, but not upon the economic consequences of a disturbing external force upon an artist's creative powers. His opinions have not been submitted to peer review; there appears to be no prior application of his theories or methodology to artistic creation (a circumstance that would not surprise William Wordsworth or J.D. Salinger). A psychiatrist or clinical psychologist might be in a position to opine on the effect of Defendants' conduct upon Price creative powers, but Zumwalt does not have those qualifications. Plaintiffs are unable to point to any scientific standards governing Zumwalt's application of business-oriented loss calculations to the different world of artistic creation. These are the *Daubert* criteria for admissibility. Zumwalt's opinions do not satisfy them.

But plaintiffs may argue that Zumwalt properly accepted as correct the statements to him by Price and a GPS employee that Price did in fact suffer a creative decline because of Defendants' infringements and that $60,000 is a reasonable licensing fee for the four sculptures in question. This does no more than impale Plaintiffs upon the remaining prong of expert testimony inadmissibility: the requirement that the expert's testimony would "assist the trier of the fact," that is, the jury. Zumwalt's report and deposition make it plain that he assumed the correctness of Plaintiffs' statements on these core questions of fact uncritically and without subjecting them to any inquiry or corroboration, from other sources or his own experience (he has none). In consequence, Zumwalt's proffered opinions would in large measure simply parrot the testimony that Gary Price may be expected to give at the trial. That would be an unacceptable usurpation by an expert witness of the role of the jury in finding the facts based upon the testimony of a party. Zumwalt's damages calculations also usurp the role of the trial court in instructing the jury on the measures of damages recoverable for copyright infringement. In short, the jury is capable without assistance from Zumwalt to determine Defendants' conduct served to diminish Price's creative output, and, if it finds such effect occurred, to determine Plaintiffs' resulting economic loss on the basis of the fact witnesses available to Plaintiffs and the Court's instructions on the law of damages in copyright infringement cases.

**\*9** The two most recent cases in the Second Circuit, *Nimely* and *Ruggiero,* applied these gatekeeping criteria and held that the opinions of the experts in question were inadmissible. These cases are fact-intensive and I need not discuss *Nimely* and *Ruggiero* in further detail. It is sufficient to say in this case that, for the foregoing reasons, I conclude that Zumwalt's proffered expert testimony is inadmissible, and I preclude it in its entirety.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1319543

---

Footnotes

1    Zumwalt Deposition ("Zumwalt Dep.") Tr. 31-32.

2    Zumwalt Dep. Tr. 32-33. Zumwalt received an undergraduate degree (B.S.) in business administration from Oklahoma State University in 1978. He has no other academic degrees. He has qualified as a certified public accountant. *Id.* Tr. 17-18.

3    Zumwalt Report ("Zumwalt Rep.") at 3.

4    Zumwalt Dep. Tr. 21-29.

2006 WL 1319543

5     *Id.* Tr. 6.

6     Zumwalt Rep. at 3.

7     Zumwalt Rep. at 4.

8     Zumwalt Rep. at 5-6 (emphases added).

9     Zumwalt Dep. Tr. 60-61, 66-69 (emphases added).

10     Zumwalt Rep. at 8.

11     *Id.* at 14.

12     *Id.* at 10.

13     During Zumwalt's deposition, reference was made from time to time to "a schedule which reflects 15 works not created." *See* Zumwalt Dep. Tr. 94. That 15 "lost works" schedule does not appear to be included in the record on this *in limine* motion, and the seeming discrepancy between 15 "lost works" and the 18.6 "lost works" computed in Exhibit B to Zumwalt's report, discussed in text, is not explained with any clarity. However, given the view I take of the case this discrepancy, if such it be, need not be further pursued.

14     Zumwalt Rep. at 15.

15     *Id.* at 14.

16     *Id.* at 16.

17     *Id.*

18     *Id.* at 17.

19     *Id.* at 19.

20     *Id.* at 16.

21     Wordsworth, *Miscellaneous Sonnets,* pt. ii, iii

22     A particularly striking comparison may be made between Price's number of created works in 1996(40) and the following year, 1997(9). These were both pre-infringement years.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Hillman Power Company, LLC v. On-Site Equipment Maintenance, Slip Copy (2021)

2021 WL 4487965

2021 WL 4487965
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Northern Division.

HILLMAN POWER COMPANY, LLC, Plaintiff,
v.
ON-SITE EQUIPMENT MAINTENANCE, Defendant.

Case No. 1:19-cv-11009
|
Signed 10/01/2021

**Attorneys and Law Firms**

Richard T. Hewlett, Salvatore J. Vitale, Jr., Varnum LP, Novi, MI, for Plaintiff.

Kevin J. Kelly, Kevin L. Kula, Victor J. Mastromarco, Jr., The Mastromarco Firm, Saginaw, MI, for Defendant.

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERT TESTIMONY AND DENYING PLAINTIFF'S MOTION TO QUASH DEFENDANT'S SUBPOENAS AND DEFENDANT'S MOTION FOR PROTECTIVE ORDER**

THOMAS L. LUDINGTON, United States District Judge

**\*1** Plaintiff, Hillman Power Company, LLC ("Hillman") is a biomass electrical power generating plant located in Hillman, Michigan. Hillman's facility utilizes a stoker boiler primarily burning wood products. Defendant, On-Site Equipment Maintenance LLC, ("On-Site") is an industrial equipment repair company with its principal place of business located in Edison, New Jersey. The dispute leading to this case arises out of On-Site's effort to repair a steam stop valve for Hillman. Plaintiff, Hillman Power Company, LCC, ("Hillman"), filed a five count Complaint, including: breach of contract (Count I); negligence (Count II); unjust enrichment (Count III); fraudulent misrepresentation (Count IV); and negligent misrepresentation (Count V) against Defendant, On-Site Equipment Maintenance, LCC ("On-Site"). ECF No. 1 at PageID.2. After the case was removed to federal court, On-Site filed a cross-claim with its answer. *Id.*; ECF No. 12-2 at PageID.88–90.

Hillman sought summary judgment on Counts I, II and V on December 23, 2020. ECF No. 55 at PageID.1117. On-Site, in turn, filed a cross-motion for summary judgment for its breach of contract counterclaim (due to Hillman's alleged failure to pay the entire balance owed and breaching contractual warranty terms) and sought a denial of all five counts of Hillman's Complaint. *Id.* at PageID.1122. On-Site's Motion to Dismiss Counts II, III, IV and V of Hillman's Complaint was granted. *Id.* at PageID.1132. Hillman and On-Site's cross-claims for breach of contract remain because there is a genuine dispute of material fact regarding the inoperability of the valve and uncertainty as to whom breached the contract first. *Id.* at PageID.1122–23.

On June 10, 2020, On-Site moved to exclude one of Hillman's witnesses from testifying as an opinion witness at trial, Mr. Talmage, an employee of engineer company MD&A. ECF No. 32 at PageID.284. On-Site contends that Mr. Talmage's testimony should be struck because Hillman violated expert disclosure provisions of Federal Rule of Civil Procedure 26(a). *Id.* at PageID.275; Fed. R. Civ. P. 37(c)(1). Second, On-Site asserts that the witness should be struck from testifying as an opinion witness because his testimony does not satisfy Federal Rule of Evidence 702. ECF No. 32 at PageID.279–80.

As alternate relief, on September 9, 2020, On-Site filed a motion for a protective order, seeking to depose Mr. Talmage and Mr. Early (another MD&A employee). ECF No. 46. On-Site noticed their depositions in August 2020 and it seeks to enforce the depositions. *Id.* Although requested after the close of discovery, On-Site claims it could not have deposed the witnesses during the discovery period because the witnesses' identities and the required expert reports were not previously released. *Id.*

In response, Hillman filed a motion to quash On-Site's subpoenas. ECF No. 45. Hillman insists that On-Site had proper notice of the witnesses and adequate time to depose them during discovery. *Id.* at PageID.958-59; ECF No. 45-2 at PageID.973. Since the beginning of discovery, Hillman explains MD&A (Mr. Talmage and Mr. Early's employer) "has been explicitly referenced throughout written responses to discovery, correspondence, and documents produced in this matter, and Mr. Talmage and Mr. Early specifically

Hillman Power Company, LLC v. On-Site Equipment Maintenance, Slip Copy (2021)

2021 WL 4487965

were identified in documents produced in November of 2019." ECF No. 45 at PageID.958–59. Hillman also points out accurately that the F.R.C.P. 26(a) expert reporting requirements "only appl[y] to witnesses 'retained or specially employed to provide expert testimony in the case.' " *Id.* at PageID.960 (citing *Liberty Mutual Ins. Co. v. City of Dearborn*, 2012 WL 13009107 (E.D. Mich. Apr. 25, 2012)). Therefore, Hillman contends that, because its witnesses are not testifying strictly as experts, F.R.C.P. 26(a)'s requirement to report is inapplicable. *Id.*

**\*2** On-Site's Motion to Strike Plaintiff's Expert Witness will be granted. Hillman's Motion to Quash On-Site's Subpoena of Hillman's Expert Witnesses and On-Site's Motion for Protective Order will be denied.

### I.

### A.

On-Site asserts that Mr. Talmage should not be permitted to offer opinion testimony at trial because Hillman did not abide by the F.R.C.P. 26(a) rules of disclosures. ECF No. 32 at PageID.282. Under F.R.C.P. 26(a), a party must provide witnesses' names as well as their contact information to all other parties to a litigation without awaiting a discovery request. *See* Fed. R. Civ. P. 26(a)(1)(A)(i)-(iv). In the initial April 30, 2019 Scheduling Order, Plaintiff Hillman was required to disclose its expert witnesses to Defendant within three business days of their retention or no later than September 27, 2019. ECF No. 3. The scheduling order was later extended, but the expert disclosure deadline did not change. ECF Nos. 13, 22, 29, 38. Discovery ultimately closed on May 18, 2020. ECF No. 29.

On-Site argues that

> Plaintiff was required to disclose the identify of any experts it anticipated calling at trial [and while it] supplied expert disclosures on March 6, 2020, [it] did not, at any point, disclose the actual name of its expert to the Defendant beyond stating that he or

she was from MD&A Turbines. Even when pressed by Defense counsel, Plaintiff's counsel did not reveal the name. Plaintiff never produced the expert's qualification or explained what his methodology would be at the inspection or even his purpose. Finally, Plaintiff has never produced an expert report to date.

ECF No. 32 at PageID.280–81 (citation omitted). Because Hillman did not comply with discovery rules without just cause, On-Site contends that Mr. Talmage's expert testimony should not be permitted, explaining that "if a party fails to ... identify a witness ..., the party is not allowed to use that ... witness to supply evidence on a motion, at a hearing, or at trial." Fed. R. Civ. P. 37(c)(1); ECF No. 32 at PageID.281.

In response, Hillman explains that expert reports only need to be filed if the expert was retained for the litigation. ECF No. 35 at PageID.349–50. If the expert "formed their opinions at the time of their involvement and not at the request of counsel" "[a]n expert will not be considered to have been retained for the purposes of providing expert testimony." *Id.* (citing *Fielden v. CSX Transp., Inc.*, 482 F.3d 866 (6th Cir. 2007)); *Webastro Thermo & Comfort N. Am., Inc. v. Bestop Inc.*, 2019 WL 2417070 (E.D. Mich. June 10, 2019). However, Hillman does not address the fact that MD&A is a company and not an individual expert, nor the fact that Hillman did not update its expert disclosures to include Mr. Talmage once it identified him as the individual expert. Further, Hillman does not provide any legal authority to support its suggestion that identifying an expert's employer but not the individual expert is sufficient to meet the requirements of FRCP 26.

Under FRCP 26(a), a party is required to "disclose to the other parties the identity of any witness it may use at trial to present evidence." *See* Fed. R. Civ. P. 26(a)(2)(A). It also requires a party to "make its initial disclosures based on the information then reasonably available to them" and to confer as soon as possible so parties can consider the basis of their claims and defenses. *See* Fed. R. Civ. P. 26(a)(1)(E), (f)(1)-(2). If a party does not follow FRCP 26, then "the party is not allowed to use that information or witness ... at a hearing, or at a trial,

Christner, Collin 7/7/2023
For Educational Use Only

Hillman Power Company, LLC v. On-Site Equipment Maintenance, Slip Copy (2021)
2021 WL 4487965

unless the failure was substantially justified or is harmless," regardless if the person is a fact witness, expert or both. *See* Fed. R. Civ. P. 37(c)(1).

**\*3** Hillman disclosed MD&A as an expert witness in its expert disclosures in early March 2020, but not the individual experts themselves. ECF No. 32 at PageID.274. It also did not identify any legal authority providing that identifying an expert's employer, rather than the expert themselves, is sufficient to meet the FRCP 26 disclosure rules. Further, to the extent that Hillman argues it could not have identified the specific individual experts until the June 9, 2020 inspection, Hillman did not update its expert disclosures to list Mr. Talmage's name. Listing the expert's employer, MD&A, as the expert witness was not sufficient to disclose the expert to Defendant. Rule 26 requires an individual's name, address and telephone number, not just a company name. Fed. R. Civ. P. 26(a)(1)(A)(i).

### B.

Since Mr. Talmage's identity should have been disclosed, Hillman may only qualify him as an expert during trial if the failure was "substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). On-Site argues that "Defendant does not know what Mr. Talmage's conclusions are or even what his qualifications were to do the inspection [of the valve] in the first place. The Defendant is prejudiced by this because it will, presumably, only get these materials on the eve of the dispositive motion deadline with no time in which to conduct expert discovery." ECF No. 32 at PageID.282. Defendant also argues Mr. Talmage's testimony is not reliable and would disrupt trial because his "expected testimony is based on incorrect facts." *Id.* at PageID.282–83.

Hillman responds that MD&A's involvement with the valve was disclosed in November of 2018 and "On-Site is in possession of MD&A's daily reports, email correspondence, purchase orders, and photographs from the time of its work at the Plaint. On-Site never attempted to depose MD&A or sought discovery regarding its qualifications." ECF No. 35 at PageID.352–53. Further, it contends "On-Site will have the opportunity to inspect and respond to any report both in dispositive motions and cross-examination." *Id.* at PageID.354. The "evidence regarding the state of the Valve

in question is critical to the disposition of the case" and "On-Site's repeated cancellation of the [valve] inspection has been the cause of this delay." *Id.*

To determine if such a failure was justified or is harmless, the Sixth Circuit has adopted the five factor *Howe v. City of Akron* test, which evaluates: (1) surprise to the other part(ies); (2) that party's ability to cure the surprise; (3) the disruption the evidence would cause if allowed at trial; (4) the evidence's importance; and (5) the nondisclosing party's explanation for failing to disclose the evidence. *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). When applying the Howe test, a court should evaluate the factors individually. *See Howe*, 801 F.3d at 748–49. Afterwards, the factfinder should balance he factors against each other. *Id.* at 749.

Although On-Site claims surprise, there is evidence that On-Site previously learned of Mr. Talmage's identity, despite Hillman's improper and insufficient disclosure. A purchase order from October 2018 lists both Mr. Talmage and Mr. Early as the MD&A professionals who helped repair and install the shop valve. ECF No. 45-2 at PageID.973.[1] On-Site's counsel was also present during Mr. Talmage's June 9, 2020 valve inspection and they saw his name on the plant sign-in log. ECF No. 32 at PageID.274. This factor favors Hillman because even though Hillman did not follow protocol for expert disclosures, On-Site's counsel could have learned the identity of the experts during discovery and in June 2020, counsel met Mr. Talmage in person.

**\*4** Second, On-Site may cure the surprise by deposing Mr. Talmage, but not without delaying trial. This Court determined there is a question of fact about who first breached the contract. Trial is currently scheduled for October 26, 2021. Any additional depositions and responsive documents would likely result in a further delay. Third, the evidence itself would not cause a disruption at trial, but as mentioned, it would likely result in a delay of trial to ensure sufficient time for depositions. Factors two and three favor excluding the expert's testimony.

Fourth, the only issue at trial is the cross-claims for breach of contract, which focus on the warranty terms and the order of Hillman and On-Site's actions regarding the valve. The details of how the valve functioned (or did not) is less relevant and may indeed be addressed without qualifying the

Christner, Collin 7/7/2023
For Educational Use Only

Hillman Power Company, LLC v. On-Site Equipment Maintenance, Slip Copy (2021)

2021 WL 4487965

gentlemen under FRE 702. Mr. Talmage's expert testimony is not essential to the breach of contract inquiry. Fifth, Hillman's argument that it did not update the expert witness disclosures once it became aware of Mr. Talmage's involvement in the inspection because it already listed their employer as the expert does not justify the non-disclosure. If Mr. Talmage is a percipient witness who is not required to write a report (as Hillman argues), then Hillman would have been aware of the expert's involvement earlier in the case. Thus, it should have been able to identify any MD&A employees at the time of its expert disclosures. If Hillman was waiting to see who was involved with the inspection, then Mr. Talmage's participation would more closely resemble that of retained experts and an expert report would have likely been required.

On the whole, Hillman has not provided good cause for its failure to identify Mr. Talmage as an expert witness. Plaintiff's Motion to Srike Defendant's expert will be granted. Mr. Talmage will not be allowed to testify at trial in any expert capacity, as a retained or percipient expert witness.

Because Mr. Talmage will not be allowed to testify as experts at trial, Plaintiff's Motion for Protective Order for Depositions and Defendant's Motion to Quash Subpoenas will be denied as moot as to Mr. Talmage.

In Plaintiff's Motion for Protective Order, it also seeks to depose Mr. Early, another employee of MD&A. ECF No. 46.

Defendant's Motion to Quash Subpoenas also seeks to quash Mr. Early's subpoena. ECF No. 45. As explained, *supra*, On-Site was aware of Mr. Early's involvement with the valve earlier in the case. On-Site cannot now, after the close of discovery and dispositive motions were filed depose Mr. Early. Plaintiff's motion for protective order will be denied and Defendant's motion to quash subpoena will be denied as moot.

## II.

Accordingly, it is **ORDERED** that the Defendant's Motion to Strike Plaintiff's Experts, ECF No. 32, is **GRANTED**. Mr. Talmage may not testify as a retained or percipient expert witness at trial.

It is further **ORDERED** that the Plaintiff's Motion to Quash On-Site's Subpoenas, ECF No. 45, is **DENIED AS MOOT.**

It is further **ORDERED** that the Defendant's Motion for Protective Order Pertaining to Expert Depositions, ECF No. 46, is **DENIED**.

### All Citations

Slip Copy, 2021 WL 4487965

## Footnotes

1    The purchase order itself was included in Plaintiff's motion to quash subpoenas. However, the document is part of the discovery referenced by Plaintiff in their response to Defendant's motion to strike, ECF No. 35 at PageID.349 ("Perhaps most tellingly, On-Site itself served a subpoena for documents on On-Site, which On-Site responded to in March with over 100 documents relating to the work it performed in October of 2018 at Hillman.").

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3213 Filed 07/10/23 Page 44 of 66
In re Jackson Nat. Life Ins. Co. Premium Litigation, Not Reported in F.Supp.2d (2000)
2000 WL 33654070, 46 Fed.R.Serv.3d 201

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Johnson v. City of Rockford, N.D.Ill., March 27, 2018

2000 WL 33654070
United States District Court, W.D. Michigan.

In re JACKSON NATIONAL
LIFE INSURANCE COMPANY
PREMIUM LITIGATION

No. 96–MD–1122.
|
Feb. 8, 2000.

**Attorneys and Law Firms**

Feldman, Joel, Sachnoff & Weaver, Ltd., Chicago, IL.

Hubbard, Stephen L., Hubbard & Biederman, LLP, Dallas, TX.

Susman, Arthur T., Susman, Buehler & Watkins, Chicago, IL.

Weiss, Melvyn I., Milberg Weiss Bershad Hynes & Lerach, LLP, New York, NY.

Edelman, Daniel A., Edelman & Combs, Chicago, IL.

Trizna, Robert J., Trizna & Lepri, Chicago, IL.

Bockelman, Jr., C. William, O'Neill & Bockelman, P.C., Lake Forest, IL.

Misko, Fred Jr., Law Office of Fred Misko, Jr., Dallas, TX.

Caldwell, G. Wade, Martin, Drought & Torres, San Antonio, TX.

Phillips, Richard, Smith, Phillips, Mitchell, Scott & Rutherford, Batesville, MS.

DeYoung, Edwin, Liddell, Sapp, Zivley, Hill & LaBoon, LLP, Dallas, TX.

Miller, Marvin Alan, Miller, Faucher, Cafferty & Wexler, Chicago, IL.

Friedman, Andrew S., Bonnett, Faibourn, Friedman & Balint, Phoenix, AZ.

Finkelstein, Howard D., Finkelstein & Krinsk, San Diego, CA.

MEMORANDUM OPINION AND ORDER AFFIRMING MAGISTRATE JUDGE'S ORDER PRECLUDING EXPERT WITNESS TESTIMONY

MCKEAGUE, District J.

**\*1** On September 29, 1999, Magistrate Judge Joseph G. Scoville issued an order precluding testimony by plaintiffs' expert Philip J. Bieluch. Plaintiffs have appealed the ruling.

Magistrate Judge Scoville's ruling is premised upon three findings. First, he found that plaintiffs violated Fed.R.Civ.P. 26(a)(2)(B) by providing defendant with an expert witness report that had not actually been "prepared" by the witness, Philip Bieluch. Second, he found that Mr. Bieluch testified untruthfully in his deposition concerning the authorship of the language of the report and that plaintiffs' counsel unjustifiably impeded defendant's counsel's search for the truth of the matter. Third, he concluded plaintiffs had failed to show their violation of Rule 26(a)(2) was harmless.

The magistrate judge's ruling on a nondispositive matter will be affirmed unless it is shown to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72(a). Factual findings are reviewed for clear error, while conclusions of law are reviewed de novo. United States v. Navarro–Camacho, 186 F.3d 701, 705 (6th Cir.1999). In reviewing the factual findings, the evidence must be considered in the light most likely to support the magistrate judge's decision. Id. "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id.

Applying this standard of review after duly considering the parties' briefs and exhibits, oral arguments of counsel, and the record of proceedings before Magistrate Judge Scoville, including the transcript of his thorough bench ruling, the Court finds no error in his factual findings. The record clearly supports the finding that the language of Mr. Bieluch's report, including the formulation of his opinions, was not prepared by him, but was provided to him by plaintiffs' counsel. Granted, Rule 26(a)(2) contemplates some assistance of counsel in the preparation of an expert's report. See Marek v. Moore, 171 F.R.D. 298 (D.Kan.1997). However, undeniable substantial similarities between Mr. Bieluch's report and the report of another expert prepared with assistance from

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3214 Filed 07/10/23 Page 45 of 66
In re Jackson Nat. Life Ins. Co. Premium Litigation, Not Reported in F.Supp.2d (2000)
2000 WL 33654070, 46 Fed.R.Serv.3d 201

the same counsel in an unrelated case, demonstrate that counsel's participation so exceeded the bounds of legitimate "assistance" as to negate the possibility that Mr. Bieluch actually prepared his own report within the meaning of Rule 26(a)(2). Plaintiffs' failure to furnish defendant with a report prepared by Mr. Bieluch constitutes a violation of Rule 26(a)(2). See *Indiana Ins. Co. v. Hussey Seating Co.,* 176 F.R.D. 291, 293–94 (S.D.Ind.1997) (Rule 26 held violated where portions of report were drafted by counsel and expert's report was not "written in a manner that reflected the testimony specifically to be given by him and embraced by him.")

The Court also concurs with the magistrate judge's finding that Mr. Bieluch testified untruthfully in his deposition. Plaintiff's counsel's attempts to assign arguably truthful meaning to Mr. Bieluch's testimony are not persuasive. Mr. Bieluch, with advice of counsel, clearly gave incomplete and misleading answers to legitimate questions concerning the authorship of his report.

 **\*2** Magistrate Judge Scoville further concluded that plaintiffs' violation of Rule 26(a)(2) warranted exclusion of Mr. Bieluch's testimony pursuant to Fed.R.Civ.P. 37(c)(1) unless plaintiffs were able to show their violation was harmless. Finding that plaintiffs had not carried this burden, he imposed the exclusionary sanction. Plaintiffs object, contending defendant suffered no prejudice as a result of counsel's participation in the preparation of Mr. Bieluch's report. Since Mr. Bieluch was made available for deposition, plaintiffs contend, defendant was able to avoid any harm that might flow from the supposed Rule 26(a)(2) violation.

Again, the Court cannot find the magistrate judge clearly erred in finding the violation had not been shown to be harmless. In *Indiana Ins. Co.,* Rule 26(a)(2) was found to have been "technically" violated in that the expert's report had not been signed by the expert and included, in addition to the expert's own opinions, portions that were prepared by counsel. The violation was deemed harmless, however, because the report did contain portions actually prepared by the expert and because the expert, in deposition, frankly explained what portions of the report were his.

Here, in contrast, the Court is presented with something more than a mere "technical violation." First, it has been established that the language of Mr. Bieluch's report was originally prepared by plaintiffs' counsel. The report does not contain a statement of Mr. Bieluch's opinions in his own words. Moreover, Mr. Bieluch's deposition, rather than affording opportunity to remedy any prejudice, actually compounded the violation. When confronted with questions about the report's authorship, Mr. Bieluch gave misleading and evasive answers. It is this conduct by Mr. Bieluch, and plaintiffs' counsel, in the deposition, reflecting a cavalier or stubborn disregard for the Rules of Civil Procedure and the integrity of the judicial process which, in the Court's opinion, justifies the sanction imposed. The magistrate judge did not abuse his discretion in ordering Mr. Bieluch's testimony excluded.

Accordingly, plaintiffs' appeal is DENIED and the order precluding expert witness testimony is AFFIRMED.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2000 WL 33654070, 46 Fed.R.Serv.3d 201

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3215 Filed 07/10/23 Page 46 of 66
James T. Scatuorchio Racing Stable, LLC v. Walmac Stud..., Not Reported in...
2014 WL 1744848

KeyCite Yellow Flag - Negative Treatment

Distinguished by Mullen v. South Denver Rehabilitation, LLC, D.Colo., November 12, 2020

2014 WL 1744848
Only the Westlaw citation is currently available.
United States District Court, E.D. Kentucky,
Central Division, at Lexington.

James T. SCATUORCHIO RACING STABLE, LLC, et al., Plaintiffs,

v.

WALMAC STUD MANAGEMENT, LLC, et al., Defendants.

Civil Action No. 5:11–374–DCR.
|
Signed April 30, 2014.

**Attorneys and Law Firms**

Stephen C. Matthews, Porzio, Bromberg & Newman, P.C., Morristown, NJ, David Thomas Faughn, Michael D. Meuser, Miller, Griffin & Marks, P.S.C., David James Treacy, Barbara B. Edelman, Patrick Drake Schach, Dinsmore & Shohl LLP, Lexington, KY, Richard David Schibell, Schibell Mennie & Kentos, LLC, Ocean, NJ, for Plaintiffs.

James M. Kelly, Michael Alan Galasso, Ricky L. Johnson, Jr., Robbins, Kelly, Patterson & Tucker, Cincinnati, OH, for Defendants.

**MEMORANDUM OPINION AND ORDER**

DANNY C. REEVES, District Judge.

**\*1** Plaintiffs James T. Scatuorcho, LLC ("Scatuorchio, LLC"), James T. Scatuorchio, Kevin Scatuorchio, Courtney Sullivan, and Bryan Sullivan have moved to exclude the opinion testimony of Michael E. Hernon and strike his affidavit and errata sheet. [Record Nos. 196, 263] For the reasons discussed below, the plaintiffs' motions will be granted.

**I.**

The plaintiffs retained Stephen Johnson and James LaMonica as experts to render opinions on the standard industry practices for advertising and managing stallions. [*See* Record Nos. 191–6, 191–7.] These experts opined that the defendants' management and billing practices did not conform to industry standards and practice. [*Id.*] The defendants hired Michael Hernon to counter the testimony of Johnson and LaMonica. [Record No. 196–8] For example, on the topic of Walmac Stud assigning stallion manager duties to Walmac Farm, Hernon states "The Co–Owners Agreement allows for the assignment of the duties of Walmac Stud [ ] as stallion manager to an affiliate. It is not uncommon for farms to have a separate entity which acts as the syndicate or stallion manager." [*Id.*, p. 5]

The plaintiffs deposed Hernon on January 16, 2014. During his deposition, Hernon testified that he met with Robert Beck, Frank Becker, and Defendant Jones to review a draft of the report before it was submitted.[1] [Record No. 196–9, p. 172] Hernon stated that he brought his company letterhead to this meeting and Jones brought a first draft of the report that he had prepared for Hernon containing opinions responding to Johnson and LaMonica's reports. [*Id.*, pp. 171, 174] Hernon stated that, while edits were made to Jones' draft, the final report was 90% unchanged. [*Id.*, pp. 179–80] Hernon could not identify any portion of his opinion, analysis, or subject matter that had been removed or changed from Jones' draft. [*Id.*, pp. 180–81, 184] Hernon went on to state that after review of the draft, it was printed it on his company letterhead and he signed it. [*Id.*, p. 177] Hernon testified that this entire process took sixty to ninety minutes. [*Id.*, pp. 177–78]

Hernon also disclosed that while his report contained opinions based on the COA and the Dean Dorton Ford Report, an equine industry accounting survey, he had not seen those documents until after his report was submitted. [*Id.*, pp. 187–89, 305] During questioning by the defendants' counsel, Hernon testified that he had other meetings with Jones and Robert Beck during which they discussed his expert report and that Jones had informed him of the Dean Dorton Ford Report before his report was signed. [*Id.*, p. 355–56] Hernon also stated that he had spent approximately 15 to 20 hours on the matter, including attending meetings and review of materials. [*Id.*, p. 171]

The plaintiffs have moved to exclude Hernon as an expert, arguing that his report is deficient under Rule 26(a)(2)(B) because: (i) the opinions in the report are not Hernon's; (ii) Hernon's testimony is unreliable under the Federal Rules of

2014 WL 1744848

Evidence; and (iii) Hernon is not qualified to offer testimony concerning certain subject areas. [Record No. 196–1, p. 1] In response, the defendants filed an affidavit of Hernon and an errata sheet. These materials contend that, due to his inexperience with depositions, Hernon was confused and gave incorrect answers. [Record Nos. 241, 262–1] Those documents state that the actual amount of material changed from the first draft and the final report was closer to 50% and that there were actually five meetings involving Hernon and his counsel during which they reviewed and revised his opinion letter. [*Id.*] Thus, they argue that Hernon should not be excluded because his report was substantially his own. The defendants also contend that Hernon is qualified to testify on matters concerning stallion management. [Record No. 240, p. 5]

**\*2** The plaintiffs have also moved to strike the affidavit and errata sheet. [Record No. 263] They argue that the errata sheet does not comply with Rule 30(e) of the Federal Rules of Civil Procedure because it makes significant alterations to what Hernon said under oath and does not comply with the procedural requirements of the rule. [Record No. 263–1, pp. 6–8] The plaintiffs seek to strike Hernon's affidavit, claiming that it contradicts his deposition testimony and, alternatively, should be considered an inappropriate "sham affidavit." [*Id.,* pp. 8–17] In response, the defendants argue that the Sixth Circuit allows substantive changes through errata sheets to deposition testimony and that rules regarding contradictory and sham affidavits do not apply. [Record No. 269, pp. 2–8]

## II.

### A. Motion to Strike Affidavit and Errata Sheet
The plaintiffs assert that the errata sheet is impermissible under Rule 30(e) of the Federal Rules of Civil Procedure. They claim that the defendants did not comply with the procedural requirements of the rule which mandates that a deponent or party request a review of the deposition transcript or recording before the deposition is completed. [Record No. 263–1, pp. 6–7] Additionally, they argue that the errata sheet impermissibly seeks to substantially alter what was said under oath. The plaintiffs contend that this is prohibited in this circuit. [*Id.,* pp. 7–9] However, the defendants assert that Sixth Circuit allows parties to make substantive changes to depositions through the use of errata sheets. [Record No. 269, pp. 2–5]

Rule 30(e) provides as follows:

(e) Review by the Witness; Changes.

(1) *Review, Statement of Changes.* On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available which:

 (A) to review the transcript or recording; and

 (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them

(2) *Changes Indicated in the Office's Certificate.* The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30–day period. Fed.R.Civ.P. 30(e).

The rule has a number of procedural requirements that must be satisfied before changes to deposition testimony will be permitted. Once these rules are met, changes to deposition testimony may be allowed. While courts are split regarding whether to allow substantive changes to depositions, there is no disagreement that the procedural requirements must be satisfied. Compliance with these procedural rules is mandatory. And if they are not satisfied a Court may strike the proposed changes. *Agrizap, Inc. v. Woodstream Corp.,* 232 F.R.D. 491, 493–94 (E.D.Pa.2006) (failure to request review is grounds for barring an errata sheet); *see also EBC, Inc. v. Clark Bldg. Sys., Inc.,* 618 F.3d 253, 265 (3d Cir.2010); *Kull v. Vill. of Yorkville, Ohio,* 2:07–CV–686, 2008 WL 5188167, at *4 (S.D.Ohio Dec.10, 2008) (an untimely and uncertified errata sheet is subject to exclusion).

**\*3** The plaintiffs assert that neither Hernon nor any party asked to review the transcript for errors. Thus, the procedural requirements of Rule 30(e) have not been satisfied. [Record No. 263–1, pp. 6–7] The defendants apparently concede this point. [*See* Record No. 269.] Therefore, a failure to comply with the procedural requirements of Rule 30(e) justifies the errata sheet's exclusion. *Agrizap,* 232 F.R.D. at 493–94. However, the errata sheet is also impermissible for other reasons. The plaintiffs argue that errata sheets cannot substantively change what was said under oath at a deposition and are only limited to correcting typographical errors or transcription mistakes. [Record No. 263–1, pp. 7–8] The defendants claim that, although there is a split in the Sixth Circuit on this point, the rules clearly allow an errata sheet

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3217 Filed 07/10/23 Page 48 of 66

James T. Scatuorchio Racing Stable, LLC v. Walmac Stud..., Not Reported in...

2014 WL 1744848

to correct substantive deposition testimony. [Record No. 269, pp. 2–5]

Courts are split in their interpretation of how broadly changes may be made through an errata sheet under Rule 30(e). *See* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2118 (2010). The traditional view is that Rule 30(e) allows a deponent to change deposition testimony with procedurally correct changes, even if they substantively change or contradict the original answers. *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir.1997); *Titanium Metals, Corp. v. Elkem Mgmt., Inc.,* 191 F.R.D. 468, 472 (W.D.Pa.1998); *Foutz v. Town of Vinton,* 211 F.R.D. 293, 295 (W.D.Va.2002); *Reilly v. TXU Corp.,* 230 F.R.D. 486, 490 (N.D.Tex.2005). Under this approach, the change may be subject to impeachment that may affect credibility. Further, the revision does not replace the testimony; rather, the original testimony remains and may be used on cross-examination. *Podell,* 112 F.3d at 103. However, other courts have taken a more restrictive approach, preventing parties from changing what was said under oath through an errata sheet. *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.,* 330 F.3d 1275, 1282 (10th Cir.2003); *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992); *Wyeth v. Lupin Ltd.,* 252 F.R.D. 295, 296 (D.Md.2008).

In a recent unpublished opinion, the Sixth Circuit indicated that Rule 30(e) does not allow a deponent to alter what was said under oath. *Trout v. FirstEnergy Generation Corp.,* 339 F. App'x 560, 565 (6th Cir.2009) (citing *Tuttle v. Tyco Electronics Installation Servs., Inc.,* 2:06–CV–581, 2008 WL 343178 (S.D.Ohio Feb.7, 2008)). The court went on to state that, if Rule 30(e) allowed for substantive changes, " 'one could merely answer the questions with no thought at all[ ], then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.' " *Id.* Courts applying the holding in *Trout* have stricken errata sheets that attempt to alter substantive testimony rather than correct typographic or transcription errors. *See CNB Bancshares, Inc. v. StoneCastle Secs. LLC,* No. 3:09–CV–33, 2012 WL 2887256, at *3 (E.D.Tenn. July 13, 2012); *EEOC v. Skanska USA Building, Inc.,* 278 F.R.D. 407, 412 (W.D.Tenn.2012); *Walker v. 9912 East Grand River Assocs., LP,* No. 11–12085, 2012 WL 1110005, at *3–4 (E.D.Mich. Apr.3, 2012); *Giebel v. Lavalley,* 5:12–CV–750, 2013 WL 6903784 (N.D.Ohio Dec.31, 2013). And other courts outside the circuit have recognized that the Sixth Circuit is the "[o]ne court of appeals [that] permits a defendant

to correct only typographic and transcription errors." *Devon Energy Corp. v. Westacott,* 09–1689, 2011 WL 1157334 (S.D.Tex. Mar.24, 2011).

**\*4** The defendants cite a recent district court case in this circuit that reached a contrary result by allowing substantive changes to prior testimony. [Record No. 269, p. 4 (citing *Buchanan v. City of Mt. Juliet,* 2012 U.S. Dist. LEXIS 137999, at *3 (M.D.Tenn. Sept. 26, 2012) ] However, this Court follows the Sixth Circuit's most recent pronouncement regarding the issue in concluding that Rule 30(e) does not permit changes to what was said under oath, aside from typographical and transcription errors. Hernon's errata sheet does much more than attempt to correct typographical errors. It substantively changes answers that were provided at his deposition. Thus, the errata sheet will be stricken.

The plaintiffs also argue that the affidavit must be stricken as it provides contradictory testimony without providing a persuasive reason for the contradiction. [Record No. 263–1, p. 8] They also assert that if the affidavit is not stricken as contradictory, it should be stricken as a sham affidavit. [*Id.,* p. 15] In response, the defendants assert that they have given sufficient justification for any contradiction and that Hernon's affidavit is not an attempt to create a sham factual issue. [Record No. 269, p. 5] They also argue that the sham affidavit rule does not apply because the alleged inconsistency was actually in Hernon's deposition itself. [*Id.,* p. 6] The affidavit states that the actual amount of material changed from the first draft and the final report was somewhere closer to 50% and that there were actually five meetings where Hernon and his counsel reviewed and revised his opinion letter. [Record No. 241]

In determining whether to strike a post-deposition affidavit, a district court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L., v. PCC Airfoils, L.L.C.,* 448 F.3d 899, 908 (6th Cir.2006). If the affidavit does directly contradict prior testimony, then the court must strike the affidavit "unless the party ... provides a persuasive justification for the contradiction." *Id.* If the affidavit is not excluded as contradictory, it should not be stricken unless it creates a sham issue. *Id.* (citation omitted). Factors used to determine whether an affidavit attempts to create a sham issue include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3218 Filed 07/10/23 Page 49 of 66
James T. Scatuorchio Racing Stable, LLC v. Walmac Stud..., Not Reported in...
2014 WL 1744848

evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* at 909 (citing *Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986)). However, if the claimed inconsistency that is created by the affidavit is actually in the deposition, then the affidavit cannot be considered a sham. *O'Brien v. Ed Donnelly Enterprises, Inc.,* 575 F.3d 567, 593 (6th Cir.2009) (citing *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 894 (5th Cir.1980)).

**\*5** The defendants argue the alleged inconsistency between the affidavit and the report existed in the deposition itself and, therefore, there is no direct contradiction. [Record No. 269, p. 7 (citing *O'Brien,* 575 F.3d at 593) ] In support, they cite Hernon's deposition in which he testified that he had several meetings with Jones and counsel, discussing the report, and that he spent a lot of time "contemplating" the matters surrounding his report. [Record No. 240–1, pp. 355–56] Hernon stated that, given these meetings and the time spent contemplating the matter, he spent a lot of time working on the letter. [*Id.*] However, this testimony does not create the same alleged inconsistency between the deposition testimony in question and the affidavit.

The affidavit states that Hernon had several meetings with his attorney where he "revised" his letter and that he "drafted" it over several meetings. [Record No. 241, pp. 1–2] The deposition testimony cited by the defendants is not so clear that the time spent in these meetings was explicitly devoted to revising and drafting of the report. Rather, it concerns the time spent "contemplating" the matter. Hernon does say they spent "quite a bit of time" "working" on the letter, but this could mean time spent discussing the issues the report would address or just generally thinking about its contents, not necessarily the actual creation of the report.

Hernon's testimony during his deposition clearly demonstrates that the process of creating his report consisted of Jones bringing his draft to a meeting, reviewing it for sixty to ninety minutes, printing it on Hernon's letterhead, and signing it. [Record No. 196–9, pp. 171–74] This is not the case where the deposition "did not speak with one voice." *O'Brien,* 575 F.3d at 593. The deposition transcript cited by the defendants in their argument does not state with clear language that Hernon spent the time during his prior meetings actually drafting or revising his report, but only "contemplating" and generally "working" on the matter. Therefore, the contradiction created by the affidavit did not exist in the deposition itself. Thus, there are direct

contradictions between the deposition testimony and the affidavit.

The defendants argue that Hernon's general inexperience with the deposition process and confusion provides the persuasive justification for the inconsistency between the deposition testimony and the affidavit. [Record No. 269, p. 7] But the plaintiffs claim that Hernon's justifications are not persuasive as this was not his first time acting as an expert or giving sworn deposition testimony. [Record No. 263–1, pp. 14–15] The Court is not convinced by the defendants assertion that Hernon had a general confusion with the deposition process and the questions the affidavit seeks to answer.

The transcript does not support Hernon's claims that he was confused during the deposition regarding questions relating to the time spent drafting the report due to his lack of experience with the deposition process. Hernon's answers were direct and did not reflect any inconsistency. Apart from Hernon's later claim of confusion, there is no evidence of any confusion from the record. Hernon explained that he had other meetings with his counsel and spent more time on the entire matter than he initially disclosed. The source of Hernon's confusion was explained thoroughly later in the deposition, clarifying any confusion he may have had, but it did not rebut earlier statements regarding the report. Further, Hernon's claim that he was confused by the deposition process as whole is undermined by the fact that he has previous deposition experience. [Record No. 263–6, pp. 9–10] A general claim of confusion will not justify the introduction of a contradictory affidavit to rebut prior sworn testimony. *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.,* 330 F.3d 1275, 1282 (10th Cir.2003).

**\*6** The affidavit is directly contradictory to the testimony provided at Hernon's deposition and the reason provided for this contradiction is not sufficiently persuasive. Therefore, the affidavit will be stricken. Because the Court concludes that the affidavit is contradictory and that a persuasive justification for its contradictions have not been demonstrated, it is unnecessary to determine whether the affidavit is a sham. *Aerel,* 448 F.3d at 908.

### B. Motion to Exclude Hernon
The plaintiffs have also moved to exclude Hernon's testimony on several grounds. They assert that, because Hernon's report was not actually written by him and contains the opinions of Defendant Jones, it is deficient under Rule 26 of the Federal Rules of Civil Procedure. They also argue that, because

Case 2:19-cv-10027-GAD-APP ECF No. 169-5, PageID.3219 Filed 07/10/23 Page 50 of 66

James T. Scatuorchio Racing Stable, LLC v. Walmac Stud..., Not Reported in...

2014 WL 1744848

Hernon did not prepare his report, his testimony which is based on the report is not reliable. They further contend that Hernon is not qualified to offer testimony regarding several subjects.

### i. Rule 26 Deficiency

As discussed above, Hernon's errata sheet and affidavit (stating that he had several meetings where he created the report and that 50% of the final product was based on Jones' draft) will be stricken. This leaves deposition testimony in which Hernon states that Jones provided the draft report which he adopted 90% after a sixty to ninety minute meeting. Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure requires that reports accompanying an expert witness disclosure be prepared by the witness himself or herself. Fed.R.Civ.P. 26(a)(2)(B). As referenced in Rule 26, "preparation" means involvement in the creation rather than "perusing a report drafted by someone else and signing one's name at the bottom to signify agreement." Manning v. Crockett, 95 C 3117, 1999 WL 342715, at *3 (N.D.Ill. May 18, 1999). Creating an expert's opinion and then asking the purported expert to sign it does not comply with the rule's requirement. Id. The advisory committee's notes indicate that an attorney may help draft the report, but they do not mention that a party may prepare the report for the witness. Fed.R.Civ.P. 26 advisory committee's note. Additionally, counsel's assistance is generally limited to helping the expert draft a report in a way that satisfies the requirements of Rule 26. Id.

Hernon testified that approximately 90% of his draft was prepared by Jones after a sixty to ninety minute meeting. Compounding the problem, Hernon could not identify the portion of the report that was changed. [Record No. 196–9, pp. 180–81, 184] Further, Hernon's report heavily relies on the COA and the Dean Dorton Ford Report. And Hernon admitted that he had not reviewed these documents before the report was submitted. The defendants' claim that Hernon testified at his deposition that he had actually spent more time on his report than he initially stated is not convincing.

As discussed above, the statements Hernon made at his deposition involve meetings he had with his counsel and the time he spent on the entire matter itself, not the actual drafting of his report. [Id., pp. 171, 355–56] In short, based on Hernon's on sworn testimony, the Court concludes that he did not substantially participate in the creation of his report. Instead, he adopted the opinions of Defendant Jones and signed a copy of the report printed on his letterhead. This

practice has been rejected as contravening the requirements of Rule 26. Bekaert Corp. v. City of Dyersburg, 256 F.R.D. 573, 579 (W.D.Tenn.2009); Trigon Ins. Co. v. United States, 204 F.R.D. 277, 296–69 (E.D.Va.2001); O'Hara v. Travelers, 2:11–CV–208–KS–MTP, 2012 WL 3062300 (S.D.Miss. July 26, 2012) ("An attorney—or, in this case, a party—is not permitted to 'ghost-write' an expert's report."). Thus, Hernon's report does not satisfy Rule 26.

**\*7** When a party does not comply with Rule 26(a) he or she is "not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). The test for exclusion under 37(c) is "very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp., 596 F.3d 357, 370 (6th Cir.2010). Courts have found exclusion of an expert under Rule 37 appropriate when a report is improperly adopting the opinion of another. Bekaert, 256 F.R.D. at 579; see also In re Jackson Nat. Life Ins. Co. Premium Litig., 46 Fed. R. Serv.3d 201 (W.D.Mich.2000). Indeed, "exclusion is automatic without a showing of substantial justification or harmlessness." Bekaert, 256 F.R.D. at 578.

The defendants behavior is neither substantially justified nor harmless. If allowed to testify, Hernon would be offering the opinions of Defendant Jones under the guise of an expert while simultaneously preventing Jones from being cross-examined on those opinions. The harm of allowing such testimony is self-evident. While a deposition was taken, it did not cure the deficiency of the report, as Hernon could not even identify the part of the report actually containing his original opinions. Therefore, Hernon will be excluded under Rule 37.

### ii. Federal Rule of Evidence 702

If the opinions in an expert report are not his own, the expert will not satisfy the requirements of Rule 702 of the Federal Rules of Evidence and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), because the report is not based on the expert's own reasoning and methodology. See Fed.R.Evid. 702 ("a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, in (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."); Daubert, 509

2014 WL 1744848

U.S. at 592–93 ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."). And if an expert is not independent to form his or her own opinions, he or she lacks the required credibility to be of any assistance to the trier of fact. Fed.R.Evid. 702 (Expert testimony is admissible first if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, ...."); *see also Polsby v. Shalala,* 925 F.Supp. 379, 392 (D.Md.1996) ("[A] lack of independence as an expert destroys his credibility."); *Trigon Ins. Co. v. United States,* 204 F.R.D. 277, 295 (E.D.Va.2001) (finding that when an expert did not draft his report his testimony is inadmissible under Rule 702).

 **\*8** Hernon admitted that his proffered opinion is approximately 90% of the opinion Jones supplied. Thus, his proposed testimony lacks independence. Because Hernon's opinions are not truly independent, his testimony will not assist the trier of fact and will be excluded under Rule 702.[2]

**III.**

Hernon's errata sheet may not be used to make substantive changes to sworn testimony. Additionally, his affidavit is improper because it contradicts prior deposition testimony. And a persuasive justification for the contradiction has not been provided. Further, because Hernon simply adopted Jones' opinions in his report, the report does not satisfy the requirements of Rule 26. Accordingly, it is hereby

**ORDERED** as follows:

1. Plaintiffs James T. Scatuorcho, LLC; James T. Scatuorchio; Kevin Scatuorchio; Courtney Sullivan; and Bryan Sullivan's motion to strike the affidavit and errata sheet of Hernon [Record No. 263] is **GRANTED.** The affidavit and errata sheet of Hernon will be stricken from the record.

2. Plaintiffs James T. Scatuorcho, LLC; James T. Scatuorchio; Kevin Scatuorchio; Courtney Sullivan; and Bryan Sullivan's motion to exclude Michael E. Hernon as an expert [Record No. 196] is **GRANTED .** Hernon will be **EXCLUDED** from testifying as an expert at trial.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1744848

Footnotes

1    Robert Beck is counsel for Gainesway Farm, Hernon's employer. Frank Becker represented the defendants.

2    The plaintiffs also argue that Hernon is not qualified to express opinions on several subjects. [Record No. 196–1, pp. 20–24] However, the Court need not address those arguments.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3187685

📙 KeyCite Yellow Flag - Negative Treatment

Distinguished by CDW LLC v. NETech Corp., S.D.Ind., September 28, 2012

2009 WL 3187685
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

KING–INDIANA FORGE, INC., Plaintiff,

v.

MILLENNIUM FORGE, INC., Defendant.

No. 1:07–cv–00341–SEB–DML.
|
Sept. 29, 2009.

**Attorneys and Law Firms**

Jennifer Smith Roach, Thomas J. Collin, Thompson Hine LLP, Cleveland, OH, Joel E. Tragesser, Frost Brown Todd LLC, Indianapolis, IN, for Plaintiff.

James L. Petersen, Julianna Marie Plawecki, Ice Miller LLP, Indianapolis, IN, John Lentz Kirtley, Karen A. Waple, Michael D. Huitink, Godfrey & Kahn, Milwaukee, WI, for Defendant.

**ORDER GRANTING MOTION IN LIMINE**

SARAH EVANS BARKER, District Judge.

**\*1** This cause is before the Court on Defendant Millennium Forge, Inc.'s Motion *In Limine* Regarding Portions of the Expert Testimony of Thomas J. Sponsel [Docket No. 106], filed on September 4, 2008. Defendant moves the Court to exclude the following two opinions in the proposed expert testimony of Plaintiff's damages expert: (1) that the alleged misappropriation of Plaintiff's axle spindle process by Millennium netted a cost savings of $295,000 to Millennium; and (2) that the proper damage period for measuring King's damages is two years. For the reasons detailed below, Defendant's Motion is *GRANTED.*

**Discussion**

**I. Standard of Review**

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Applying this framework, courts must undertake:

> a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

*Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007) (quoting Fed.R.Evid. 702); *see also Kumhoe Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (extending the *Daubert* admissibility framework to expert testimony in the social sciences). "The *Daubert* standard applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir.2000) (citing *Kumho,* 536 U.S. at 141).

Millenium does not oppose Thomas J. Sponsel's proffered opinions on the basis that he is not qualified as an expert in the subject matter.[1] Therefore, the issues before the Court regard only the other prongs of *Daubert,* and the Court, "in its role as a gate-keeper," must determine if Sponsel's opinions are based on reliable methodology, and whether they would be helpful to a jury. *Winters v. Fru–Con, Inc.,* 498 F.3d 734, 743 (7th Cir.2007).

**II. Thomas J. Sponsel's Opinion on Damages Amount**

In his expert report, Thomas J. Sponsel ("Sponsel") opines that Plaintiff King–Indiana Forge, Inc's ("King") damages should include $295,000, which he contends is a reasonable estimate of the cost savings that Millennium enjoyed as a result of its alleged misappropriation. Report of Sponsel at 1, 8–9. Defendant Millennium Forge, Inc. ("Millennium") contends that this opinion is not reliable expert testimony because it is wholly based on the cost recited to Sponsel by King employee Greg Ankney ("Ankney"). Millennium further contends that Sponsel's opinion should be excluded because Sponsel admitted that he did not independently verify the figures supplied to him by Ankney.

**\*2** King rejoins that Sponsel relied upon factual information provided by Ankney because that was the "best information

2009 WL 3187685

available to him at the time." Because Generally Accepted Accounting principles did not require King to accumulate and include the development cost for King's proprietary process as an asset on its balance sheet, the "best" accounting information available came from Ankney, a manager at King who was responsible for observing costs incurred. King further rejoins that this is not a case in which "Sponsel relied on information or summaries prepared by counsel without knowledge of the underlying facts-Sponsel conducted his own independent examination of Ankney." Pl.'s Response at 6.

When an expert's proffered opinion merely parrots information provided to him by a party, that opinion is generally excluded. *See Black & Decker v. Bosch Tools,* 2006 WL 5156873, at *1 (N.D.Ill.2006). Furthermore, when an expert relies upon information given to him by a party or counsel, he must independently verify that information before utilizing it in his calculations. *MDG International, Inc. v. Australian Gold, Inc.,* 2009 WL 1916728, at *5 (S.D.Ind. June 29, 2009) (Barker, J.).

Sponsel testified in his deposition as follows:

Q: Is it fair to say, then, the items listed ... are Mr. Ankney's calculations, not yours?

A: That's correct.

Dep. of Sponsel at 78–80. "An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him." *In re James Wilson Associates,* 965 F.2d 160, 172 (7th Cir.1992). However, in doing so, the expert must incorporate the information supplied to him into his underlying facts, independently review the information, and then formulate, with calculations consistent with his expertise, an opinion that relies upon that any other relevant information.

It is clear from his report and testimony that Sponsel did not use the information provided by Ankney as the basis for his proffered opinion. Although Sponsel conducted the interview of Ankney, he never independently verified the facts Ankney provided to him. Instead, he simply offered Ankney's conclusions as his own. "Federal Rule of Evidence 703 does not 'allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece fo the witnesses on whose statements or opinions the expert purports to base his opinion.' " *Black and Decker,* 2006 WL 5156873, at *1 (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.,* 387 F.Supp.2d 794 (N.D.Ill.2005). We therefore conclude that

Sponsel's opinion specifically stating that King's damages should include this amount of $295,000 must and shall be excluded.

### III. Sponsel's Opinion Regarding Two–Year Damage Period

Sponsel further opines that the appropriate damage period for the calculation of King's damages is two years. He bases this opinion on an assumption that Millennium would have taken two years to develop the allegedly misappropriated information, which assumption is derived from the fact that it took King two years to develop that information. Rep. of Sponsel at 9 ("I anticipate that Millennium would have to go through the same process in development of spindles, and that by using the confidential information allegedly obtained in June 2006, it avoided the majority of these costs."). According to Millennium, because Sponsel does not explain how the amount of time it took King to develop its process relates to how long it would have taken Millennium to develop a similar process, the opinion should be excluded as unreliable. Millennium further attacks Sponsel's opinion by noting that Sponsel conceded that he did not take into account numerous variables that were relevant to the "damages period" calculation. See Dep. of Sponsel at 22–25.

**\*3** King does not substantially defend Sponsel's opinion in this regard but rather contends that any weaknesses alleged by Millennium should be explored by Millennium on cross-examination. *See Daubert,* 508 U.S. at 595. Although this is ordinarily the case under *Daubert,* in assessing an expert's methodology, the Court "must rule out subjective belief or unsupported speculation." *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 344 (7th Cir.1995) (internal citations omitted). It is clear from Sponsel's testimony and expert report that his conclusion regarding the damages period is nothing more than an equation of King's development process time to what may have been Millennium's development process time.

An expert report purporting to calculate damages, which "fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has not value as causal explanation and is therefore inadmissible in a federal court." *People Who Care v. Rockford Board of Educ.,* 111 F.3d 528, 537–38 (7th Cir.1997); *Fogle v. William Chevrolet/ GEO, Inc.,* 275 F.3d 613, 616 (7th Cir.2001). Sponsel offers no explanation, scientific or otherwise, for why these two periods, one real and one speculative, should be equated, nor does he say precisely why this should be considered the damages period in this case.[2] Because of the inherent

2009 WL 3187685

unreliability of Sponsel's opinion related to the damages period, we hold that this opinion, too, must be excluded.

### IV. Conclusion

Having considered the parties' arguments regarding the admissibility of Thomas J. Sponsel's opinions relating to the amount of damages and damages period in this case, we conclude that those opinions do not satisfy the reliability prongs of *Daubert.* Accordingly, Defendant's Motion *In Limine* to exclude those opinions is *GRANTED.*

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3187685

Footnotes

1   Sponsel has worked as a Certified Public Accountant since 1979 and has audit, accounting, and tax consulting experience in a wide variety of industries. He has received various awards from the Indiana CPA Society.

2   Sponsel does cite one accepted methodology in his report, the definition of a damages period provided by the American Institute of Certified Public Accountants. However, he admits to rejecting this method and replacing it with the "alternative" approach of equating the damage period to King's two-year development process. This is insufficiently reliable under *Daubert.*

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Bertin Steel Processing, Inc. v. U.S. Steel Corp.,
N.D.Ohio, September 6, 2005

1999 WL 342715
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Margaret MANNING and
Martin Manning, Plaintiffs,

v.

J. David CROCKETT and
Ruth Crockett, Defendants.

No. 95 C 3117.
|
May 18, 1999.

MEMORANDUM AND ORDER

MANNING, District Court J.

**\*1** This order is yet another chapter in the continuing saga of plaintiffs Margaret and Martin Manning's efforts to adequately disclose their expert, psychologist Eric Ostrov. On January 26, 1999, the court gave the Mannings leave to file an amended expert disclosure by February 1, 1999 and warned them that if their disclosure did not comply with Rule 26 for any reason, it would bar Dr. Ostrov. Dr. Ostrov's new expert report repeats much of the language in the complaint. The question before the court is whether this means that he did not prepare the report as required by Fed.R.Civ.P. 26(a)(2) (B). For the following reasons, the court finds that, at this stage in the proceedings, the motion to bar Dr. Ostrov must be denied. The court also denies the Mannings' motion for sanctions based on the filing of the motion to bar.

*Background*

In this diversity case, the Mannings seek damages for injuries resulting from allegedly negligent psychotherapeutic treatment of Ruth by defendant J. David Crockett and his wife, defendant Ruth Crockett. Margaret claims that David, among other things, wrongfully convinced her that satanic ritualists brain-washed, abused, raped and impregnated her, and that Ruth participated in this treatment. The court

previously granted summary judgment to Ruth and found that material issues of disputed fact precluded the entry of summary judgment as to David.

The Mannings have provided three reports signed by Dr. Ostrov. The first report, prepared pursuant to 735 ILCS 5/2– 622, briefly states that Margaret has a meritorious cause of action against David. The second report, purportedly prepared by Dr. Ostrov pursuant to Rule 26, failed to include all of the information required by paragraph (a)(2). Notably, this report also virtually mirrors the allegations in the Mannings' complaint, right down to the repetition of a typographical error from the complaint.

In its January 26, 1999 memorandum and order, the court denied the Crocketts' first motion to bar Dr. Ostrov based on the Mannings' first two expert disclosures, explaining that "the plaintiffs' failure to comply with Rule 26 stemmed from ignorance, not a desire to sand-bag David and Ruth" and "neither David nor Ruth has established that the plaintiffs' myriad problems with Rule 26 prejudiced them." The court also gave the Mannings one final chance to disclose their expert, and warned them that it would bar Dr. Ostrov if the Mannings' disclosure did not comply with Rule 26 for any reason.

In response, the Mannings filed a third report from Dr. Ostrov. This report, which is signed by him as well as the Manning's attorney, is remarkably similar to the Manning's third amended complaint, although it is in the form of a narrative, rather than a paragraph by paragraph elucidation of his opinion. It is not, however, a verbatim repetition of the allegations in the complaint.

*Motion to Bar*

David Crockett seeks to bar Dr. Ostrov, contending that, because he did not prepare the majority of his report himself, his report fails to comply with Rule 26(a)(2)(B). That rule provides that:

**\*2** Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be *accompanied by a written report prepared and signed by the witness*. The report shall contain a complete statement of all opinions to

Manning v. Crockett, Not Reported in F.Supp.2d (1999)

1999 WL 342715

be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed.R.Civ.P. 26(a)(2)(B) (emphasis added).

The 1993 amendments to Rule 26 added paragraph (a)(2)(B). The advisory committee notes accompanying this section amplify the intended meaning of the phrase "prepared and signed by the witness," explaining that a report can be "prepared" by an expert witness even if counsel has aided the witness. Specifically, the advisory committee notes provide that:

Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed, with experts such as automobile mechanics, this assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Fed.R.Civ.P. 26(a)(2)(B) (1993 advisory committee notes); 8 Charles A. Wright & Richard L. Miller, Federal Practice and Procedure Civ.2d § 2031.1 (2d ed. 1994 & Supp.1999) (the advisory committee notes to Rule 26 indicate that "it is expected that counsel may assist some witnesses" in preparing their reports).

Only two reported decisions address Rule 26(a)(2)(B)'s use of the phrase "prepared and signed by the witness"—*Marek v. Moore,* 171 F.R.D. 298 (D.Kan.1997), and *Indiana Insurance Co. v. Hussey Seating Company,* 176 F.R.D. 291 (S.D.Ind.1997). In *Marek,* two reports were at issue. The expert personally prepared the first report and the plaintiff's attorney prepared a second report which was substantively similar to the first report but more detailed. 171 F.R.D. at 300. The *Marek* court found that, because "the substance of the expert opinions and conclusions, as well as their underlying bases and reasons, remain in the second version of the report[, it was] essentially the same as the first. The court finds no difference of such consequence as to nullify the character of the report as one prepared in substance by the expert witness." *Id.* The *Marek* court also noted that expert witnesses are likely to preoccupy themselves with their field of expertise, and that counsel may need to assist them in preparing a

report that complies with the rules, as they may have "little appreciation or none whatsoever for Rule 26 and its exacting requirements." *Id.* at 301.

**\*3** In *Hussey,* the expert testified at his deposition that the plaintiff's attorneys prepared his Rule 26 disclosure. 176 F.R.D. at 292. The court observed that, "[f]ortunately for Plaintiff, the [expert's] deposition did not conclude on the spot," as the expert went on to testify that, among other things, he had personally prepared the nine opinion reports and the work papers attached to the Rule 26 disclosure. *Id.* The expert also testified that the opinions in the disclosure were his. *Id.* The court found that, while "Rule 26 unquestionably requires an expert witness to prepare his own Rule 26 Report," the rules also contemplate that counsel may assist the expert in doing so. *Id.* at 293.

The *Hussey* court then found that report satisfied Rule 26 because the expert had personally prepared the heart of the disclosure: the attachments consisting of his opinions and work papers. *Id.* It also noted that the materials prepared by counsel, such as the summary of the expert's qualifications, did not directly relate to the expert's opinion and were "paraphrased" by counsel from conversations with the expert. *Id.* Explaining that Rule 26(a)(2)(B) contemplated this type of assistance and that the expert had specifically embraced the entire disclosure, the court found that the expert's involvement in the preparation of his report satisfied the rules.

Both sides claim that *Marek* and *Hussey* support their positions. In contrast, the court finds that they are helpful but not dispositive. *Marek* and *Hussey,* as well as the advisory committee notes to Rule 26(a)(2), stand for the proposition that some attorney involvement in the preparation of an expert report is permissible, but that the expert must also substantially participate in the preparation of his report. Thus, certain kinds of help are clearly in tune with the concept of assisting the expert discussed in *Marek, Hussey,* and the advisory committee notes. Specifically, an attorney's assistance with the preparation of documents required by Rule 26, such as a list of cases in which the expert has testified, or fine-tuning a disclosure with the expert's input to ensure that it complies with the rules is permissible.

In contrast, preparing the expert's opinion from whole cloth and then asking the expert to sign it if he or she wishes to adopt it conflicts with Rule 26(a)(2)(B)'s requirement that the expert "prepare" the report. Preparation implies involvement other than perusing a report drafted by someone else and signing

Case 2:19-cv-10027-GAD-APP   ECF No. 169-5, PageID.3226   Filed 07/10/23   Page 57 of 66
Manning v. Crockett, Not Reported in F.Supp.2d (1999)
1999 WL 342715

one's name at the bottom to signify agreement. In other words, the assistance of counsel contemplated by Rule 26(a)(2)(B) is not synonymous with ghost-writing. The court thus disagrees with the Manning's belief that "no rule ... prohibits an expert from adopting the precise language alleged in a complaint" in his report. Rule 26(a)(2)(B)'s inclusion of the phrase "prepared and signed by the witness" does just this. Allowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word "prepared" completely out of the rule. With these principles in mind, the court turns to Dr. Ostrov's reports.

**\*4** Dr. Ostrov's first report is essentially a nullity as it does not provide any detail as to the substance of his testimony. The court finds that the second report is virtually identical to the Mannings' complaint and that the third report is largely similar to the complaint. The court will focus on the third report because it has previously found that the first two reports were inadequate.

The problem with David's motion to bar is that the commonalities between the third report and the complaint are not enough, by themselves, to establish that Dr. Ostrov lacked the requisite involvement with the report that he signed. First, while the Mannings appear to be contending that a report complies with Rule 26 merely if the expert signs it, it is unclear whether they are conceding that this is all Dr. Ostrov did. It is true that Dr. Ostrov's opinion is signed by counsel as well as Dr. Ostrov, but this fact does not compel the conclusion that counsel drafted the opinion by herself.

Second, the court cannot ascertain the level of Dr. Ostrov's involvement in the preparation of this report based solely on a comparison between the report and the complaint because it cannot determine who was responsible for each portion of the report. In other words, the court cannot exclude the possibility that the complaint was drawn from Dr. Ostrov's opinions rather than the other way around. Third, the report —especially the portions expressing Dr. Ostrov's opinion, as opposed to the details regarding Margaret's alleged interactions with David—is not exactly like the complaint.

While this does not necessarily mean that Dr. Ostrov was responsible for the similar but non-identical sections of the report, he could easily have prepared or directed the preparation of these additional portions.

Accordingly, the motion to bar is denied without prejudice. Any renewed motion must, consistent with this order, be accompanied by evidence supporting the conclusion that Dr. Ostrov lacked significant personal involvement in the preparation of his report.

*Motion for Sanctions*

In the Mannings' response to the motion to bar, they seek Rule 11 sanctions for David's allegedly frivolous motion to bar. This motion is denied because the Mannings failed to request sanctions in a separate motion and failed to follow Rule 11's safe harbor provisions. Fed.R.Civ.P. 11; *Corley v. Rosewood Care Center, Inc. of Peoria,* 142 F.2d 1041, 1057–59 (7th Cir.1998). Moreover, even if the motion was properly before the court, it would be denied. David's motion to bar was an eminently reasonable response, at this stage of the proceedings, to the filing of the third expert disclosure, which is unquestionably quite similar to the Mannings' complaint. The court also advises the Mannings' counsel to more carefully research the basis for any further filings, as resolution of this 1995 case has been unnecessarily delayed by counsel's repeated problems with the federal and local rules.

*Conclusion*

**\*5** David Crockett's motion to bar Dr. Ostrov [121–1] is denied without prejudice, and the Manning's motion for sanctions is denied.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 342715

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Won v. General Motors, LLC, E.D.Mich., July 28, 2022

2011 WL 500034
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Frank ULBRICK, Jr., Plaintiff,

v.

UPR PRODUCTS, INC., Defendant.

No. 08–13764.
|
Feb. 8, 2011.

**Attorneys and Law Firms**

David B. Timmis, Timothy J. Connaughton, Vandeveer
Garzia, Troy, MI, for Plaintiff.

Patrick F. Mulcahy, Mulcahy and Mulcahy, Northville, MI,
for Defendant.

*ORDER*

JULIAN ABELE COOK, JR., District Judge.

**\*1** In this case, the Plaintiff, Frank Ulbrick, Jr., acting in his
capacity as the personal representative of the decedent estates
of his brothers, Michael Anthony Ulbrick and Christopher
Ryan Ulbrick, filed a complaint in which he charged
the Defendant, UPR Products, Inc. (referred hereinafter as
"UPR"), with being directly responsible for the untimely
demise of these two men, both of whom were fatally injured
on October 12, 2006, while they were the driver and occupant
of a 1988 Mustang motor vehicle. In his complaint, the
Plaintiff attributed their deaths directly, among other things,
to the negligence of UPR in the manufacture of an integral
part of the decedents' automobile. This accusation has been
denied by UPR.

Currently before the Court is the Plaintiff's appeal of a
decision by Magistrate Judge Mona K. Mazjoub who, *inter
alia,* granted UPR's motion to exclude the Plaintiff's proposed
expert witness from providing testimony during a trial.

I.

Subsequent to the fatal accident in 2006, the decedents' father
asked Bob McSwain, a friend of the family and a "racing
buddy," to dispose of the vehicle. Acting in response to this
request, McSwain—a racing mechanic—took possession of
the vehicle and brought it to his garage where extensive
photographs of the damaged vehicle were taken. Thereafter,
he—after personally examining the Mustang in an attempt
to determine the cause of the accident—concluded that
(1) the lower left control arm had been improperly and/or
incompletely welded, (2) this arm had broken immediately
prior to the accident, and (3) the breakage caused Michael—as
the driver—to lose control of his vehicle. McSwain thereupon
disassembled the vehicle, disposed most of it, and retained
only portions of the lower control arms as well as a few other
parts for sentimental or monetary value.

On June 28, 2008, this lawsuit was filed in the Macomb
County Circuit Court of Michigan, and was subsequently
removed by UPR to this Court on the basis of its diversity
jurisdiction.[1] The Plaintiff alleges that the lower control arms
were manufactured by UPR—an allegation that has been
denied. In June 2009, the Court entered a scheduling order
which required, *inter alia,* a party "who proffer[ed] a witness
as an expert, [to] provide the opponent and the Court with
a written report and all other pertinent forms of disclosures
(e.g., compensation and testimony in other cases) that are
required under Fed.R.Civ.P. 26(a)(2) not later than ninety (90)
days prior to the date of trial."

As the docket for this case reflects, discovery has not
proceeded smoothly, with the parties having brought multiple
discovery-related motions and freely hurling accusations in
which one party contends that the adversary had not fulfilled
the requisite discovery obligations, as authorized by the
Federal Rules of Civil Procedure. The balance of this order
will be confined to a discussion of only those issues which
specifically relate to the pending appeal.

**\*2** On October 7, 2008, UPR forwarded a set of
interrogatories to the Plaintiff, who filed his response
on January 15, 2009. However, UPR concluded that his
responses to its set of interrogatories which had sought
specific information (including fourteen sub-parts) about his
proposed expert witnesses and their opinions ("Interrogatory
51") were insufficient. Although McSwain was deposed on
September 1, 2009, UPR contends that his deposition was

Gilbrick v. UPR Products, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 500034

insufficient because he had not been definitively identified as an expert in this action. Rather, UPR opined that Mc Swain was deposed as a friend of the family who had prior knowledge of, and was responsible for the dismantling and the ultimate disposition of, the Mustang.[2]

During the month of November 2009, UPR filed a motion in which it petitioned Magistrate Judge Majzoub to, *inter alia,* (1) compel the Plaintiff to provide specific answers to Interrogatory 51; and (2) require him to produce his expert witnesses for depositions. The Plaintiff responded with a supplemental answer to Interrogatory 51, in which he itemized the names of several persons who would be called by him during the trial as expert witnesses. But UPR insisted that the Plaintiff's latest response was still incomplete in light of the detailed information that it had sought from him. On February 26, 2010, the Plaintiff provided UPR with a second supplemental answer to Interrogatory 51, which included the name of another proposed expert witness without adding any more information about the other persons who had been previously identified by him as his prospective expert witnesses.

During a hearing on UPR's motion on March 10th, the Plaintiff advised Magistrate Judge Majzoub that McSwain, as well as James Sprague, Nitan Paranjpe, and David Moore, would be the only individuals who would be called by him to testify as expert witnesses. However, he asserted that these expert-nominees were not ready to be deposed because UPR had failed to provide him with an adequate quantity of discovery information upon which their professional evaluations and conclusions could be made. Notwithstanding, Magistrate Judge Majzoub issued an order two days later (March 12th) in which she, *inter alia,* directed the Plaintiff to (1) provide UPR with thorough answers to Interrogatory 51 within a period of twenty-one days thereafter, (2) transmit the reports of all expert witnesses to UPR within the same time frame, and (3) arrange to have all of his proposed experts available for deposition on or before April 30, 2010.

In his supplemental answers to Interrogatory 51, the Plaintiff acknowledged that McSwain had not prepared a formal report, and the majority of these answers simply made global reference to his prior deposition testimony. In directing the Plaintiff to supplement this response, Magistrate Judge Majzoub rejected his contention that the content of McSwain's deposition was a sufficient basis upon which to

satisfy the obligatory disclosure and expert report standards under the Federal Rules of Civil Procedure.

**\*3** On March 31st, the Plaintiff served another supplemental answer to Interrogatory 51, in which he listed only McSwain and Sprague as his prospective expert witnesses. UPR described these answers as being incomplete. On April 2nd, the Plaintiff submitted Sprague's expert report to UPR. UPR rejected this proffer, maintaining that the Sprague report was not only "very limited and provide[d] no specific detail," but also failed to comply with the basic requirements of Federal Rule of Civil Procedure 26. Even though several dates were scheduled for Sprague's deposition, all of them were canceled by the Plaintiff, who asserted that the cancellations were due to the failure by UPR to provide him with the requisite discovery upon which the expert opinions depended. Significantly, the April 30th deadline that had been established by Magistrate Judge Majzoub passed without any of the depositions being conducted.

On May 27th, UPR filed a motion in which it asked Magistrate Judge Majzoub to (1) prevent the Plaintiff from presenting any expert witnesses at trial; and (2) dismiss the action with prejudice because of his failure to comply with multiple court orders. The Plaintiff, in response, agreed to the exclusion of all expert witnesses except McSwain, who would be his only expert witness. Furthermore, the Plaintiff contended that he had provided UPR with full answers to all of its interrogatories, including Interrogatory 51. Although he acknowledged that no expert report had been prepared by McSwain, the Plaintiff argued that the information that would have been included in an expert report had already been provided to UPR through his disclosures and McSwain's earlier deposition.

On December 9, 2010, Magistrate Judge Majzoub issued an order in which she denied UPR's request for a dismissal of this action but granted its request that the Plaintiff be precluded from presenting McSwain as an expert witness at trial.

The Plaintiff timely appealed this ruling, again contending that all of the information required in an expert report had already been provided to UPR through the September 2009 deposition of McSwain. The Plaintiff argues that he has satisfied and/or substantially complied with the requirements of Rule 26(a)(2)(B); and, furthermore, any failure to strictly comply with this Rule was harmless. He also points out that the exclusion of this proposed expert witness is not mandated by Rule 37(c)(1).

Ulbrick v. DPR Products, Inc., Not Reported in F.Supp.2d (2011)

2011 WL 500034

II.

If a litigant makes a timely objection to a magistrate judge's ruling on a nondispositive pretrial matter, the district court may "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a); see also 28 U.S.C. § 636(b)(1). The "clearly erroneous" standard does not permit a district court to reverse the magistrate judge's finding simply because it would have decided the matter differently. Anderson v. City of Bessemer, N.C., 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Rather, a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

III.

**\*4** The Federal Rules of Civil Procedure require that the disclosure of proposed expert testimony "be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." Fed.R.Civ.P. 26(a)(2)(B). "If a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c)(1). Under these circumstances, the court is also permitted to enter—as an additional or substitute sanction—any of the sanctions listed in Rule 37(b)(2)(A)(I)-(vi). Finally, if a party fails to obey a discovery order, the court "may issue further just orders ... [including] prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed.R.Civ.P. 37(b) (2)(A).

Although the Plaintiff has not disputed that McSwain was subject to the expert report requirement, the Court will first evaluate whether McSwain was "retained or specially employed to provide expert testimony in the case," and thus was obliged by the terms of Fed.R.Civ.P. 26(a)(2)(B) to provide a written report. If a witness falls within this requirement is determined primarily by the scope, substance, and source of the intended testimony—not on whether the witness is being compensated. See Fielden v. CSX Transp., Inc., 482 F.3d 866, 871 (6th Cir.2007). Treating physicians, for example, may not be required to submit a written report as long as their testimony relates only to their treatment of the individual and opinions formed by them at the time of treatment. E.g., id.; see also Gorajczyk v. City of St. Clair Shores, No. 08–14764, 2010 WL 3245432, at \*4–5 (E.D.Mich. Aug.17, 2010) (listing factors for determining whether treating physician's proposed testimony requires filing of expert report); Bekaert Corp. v. City of Dyersburg, 256 F.R.D. 573 (W.D.Tenn.2009) (extending this analysis to non-physician expert witnesses). By analogy, McSwain would seemingly be required to file an expert report, inasmuch as his opinions were formed not, for example, in an attempt to repair the vehicle, but rather in an effort to determine the cause of the accident. Thus, he was functioning analogously to a physician performing an "after-the-fact" diagnosis rather than providing "in-the-moment" or "on-the-scene" treatment. Compare Fielden, 482 F.3d at 869 (physician who forms opinion as to causation in course of treating patient is not required to submit report of expert), with Meyers v. Nat'l R.R. Passenger Corp., 619 F.3d 728, 734–35 (7th Cir.2010) ("[A] treating physician who is offered to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2)."). Moreover, his opinions were not formed as a result of witnessing or experiencing the accident which is the subject matter of this lawsuit. Rather, they were presumably formed as a result of a process that any expert witness would undertake; namely, an "after-the-fact" examination of the vehicle in question. See Fed.R.Civ.P. 26 advisory committee's notes to 1970 amendments ("It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness."). Finally, it is worth noting that, by virtue of the disassembling and subsequent disposal of most of the vehicle by Mc Swain, he is the only person who had the opportunity to undertake an examination of the entire vehicle. While the exact parameters of the report requirement in Rule 26 are not well-defined, the foregoing analysis demonstrates that the judicial directive which required the production of McSwain's written expert report is not "clearly erroneous."

IV.

**\*5** The Court notes that the Plaintiff has never contended that McSwain was not subject to the expert report requirement. In fact, the sole ground for this appeal is his contention that he complied or substantially complied with the expert report requirement, as defined by the Federal Rules of Civil Procedure. Furthermore, it is the Plaintiff's belief that McSwain's deposition—standing alone—satisfied all of the requirements for the production of an expert report under Rule 26(a)(2)(B). However, the record clearly indicates that the Plaintiff was specifically ordered by Magistrate Judge Majzoub to provide UPR with a copy of McSwain's expert report. Furthermore, there is evidence that the Plaintiff was warned that his failure to comply with her directive could result in the preclusion of McSwain as an expert witness. Significantly, this order was entered long after the deposition of McSwain that, in the opinion of the Plaintiff, is sufficient to satisfy the report requirements. In her March 2010 order, Magistrate Judge Majzoub rejected the Plaintiff's assertion that he could discharge his disclosure obligations simply by referring to the McSwain deposition. Rather, she ordered him to (1) amend his responses to Interrogatory 51 so as to "answer in full and by sub-part for each of the four named experts," and (2) submit to UPR reports for each of his proposed expert witnesses, including McSwain.

The Plaintiff has provided this Court no explanation whatsoever for his failure to submit McSwain's expert report to UPR. A litigant cannot blithely ignore court orders and then object to the consequent sanctions on the ground that he did not believe that the directives were necessary. In his appeal of Magistrate Judge Majzoub's order, the Plaintiff—for the first time—specifically lists those parts of McSwain's deposition testimony that purportedly satisfy each requirement of Rule 26(a)(2)(B). The Court does not understand the inexplicable failure by the Plaintiff to direct McSwain to prepare a full report if all of the required information was purportedly readily available and already on the record. Moreover, the Plaintiff not even attempted to provide the Court with an explanation. In light of the foregoing, the Court fully agrees with Magistrate Judge Majzoub's determination that the Plaintiff has neither satisfied nor substantially complied with his obligation to provide McSwain's expert report.

Furthermore, the Court finds no error—much less a clear error—in Magistrate Judge Majzoub's determination that the Plaintiff's failure to provide McSwain's report was not harmless. The Sixth Circuit has construed "harmless" as involving "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Sommer v. Davis,* 317 F.3d 686, 692 (6th Cir.2003) (citation and internal quotation marks omitted). Neither aspect appears to have been satisfied here.

There can be no claim that the Plaintiff's failure to submit the report was an honest mistake. He, despite having been explicitly directed to convey McSwain's expert report to UPR, simply chose not to do so. Moreover, the argument that has been raised by him on this appeal—that the report was not needed because all of the relevant information had already been provided to UPR—is not a good and sufficient ground for an honest mistake where this precise argument was raised to, and rejected by, the presiding Magistrate Judge.

**\*6** As Magistrate Judge Majzoub found, the Plaintiff's noncompliance does harm UPR "where [UPR] has been left without the expert's report and this expert is allegedly the only one to have dismantled the vehicle in question prior to its destruction and the filing of this action." Moreover, an expert deposition is not a replacement for an expert report. On the contrary, the Federal Rules of Civil Procedure specifically mandate that an expert deposition may only occur *after* the expert report has been provided. Fed.R.Civ.P. 26(b)(4)(A) ( "A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided."). The expert report allows the opposing party to properly prepare for the deposition and narrows the terrain that must be covered therein. These functions cannot be served if the report does not precede the deposition. *Cf. Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 642 (7th Cir.2008) (citations omitted) ("The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition— as to what the expert witness will testify, and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony."). This Rule clearly contemplates that the expert report and the expert deposition may serve different and complementary purposes. Here, UPR was forced to depose McSwain without the benefit of his report. This is not a case of a deficient expert report, but rather an entirely missing expert report. For these reasons, the Plaintiff's noncompliance with the court orders here at issue cannot be deemed harmless. Therefore, the Court concludes that Magistrate Judge Majzoub's order contained no error,

2011 WL 500034

much less the "clear error" that would be required to set aside that order.

Majzoub's directive which precluded him from presenting McSwain as an expert witness during a trial in this action.

IT IS SO ORDERED.

V.

Following its examination of the record in this cause, the Court denies the Plaintiff's appeal of Magistrate Judge

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 500034

Footnotes

1    An amended complaint was filed on November 24, 2008.

2    The Court notes, however, that UPR referred to McSwain as "Plaintiff's expert witness[ ]" in the deposition notice.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Webastro Thermo & Comfort North America, Inc. v. Bestop, Inc., Not Reported in Fed....

2019 WL 2417070
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

WEBASTRO THERMO & COMFORT
NORTH AMERICA, INC., et al., Plaintiffs,

v.

BESTOP, INC., Defendant.

No.16-13456
|
Signed 06/10/2019

**Attorneys and Law Firms**

Eric P. Carnevale, Craig R. Smith, Peter Jason Evangelatos, Lando & Anastasi, LLP, Cambridge, MA, Steven C. Susser, Brian B. Brown, Carlson, Gaskey & Olds, P.C., Birmingham, MI, for Plaintiffs.

Andrew M. Grove, Jeffrey A. Sadowski, Jonathan F. Karmo, Howard and Howard Attorneys PLLC, Royal Oak, MI, E. Powell Miller, Marc L. Newman, The Miller Law Firm, Rochester, MI, for Defendant.

**OPINION AND ORDER**

R. STEVEN WHALEN, UNITED STATES MAGISTRATE JUDGE

**\*1** This is a patent case. Before the Court is Plaintiff's Motion to Strike Defendant's Non-Report Expert Disclosure and Exclude Testimony of its Putative Experts [Doc. #126]. For the reasons and under the terms discussed below, the motion is GRANTED.

**I. BACKGROUND**

Under the Court's amended scheduling order [Doc. #99], expert disclosures were due on October 2, 2018. Plaintiff served two expert reports on that date. Defendant Bestop, Inc. ("Bestop") served no expert reports, but on October 3, 2018 served a "Non-Report Witness Expert Disclosures Pursuant

to Fed. R. Civ. P. 26(a)(2)," identifying two proposed "lay experts," William H. Haberkamp and Eric D. Getzschman. Bestop indicated in its disclosure that "no written expert report is required."

**II. DISCUSSION**

Fed. R. Civ. P. 26(a)(2) governs discovery practice related to expert witnesses. Rule 26(a)(2)(A) provides that "[i]n addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26(a)(2)(B), which would apply to retained experts, provides:

"**(B) Witnesses Who Must Provide a Written Report.** Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report-- prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."

Rule 26(a)(2)(C)[1] governs witnesses who are not required to produce a report, and reads as follows:

**(C) Witnesses Who Do Not Provide a Written Report.** Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

(ii) a summary of the facts and opinions to which the witness is expected to testify.

Defendant Bestop contends that Messrs. Haberkamp and Getzschman fall within Rule 26(a)(2)(C), and are therefore not required to produce written reports, because they are "lay" or "percipient" experts. Defendant bears the burden of establishing that these two witnesses are not required to produce a report. *EEOC v. Kaplan Higher Ed. Corp.*, 748 F.3d 749, 752 (6thCir. 2014); *Advent v. Covidien, Inc.*, 114 F.R.D. 547, 559 (E.D. Mich. 2016).

Webastro Thermo & Comfort North America, Inc. v. Bestop, Inc., Not Reported in Fed....

In *Fielden v. CSX Transportation, Inc.*, 482 F.3d 866 (6th Cir. 2007), the Sixth Circuit held that a treating physician could offer expert testimony without providing a written report, so long as the testimony related to his opinions as to causation that were formed at the time of treatment, not at the request of counsel:

> **\*2** "Rule 26(a) (2)(B) by its terms provides that a party needs to file an expert report from a treating physician only if that physician was 'retained or specially employed to provide expert testimony.' In this case, Fielden did not retain Dr. Fischer for the purposes of providing expert testimony because *there is evidence that Dr. Fischer formed his opinions as to causation at the time that he treated Fielden and there is no evidence that Dr. Fischer formed his opinion at the request of Fielden's counsel.*" *Id.* at 869 (emphasis added).

In *Downey v. Bob's Discount Furniture Holdings, Inc.*, 633 F.3d 1 (1st Cir. 2011), the First Circuit found that an exterminator was not an expert retained to give an opinion, and thus was not required to produce a written report, where his opinion testimony arose "not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation." *Id.* at 6. The Court explained:

> "In order to give the phrase "retained or specially employed" any real meaning, a court must acknowledge the difference between a percipient witness who happens to be an expert and an expert who without prior knowledge of the facts giving rise to litigation is recruited to provide expert opinion testimony. It is this difference, we think, that best informs the language of the rule." *Id.*

The defining characteristic of a percipient witness is that he or she forms the opinion at the time of and during the course of working on the subject matter of the lawsuit, be it a treating physician testifying as to causation or a project engineer testifying as to patent invalidity. In *Fielden*, the Sixth Circuit did not hold that such witnesses *never* have to disclose an expert report. *Fielden*, 482 F.3d at 870(noting the concern that permitting treating physicians to testify in all circumstances without providing expert reports would circumvent the policies underlying Rule 26(a)(2)(B)). *See also Meyers v. Nat'l R.R. Passenger Corp.*, 619 F.3d 729,

734–35 (7th Cir. 2010) (affirming grant of summary judgment where no evidence in the record suggested that plaintiff's doctors considered or determined the cause of his injuries during the course of treatment). In *Gaspar v. Dicks*, 2011 WL 5975061, at \*4 (E.D. Mich. Nov. 29, 2011), the Court, addressing the question of whether a written expert report is required in the context of a treating physician's testimony, referred to five factors that might be considered:

> "Courts attempting to determine whether a physician's testimony regarding causation falls into this "core" have considered factors such as: (1) whether the physician reached his conclusion at the time of treatment; (2) whether the opposing party would be surprised by the testimony; (3) whether the condition at issue leaves room for debate as to the specific ailment and its sources; (4) whether the physician relied upon ordinary medical training in drawing his conclusion; and (5) whether the physician will rely on tests, documents, books, videos, or other sources not relied upon during treatment." (Citing *Fielden* at 871-72).

In this case, a number of factors stand clearly at odds with Bestop's argument that Haberkamp and Getzschman are percipient witnesses who are not required to produce written expert reports.

In terms of their identical disclosures under Rule 26(a)(2)(C), both witnesses describe the subject matter of their testimony as Bestop's invalidity contentions "that anticipate asserted claims or render obvious asserted claims" of the '342 patent (the patent in suit); responding to claims of non-obviousness by Plaintiff; and "questions relating to interpretation of the prior art." *See* Doc. #126, Exhibit A. The witnesses also disclose an intent to testify about additional engineering issues. Mr. Haberkamp testified at his deposition that part of his job at Bestop was assisting in the creation of new products. *Haberkamp Dep.* [Doc. 27], at 13. He first saw the Plaintiff's complaint for patent infringement about a week or two before his deposition. *Id.* at 86-87. He did not know what an affirmative defense was, and when showed a list of Bestop's affirmative defenses, he denied personal knowledge of any of them. *Id.* at 88, 90. This would include the affirmative defenses relating to invalidity, non-infringement, prior art, and obviousness. Of course, Plaintiff's invalidity contentions were prepared specifically for litigation, not in the ordinary course of Haberkamp's employment with Bestop. In addition, in its supplemental answers to interrogatories, Bestop stated

Christner, Collin 7/7/2023
For Educational Use Only

Webastro Thermo & Comfort North America, Inc. v. Bestop, Inc., Not Reported in Fed....

that it did not have knowledge of the '342 patent "until the lawsuit was filed and served." Asked to state the basis for any invalidity defense, including "prior art references that anticipate or render obvious any claim," Defendant responded that the "entirety of Bestop's defense is embodied in the pleadings."

**\*3** Thus, Haberkamp had no knowledge of defenses relating to prior art and obviousness, and was not aware of either those defenses or even the existence of the '342 patent until after the lawsuit was filed. He therefore did not reach any conclusion about those matters at the time he was working on the alleged infringing product, and his testimony would necessarily be based on material not relied upon at that time. His opinion was formed during litigation, at the request of counsel, not pre-litigation during the course of his work. At the same time, without the production of a written report Plaintiff would be unfairly surprised by his opinion testimony.

Mr. Haberkamp does not, therefore, qualify as a percipient witness who can testify as to Bestop's invalidity contentions, including prior art and obviousness. As an engineer who participated in production, however, he may testify as to engineering issues he dealt with during the production process.

Unlike Haberkamp, Mr. Getzschman is not an engineer, but rather has a degree in business administration. He was not involved in product design; instead, his focus was on the marketability of Bestop's product. *Getzschman Dep.* [Doc. #136], 10, 127-28. He was shown a variety of patent material, including the '342 patent, and testified that he never examined or analyzed the patents in any detail. Rather, he testified repeatedly that he "rel[ies] on my patent attorney to provide me guidance." *Id.* at 122-25. He said that any analysis of the patent would have been very general in nature. By that he meant that he was looking at the marketability of the product. Regarding infringement analysis, he again testified that he relies on his patent attorney and litigation attorney; that he would not personally perform an analysis of patents; that he performed no in-depth analysis of the '342 patent; and had not considered that patent for any purpose regarding this lawsuit *Id.* at 125, 127-128, 131, 142. He said that "[a]ny analysis ... for this lawsuit would have been done by our patent attorney." *Id.* at 145-46. When asked how he would know, for example, that another Bestop patent would invalidate the '342 patent, Mr. Getzschman testified as follows:

A: Just my opinion.

Q: So you would have an opinion, but its not backed up by any analysis?

A: I rely on the attorneys for my analysis.

\* \* \*

Q: So your expert opinion is 'Ask my attorney'?

A: That is correct. *Id.* at 159-60.

With respect to whether anything in the claim chart would be sufficient to invalidate the '342 patent, Getzschman testified that he "cannot provide an opinion" and would rely on the attorneys. *Id.* at 170. He reiterated that any opinion that the other Webasto patent would invalidate the '342 patent would be based on what Webasto's attorney said.

In sum, Mr. Getzschman's bailiwick is marketing, not infringement or invalidity analysis, and any opinions he might offer on any issue properly in this case would be based on information from Bestop's attorneys, not on his on-the-job conclusions. For the same reasons discussed above, he does not qualify as a percipient witness who can testify without providing a written report.

On another note, Plaintiff argues that the proposed testimony of these two witnesses is irrelevant insofar as it relates to when Bestop conceived of or invented the alleged infringing product. Plaintiff is correct. In 2011, Congress amended 35 U.S.C. § 103 when it passed the Leahy-Smith America Invents Act ("AIA"). The AIA "abolished the first-to-invent interference rule in favor of a first-to-file rule." *Storer v. Clark*, 860 F.3d 1340, 1342 (Fed. Cir. 2017). "Among other things, the AIA revised § 103 to provide that obviousness be determined as of 'the effective filing date of the claimed invention' rather than 'at the time the invention was made.' Compare § 103 (post-AIA) with § 103(a) (pre-AIA)." *Hospira, Inc. v. Fresenius Kabi USA, LLC*, 343 F. Supp. 3d 823, 840 (N.D. Ill. 2018).

**\*4** The effective date of the AIA is March 16, 2013. The '342 patent was filed on March 10, 2015, and involves no claims that predate March 16, 2013. The AIA therefore controls this case, making conception and reduction to practice irrelevant.

Christner, Collin 7/7/2023
For Educational Use Only

Webastro Thermo & Comfort North America, Inc. v. Bestop, Inc., Not Reported in Fed....

Yet that is exactly what underlies the proposed testimony of these witnesses on the issue of obviousness. Bestop's Non-Report Expert Disclosures state:

> "That [Getzschman and Haberkamp], as an employee of Bestop with an appropriate background to be a person of ordinary skill in the art prior to the date of the filing of the '342 Patent and capable of rendering an opinion that the '342 patent was obvious at the time of filing the patent application *because Bestop created and conceived the Sunrider for Hardtop before Webasto filed any patent application on the patent in suit.*" (Emphasis added).

Apart from the fact that Getzschman and Haberkamp do not qualify as percipient witnesses, their proposed testimony is irrelevant.

## III. CONCLUSION

Plaintiff's Motion to Strike Defendant's Non-Report Expert Disclosure and Exclude Testimony of its Putative Experts [Doc. #126] is GRANTED, with the proviso that Mr. Haberkamp will be permitted to testify as to engineering matters. [2]

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2417070

## Footnotes

1    Rule 26(a)(2)(C) was added in 2010 to "resolve[ ] a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement." Fed. R. Civ. P. 26, Advisory Committee's Note.

2    Subject, of course, to any objection based on relevance or other evidentiary matters.

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.