# EXHIBIT A

Case 2:19-cv-10027-GAD-APP ECF No. 171-2, PageID.3300 Filed 07/10/23 Page 2 of 10
Bates v. Dura Automotive Systems, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 2618235, 24 A.D. Cases 1584

2011 WL 2618235
United States District Court,
M.D. Tennessee,
Columbia Division.

Velma Sue BATES, Claudia Birdyshaw,
Willarene Fisher, Mark Long, Jon Toungett,
Carolyn Wade, and Richard White, Plaintiffs,
v.
DURA AUTOMOTIVE
SYSTEMS, INC., Defendant.

No. 1:08–cv–0029.
|
July 1, 2011.

**Attorneys and Law Firms**

J. Matthew Sharp, Alliance Defense Fund, Lawrenceville, GA, John A. Beam, III, Kristin J. Fecteau, Equitus Law Alliance, PLLC, Nashville, TN, for Plaintiffs.

Craig M. Stanley, Gary W. Klotz, Butzel Long, Detroit, MI, Robert Earl Boston, Andrew S. Naylor, Michael J. Rusie, Waller, Lansden, Dortch & Davis, Nashville, TN, George Benson Boston, Boston, Holt & Sockwell, Lawrenceburg, TN, for Defendant.

*MEMORANDUM*

ALETA A. TRAUGER, District Judge.

 *1 Pending before the court are nine Motions in Limine filed by the defendant (Docket Nos. 133, 135, 137, 139, 141, 143, 145, 147, and 150), to which the plaintiffs have filed responses (Docket Nos. 154, 155, 156, 157, 159, 160, 161, 162, and 163), and two Motions in Limine filed by the plaintiffs (Docket Nos. 129 and 131), to which the defendant has filed responses (Docket Nos. 153 and 158). For the reasons discussed below, two of the defendant's motions will be granted, one of the defendant's motions will be decided after the pretrial conference, and the rest of the parties' motions will be denied.

*BACKGROUND*

The plaintiffs are seven former Dura employees who worked at Dura's Lawrenceburg, Tennessee manufacturing facility (the "Facility") and who were terminated by Dura.[1] Employees at the Facility manufacture glass window units for cars, trucks, and buses, using, among other things, heavy pieces of glass, metal frames, and rubber molding and adhesives. In doing this work, the employees perform a wide range of jobs, from working with high temperature injection molds and cutting machines to painting primer on metal frames. Over the course of their employment, the seven plaintiffs performed a variety of jobs at the Facility, including driving a tow motor, assembling windows, and trimming and water testing windows.

In early 2007, managerial officers at the Facility became increasingly concerned that drug use at the Facility was leading to a significantly higher rate of workplace accidents than at comparable plants. There apparently were widespread rumors of drug use at the Facility, and, in early 2007, the Facility experienced two industrial accidents in which the injured employees tested positive in post-accident drug tests. At this time and for several years before, the Facility also had substantially more lost time incidents (an industrial accident that causes an employee to miss work due to injury), OSHA recordable incidents, and worker's compensation expenses than other Dura manufacturing facilities. Dura concluded that there was "a connection between drug use, whether legal or illegal, and the high incidence of workplace accidents." (Docket No. 61 at 1.)

Through early 2007, the policy of the Facility was that an employee could not use legal prescription drugs if such use adversely affected safety, company property, or job performance. Convinced that this policy was not sufficiently protective of workplace safety, however, Dura contacted an independent, third-party drug testing organization, Freedom From Self ("FFS"), to assist Dura in implementing a new drug testing program. Dura ultimately decided that its new program would test for twelve substances, some of which are found in legal prescription drugs. Dura believed that these substances, although legally prescribed, could create a safety risk in a manufacturing environment.

In May 2007, on behalf of Dura, FFS conducted Facility-wide drug testing of the Facility's more than 450 employees. Specifically, each employee was brought into a large room

at the Facility, where the employee registered with an FFS representative. That representative handed the employee a cup, and the employee went into a controlled environment (a bathroom with no soap or running water) to urinate in the cup. Afterward, the employee delivered the cup back to the FFS representative, who conducted an "initial panel test," which made a preliminary finding as to whether the urine contained any of the twelve substances. These results were available almost immediately. If the results of the initial panel test were "clean"—that is, none of the twelve substances was detected—the employee was free to return to work. Employees who tested "positive" for any of the twelve substances were deemed to have failed the initial panel test and were generally sent home or asked to remain on site to await further instructions.

**\*2** After each panel test, FFS sent the employee's urine sample to Quest Diagnostics, for confirmatory testing. Quest then sent the results of the confirmatory tests to Dr. Seth Portnoy, who is a licensed medical review officer. If Dr. Portnoy saw that an employee tested positive for a substance found in legal prescription drugs, he would contact the employee to determine if there was a medical explanation for the positive result. If the employee provided a valid medical explanation (and documentation, such as a prescription), Dr. Portnoy changed the final, confirmed result of the drug test from "positive" to "negative." Dr. Portnoy sent the final, confirmed results for all employees back to FFS, which forwarded the results to Dura.

From Dura's perspective, however, all of this confirmatory testing was essentially irrelevant. If an employee failed the initial panel test, Dura ordered the employee to meet with FFS and present to FFS a list of all of the prescription medications that the employee was taking. After this meeting, FFS sent Dura the employee's list of prescription medications and the warnings associated with them. Dura's human resources personnel, in consultation with other senior managers at the Facility, then determined, for each employee, which of the medications listed had warnings about the operation of equipment or machinery or impaired mental alertness while using the medication ("adverse warnings"). Such medications were identified as being prohibited. Dura then sent the employee a letter advising that it was placing the employee on a thirty-day leave of absence, to allow the employee an opportunity to transition to other drugs that Dura perceived as less risky or to stop using the drugs altogether.

This policy was inflexible; that is, after receiving the letter from Dura, several of the plaintiffs obtained letters from their physicians stating that their medications would not affect work performance and were necessary for their health and functioning. These letters had no affect on Dura's treatment of the matter. Instead, Dura's policy was that "any employee, regardless of age or health status, taking drugs for any reason that carried warnings about the operation of equipment or machinery or impaired mental alertness [was] not allowed to work at Dura until he/she discontinued use of the prohibited drug." (Docket No. 62 at 2.)

If an employee failed the May 2007 Facility-wide test, that employee was permitted to re-test within 30 days, and, if the second initial panel test was "clean," the employee was free to return to work. If the employee failed a second initial panel test, then that employee was placed on an indefinite layoff and was automatically terminated six months later. In the summer of 2007, Dura implemented random and "post layoff return to work" drug screening. If an employee failed an initial panel test during this screening, the employee could be immediately terminated.

Each of the seven plaintiffs, at one time or another, failed an initial panel test because he or she was taking a legally prescribed drug that contained one of the twelve banned substances. The prescription drugs taken by the plaintiffs include pain medications Oxycodone and Lortab, anti-anxiety medication Xanax, and weight loss medication Didrex; all of these drugs come with adverse warnings. Dura concedes that the plaintiffs' positive tests were caused by their use of legal, properly prescribed drugs. With one possible exception, none of the plaintiffs had any safety violations at Dura while taking their prescribed medications.

**\*3** The plaintiffs asserted a number of claims, including claims under the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 et seq. In its April 23, 2009 Memorandum, the court found that, with the exception of plaintiff Willarene Fisher, none of the plaintiffs was disabled, as that term is used in the ADA.[2] (Docket No. 77 at 18–23.) Thus, the court dismissed all of the plaintiffs' disability discrimination claims except for Fisher's.[3] The court found, however, that the plaintiffs could proceed, regardless of their disability status, with a claim based on 42 U.S.C. § 12112(b)(6), which prohibits an employer from:

using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]

42 U.S.C. § 12112(b)(6). The defendant filed an interlocutory appeal, and the Sixth Circuit held that only disabled plaintiffs may pursue § 12112(b)(6) claims. *Bates v. Dura Auto. Sys., Inc.,* 625 F.3d 283, 287 (6th Cir.2010). Thus, only Fisher's § 12112(b) (6) claim remains for trial. All of the plaintiffs, however, still have claims under § 12112(d)(4)(A). That subsection provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). Thus, to recover, the plaintiffs must show: (1) that Dura's drug testing constituted a "medical examination"; (2) that the examination was not "job-related and consistent with business necessity"; and (3) that the examination proximately caused damages. *See id.; Harrison v. Benchmark Elecs. Huntsville, Inc.,* 593 F.3d 1206, 1216 (11th Cir.2010) (stating that a plaintiff must show damages to recover on a § 12112(d) claim).

The court has previously found that all three elements of the claim are questions of fact for the jury. (Docket No. 77 at 27–28; Docket No. 116 at 8, 12.) The court previously discussed how Dura can show that its drug testing was "consistent with business necessity":

> [I]n proving business necessity, an employer must show more than that its inquiry is consistent with "mere expediency." An employer cannot simply demonstrate that an inquiry is convenient or beneficial to its business. Instead, the employer must first show that the asserted "business necessity" is vital to the business. For example, business necessities may include ensuring that the workplace is safe and secure or cutting down on egregious absenteeism. The employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.

*4 (Docket No. 77 at 26 (quotation marks omitted).)

## ANALYSIS

The plaintiffs and the defendant have now filed a number of Motions in Limine. The court will address each motion in turn.

**I. The Plaintiffs' Medical Conditions (Docket No. 133)**

The defendant seeks to prohibit the plaintiffs from making any reference to their medical conditions.[4] The defendant argues that the plaintiffs' medical conditions are irrelevant to their remaining claims and that evidence of their conditions would only serve to bias the jury by engendering sympathy. (Docket No. 134 at 2–3.)

The Federal Rules of Evidence provide that relevant evidence is admissible, while non-relevant evidence is inadmissible. Fed.R.Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Id.* 401. Even if evidence is relevant, it may still be excluded if "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* 403.

With the exception of Fisher, the only claims remaining are the plaintiffs' § 12112(d)(4)(A) claims. As described above, the elements of that claim are: (1) that the defendant required the plaintiff to submit to a medical examination; (2) that the examination was not "job-related and consistent with business necessity"; and (3) that the examination caused the plaintiff to suffer damages. With a few exceptions discussed below, the medical condition of the plaintiffs at the time of termination has no bearing on any of these elements. The main issue in this case is whether the defendant's drug test was a reasonably effective and tailored method of reducing safety risks; this depends on the general effects of the banned drugs on employees, not the maladies suffered by these individual plaintiffs. Certainly, the plaintiffs may present evidence that the medications they were taking were lawfully prescribed for them. But, because further evidence regarding the plaintiffs' medical conditions at the time of termination is irrelevant and

might serve to unfairly prejudice the jury, such evidence is properly excluded at trial.

There are two exceptions to this general ruling: (1) emotional distress damages and (2) plaintiff Wade's decision to stop taking Didrex. First, it is possible that testimony regarding the plaintiffs' medical condition might be relevant to show emotional distress damages; for example, they might testify regarding psychological symptoms that they suffered after their termination. *See, e.g., Moorer v. Baptist Mem'l Health Care Sys.,* 398 F.3d 469, 485–86 (6th Cir.2005) (holding that an ADA plaintiff had sufficiently shown emotional distress, in part because he "sought treatment from a clinical psychologist"). This might necessarily entail a discussion of the plaintiffs' psychological health before the termination. Second, plaintiff Wade stopped taking Didrex, a weight loss drug she was taking to treat her diabetes, after testing positive at the drug test. This stoppage apparently caused her to suffer physical injuries, including a loss of vision in her eye caused by subsequent weight gain. (*See* Docket No. 161 at 2.) Thus, in Wade's case, testimony regarding her medical condition is necessary for her to properly explain her damages. For both of these exceptions, the testimony regarding medical condition is relevant, so the court will not exclude it at trial.

**\*5** Otherwise, however, evidence regarding the plaintiffs' medical conditions is irrelevant. The plaintiffs argue that excluding such testimony is "not very practical and contrary to the policy of the [ADA]." (Docket No. 154 at 2.) In support, they quote *Ross v. Campbell Soup Co.,* 237 F.3d 701 (6th Cir.2001), which stated that, "where there is substantial evidence that an individual's medical status played a significant role in an employer's decision to fire that individual, ... the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute." *Id.* at 709. But *Ross* involved a § 12112(a) claim alleging that the plaintiff was fired due to a disability. *Id.* at 705–06. Similarly, the plaintiffs also cite *Morton v. United Parcel Service, Inc.,* 272 F.3d 1249 (9th Cir.2001), but that case involved a § 12112(a) failure to accommodate claim. Here, however, the plaintiffs' § 12112(a) disability discrimination claims have been dismissed, so their medical status is not at issue. *Ross* and *Morton* offer no support for the contention that the plaintiffs' medical conditions are somehow relevant to their § 12112(d)(4)(A) claims.

The plaintiffs further argue that "[t]estimony regarding Plaintiffs' medical conditions is the only testimony that can negate Defendant's assumption that Plaintiffs might experience the possible side effects associated with their prescription medications." (Docket No. 154 at 3.) This is plainly incorrect. The plaintiffs can testify regarding the existence or absence of side effects without discussing their underlying medical conditions.

Accordingly, the defendant's motion to exclude evidence regarding the plaintiffs' medical conditions will be granted, except that such testimony will be allowed to the extent that it is relevant to damages.

**II. Dismissed and Adjudicated Claims (Docket No. 139)**
The defendant seeks to exclude evidence regarding claims that have already been adjudicated or dismissed. Previously, the court dismissed claims for disability discrimination, invasion of privacy, and breach of contract. The defendant seeks to exclude evidence that it claims was relevant only to those claims, including, but not limited to:

> [E]vidence of an implied contract between Dura and its employees, evidence that during testing the water was turned off in the bathroom and hand soap was removed, evidence that [drug testing company] employees did not always change their gloves, and evidence that employees who tested positive were placed in a "guilty area" or called "addicts."

(Docket No. 140 at 2 n. 1.)

The court disagrees that evidence regarding the drug testing procedure, and how the plaintiffs were treated once their tests came back positive, is irrelevant to the plaintiffs' currently pending claims.[5] First, the jury must determine whether the testing was a "medical examination," and evidence regarding how the testing was conducted is relevant to that determination. Second, if the jury determines that the defendant's drug testing violated § 12112(d)(4)(A), the plaintiffs may recover damages proximately caused by that testing. Compensatory damages recoverable under the ADA include damages for emotional distress and humiliation. *Moorer v. Baptist Mem'l Health Care Sys.,* 398 F.3d 469, 485 (6th Cir.2005) (stating that, for an ADA claim, damages relating to "mental and emotional distress" may be "proven by 'competent evidence.'"). *See Tramill v. UPS,* 10 Fed. Appx. 250, 255 (6th Cir.2001) (affirming the trial court's award of damages for emotional distress and humiliation on the plaintiff's ADA claim); *EEOC v. Convergys Customer Mgmt. Group,* 491 F.3d 790, 797 (8th Cir.2007) ("A plaintiff may seek compensatory damages under the ADA for emotional distress."). If the plaintiffs were, for example, called "addicts"

Case 2:19-cv-10027-GAD-APP ECF No. 171-2, PageID.3304 Filed 07/10/23 Page 6 of 10
Bates v. Dura Automotive Systems, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 2618235, 24 A.D. Cases 1584

in front of other employees, this might have added to their humiliation.

**\*6** Accordingly, the defendants' motion to exclude evidence relating to the plaintiffs' dismissed or adjudicated claims will be denied. If some particular piece of testimony offered at trial by the plaintiffs is irrelevant—for example, testimony regarding the existence of an implied contract—the defendant may object at that time.

### III. Viewing the Lawrenceburg Facility (Docket No. 150)

The defendant requests that the court permit the jury to tour the defendant's Lawrenceburg, Tennessee manufacturing facility.

The defendant argues that "[t]he nature of the manufacturing facility is highly relevant" because a central issue is whether the drug testing policy was job-related and consistent with business necessity. (Docket No. 151 at 2.) It claims that viewing the "inherently dangerous" facility will familiarize the jurors with the "fluid, active, and loud heavy manufacturing environment at the facility." (*Id.*) According to the defendant, photographs do not adequately convey the reality of this environment. In response, the plaintiffs argue that: (1) the central issue in this case is not the facility; (2) it will be difficult to object to the tour guide's speech during the tour and cross-examine the tour guide after the tour; and (3) the jury will not view the exact workstations of the plaintiffs. (Docket No. 162 at 1.)

"The trial court has discretion whether to permit a view of premises that are the subject of litigation." *United States v. Simmons,* 174 Fed. Appx. 913, 917 (6th Cir.2006) (quoting *Nw. Nat'l Cas. Co. v. Global Moving & Storage, Inc.,* 533 F.2d 320, 323 (6th Cir.1976)). A court may deny a viewing "when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs." *Id.* (quotation marks omitted). On the other hand, viewings "are generally accepted when they are necessary to an understanding of the litigation and the requisite information cannot be introduced in any other way." *Id.* at 918 (quotation marks omitted).

The nature of the Facility is definitely at issue in this case, but the court is not persuaded that the only way to adequately convey the "reality" of the defendant's manufacturing facility is for the jury to personally tour it. The defendant's witnesses can testify as to the nature of the facility and the dangers contained therein. The defendant argues that photos are insufficient because they do not portray the production lines and tools "in constant movement" (Docket No. 151 at 2), but the defendant does not explain why, for example, a video of the facility would not sufficiently convey this movement.

Because it does not appear that a viewing is the only way for the jury to understand the manufacturing facility, the defendant's motion will be denied.

### IV. Statements Designed to Appeal to Economic Bias (Docket No. 143)

The defendant seeks to exclude statements regarding the relative wealth between the plaintiffs and Dura, arguing that such information is irrelevant and prejudicial. (Docket No. 149 at 1–2.)

**\*7** The plaintiffs are seeking punitive damages, so the defendant's wealth is directly relevant to the appropriate amount of punitive damages.[6] *Romanski v. Detroit Entm't, L.L.C.,* 428 F.3d 629, 649 (6th Cir.2005) (stating that a punitive damages award must "achieve[ ] the twin purposes of punishment and deterrence" and that " 'deterrence is directly related to what people can afford to pay' "). The court does not believe that evidence regarding the defendant's financial condition will necessarily unduly prejudice the jury. Furthermore, the plaintiffs argue that, because Dura maintains self-insured group medical insurance, it had a financial incentive to terminate workers who take prescription medications. (Docket No. 159 at 2.) A strong financial incentive would tend to undermine the defendant's claim that it enacted the testing to minimize safety risks, and the defendant's wealth is relevant to an assessment of that financial incentive.

Accordingly, the defendant's motion will be denied as to the evidence of its wealth. However, the financial status of the plaintiffs or a comparison of it with the defendant's financial status has no purpose and will be excluded. If the plaintiffs' evidence at trial goes beyond what is relevant to their claims, or is of a nature that is unduly prejudicial, the defendant may object at that time.

### V. Other Employment–Related Lawsuits (Docket No. 141)

The defendant seeks to exclude evidence of other employment-related lawsuits and administrative charges filed against it. It asserts that the plaintiffs may attempt to introduce evidence of several other pending and dismissed matters, which the defendant asserts are irrelevant to the instant case. (Docket No. 142 at 1–2.) In response, the plaintiff argues that

each plaintiff's testimony is "best handled on a case by case basis at trial." (Docket No. 157 at 1.)

Generally, evidence regarding a defendant's other acts "is not admissible to prove [character] in order to show action in conformity therewith." Fed.R.Evid. 404(b). Such evidence "may, however, be admissible for other purposes, such as proof of motive [or] intent." *Id.* In the Sixth Circuit, courts use a four-part test to determine whether evidence of a defendant's prior acts is admissible under Rule 404(b):

> (1) the evidence must be directed toward establishing something other than a party's propensity to commit the act charged; (2) the other act must be similar enough and close enough in time to be relevant to the matter at issue; (3) the evidence must be such that the jury could find that the act occurred and that the party in question committed it; and (4) the prejudicial effect of the evidence must not clearly outweigh its probative value.

*McLeod v. Parsons Corp.,* 73 Fed. Appx. 846, 854 (6th Cir.2003).

Thus, the admissibility of evidence regarding other discrimination suits against an employer turns on the specific facts of those cases. *See, e.g., id.* (finding that "evidence concerning ... other employment discrimination lawsuits filed against [the defendant] was [not] relevant"); *Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261, 1286 (11th Cir.2008) (holding that evidence of discriminatory retaliation against the plaintiff's co-workers "was admissible, under Rule 404(b), to prove the intent of [the defendant employer] to discriminate and retaliate.") Here, the parties have not described in detail the other suits that the plaintiffs may seek to reference, nor is it clear that the plaintiffs would necessarily be introducing such evidence to establish the defendant's "propensity to commit the act charged."

 **\*8** Thus, the court agrees with the plaintiff that it is preferable to address matters on a caseby-case basis at trial, and the defendant's motion will be denied. If the plaintiffs decide to introduce evidence of other suits at trial, however, their counsel should alert the court before doing so, so that the court may assess the evidence outside the presence of the jury and analyze the factors listed in *McLeod.*

**VI. Damages Not Caused by the Drug Test (Docket No. 147)**

The defendant seeks to exclude evidence of alleged damages that were not caused by the drug test. Specifically, because plaintiffs Wade and Fisher were ultimately terminated for reasons unrelated to the drug test, the defendant wants to exclude evidence of damages "from the time they returned to work from their respective leaves of absence following the drug test" to the time of their termination. (Docket No. 148 at 2.)

But Wade alleges that she suffered physical injuries when, after testing positive, she stopped taking the weight-loss drug Didrex, which she had been using to treat her diabetes. These damages, suffered after the drug test but before she was terminated, are properly compensable. As for Fisher, her termination forms the basis of her disability discrimination. Although the defendant seeks to exclude evidence "of damages prior to [her] lay-off," it is unclear exactly what evidence the defendant believes Fisher will offer.

Accordingly, the defendant's motion will be denied. The defendant is free to object at trial if the plaintiffs attempt to offer irrelevant testimony regarding damages.

**VII. Subsequent Remedial Measures (Docket No. 145)**

The defendant seeks to exclude evidence of subsequent changes to its drug testing policy; since the events at issue in this suit, Dura has stopped enforcing the policy. (Docket No. 146 at 1.) The defendant argues that evidence of its change in policy would impermissibly suggest that Dura has admitted culpability. In response, the plaintiffs argue that they will not introduce evidence of the policy change to prove culpability, but rather to "impeach[ ] on issues of safety in the plant." (Docket No. 160 at 2.)

Federal Rule of Evidence 407 provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence [or] culpable conduct.... This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Fed.R.Evid. 407.

Evidence regarding Dura's change in policy is generally inadmissible under Rule 407. However, a ruling on this motion will be reserved until the court can discuss it with counsel at the pretrial conference.

**VIII. Damages Not Previously Disclosed (Docket No. 137)**

*\*9* The defendant claims that the plaintiff failed to disclose its damages computations, as required by the Federal Rules of Civil Procedure, and it seeks to exclude evidence of such computations. (Docket No. 138 at 1–4.)

Rule 26 requires plaintiffs to provide, in their initial disclosures, "a computation of each category of damages claimed." Fed.R.Civ.P. 26(a)(1)(A)(iii). Plaintiffs must also "make available for inspection and copying ... the documents or other evidentiary material ... on which each computation is based." *Id.* Rule 37 provides that, if a party fails to disclose information as required by Rule 26(a), that information must be excluded at trial, "unless the failure was substantially justified or is harmless." *Id.* 37(c)(1).

The defendant has submitted the plaintiffs' initial Rule 26 disclosure, which merely listed the various types of damages sought by the plaintiffs—lost wages, punitive damages, and attorney's fees and costs—without giving precise calculations. (Docket No. 138, Ex. 1 at 3.) The defendant claims this "complete failure to provide any computation of damages" will prevent it from "adequately respond[ing] to what may be presented [at trial]." (Docket No. 138 at 3–4.) But the plaintiffs have submitted a supplemental Rule 26 disclosure, served on the defendant on January 29, 2009,[7] containing detailed calculations for each plaintiff's claimed front pay, back pay, and medical insurance expenses.[8] (Docket No. 163 at 5–12.) The document does not contain computations of the plaintiffs' humiliation, emotional distress, and loss of reputation, but those damages are not susceptible to precise advance calculation.

Because the plaintiffs have, in fact, provided the defendant with damages computations, the defendant's motion will be denied.

**IX. Physicians' Desk Reference (Docket No. 135)**

The defendant requests that the court take judicial notice of the Physicians' Desk Reference, a well-known drug treatise, with regard to the adverse drug effects and adverse warnings it lists for the prescription drugs at issue in this case. The defendant argues that the adverse warnings associated with those drugs are relevant to whether Dura's drug testing was necessary to eliminate safety risks in its manufacturing facility. (Docket No. 136 at 2–3.)

Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Courts generally "take judicial notice of the content of the [Physicians' Desk Reference] when it is relevant to some fact in issue." *United States v. Dillavou,* No. 3:08–po–042, 2009 U.S. Dist. LEXIS 12431, at \*1, 2009 WL 230118 (S.D.Ohio Jan. 30, 2009) (collecting cases); *see also, e.g., United States v. Howard,* 381 F.3d 873, 880 (9th Cir.2004) (taking judicial notice of drug facts contained in the Physicians' Desk Reference).

*\*10* In response, the plaintiffs do not attack the accuracy of the Physicians' Desk Reference. Instead, they argue that the side effects and warnings related to the drugs at issue are irrelevant because: (1) the drug testing did not detect specific prescription drugs, but rather detected substances that may be found in either prescription drugs or illegal drugs; and (2) the plaintiffs might not have experienced the side effects listed in the treatise. (Docket No. 155 at 1–2.) These arguments are unpersuasive. First, the defendant's drug testing was intended to detect certain prescription drugs, and it apparently did so effectively. Certainly, the side effects of those drugs are relevant to whether the testing was job-related and necessary to eliminate safety risks. Second, the plaintiffs are free to point to evidence in the Physicians' Desk Reference regarding the general incidence of the drugs' side effects and to introduce testimony as to whether the plaintiffs, personally, experienced side effects.

Accordingly, the defendant's motion will be granted, and the court will take judicial notice of the contents of the Physicians' Desk Reference.

**X. Documents Referenced by the Defendant's Expert (Docket No. 131)**

The plaintiffs seek to exclude certain testimony by the defendant's expert, Patsy Bramlett, because they claim that the defendant failed to produce documents referenced in her report. (Docket No. 132 at 1–2.) They also seek to exclude any reference by Bramlett to the warning labels on the plaintiffs' prescription medication. (*Id.* at 2–3.)

Bramlett is a vocational expert. In her report, she opines that, even if the plaintiffs' medications render them unable to work in hazardous environments or around heavy machinery, "there are a substantial number of jobs in the competitive labor

market which remain available to these workers." (Docket No. 158, Ex. 1 at 5.) Rule 26 requires a party offering an expert witness to provide an expert report, which must contain "the facts or data considered by the witness in forming [her opinions]." Fed.R.Civ.P. 26(a)(2) (B)(ii). Bramlett's report lists a number of items upon which she relied, including: (1) job descriptions; (2) the plaintiffs' testimony on job duties; (3) letters outlining results of drug tests; (4) the defendant's substance abuse policy; (5) the section of the defendant's handbook regarding substance abuse; (6) the Amended Complaint; and (7) the defendant's Answer. (Docket No. 158, Ex. 1 at 3.)

Although these documents were not attached to the report, they were all undoubtedly already in the plaintiffs' possession. (*See* Docket No. 158 at 2 (asserting that "[t]here are no items relied upon by Ms. Bramlett which have not been produced in discovery, and most of which have been identified as trial exhibits"). Similarly, to the extent that Bramlett referenced drug warning labels, the defendant did not need to produce the labels, because such labels were already in the plaintiffs' possession.[9]

**\*11** Accordingly, the plaintiffs' motion will be denied, and none of Bramlett's testimony will be excluded in advance of trial.

**XI. Expert Testimony from Lay Witnesses (Docket No. 129)**
Finally, the plaintiffs seek to exclude certain testimony from two of the defendant's employees, Nancy VanSolkema and Donna Stilson, regarding Dura's drug testing policy. Specifically, because the defendant did not designate these employees as expert witnesses, the plaintiff seeks to prevent them from offering "opinion evidence ... related to drug testing procedures or the Tennessee Drug Free Workplace Act and Defendant's compliance with that Act." (Docket No. 130 at 1.) The plaintiffs claim that this testimony would constitute expert testimony under Federal Rule of Evidence 702.[10] (*Id.* at 2.)

In response, the defendant points out that VanSolkema and Stilson were personally involved in drafting the defendant's drug policy. (Docket No. 153 at 1.) Certainly, these witnesses may testify regarding their personal knowledge of Dura's drug testing policy and procedure, including their knowledge regarding Dura's motives in drafting the policy and the efforts Dura took to comply with any particular law. *See* Fed.R.Evid. 701. The defendant correctly points out that such testimony will be relevant to whether the drug testing policy was job-related and consistent with business necessity. (Docket No. 153 at 2.)

Accordingly, the plaintiff's motion to exclude testimony of VanSolkema and Stilson will be denied. If, at trial, these witnesses attempt to offer expert opinions based on specialized or technical knowledge, the plaintiffs may object at that time.

*CONCLUSION*

For the reasons discussed above, two of the defendant's Motions in Limine will be granted: (1) the motion seeking to exclude evidence of the plaintiffs' medical conditions; and (2) the motion seeking judicial notice of the Physicians' Drug Reference. The court will reserve ruling on the defendant's motion seeking to exclude evidence of subsequent changes to Dura's drug testing policy, and the remainder of the defendants' motions will be denied. The plaintiffs' Motions in Limine will be denied.

An appropriate Order will enter.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2618235, 24 A.D. Cases 1584

Footnotes

1 The court's discussion of the factual background of the case is largely reproduced from the court's April 23, 2009 Memorandum regarding the parties' Motions for Summary Judgment. (Docket No. 77 at 1–10.)

2 Fisher has a history of shoulder problems, asthma, shingles, and carpal tunnel syndrome. In the twelve months leading up to her termination, Fisher missed a substantial amount of time at work due to various ailments and other reasons, and she only worked about 275 hours in that time period. Specifically, Fisher's shingles kept her from working for a substantial

portion of the early part of 2007. Fisher returned from a leave of absence in June 2007 and failed her "return from leave" initial panel test. Fisher revealed that she had a prescription for Lortab, so she was placed on the thirty-day leave of absence. In July 2007, Fisher passed the initial panel test and was allowed to return to work. In September 2007, in conjunction with a larger layoff at Dura, Fisher was laid off, in large part because she had only worked about 275 hours in the past twelve months.

3   The court also dismissed various state law claims.

4   The defendant's motion does not pertain to Fisher, the lone plaintiff with a disability discrimination claim remaining for trial. She, of course, may present evidence regarding her medical condition.

5   In response to the defendant's argument, the plaintiffs offer a *non sequitur,* stating that, without their medication, they would be "substantially limited in their ability to ... perform most major life activities" and would thus be disabled under the ADA. (Docket No. 156 at 2.) But, with the exception of Fisher, the plaintiffs' disability discrimination claims have been dismissed, and the court has found that they were not disabled when they were terminated. (Docket No. 77 at 19–22.) The plaintiffs contend that they must be allowed to show "how essential their legally prescribed medications are to properly functioning on their job," but they fail to explain how this is relevant to their remaining § 12112(d)(4)(A) claims. As explained above, evidence regarding the plaintiffs' medical conditions before their termination is irrelevant and will be excluded at trial.

6   The defendant cites *Follis v. Memorial Medical Center,* No. 08–3056, 2010 U.S. Dist. LEXIS 7648, 2010 WL 431920 (C.D.Ill. Jan. 29, 2010), which barred the plaintiff "from referencing the parties' relative financial statuses for purposes of invoking the jury's sympathy." *Id.* at *5*. But the *Follis* court also recognized that this "[did] not necessarily prevent Plaintiff from providing evidence of financial status relevant to her claims for ... punitive damages ." *Id.* The court directed the plaintiff to preview her financial evidence outside the presence of the jury before offering it at trial, so that the court could "evaluate whether the proffered evidence [was] relevant or only an appeal for sympathy." *Id.*

7   The document actually says January 29, 2008 (Docket No. 163 at 12), but this must be a typographical error, because this suit was not filed until May 9, 2008.

8   It does not appear that the plaintiffs failed to produce documents or other evidence to support their claimed damages. The defendant's motion focuses on the lack of computations, not on a lack of documentation.

9   It is unclear from the plaintiffs' motion exactly what testimony they seek to exclude regarding warning labels. (*See* Docket No. 132 at 2–3.) Bramlett is not opining regarding the medications the plaintiffs were taking. She is simply opining on the jobs available to applicants who might be prevented, by their medications, from working with heavy machinery or in otherwise hazardous environments.

10  The plaintiffs cite *United States v. Lopez–Medina,* 461 F.3d 724 (6th Cir.2006), which held that "permitting police officers to testify as experts in their own investigations and give opinion testimony on the significance of evidence they have collected, absent any cautionary instruction, threatens the fairness, integrity, and public reputation of judicial proceedings." *Id.* at 745. That case is inapposite, and, in any event, VanSolkema and Stilson will not necessarily give opinion testimony.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.